**PACIFIC LEGAL FOUNDATION**

September 27, 2012

Honorable Kenneth L. Salazar
Secretary of the Interior
United States Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Mr. Daniel M. Ashe
Director, U.S. Fish and Wildlife Service
United States Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Re:  60-Day Notice of Intent To Bring a Citizen Suit Under the Endangered Species Act To Challenge the Designation of Critical Habitat for the Dusky Gopher Frog (Previously Mississippi Gopher Frog) 77 Fed. Reg. 35188 (June 12, 2012)

Dear Secretary Salazar and Director Ashe:

Purusant to Section 11(g) of the Endangered Species Act (ESA), 16 U.S.C. § 1540(g), this letter provides notice of intent to commence civil litigation against the Department of Interior and the U.S. Fish and Wildlife Service for violating Section 4(b)(2) of the Act, 16 U.S.C. § 1533(b)(2), governing the designation of Critical Habitat for listed species. The federal government has unlawfully issued a final rule designating Critical Habitat for the Dusky Gopher Frog, including private land identified as Unit 1 in St. Tammany Parish, Louisiana, owned in part by Markle Interests, LLC. Markle intends to bring a citizen suit after 60 days if the Department and Service do not revise the Critical Habitat to exclude Unit 1 from the designation.

### INTRODUCTION

On June 12, 2012, the U.S. Fish and Wildlife Service issued a controversial Critical Habitat designation for the Dusky Gopher Frog (formerly the Mississippi Gopher Frog) in the Gulf Coast. The controversy surrounds the inclusion of 1,544 acres of private land in Louisiana, with a potential impact of approximately $34 million dollars, that the agency admits is not occupied or usable, and may never become suitable habitat for the endangered species. The Service designated this forested

HEADQUARTERS: 930 G Street | Sacramento, CA 95814 | (916) 419-7111 | FAX (916) 419-7747
ALASKA: 121 West Fireweed Lane, Suite 250 | Anchorage, AK 99503 | (907) 278-1731 | FAX (907) 276-3887
ATLANTIC: 1002 SE Monterey Commons Blvd., Suite 102 | Stuart, FL 34996 | (772) 781-7787 | FAX (772) 781-7785
HAWAII: P.O. Box 3619 | Honolulu, HI 96811 | (808) 733-3373 | FAX (808) 733-3374   OREGON: (503) 241-8179
WASHINGTON: 10940 NE 33rd Place, Suite 210 | Bellevue, WA 98004 | (425) 576-0484 | FAX (425) 576-9565

E-MAIL: plf@pacificlegal.org
WEB SITE: www.pacificlegal.org

Honorable Kenneth L. Salazar
September 27, 2012
Page 2

area in St. Tammany Parish as Critical Habitat on pure speculation; hoping that the land may someday be managed by private parties for the species' conservation. The only way to make this area suitable for habitat is through controlled burns and revegetation which the Service states it cannot mandate on private land. This is an unprecedented expansion of the Endangered Species Act.

## INTERESTS OF THE PARTY

Markle is a limited liability company that owns an undivided interest in forested property identified in the final rule as Unit 1 in St. Tammany Parish, Louisiana, and included as Critical Habitat for the Dusky Gopher Frog. This designation imposes significant regulatory burdens on the property such that costly federal approval may be required for any activity deemed to affect the species, including adverse habitat modification. In addition to these regulatory burdens, the designation of Unit 1 as Critical Habitat results in a drastic reduction in value and limits the usability and saleability of the property.

## NATURE OF THE CHALLENGE

1.  **The Service Failed To Make the Threshold Determination for Designating Critical Habitat**

Critical Habitat is defined as those areas "essential to the conservation of the species." 16 U.S.C. § 1532(5). In turn, the ESA defines "conservation" to mean the use of all methods and procedures necessary to bring a "threatened" or "endangered" species to "the point" at which the protections of the Act are no longer required. 16 U.S.C. § 1532(3). The Act does not define "essential" but it is axiomatic that to determine what is "essential to the conservation of the species," the Service must first identify "the point" when the species will no longer be "threatened" or "endangered." That point can be identified only if the Service has determined a viable population size and the minimum habitat necessary to sustain that population. However, those threshold determinations are entirely missing from the final rule.

It is not enough to say that areas "essential to the conservation of the species" include all areas that contain one or more Primary Constituent Elements (or PCE's), like Unit 1, because not all areas that contain the PCE's are "essential" to the species. PCE's define suitable habitat, not essential habitat. What is "essential to the conservation of the species" is a function of a viable population, which the Service has not determined.

