# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MARKLE INTERESTS, LLC** | ) | |
| | ) | **CIVIL ACTION** |
| **Plaintiff,** | ) | |
| | ) | **CASE NO. 13-cv-00234** |
| **UNITED STATES FISH AND WILDLIFE** | ) | c/w 13-362 & 13-413 |
| **SERVICE, et al.** | ) | |
| | ) | **JUDGE MARTIN L.C. FELDMAN** |
| **Defendants.** | ) | **SECTION "F"** |
| | ) | |
| | ) | **MAG. SALLY SHUSHAN** |
| | ) | **DIVISION (1)** |
| | ) | |
| | ) | |

### MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY P&F LUMBER COMPANY (2000), L.L.C., ST. TAMMANY LAND COMPANY, L.L.C. AND PF MONROE PROPERTIES, L.L.C.'S

**MAY IT PLEASE THE COURT:**

This Motion for Summary Judgment, filed by P&F Lumber Company (2000), L.L.C., St. Tammany Land Co, L.L.C. and PF Monroe Properties, L.L.C. (collectively, the "Poitevent Landowners"), seeks an Order from this Court declaring invalid and void as to the Poitevent Landowners the unconstitutional, illegal, arbitrary and capricious rule dated June 12, 2012, (the "Rule")[1], issued by the United States Department of the Interior, through the U.S. Fish and Wildlife Service (the "FWS"), insofar as it designates 1,544 acres in St. Tammany Parish, Louisiana (identified in the Rule and sometimes in this Memorandum as "Unit 1" or as the

---

[1] *See* "Rule," 77 Fed. Reg. 35118, *et seq.*, attached hereto as Exhibit "A." The entire Administrative Record, including the Rule, has been submitted to the Court for its consideration; however, certain critical portions of the Administrative Record have also been attached hereto as exhibits for ease of the Court's reference.

"Poitevent Lands"),[2] as "Critical Habitat" for the dusky gopher frog (previously Mississippi gopher frog; herein, sometimes, the "frog") in spite of the facts that, among others, that:

1.  **No frogs** have been seen in the State of Louisiana and **no frogs** have occupied the Poitevent Lands since at least 1965, a period of nearly 50 years;

2.  The physical and biological habitat elements FWS **requires** be present to support frog life on the Poitevent Lands (known as "Primary Constituent Elements," or "PCEs") **disappeared** many years ago; and

3.  There will be **no frogs** on the land and **no habitat** elements on the Poitevent Lands **in the future**.

For the reasons set forth in more detail hereinafter, the Rule is invalid as to Unit 1 because it violates (i) the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq*., (ii) the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq.* and (iii) the Commerce Clause of the U.S. Constitution, art. 1, § 8, cl. 3.  As such, the Rule should be invalidated as to Unit 1.  For the sake of brevity, the Poitevent Landowners expressly adopt and incorporate herein all arguments and authorities set forth by Markle and Weyerhaeuser in their respective motions for summary judgment [R. Doc. Nos. 67 & 69].

## INTRODUCTION

This case is unprecedented under the ESA. Until now, FWS has **never** attempted to bank aside private land such as the 1,544 acres in Unit 1 as critical habitat for a species knowing that the land is clearly unsuitable for the species; that the species is gone from the land; and that the habitat will never be restored nor the frog be returned to the land.  The FWS' illegal and unconstitutional inclusion of Unit 1 under the Rule in these circumstances is perfectly summed

---

[2]Of the 1,544 acres in Unit 1, approximately 95% of the land is owned in indivision by the Poitevent Landowners and Plaintiff Markle Interests, L.L.C. ("Markle"). *See* Declaration of Edward B Poitevent, II, attached as Exhibit "B," ¶ 8.  The remaining 5% of the land in Unit 1 is owned by Plaintiff Weyerhaeuser Company ("Weyerhaeuser"), which also holds a timber lease on the Poitevent Lands. *See id.*

up by the following quote from *Cape Hatteras Access Preservation Alliance v. U.S. Dept. of Interior,* 344 F. Supp.2d 108, 122 (D. D.C. 2004):

> The FWS may not statutorily cast a net over tracts of land with the mere hope that they will develop [the physical and biological elements species require to survive] and be subject to designation.

That is precisely what FWS did here.  Knowing that the Poitevent Landowners would never allow their lands to be converted to a frog preserve as doing so will cause them enormous economic harm, FWS did the next best thing—"threw a statutory net" over the Poitevent Lands by way of the Rule in order to set them aside for the uncertain day that FWS may be able to achieve its "hope" to convert the lands to a frog preserve.

The ESA expressly requires that "critical habitat" be limited to those areas that are "essential to the conservation of [a] species." 16 U.S.C.1532(5)(A).  The ESA also prohibits FWS from designating as habitat lands that were not occupied by a species at the time it is listed under the Act as "endangered."[3]  Unit 1 does not pass these tests as the frog did not inhabit the lands in 2001 when the frog was listed as endangered; it does not contain the frogs today; and  it also does not have the required PCEs the frogs need to survive there.  Therefore, designating the land as their critical habitat does not and cannot lead to the conservation of this endangered species.  The only way for frog conservation in Unit 1 to happen is for the land to be utterly transformed into frog habitat and for frogs to be moved there.  But, FWS acknowledges that it

---

[3] *See* FWS and National Marine Fisheries' Draft Joint Policy Guidance 77 Fed. Reg. 76987 ("For the reasons described above…we conclude that … it is the conservation status of the then-current range at the time of the listing determination in question that must be evaluated" (*see Ctr. for Biological Diversity v. Norton*, 411 F. Supp.2d 1271 (D.N.M. 2005), vacated by No. 06–2049 (10th Cir. May 14, 2007); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,* 2007 U.S. Dist. LEXIS 16175 (D.Colo. Mar. 7, 2007), vacated by No. 07–1203 (10th Cir, Oct. 22, 2007)). Here, the frog was listed as an "endangered species" in 2001, but it has not inhabited the Poitevent Lands, or, indeed, been "seen" in the State of Louisiana since at least 1965.  *See* Mississippi Gopher Frog (distinct population segment of *Rana capito sevosa*), FWS Pamphlet, attached as Ex. "C" (emphasis added by the Poitevent Landowners).