The practical effect of the Service's failure to determine a viable population and minimum habitat size is that the Service is logically incapable of ascertaining which areas are "essential to the conservation of the species" and whether the designation of any particular unoccupied area is required. See 50 C.F.R. § 424.12(e) ("[t]he Secretary shall designate as critical habitat areas outside

the geographical area presently occupied by a species only when a designation limited to its present range would be inadequate to ensure the conservation of the species."). In this case, there are no facts found in the rule from which to draw a rational connection as to the size of the Critical Habitat area. Without the foundational underpinning of a viable population, no one, including the Service, can determine whether the areas designated as Critical Habitat are too much or too little.

2.     **The Secretary Used an Incorrect Standard To Determine Critical Habitat**

The Secretary does not have unfettered discretion to designate unoccupied areas as Critical Habitat. Such areas must be "essential for the conservation of the species." 16 U.S.C. § 1532(5)(ii). Logically, this would include areas that at least contain those physical and biological features that are themselves "essential to the conservation of the species." The Service has identified such features as Primary Constituent Elements. For the Dusky Gopher Frog, there are three: (1) ephemeral wetland habitat; (2) upland forested nonbreeding habitat; and (3) upland connectivity habitat. *See* 77 Fed. Reg. 35131. The Service maintains that all of these PCE's are "essential to the conservation of the species." By definition, therefore, all of the PCE's must be present for an area to qualify as "essential." If an area is designated as Critical Habitat that contains fewer than all identified PCEs, then the area is not capable of serving the conservation goals of the species because essential elements to that goal are absent. According to the Service, Unit 1 contains only one of the three PCE's identified as "essential to the conservation of the species," *see* 77 Fed. Reg. 35135, and is currently not suitable for habitat. Therefore, Unit 1 does not qualify as Critical Habitat.

Nevertheless, contrary to logic, the Secretary included this unoccupied area in the designation. In effect, the Secretary designated Unit 1 as Critical Habitat on the absurd premise that the area **would** be "essential for the conservation of the species," **if** it ever did contain the requisite PCE's. *See id.* 35135. But it doesn't now and likely never will. The private owners have no intent to convert their property to conservation purposes and, according to the Service, they can't be compelled to do so.

If the Secretary can designate completely unusable areas as Critical Habitat, there would be no limit on agency power and the size of Critical Habitat. This is contrary to the language of the Act and the intent of Congress. Congress intended to limit the size of Critical Habitat, not enlarge it without bounds. Hence, the requirement that designated areas must actually be "essential to the conservation of species" and the directive that in most cases "critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species." 16 U.S.C. § 1532(5)(ii) and (C). It follows, therefore, that if Congress did not want Critical Habitat to extend to all areas that can be occupied, it surely did not want Critical Habitat to extend even further to areas, like Unit 1, that cannot be occupied. Ironically, the Secretary takes the position that areas *occupied* at the time the frog was listed must have all the PCE's but *unoccupied* areas need have only one PCE to qualify as Critical habitat.

Honorable Kenneth L. Salazar
September 27, 2012
Page 4

### 3. The Economic Analysis Is Inadequate

The Economic Analysis (EA) adopts the "baseline" approach whereby the Service only considers the *qualitative* impacts that occur "without critical habitat," such as those impacts caused by listing of the species, whereas the incremental impacts occurring "with critical habitat" are given a *quantitative* analysis. *See* 77 Fed. Reg. at 35140-41. The result of this approach is that neither the Service nor the public are ever provided a meaningful cumulative economic impacts analysis. This approach was rejected by the Tenth Circuit in *New Mexico Cattle Growers Association v. U.S. Fish and Wildlife Service*, 248 F.3d 1277 (10th Cir. 2001). According to the Tenth Circuit, the "baseline" approach is meaningless and inconsistent with the language of the Act and the intent of Congress. Therefore, that Circuit held the Economic Analysis must consider all of the impacts of Critical Habitat designation, including those impacts co-extensive with the listing. In other words, the EA must consider the cumulative impacts of the listing and the Critical Habitat designation together, not just the incremental impacts of the designation. (For a contrary view see *Arizona Cattle Growers' Association v. Salazar*, 606 F.3d 1160 (9th Cir 2010)). In *Home Builders Association of Northern California v. Norton*, 293 F. Supp. 2d 1 (D.D.C. 2002), the Service appears to have represented to the court that it would follow the *New Mexico Cattle Growers'* co-extensive approach in all future Critical Habitat designations. But it has not done so here.

Moreover, the EA failed to quantify economic and other impacts of the designation on oil and gas exploration, forestry, and those impacts resulting from conservation activities such as controlled burns.