**cannot** compel the Poitevent Landowners to change their lands to include all three PCEs, and that it **cannot** require them to reintroduce the frog to their lands[4].

According to FWS, it has the right under the ESA to designate the Poitevent Lands as critical habitat for non-existent frogs merely by claiming that the Poitevent Lands are "necessary" **now** to protect the frog to satisfy FWS' unjustifiable "hope" that the lands will somehow, someday, be transformed into frog habitat with actual frogs.  Including Unit 1 in the Rule, then, was purely an illegal and blatant abuse of agency power by FWS bureaucrats in their rush to grab the Poitevent Lands and then force the Poitevent Landowners to do the bureaucrats' bidding.   Common sense, the U.S. Constitution, the ESA and the APA dictate a different conclusion.

If the Rule is allowed to stand for the Poitevent Lands when there are no frogs on the Lands and it is unusable as frog habitat, and the land will never be allowed to become frog habitat with frogs living there, there are no limits on the amount or location of private land that can be set aside anywhere  as "critical habitat" based on the mere speculative "hope" that the land might someday, somehow actually become real habitat for some species.  FWS cannot simply cast their statutory net over Unit 1 or any other land unsuitable as habitat and then walk away hoping that the land will develop the physical and biological elements a species needs to survive.

---

[4]The Poitevent Landowners told FWS representatives **before** the Rule was issued on a number of occasions and in their comments objecting to the issuance of the Rule that they would not allow their lands to be turned into a conservation habitat. There are three very good reasons for this. First, if the Poitevent Lands are ever converted to frog habitat, there will have to be regular controlled burns of their land. *See* Poitevent Decl., Ex. "B," ¶ 9.  These regular burns will cause air pollution and drive away other species, and will also destroy the value of Unit 1and the Poitevent Landowners' adjoining lands, and will also endanger the lives and property of others. Second, if the Poitevent Landowners convert their land to frog habitat or allow the frog to be moved there, they will breach their timber contract with their timber lessee, Weyerhaeuser. Third, the FWS will not pay the Poitevent Landowners the value of their lands so that they may be converted to frog habitat, or pay them for the damage to their adjoining lands. *See id.* at ¶¶ 9-11 .

The whole point of critical designation for a species under the ESA is to take land out of commerce and reserve it for a species, not people. Otherwise, establishing a protected preserve for the species is meaningless. FWS was therefore given the power in the ESA to prohibit any development activity a landowner may wish to pursue once critical habitat is established for a species if FWS deems that the development activity may harm the species. *See* 16 U.S.C. § 1540(g). This may include "habitat modification or degradation." 50 C.F.R. § 17.3. This power can also be enforced against a landowner by development opponents in a citizen suit under ESA. 16 USC § 1540(g).

In conjunction with the critical habitat designation, FWS completed an Economic Impacts Analysis (the "EA"). 77 Fed. Reg. 35140-41. The EA shows that designating Unit 1 as critical habitat will likely cost the Unit 1 landowners as much as $33.9 million. *See id*. at 35141.[5] Also, in the EA, and in the Rule, FWS admits that much of the lands in Unit 1 are likely jurisdictional "wetlands" that will require a Clean Water Act Section 404 permit from the U.S. Army Corps of Engineers before the Poitevent Landowners can develop them. *See* 77 Fed. Reg. 35126 ("As summarized on pages ES–4 and ES–5, the DEA assumes that a Federal nexus is [sic] present under scenarios 2 and 3 because of the need for a Corps Clean Water Act Section 404 permit"). In turn, when the Poitevent Landowners request a Section 404 permit from the Corps, that agency is then required to "consult" with FWS due to the critical habitat designation. *See* 77 Fed. Reg. 35138, *et seq.*

The end result of the FWS-Corps "consultation" is ostensibly to allow certain areas of a critical habitat area to be developed, but FWS has already announced that it will **veto** any development plans the landowners may propose:

---

[5] Incredibly, FWS also concluded in the EA that its "economic analysis did not identify any disproportionate costs that are likely to result from the designation." 77 Fed. Reg. 35141.

> Under the most conservation [sic] assumption (e.g., most likely to overstate rather than understate impacts) regarding the outcome of section 7 consultation, <u>the Service would recommend complete avoidance of development within Unit in order to avoid adverse modification of critical habitat.</u>[6]

*See* EA, page 4-3 (emphasis added).  But, of course, as the EA preceded the Rule, to be able to wield its veto, FWS first had to issue the Rule in order to have the power to control future use of the Poitevent Lands.  Certainly, then, there is no doubt that FWS both sought to take, and has now achieved its goal of taking, the Poitevent Lands out of commerce by means of issuing the Rule, given its stated intent is to recommend complete avoidance of development.

FWS is certainly aware of the fact that it is only after designations like the Rule become effective that some landowners suddenly become "willing" to manage their property for species conservation as they then see the severe constraints the designation places on development and have no other options.  But, as the Poitevent Landowners have steadfastly refused to "cooperate" with FWS to make its "hope" come true, FWS has warned them that it will veto any development of the Poitevent Lands. This "no development" result is, then, the real motivation for the Rule: "If we [FWS] can't have your land for the frogs, then, the Poitevent Landowners can't use it either."

But, interestingly, FWS has cloaked its mailed-fist Rule with a mini-velvet glove of sorts: if the Poitevent Landowners cooperate with FWS and let it achieve its "hope" of converting their land into a frog preserve, then, FWS **may then allow** the Poitevents' development plans to proceed. As FWS so tellingly puts it in the Rule:

> Although we have no existing agreements with the private landowners of Unit 1 to manage this site to improve habitat for the dusky gopher frog, or to move the species there, <u>we **hope** to work with the landowners to develop a strategy that will</u>

---

[6] FWS admits that  much of the lands in Unit 1 are likely jurisdictional "wetlands" that will require a Clean Water Act Section 404 permit from the US Army Corps of Engineers. *See* EA at pages A-5, ES-4, and 4-3.