### 4. Failure To Exclude

Unit 1 constitutes only potential habitat, not essential habitat. But even that characterization is a stretch. Whether Unit 1 will ever contain all of the PCE's is pure speculation. The Service acknowledged, as it must, that Unit 1 will only become suitable habitat if the land is managed to develop the requisite PCE's. *See* 77 Fed. Reg. 35135. The Service also acknowledged that Unit 1 is comprised entirely of private land, *id.* at 35134-35, and that private landowners cannot be compelled to manage the land for recovery purposes, *id.* at 35126. In fact, because this land is unoccupied and used for timber harvesting and has the potential for development or oil and gas exploration, that the EA valued at $34 million dollars, the private owners have no intent to convert their property to conservation purposes. Not only do these facts compel a finding that Unit 1 is not "essential for the conservation of the species," but they also compel a finding that the benefits of exclusion outweigh the benefits of inclusion under Section 4(b)(2) of the Act.

Given that the Critical Habitat designation may impose tens of millions of dollars in costs on private landowners to protect land that cannot be used by the species, the Service's bald conclusion that the "economic analysis did not identify any disproportionate costs that are likely to result from the

Honorable Kenneth L. Salazar
September 27, 2012
Page 5

designation," 77 Fed. Reg. 35141, is irrational, and therefore invalid under the Administrative Procedure Act. See *Natural Resources Defense Council v. U.S. Department of Interior*, 113 F.3d 1121, 1124 (9th Cir. 1997) ("Essentially, we must ask 'whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made.'").

5.  **The Service Failed To Conduct a NEPA Review**

Although the Tenth Circuit in *Catron County Board of Commissioners v. U.S. Fish and Wildlife Service*, 75 F.3d 1429 (1996), and the D.C. District Court, in *Cape Hatteras Access Preservation Alliance v. Department of Interior*, 344 F. Supp 2d. 108 (2004), have held that Critical Habitat designations are subject to review under the National Environmental Policy Act (NEPA), the Service takes the position that it need not comply with this requirement outside of the Tenth Circuit. See 77 Fed. Reg. 35144. As authority for that position, the Service relies on *Douglas County v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995). In *Douglas County,* the Ninth Circuit parted ways with the Tenth Circuit and held that NEPA review was not required for Critical Habitat designations where there is no physical change to the environment. However, this case is different.

The Critical Habitat designation for the Dusky Gopher Frog literally calls for human interference with the environment through management of the habitat by, among other things, regular controlled burns: Frequent fires are necessary to maintain the open canopy and ground cover vegetation of the gopher frog's aquatic and terrestrial habitat. See 77 Fed. Reg. 35129-30. These burns can have significant adverse effects on the physical environment, including air pollution, water pollution, loss of forest resources and habitat for other species. But the Critical Habitat designation does not discuss these effects. That can only be done through the NEPA review process. Therefore, notwithstanding the Ninth Circuit decision, and in accordance with the Tenth Circuit decision, NEPA review should have been undertaken here.

6.  **Federal Regulation of Unit 1 Exceeds Constitutional Authority**

The Service cites a long list of cases that have upheld the agency's authority to regulate intrastate, noncommercial species under the commerce power. See 77 Fed. Reg. 35120. However, those cases do not address whether the agency has authority under the Commerce Clause to regulate private land that has no connection to the protected species other than through the Critical Habitat designation itself. The designation of Unit 1 as Critical Habitat for the Dusky Gopher Frog is contrary to U.S. Supreme Court precedent not only because the frog is not a regulable entity but also because the Critical Habitat designation creates, rather than regulates, the putative commerce connection. See *United States v. Lopez*, 514 U.S. 549 (1995); *United States v. Morrison*, 529 U.S. 598 (2000); and, more recently, *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566, 2573-74 (2012) ("This Court's precedent reflects this understanding: As expansive as this Court's cases construing the scope of the commerce power have been, they uniformly describe the power as

Honorable Kenneth L. Salazar
September 27, 2012
Page 6

reaching "activity." *E.g., United States v. Lopez*, 514 U.S. at 560, 115 S. Ct. 1624, 131 L. Ed. 2d 626. The [challenged provision], however, does not regulate existing commercial activity."). Simply put, the uncontested facts show that the Service is not regulating existing commercial activity. The regulation of Unit 1 as Critical Habitat is unconstitutional because the land does not contain the listed species or any usable habitat and any activity on the land cannot affect the species or its habitat.

## CONCLUSION

For the foregoing reasons, the Critical Habitat designation for the Dusky Gopher Frog should be revised and Unit 1 should be excluded. Failure to do so within 60 days will result in court action.

*/s/ M. Reed Hopper*

M. REED HOPPER
DAMIEN M. SCHIFF
Principal Attorneys
PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
Telephone: (916)419-7111
Facsimile: (916)419-7747

Attorneys for Markle Interests, LLC