<u>allow them to achieve their objectives for the property and protect the isolated, ephemeral ponds that exist there…</u>

77 Fed. Reg. 35123. (Emphasis added.)

So, here is what the Poitevent Landowners are faced with: if they "work with" FWS, then FWS **may allow** them to "achieve their objectives for the property." In the end, the FWS' tactics here amount to nothing more than what Professor Richard Epstein aptly calls "grand theft real estate."[7]

FWS' statement that it will "work with" the Poitevent Landowners is nothing more than a subtle "extortionate" demand of the type prohibited recently by the U.S. Supreme Court in *Koontz v. St. Johns River Water Management Dist.*, 133 S. Ct. 2586, 2594 (2013), a Takings Clause case that shows how the U.S. Supreme Court intends to uphold the rights of property owners against "extortionate" governmental demands. There, the Court prohibited government acts designed to extract landowner concessions to further illegal governmental ends. Justice Samuel Alito stated that the Court's decision "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving [their Constitutional rights] up." *Id.* In another passage Justice Alito railed against "[e]xtortionate demands" imposed by governmental agencies. *Id.* at 2596.[8]

If the FWS had a legitimate reason for including Unit 1 in the Rule, it would have used it; not having a legitimate reason, it was forced to include Unit 1 in the Rule and then signal the Poitevent Landowners that they need to "work with" FWS to achieve their "hope" of

---

[7]   Richard A. Epstein, *The Classical Liberal Constitution*, DEFINING IDEAS (Dec. 2, 2013), http://www.hoover.org/publications/defining-ideas/article/137266.

[8]   *Koontz* has already been called "one of the most significant and decisive victories for property owners in decades." Hughes, *Koontz v. St. John's River Water Management District* and Its Implications for Takings Law," to be published in the forthcoming edition of *Engage*, published by the Federalist Society.

transforming Unit 1 into a frog haven with real frogs actually living there by subtly telling them, if they do so, FWS **may** allow the Poitevent Landowners to "achieve their objectives" for their land.  The Court should reject this arbitrary, capricious, and abusive behavior and invalidate the Rule as to Unit 1.

I.      **STATEMENT OF FACTS**

        A.      **Designation of Critical Habitat**

        On December 4, 2001, FWS listed the dusky gopher frog (known then as the Mississippi gopher frog) as an endangered species. *See* 66 Fed. Reg. 62993, *et seq*.  On June 12, 2012, FWS designated critical habitat for the dusky gopher frog.  *See* 77 Fed. Reg. 35118, *et seq*.  The designation covers a huge 6,477 acres in Mississippi and Louisiana, of which the 1,544 acres of Unit 1 in St. Tammany Parish, Louisiana is the only part in this State.  *Id*. at 35118.  Unit 1 is private land, most of which is owned in indivision by the Poitevent Landowners and Markle that is under a long-term timber lease to Plaintiff Weyerhaeuser, which owns the rest of the lands in Unit 1.  *See* Poitevent Decl., Ex. "B," ¶ 8.

        On November 27, 2007, the Center for Biological Diversity ("CBD"), the intervenor in this action, and Friends of Mississippi Public Lands sued FWS in the United States District Court for the District of Columbia to require FWS to designate critical habitat for the dusky gopher frog *See Friends of Mississippi Public Lands and Center for Biological Diversity* v. *Kempthorne*. AR 2421-2433; 77 Fed. Reg. 35119.  FWS then settled with CBD and agreed to submit to the *Federal Register* a proposed designation of frog critical habitat by May 30, 2010, and a final designation of frog critical habitat by May 30, 2011. FWS published a proposed rule to designate

critical habitat for the frog on June 5, 2010. *See* 75 Fed. Reg. 31387. The proposed rule did not contain Unit 1.[9]

Peer reviewers and other commenters then told FWS that the lands in Unit 1 should be added to expand the area covered by the Rule's critical habitat for the frog.[10] FWS and the CBD then duly agreed to extend the deadline established by their original settlement. The Court issued a modification to the original settlement on May 4, 2011, and FWS agreed to send a revised proposed critical habitat rule for the frog to the *Federal Register* by September 15, 2011, and a final critical habitat rule to the Federal Register by May 30, 2012.

FWS published a revised proposed critical habitat rule in the Federal Register on September 27, 2011 (76 Fed. Reg. 59774) and replaced FWS' June 3, 2010 (75 Fed. Reg. 31387), proposed critical habitat rule in its entirety. The September 27, 2011 proposed rule included Unit 1 as proposed critical habitat for the frog.  Unit 1 landowners, including the Poitevent Landowners, submitted comments to FWS opposing the designation of their land in Unit 1 as critical habitat and expressing their resolve not to manage Unit 1 as frog habitat.  77 Fed. Reg. 35123.  Over these objections, FWS issued the Rule.[11]

---

[9] The Poitevent Landowners were never informed about the CBD-FWS suit or their settlement and were completely left out of any negotiations to include their lands in the proposed Rule. The first time they learned that their lands were the subject of the proposed Rule was in a telephone call from FWS agents Linda LaClaire and Carey Norquist on May 21, 2011. Prior to this call, FWS agents and Prof. Pechmann had entered the Poitevent Lands in an illegal trespass that was conducted without the Poitevent Landowners' prior knowledge or approval. *See* Poitevent Decl., Ex. "B," ¶ 5.

[10] FWS admits that they, along with one of their "peer reviewers," Prof. Joseph Pechmann targeted the Poitevent Lands after the original settlement was signed in the CBD-FWS suit that then ended up including the Poitevent Lands under the Rule. FWS bureaucrats and Prof. Pechmann then remained in contact and  jointly trespassed on the Poitevent Lands in March 2011. *See* Poitevent Decl., Ex. "B," ¶ 5.

[11] The process so blandly described here is taken from the Rule.  It actually describes the infamous "sue and settle" process in which the agendas of the radical environmental movement are decided in secret behind closed doors with government agents like FWS bureaucrats without input from affected landowners like the Poitevent Landowners. As described by a March 11, 2013, *Wall Street Journal* editorial, (attached as Exhibit "D"), here is how this reprehensible secret process works:

The Poitevent Landowners then filed the 60-day notice of intent to sue as required by Section 11(g) of the ESA, 16 U.S.C. § 1540(g).[12]   When the FWS and the Secretary of the Interior failed to respond to the Poitevent Landowners' 60-day notice, this lawsuit ensued.

**B.     The Frog is Not Present in Unit 1 and Unit 1 Does Not Contain and Will Not Contain Suitable Habitat for the Frog**

No dusky gopher frogs are not present in Unit 1 and were not present at the time the species was listed in 2001.  77 Fed. Reg. 35135.   The frog is known to exist today only in Mississippi.  77 Fed. Reg. 35120.  It was  last observed in Louisiana in 1965.  77 Fed. Reg. 35133.  *See* Exhibit "C."

**1.     Current Status of the Lands in Unit 1**

Historically, the dusky gopher frog was endemic to the southern longleaf pine ecosystem: "They spend most of their lives underground in forested habitat consisting of fire-maintained, open-canopied, pine woodlands historically dominated by longleaf pine…," (77 Fed. Reg. 35129, 35130), traveling to isolated, ephemeral ponds to breed, then returning to their subterranean forested environment, followed by the offspring that survive to metamorphose into frogs.  77 Fed. Reg. 35131.

---

The [FWS] has resurrected a Clinton-era tactic known as "sue and settle". With this tactic, outside green groups friendly to the Administration sue the government demanding a particular regulatory action. The agency happily forswears court and sits down with the plaintiff to reach a settlement. The Administration then claims that it is forced to take an action it wanted all along. One more thing: Businesses and property owners most hurt by the settlement are barred from the talks; the public gets no input. Is this a great country or what?

The *Wall Street Journal* neglected to add that there was a bonus for the CBD when it sued and settled with FWS in this matter. Once CBD and FWS finalized their settlement, CBD was paid its costs and  attorneys' fees, courtesy of the US taxpayers.

In a February, 2013 op-ed piece in the *Washington Times,* Untied States Senator David Vitter openly criticized this ugly secret process as " 'sue and settle' abuse"  that has allowed the Obama Administration "to advance the radical environmental agenda…" *See* Exhibit "E".

[12] *See* Poitevent Landowners' 60-Day Notice, attached as Exhibit "H."

All of the longleaf pine forests were harvested from Unit 1 prior to the beginning of Weyerhaeuser's lease with the predecessors in interest to Poitevent Landowners and Markle in 1953.  AR 1829.  At present, the forests within Unit 1, an active tree farm, are largely closed-canopy loblolly pine plantations (largely planted post-Katrina with over 400 planted trees per acre). As the trees grow, they will become more closed-canopy. AR 2383.  FWS describes this loblolly pine tree farm as "unsuitable" for dusky gopher frog habitat.  77 Fed. Reg. 35129.

Under 50 C.F.R. §424.12(b), FWS is required to identify the physical and biological features that are "essential" to the conservation of the species, "focusing on the features' primary constituent elements" ("PCEs").  PCEs are those "physical and biological features that, when laid out in the appropriate quantity and spatial arrangement to provide for a species' life-history processes, are essential to the conservation of the species." 77 Fed. Reg. 35131.

FWS identified three PCEs for the dusky gopher frog on Unit 1:

(1) small, isolated, acidic ephemeral ponds (i.e., they must dry out seasonally to avoid the presence of frog predators, like fish) with open tree canopies and certain herbaceous vegetation necessary for frog reproduction, which attributes can be maintained only through the use of prescribed fire. ("PCE 1") 66 Fed. Reg. 62999; 76 Fed Reg. 59775; 77 Fed. Reg. 35123, 35131;

(2) upland non-breeding habitat comprised of forests "maintained by fires frequent enough to support an open canopy and abundant herbaceous ground cover and gopher tortoise burrows, small mammal burrows, stumpholes, or other underground habitat"("PCE 2"). 76 Fed. Reg. 59779; and

(3) upland "connecting habitat" comprised of open-canopied forests with "abundant herbaceous species and subsurface structure providing shelter for frogs during seasonal movements (to and from breeding ponds), such as "deep litter cover, clumps of grass, or burrows. ("PCE 3"). 76 Fed. Reg. 59780.

Of the 15 total units designated by FWS as critical habitat in the Rule, only Unit 1 fails to have the three PCEs.  77 Fed. Reg. 35131.  FWS notes that "[t]he uplands [PCEs 2 and 3] associated with the ponds do not currently contain the essential physical or biological features of

critical habitat", which FWS believes are "restorable."  77 Fed. Reg. 35135; 76 Fed. Reg. 59780 (emphasis added).

While FWS asserts that PCE 1 (the ponds) is present within Unit 1 (77 Fed. Reg. 35131), the record clearly indicates otherwise, as many of the Unit 1 pond areas (a) are **not** open-canopied (*see* AR 1831, citing to studies showing an increasing canopy cover at the ponds, a fact never refuted by FWS); (b) are **not** managed through prescribed fire, although FWS notes that is the only known means to make and keep the ponds suitable for the frog; (66 Fed. Reg. 62999; 76 Fed. Reg. 59775; 77 Fed. Reg. 35131);[13] and (c) the record is utterly devoid of data to support the suitability requirement that the ponds contain water for at least 195 days every year.

FWS seeks to circumvent these gross shortfalls by claiming that critical habitat for the frog can be designated although the land in Unit 1 does **not** constitute habitat in the first place. 77 Fed. Reg. 35123.

### 2.      Unit 1 Will Never Be Suitable Gopher Frog Habitat

Unit 1 cannot be made suitable for gopher frog habitat without extensive and costly human intervention, including a change in land use, controlled burns to modify the vegetation, and transplanting frogs to the site.  77 Fed. Reg. 35129-32.  FWS has acknowledged that it has no power or authority to mandate that Unit 1 be transformed to make it suitable for frog habitat or to place frogs on the land.  77 Fed. Reg. 35126. The Poitevent Landowners have told FWS on many occasions that they will not allow their lands to be converted to frog habitat and will not allow the frogs to be moved there.  *See* Poitevent Landowner Comments to Proposed Rule dated 11/23/11 and 2/28/12, attached as Exhibits "F" and "G."

---

[13] Crucial to maintaining suitable frog habitat is the frequent use of prescribed fire.  However, prescribed fire is neither used nor planned for use by the Poitevent Landowners. AR 1859-61.  FWS acknowledges it cannot require the Poitevent Landowners to burn their land or otherwise conduct restoration activities.  77 Fed. Reg. 35121, 35123, and 35126.

### C.      Economic Impacts Analysis

FWS completed the EA in conjunction with the critical habitat designation for the proposed Rule.  77 Fed. Reg. 35140-41.  The EA shows that designating Unit 1 as critical habitat will likely cost the Unit 1 landowners as much as $33.9 million.  *See id*. at 35141.  Moreover, FWS acknowledged in the EA that 99.5 to 99.7% of the impact will fall on the landowners in Unit 1.  77 Fed. Reg. 35141.  Incredibly, FWS concluded in the EA that its "economic analysis did **not** identify any disproportionate costs that are likely to result from the designation."  *Id*. (emphasis added). FWS also improperly and incorrectly used the "baseline approach" as its methodology in the EA and failed to consider the quantitative economic impacts of the critical habitat designation coextensively (or cumulatively) with the listing of the gopher frog as an endangered species.  *Id.* at 35140-42. As a result, the Rule as to Unit 1 should be invalidated.

## II.      SUMMARY OF ARGUMENTS

The following is a summary of the reasons why the Rule is flawed, illegal and unconstitutional insofar as it includes Unit 1, which must be removed from it:

1.  The designation of Unit 1 as critical habitat violates the Commerce Clause of the U.S. Constitution. The lack of frogs and their PCEs means that there is no "activity" for Commerce Clause purposes on Unit 1, and as there will be nether the frog nor their PCEs on the Unit 1 lands in the future, there will  never be the required "activity" on it. Thus, nothing on Unit 1 can or will affect the frog as a listed species or biodiversity generally.

2.  To determine if Unit 1 is "essential to the conservation" of the gopher frog, the Secretary must apply a rational and legal standard for determining "essential" habitat, such as identifying a viable population and habitat.  FWS failed to do this. Moreover, Unit 1 does not contain the physical or biological features (the PCEs) that FWS requires be present on the land to sustain the frog. Therefore, Unit 1 is not "critical habitat" under the ESA.  At best, it is "speculative habitat", but even then it will require great expense and acts of man to convert it to habitat, which the Poitevent Landowners have repeatedly told FWS they will not allow.

3.  The EA is flawed because it does not quantify the cumulative impacts of the designation.  FWS' conclusion that $33.9 million in costs is not disproportionate,

when designating Unit 1 as critical habitat provides no actual benefit to the species, is implausible and irrational.

4.  FWS was required to perform a NEPA review before it designated Unit 1 as critical habitat for the frog. Implementation of the Rule will require changes to the physical environment of the Poitevent Lands, which will require a NEPA review. No NEPA review was conducted.

5.  The **Dusky** gopher frog is, according to FWS, "its own species," and one that is "different" and "unique" from the **Mississippi** gopher frog, and as the Dusky gopher frog is not listed on the Endangered Species List as an "endangered species" under the ESA, FWS has listed Unit 1 as critical habitat for an "unendangered species" in violation of the ESA.

6.  The Poitevent Lands cannot be validly designated as frog critical habitat as the frog was not "present" on their lands when it was listed by FWS as "endangered" in 2001.

7.  FWS failed to exclude the Poitevent Lands from the designation of critical habitat in the Rule;

8.  FWS arbitrarily and capriciously included Unit 1  in the Rule by, among other things, including the tree farm constituting Unit 1 as critical habitat for the frog while excluding other agricultural lands.

Defendants' actions are therefore contrary to law and must be set aside.

## III.    ARGUMENTS AND AUTHORITIES

### A.    The Rule Violates the Commerce Clause of the U.S. Constitution

The Rule is invalid under the Commerce Clause of the U.S. Constitution, art. 1, § 8, cl. 3, which limits federal regulatory authority under the ESA to "activity" in "interstate commerce". FWS made no finding for the Rule that the frog or the designation of the 1,544 acres of private land in Unit 1 has anything whatsoever to do with interstate commerce.

FWS simply cannot issue the Rule and thereby "create" the commerce link to the lands in Unit 1 where there is **no** "activity."  As noted by Chief Justice Roberts in *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566, 2573-74 (2012), Congress cannot regulate individuals "precisely *because* they are doing nothing,"   *Id*. at 2587 (emphasis in original), and

it therefore also may not "dictate the conduct of an individual today because of prophesied future activity." *Id.* at  2590.  As there is **no** frog and **no** frog habitat and there will **never** be, the land in Unit 1 is "doing nothing."  FWS' future "hope"  for the land in Unit 1 is nothing more than an unconstitutional attempt to regulate "prophesied future activity."

### B.    Defendants Failed to Make the Threshold Determination as to Habitat Essential to the Conservation in Violation of the ESA

Critical habitat is defined in the ESA as those areas "essential to the conservation of the species."  16 U.S.C. § 1532(5).  For Unit 1, FWS concludes in summary, unsupported fashion that Unit 1 is "essential to the conservation of the species" as it **might** someday contain the ESA's required three PCEs that are the frog's habitat (and the frog itself).[14] Yet, FWS simply cannot determine if Unit 1 is "essential to the conservation" of the frog unless it applies a rational and legal standard for determining "essential" habitat by identifying a viable population with the PCEs the frog needs to survive. FWS did not do this in the Rule.

It is clear that FWS designated Unit 1 on the unrealistic "hope" that the land there **might become** "essential for the conservation of the species," but this will only happen **if** the frog is moved there and **if**  land ever contains the requisite three PCEs. 77 Fed. Reg. 35135. And **if** it would ever somehow be practicable to burn the land in Unit 1 to maintain the frog's habitat. But **none** of this is ever going to happen because the Poitevent Landowners will not allow it. FWS has known this all along.

---

[14] In its listing decision describing the historic alteration of frog habitat, the FWS notes that there has been "extensive habitat alteration" of frog habitat in Louisiana that has caused "both the uplands and the pond basins previously occupied by the Mississippi gopher frog have become unsuitable." *See* Federal Register, Vol. 66, No. 233, page 62995. This fact alone compels a finding that Unit 1 (which is undeniably in Louisiana) is not "essential for the conservation of the species" and that the benefits of exclusion of Unit 1 from the sweep of the Rule outweigh the benefits of inclusion under Section 4(b)(2) of the ESA.

In the ESA, Congress intended to limit the size of critical habitat, not enlarge it without bounds or justifiable reason, or by first imposing its will on private landowners like the Poitevent Landowners merely because FWS "hopes" that they will "cooperate" once their land is designated as habitat by "working with" FWS. This is surely the very reason that the ESA requires that critical habitat must actually be "essential to the conservation of species" and for its directive that "critical habitat shall <u>not</u> include the entire geographical area which <u>can be</u> occupied by the threatened or endangered species." 16 U.S.C. § 1532(5)(ii) and (C) (emphasis added). It follows, then, that if Congress did not want critical habitat to extend to all areas that merely **can be** occupied in the present, it surely did not want critical habitat to extend to areas like Unit 1 that cannot-- and will not-- ever be occupied by an endangered species or its PCEs.

The primary basis the Rule cites for designating Unit 1 as frog critical habitat is merely because it **may someday provide** suitable "habitat."  The land in Unit 1 is **not**, in fact, "habitat" **today**, which  really means that Unit 1 is  "speculative habitat" that will become "actual habitat" only **if and when** it is ever restored, and then only **if and when** frogs are moved there and then sustain themselves. *See id*. at 35135. These nebulous criteria are not, however, the legal standard for designating critical habitat.

### C. Defendants Failed to Apply the Proper Standard for Designating Critical Habitat in Violation of the ESA.

#### 1. No PCEs Are Present in Unit 1

Under §4 of the ESA, FWS must designate critical habitat on the basis of the "best scientific data available…" In making a critical habitat designation, FWS "shall consider those physical and biological features that are essential to the conservation of a given species and that may require special management considerations," which here are the frogs' three required

PCEs. *See* 77 Fed. Reg. 35131; 50 CFR §424.12(b), 16 U.S.C. §1532(5)(a) and 50 CFR §424.12(b)(1)-(5).

In order to properly designate critical habitat outside of the geographic area that was occupied by a species at the time of its listing, FWS must also prove that the outside area under consideration is "essential" to the conservation of the species. 16 U.S.C. §1532(5)(b).

The following are undisputed facts:

1.     As Unit 1 does not "contain sufficient PCEs to support all of the    life-history functions essential for the conservation of" the frog PCEs),76  Fed. Reg.59780, it is not "essential to the conservation of the species." 77 Fed. Reg. 35123-24.

2.     Unit 1 was not occupied at the time of listing (2001) and is not occupied today.  76 Fed. Reg. 59783.

3.     Unit 1 is not suitable habitat for the gopher frog in its current condition. 77 Fed. Reg. 35123-24.

4.     Unit 1 cannot be made suitable habitat without human intervention, including change of land use, controlled burns, revegetation, transplanting  of frogs and more. 77 Fed. Reg. 35123-24.

5.     FWS cannot compel such intervention on private property.  77 Fed. Reg. 35123-24.

6.     The Poitevent Landowners have expressed their clear intent to not manage Unit 1 for species conservation. 77 Fed. Reg. 35123-24  Unit 1 will therefore never be suitable or available for gopher frog use or recovery.

FWS thus lacks a sound legal basis under the ESA for critical habitat designation of Unit 1: Based on "the best scientific and commercial data available," 16 U.S.C. § 1533(b)(1)(A), Unit 1 is not only not "essential" to the conservation of the frog, it is also, at best, only "speculative habitat."  It is arbitrary and capricious of FWS to designate Unit 1 as critical habitat, and the Rule is invalid as to Unit 1.

## 2.      Further Problems With the Rule Arising Out of No PCEs

As noted, the frog's PCEs had to be actually be present on the Unit 1 land before it could be properly designated critical habitat under the Rule. As they were not in this case, the Rule must be set aside.  In *Home Builders Ass'n of N. California v. U.S. Fish & Wildlife Serv.*, the reviewing court set aside FWS' critical habitat designation for the Alameda whipsnake as the record showed that certain areas within the designation did not contain PCEs.  268 F. Supp. 2d 1197, 1214-17 (E.D. Cal. 2003). The Court noted as follows:

> [T]he court finds that the passage in [the record] regarding inclusion of features such as buildings, roads, canals, railroads, and large bodies of water that do not contain "habitat components" or "one or more of the primary constituent elements" within the critical habitat boundary <u>is an admission that the Final Rule designates as critical habitat areas that actually do not qualify as critical habitat under the ESA</u>.

*Id.* at 1215 (emphasis added).

More recently, in *Alaska Oil & Gas Ass'n v. Salazar*, the Court set aside a designation of critical habitat for the polar bear based on FWS' failure to establish that certain designated areas contained the necessary PCEs for the bear.  916 F. Supp. 2d 974, 1001-02 (D. Alaska 2013). Notably, the lands in *Alaska Oil & Gas* contained *one* of the necessary PCEs identified by FWS, which is more than has been shown in this case.  Yet, the Court set aside the designation as arbitrary and capricious, saying this: "[FWS] cannot designate a large swath of land … as 'critical habitat' based entirely on one essential feature that is located in approximately one percent of the entire area set aside." *Id*.

If, then, FWS cannot designate a large swath of land where only **one** PCE is present, it certainly cannot set aside the large swath of private land (1,544 acres) in Unit 1 where **none** of the requisite PCEs has been identified.  As the Court in *Cape Hatteras Access Preservation Alliance v. U.S. Dept. of Interior,* 344 F. Supp.2d 108, 122, 123 (D.C.C. 2004)*,* noted:

18

> That PCEs must be "found" on an area is a prerequisite to designation of that area as critical habitat. The FWS's argued-for interpretation, essentially that designation is proper merely if [the physical and biological elements species require to survive] will likely be found in the future, is simply beyond the pale of the statute.

Absent the existence of the three PCEs, FWS incorrectly designated Unit 1 as critical habitat for the frog. The Rule was therefore improperly issued under the ESA and is also arbitrary and capricious under the Administrative Procedure Act, insofar as far as it concerns Unit 1.

### D.    The Economic Analysis Violates the ESA

In the EA, FWS calculates that the economic impact of designating the unusable, unoccupied area of 1,544 acres in Unit 1 as "critical habitat" will cost the Poitevent Landowners, Weyerhaeuser and Markle some $34 million. FWS then absurdly proclaims in the EA that its "economic analysis did not identify any disproportionate costs that are likely to result from the designation." (Emphasis added.)  *See* 77 Fed. Reg. 35141.  As there is no evidence in the record to show why FWS concluded that the nearly $34 million cost of designation is not "disproportionate," it is an unsupported, arbitrary and capricious conclusion that requires this Court to reject the EA. Moreover, no rational decision maker would conclude that imposing a $33.9 million cost on landowners is not a "disproportionate cost"

### E.    FWS Failed to Comply with NEPA.

The National Environmental Policy Act, 42 U.S.C. § 4321, *et seq*., ("NEPA") requires that a federal agency proposing a "major Federal action[s] significantly affecting the quality of the human environment" prepare an Environmental Impact Statement (EIS), detailing the environmental impact of the action and other environmental impacts of implementation of the proposed Although Federal agencies like FWS must comply with NEPA "to the fullest extent possible," 42 U.S.C. § 4332, FWS refused to comply with NEPA and thus failed to determine the environmental devastation that will be caused by implementation of the Rule on Unit 1. 77

Fed. Reg. 35144. FWS was, however, required to have prepared an EIS under NEPA before including Unit 1 in the Rule. *Catron County Board of Commissioners v. U.S. Fish and Wildlife FWS*, 75 F.3d 1429 (10th Cir. 1996), and *Cape Hatteras Access Preservation Alliance v. Department of Interior*, 344 F. Supp 2d. 108 (2004).

F.      **Unit 1 is Not a Critical Habitat for the Frog.**

The ESA protects species identified as either "endangered" or "threatened." A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). Similarly, a species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. 16 U.S.C. § 1532(20). The ESA does not define what constitutes a significant portion of a species' range, but FWS has recently done so.

On December 9, 2011, FWS and the National Marine Fisheries FWS jointly defined the phrase "significant portion of its range" for purposes of listing a species under the ESA. *See* 76 Fed. Reg. 76987 (Dec. 9, 2011) (the "Range Rule"). The Range Rule defines "range" as the general geographical area within which the species is found at the time the listing decision is made.  It then excludes from this definition "lost historical range," as follows:

> We conclude that… lost historical range cannot be a significant portion of the range. In other words, we cannot base a determination to list a species on the status of the species in lost historical range. …Thus, ''range'' must mean ''current range,'' not ''historical range. '.. [W]e conclude that … it is the conservation status of the then-current range at the time of the listing determination in question that must be evaluated. (Citations omitted.)[15]

At the time of its listing in 2001, FWS concluded that Unit 1 was **not** occupied by the frog, *See* 66 Fed. Reg. 62994, 62995 (emphasis added).  A key element relevant to the Rule here is this: the dusky gopher frog's  "range" was the general geographical area in which it was found **at the**

---

[15]*See* Federal Register, Vol. 76, No. 237, Friday, December 9, 2011, pages 76996 and 76997.

time the listing decision for it was made in 2001.[16]   Thus, as Unit 1 was "lost historical range" at that time, it is **not** part of the frog's "significant portion of its range."[17] As a result, applying FWS's own conclusions, the Rule improperly designates Unit 1 as its Critical Habitat.

### G.   FWS Failed to Prove That All of Unit 1 is Required Frog Habitat.

In the Rule, FWS adjudicates that **all** of Unit 1's 1,544 acres are "essential for the conservation of" the frog.[18] There are, however, no facts in the record for the Rule from which FWS could have drawn a rational connection as to why all of Unit 1 is critical habitat for the frog as its designation assumes the false fact that frogs will someday be on the Poitevent Lands. Thus, FWS has once again failed to use the "best scientific data" for its conclusion and the Rule is therefore invalid for this additional reason.

Although FWS claims to have done this for Unit 1, it could not possibly have done so as it admits that there are no frogs and no habitat on the land. Therefore, in order to justify its action in the Rule for Unit 1,  FWS was forced to "cast a statutory net" over the lands there and conclude that **if** those lands are somehow transformed into suitable habitat for the frogs and **if** frogs are ever moved there, the area they **would then** need is Unit 1, or possibly some portion of Unit 1. But, all  this supposition  means is that  FWS did not use  the "best scientific data available" and it cannot justify the extent of its designation as to Unit 1.

FWS also excluded from the Rule at least one other "agricultural area" that also does not contain habitat suitable for the frog, noting that it "does not contain habitat suitable for the " frog.

---

[16]The FWS agrees: " Unit 1 is not currently occupied nor was it occupied at the time the dusky gopher frog was listed." *See* 77 FR 35118-01;  2012 WL 2090270 *10; *See also* 76  Fed. Reg. 59783.

[17]The FWS agrees: "In Louisiana, the dusky gopher frog was last observed in 1965." *See*, 77 Fed. Reg. 35118-01, 2012 WL 2090270,* 27.

[18]*See* 77 Fed. Reg. 35118-01, 2012 WL 2090270, *28.

*See* 77 Fed. Reg. 35118.  Here, although  Unit 1 is a similar "agricultural area" (a **tree farm** managed by Weyerhaeuser[19]) that also does not have habitat suitable for the frog, FWS nevertheless <u>included</u> Unit 1 based on the incorrect conclusion that it is "essential for the conservation of the species". As FWS failed to exclude the "agricultural area" that is Unit 1 that also does not contain frog habitat similar to the area FWS excluded for this very same reason, the Rule is arbitrary and capricious under the APA.

### H.    The Dusky Gopher Frog is Not an "Endangered Species" under ESA

The ESA requires that critical habitat only be designated for listed species, that is that such species be put on the "Endangered Species List." Here, the **Mississippi** gopher frog was declared to be an "endangered species" by FWS in 2001.  In the Rule, however, FWS designated Unit 1 as critical habitat for a species **not** on the Endangered Species List (the "**Dusky** gopher frog"), and without notice or opportunity for the Poitevent Landowners to be heard, in violation of Section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2),

The FWS makes a fatal error in the Rule by declaring that Unit 1 is critical habitat for an "unendangered species" (the **Dusky** gopher frog), which the ESA does not cover and FWS has failed to list it as an endangered species and cannot therefore protect.  Yet, the **Dusky** gopher frog is **not** an "endangered species" under the ESA and throughout all of the proceedings leading up to the publication of the Rule in the *Federal Register* in June 2012, the **Dusky** gopher frog was **never** mentioned.

The  facts show the following:

1.    The species listed as endangered on December 4, 2001 was **not** the **Dusky** gopher frog but a "different species"-- the **Mississippi** gopher frog.  66 Fed. Reg. 62993.

---

[19]*See* Federal Register, Vol. 66, No. 233, page 62995, for an acknowledgment by FWS that Unit 1 is a "pine plantation" similar to any other agricultural venture.

2.      On November 27, 2007, as FWS had failed to find habitat for the **Mississippi** gopher frog, **not** the **Dusky** gopher frog, CBD sued FWS for its failure to do so for the **Mississippi** gopher frog, **not** the **Dusky** gopher frog. *Friends of Mississippi Public Lands and Center for Biological Diversity v. Kempthorne*, 07-CV-02073.

3.      In the court-approved settlement, FWS agreed to submit to the *Federal Register* a new prudency determination for the **Mississippi** gopher frog, **not** the **Dusky** gopher frog, and if the designation was found to be prudent, a proposed designation of critical habitat for the **Mississippi** gopher frog, **not** the **Dusky** gopher frog, by May 30, 2010, and a final designation for the Mississippi gopher frog, **not** the dusky gopher frog, by May 30, 2011.

4.      Designation of critical habitat for the **Mississippi** gopher frog, **not** the **Dusky** gopher frog, was again found to be prudent, and a proposed rule to designate critical habitat for the **Mississippi** gopher frog, **not** the **Dusky** gopher frog, was published on September 27, 2011. 76 Fed. Reg. 59774.

In the Rule, however, FWS--without notice and allowing the Poitevent Landowners an opportunity to comment as is required by law-- abruptly, arbitrarily and capriciously changed its mind and ruled that the endangered species wasn't the **Mississippi** gopher frog at all, but was instead a "different…species"-- the **Dusky** gopher frog. It then found in the Rule that Unit 1 is required, **not** for the **Mississipp**i gopher frog, but for the **Dusky** gopher frog. It thus included Unit 1 as part of the **Dusky** gopher frog's critical habitat, **not** as critical habitat for the **Mississippi** gopher frog.

The Rule straightforwardly says as follows:

Subsequent to the listing of the dusky gopher frog (=Mississippi gopher frog), taxonomic research was completed that indicated that the entity (which we listed as a DPS of the dusky gopher frog (Rana capito [sic] sevosa)) is <u>different from</u> other gopher frogs and warrants <u>acceptance as its own species</u> (Young and Crother 2001, pp. 382-388)…[T]he frog warrants acceptance as its own species.

77 Fed. Reg. 35118.  FWS further confirmed that the Mississippi and the Dusky gopher frogs are "different" species by stating in the Rule that: "…the [Dusky gopher frog] has now been accepted by the scientific community as a <u>unique species</u>, Rana sevosa." 77 Fed. Reg. 35118 (emphasis added).

As the record makes clear, the "species" under consideration until the Rule was issued in June, 2012 was always the "**Mississippi** gopher frog", **not** the "**Dusky** gopher frog." Yet upon issuance of the Rule, the Poitevent Landowners' land suddenly becomes critical habitat for a "different species", one that is "unique" and "its own species"-- the **Dusky** gopher frog-- all without advertisement, notice or an opportunity for the Poitevent Landowners to comment, and in violation of the ESA, FWS's rules and regulations thereunder and the requirements of the Administrative Procedure Act, not to mention fundamental constitutional principles of due process. The Rule is therefore invalid insofar as it under the ESA.[20]

## <u>CONCLUSION</u>

For all of the reasons discussed herein, as well as those articulated in the motions for summary judgment filed by Markle Interests, LLC and Weyerhaeuser Company, the critical habitat designation in the Rule should be invalidated as to Unit 1 and the Rule should be revised to exclude Unit 1.

---

[20] For additional extensive discussion of the points in this Memorandum, *see* 60-Day Notice (Ex. "H") and comments of counsel for the Poitevent Landowners dated November 23, 2011 and February 28, 2012 (Exs. "F" and "G") and comments of Weyerhaeuser, all of which are contained in the Record.

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**


By: _____s/Edward B. Poitevent, II_____
     EDWARD B. POITEVENT, II (#10564)
     BRIAN M. BALLAY (#29077)
     KATHLYN G. PEREZ (#30668)
     201 St. Charles Avenue, Suite 3600
     New Orleans, Louisiana   70170
     Telephone:  (504) 566-5200
     Facsimile:  (504) 636-4000

**ATTORNEYS FOR P&F LUMBER COMPANY
(2000), L.L.C., ST. TAMMANY LAND CO, L.L.C.
AND PF MONROE PROPERTIES, L.L.C**.


## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2013, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

          _____s/Edward B. Poitevent, II____