# POITEVENT LANDOWNERS

C/O Edward B. Poitevent, II
201 St. Charles Avenue
Suite 3600
New Orleans, LA 70170

November 23, 2011

Submitted via www.regulations.gov

Division of Policy and Directives Management
U. S. Fish and Wildlife Service
4401 N. Fairfax Drive
MS 2042-PDM
Arlington, VA 22203

Re:   Letter of Comment
Docket No. FWS-R4-ES-2010-0024
Proposed Critical Habitat Designation
Mississippi Gopher Frog
76 Fed. Reg 59774 (September 27, 2011)

Dear Sir or Madam:

This letter of comment is submitted to the United States Fish and Wildlife Service ("FWS" or the "Service") by the undersigned landowner, as a Member and Manager of P&F Lumber Co. (2000), LLC, and as the attorney for P&F Lumber Co. (2000), LLC, St. Tammany Land Co. LLC, PF Monroe Properties, LLC and Donald Markle, III (collectively, the "Landowners") in the captioned matter. As noted in more detail below, the Landowners own approximately 90% of the lands in proposed critical habitat number 1 described in the matter, all of which are located in St. Tammany Parish, Louisiana ("CHU #1") (the "Lands").

The Landowners welcome the opportunity to comment on the FWS' proposal to designate critical habitat under §4 of the Endangered Species Act ("ESA") for the Mississippi gopher frog (*Rana capito sevosa*) ("MGF") noticed at 76 FR 59774-59802 (September 27, 2011) (the "Proposed Rule"). The Landowners' comments are limited to CHU #1.

The Landowners oppose the designation of the Lands in CHU #1 as critical habitat for the MGF. Simply put, the legal and factual elements of the Proposed Rule and its background, insofar as they relate to CHU#1, show as follows:

(i) the grossly negative economic impact on the Landowners of designating the Lands as critical habitat demonstrates without a doubt that CHU #1 must be excluded from the



EXHIBIT
"F"

001873

proposed designation as the benefits of such exclusion (*i.e.*, not making the critical habitat designation and thereby avoiding the demonstrated $36.2+ million impact and certain other negative economic impacts noted in this letter of comment on the Landowners) far outweigh the benefits of specifying the area as critical habitat (which are vague and highly speculative and not quantified in the DEA defined below, *see* DEA at page 5-2), and there is no determination in the Proposed Rule that the failure to include CHU #1 as critical habitat will result in the extinction of the MGF; and

(ii) the FWS has utterly failed to meet the statutory tests required to properly designate the Lands as critical habitat.

## BACKGROUND

The MGF was listed as endangered on December 4, 2001. See, Proposed Rule and 66 FR 62993. Thereafter, on November 27, 2007, the Center for Biological Diversity and Friends of Mississippi Public Lands filed a lawsuit against the FWS and the Secretary of the Interior for their failure to designate critical habitat for the frog in a timely manner. *Friends of Mississippi Public Lands and Center for Biological Diversity v. Kempthorne* (07-CV-02073). In a settlement approved by the court on June 11, 2008, the FWS agreed to submit to the Federal Register a proposed rule designating critical habitat for the MGF by May 30, 2010. A final critical habitat designation was due by May 30, 2011, but has been extended. The Proposed Rule is a step in this process.

The FWS' settlement in the *Center for Biological Diversity* lawsuit required the FWS to immediately "find" critical habitat for the MGF. The FWS then "found" it on the Lands, as in the words of the Proposed Rule, "One of the units (CHU #1) represents a historical record for the Mississippi gopher frog". Proposed Rule, page 57891.

And how did the FWS determine that the Lands were suitable for critical habitat determination? This is unknown, but as is cryptically set forth in the DEA:

Based on information received during the comment period on the Proposed Rule, the Service revised the area proposed as gopher frog critical habitat to include ... a unit in Louisiana. See, DEA at p. ES-1.

To obtain this information and other background material, the undersigned attorney for the Landowners made a request this summer (prior to publication of the Proposed Rule in the Federal Register) under the Freedom of Information Act ("FOIA"). Subsequently, some material was produced by FWS, but the FWS also refused to disclose a significant amount of documents under a claim of a "privilege" to withhold or redact it under FOIA. An appeal of this wrongful withholding and redaction has now been filed. See Exhibit "A" attached hereto and made a part hereof.

As a consequence of the wrongful withholding of this material, the Landowners are completely unaware of what is being withheld. The withholding of this material and information puts the Landowners at a serious and unfair disadvantage as they cannot fully analyze the critical habitat proposal for the Lands in St. Tammany Parish, Louisiana for purposes of this letter of

001874

comment without them. It is patently unfair of the FWS to propose that CHU #1 be designated as critical habitat on the one hand and then refuse to disclose perhaps vital information about the process to the affected Landowners on the other hand.

The FWS' withholding of the materials in question and its redacting other materials is both unfair and legally incorrect for the clear and unambiguous reasons set forth in Exhibit "A" and also denies the Landowners their constitutionally-protected right to due process and to a full disclosure so that they may respond fully to the Proposed Rule. Therefore, until this material is disclosed, the Landowners are unable to prepare an adequate response to the critical habitat designation in the Proposed Rule. Consequently, the Landowners object to this proceeding for this reason and request that it be delayed until resolution of the Landowners' FOIA appeal. The Landowners therefore file this letter of comment under protest and reserve the right to supplement it when their FOIA appeal is resolved.

A.   **THE LANDOWNERS' INTEREST IN CHU #1 AND THE HIGHLY NEGATIVE DIRECT AND INDIRECT ECONOMIC CONSEQUENCES OF DESIGNATION OF CHU #1 AS CRITICAL HABITAT**

  (i)   **Legal Background**

Section 4 of the ESA requires that the FWS "to the maximum extent prudent and determinable" designate specific geographic areas as "critical habitat" based on the "best scientific data available . . . after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. §1533(b)(2). However, even if otherwise justified, the Secretary of Interior may exclude any area from designation "if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as critical habitat, unless he determines . . . that the failure to designate such area as critical habitat will result in the extinction of the species concerned." Id.; 50 CFR §424.19. (Emphasis added). In the case of CHU #1, the benefits of excluding the Lands from the critical habitat designation clearly outweigh the benefits of including them for the reasons noted in more detail below.

  (ii)   **Applicable Facts**

CHU #1 is located in western St. Tammany Parish, Louisiana. It is comprised of approximately 1,649 acres described by the FWS in the Proposed Rule. CHU #1 is located north and south of LA State Hwy. 36, approximately 3.1 km (1.9 mi) west of LA State Hwy. 41 and the town of Hickory, Louisiana. A map showing the location of CHU #1 is included in the Proposed Rule at page 59796.

The Landowners own approximately 1,502 acres of CHU #1 (about 90%), all of which are subject to a long term timber lease held by Weyerhaeuser Company that expires in 2043. The other 10% of CHU #1 is owned by Weyerhaeuser Company. All of the Lands are therefore privately owned.

Page 3

001875

The Landowners are virtually all descendants of John Poitevent, one of the founders of the Poitevent & Favre Lumber Co., who acquired the lands starting in the 1880s. The Lands have thus largely been in family hands for well over 100 years. The current owners wish to have their children and grandchildren take over ownership of the Lands in the future. This goal will be thwarted by the designation of the Lands as critical habitat for the MGF.

The Landowners are a "small entity" under applicable federal law. See, Draft August 17, 2011 Economic Analysis of Critical Habitat Designation for the Mississippi Gopher Frog published along with the Proposed Rule (the "DEA") (page A-5) at Federal Register Docket ID: FWS-R4-ES-2010-0024. The provisions of the DEA are incorporated herein.

Weyerhaeuser Company leases the Lands from the Landowners under its long term timber lease expiring in 2043 to grow and harvest timber, primarily pine sawtimber. The Landowners will continue employing the same silviculture methods and techniques employed by Weyerhaeuser after the timber lease expires in 2043 if the Lands are designated as critical habitat so that the Landowners may obtain some economic benefit from them, unless they are developed by the Landowners sooner if the Lands do not become critical habitat for the MGF. Thus, as is amply demonstrated in this letter of comment, because the Lands do not now contain the "primary constituent elements" to permit the MGF to exist on the Lands-- and, indeed, the FWS in the Proposed Rule concludes that (by its own investigation on the Lands) the MGF does not now actually occupy the Lands-- it is certain that both the critical habitat and the MGF will never exist on the Lands.

### (iii)   Recent Events Affecting the Lands

Following the devastation of the New Orleans area by Hurricane Katrina on August 29, 2005, it became clear that many South Louisiana residents were not going to continue to live in low-lying areas. St. Tammany Parish experienced a dramatic growth rate in population on that date that has continued. [1] See also, DEA at page 4-2 and 4-3. As fully documented in the DEA, the location of the Lands in St. Tammany Parish north (above) Interstate 12 ideally suits them for future development where people can live safely in this area without the fear of the devastating flooding that accompanied Hurricane Katrina.[2]

Beginning in 2006, the Landowners and their partner (Weyerhaeuser Real Estate Development Co.) spent several hundred thousand dollars on a massive comprehensive planning and zoning effort to accommodate this future development on the Lands. The results of this effort were then approved by both the St. Tammany Parish Planning and Zoning Commission and the St. Tammany Parish Council.[3] Thus, CHU #1 is ready for the development of homes,

---

[1] The 2010 US census shows that there are some 240,000 residents in St. Tammany Parish, which is an astonishing growth rate of 22.2% for the decade. See http://quickfacts.census.gov/qfd/states/22/22103.html

[2] The Federal Emergency Management Agency has declared that Interstate 12, which runs on an east-west route through the Parish, is the line below which there will be mandatory evacuations when the next hurricane comes *The Role of Social Science Research on Preparedness and Response, ftp.resource.org/gpo.gov/hearings/109h/24463.pdf*

[3] The details of these extensive efforts by the Landowners and their partner are set out on pages 4-2 and 4-3 of the DEA.

Page 4

001876

businesses and recreation that will surely come once the current real estate crisis has passed. *See*, DEA at pages 4-1 and following for a detailed description of what the Lands represent to St. Tammany Parish.

There is no doubt that the location of the Lands makes them ideal for human habitation as they are safe from hurricane flood inundation as experienced in other areas during Hurricane Katrina. Moreover, the sensitive planning and zoning efforts by the Landowners and their partner will provide traditional neighborhoods with open space, housing and parks for current and future residents and businesses in St. Tammany Parish..

> **(iv)** **Highly Negative Direct and Indirect Economic Consequences to Landowners, St. Tammany Parish and the State of Louisiana Come From Designation**

Designation of the Lands by the FWS as critical habitat for the MGF will destroy these carefully-made plans and remove the site from commerce, with an adverse direct economic impact on the "small entity" Landowners of some $36.2+ million dollars. See, pages A-6, ES-4, ES-5, ES-8, ES-9, 4-1, 4-6 and 4-14 of the DEA. As such, the huge $36.2+ million economic burden confirmed by the DEA of designating the Lands as critical habitat for the MGF will adversely impact the small entity Landowners exclusively.

There are other highly negative economic consequences that will befall both the Landowners, St. Tammany Parish and the State of Louisiana as a result of the proposed designation that are utterly ignored by the DEA, but which are real.

In addition to the direct impact of $36.2+ million to the Landowners, the Landowners will also clearly suffer economic harm to their adjacent lands in the vicinity of CHU #1. The FWS in the DEA and in the Proposed Rule indicates that frequent burning of the Lands in CHU #1 for the proposed critical habitat will be required. See, DEA at pages 1-4 and 4-3 ("The Service has indicated that in order to properly manage... CHU #1, prescribed burnings would be necessary") and Proposed Rule at page 59780 and 59788. Smoke and flames from these burnings will drift and flames will imperil homes and businesses nearby. Indeed, the very real presence of such burnings will also very likely halt all development of Landowners' adjacent lands as the danger and health hazards from the smoke and flames will likely chill any residents or businesses from locating there.

When asked by the Landowners' attorney to address these very real negative economic impacts of burning, the FWS threw up its hands and ignored them in the DEA, along with inquiries about the negative economic impact of oil and gas drilling on the Lands.[4]

Additional negative economic consequences of the burning includes the loss of revenue from the Lands and the Landowners' adjacent lands and lost ad valorem property tax and sales taxes that would have gone to St. Tammany Parish and the State of Louisiana.

---

[4] See attached email correspondence to and from FWS representatives on this subject, attached hereto and made a part hereof as Exhibit "B".

001877

The Proposed Rule at page 59788 also states that "ground disturbance" would be prohibited. This is shorthand for the "no development" that designation will carry with it.

### (v)   Health and Safety Hazards From Flames and Drifting Smoke

As will be seen from the map accompanying the Proposed Rule, CHU#1 is bisected by LA Highway 36, a major east-west artery in St. Tammany Parish. See, DEA at page 4-2. The contemplated burnings of the Lands will create a safety nightmare for people driving on the highway which will cause accidents and loss of life or grievous injury. The Landowners would then be liable for allowing the burning to occur and thereby cause the loss of life or injury. This economic burden has also been ignored by FWS and the DEA. This nightmare is one of the main reasons the St. Tammany Parish Council has opposed the designation of CHU #1 as critical habitat. See, unanimous Resolution of the St. Tammany Parish Council (the Parish governing body) dated November 3, 2011 attached hereto and made a part hereof as Exhibit "C".[5]

### (vi)   FWS Has Failed to Exhaust Other Readily Available and Far Cheaper Alternatives to Avoid the Huge Negative Economic Impact on the Landowners And No Economic Benefits of Making the Designation Have Been Shown

Placing the entire $36.2+ million direct impact of the proposed designation of CHU #1 as critical habitat onto the backs of the five Landowners, with the attendant highly negative economic impact on the government of St. Tammany Parish and its residents and the State of Louisiana, is also wrong and unjust because the FWS has failed to exhaust all other alternatives to expand existing MGF habitat in Mississippi on Forest Service land using restorative and pond creation techniques. This is a far cheaper alternative that destroying $36.2+ million of value for the Landowner, St. Tammany and the State of Louisiana and has also been ignored by the FWS and the DEA. It should be pursued before the CHU #1 designation is made. That it has not been pursued raises troubling questions of a "land grab" by the FWS.

The proposed action is also wrong because the DEA fails to quantify any "economic benefits" arising from the proposed designation. See, DEA Chapter 5, pages 5-1 through 5-3. Significantly, the DEA admits that there are no studies "that estimate the value the public places on preserving the gopher frog" (page 5-1) and grasps to find speculative and highly subjective "ancillary benefits", all of which depend upon "avoidance of development" (pages 5-2 and 5-3).

---

[5] The FWS was invited to attend a hearing held by the St. Tammany Parish Council on the subject of the November 3 Resolution to address the issues it addresses, but declined to do so.

001878

### (vii)   The Nightmare of ESA Section 7 "Consultation" Awaits the Landowner

The Landowners have very real concerns that they will be unable to develop any part of their Lands in the future if the Service adopts the Proposed Rule for the Lands. Under Section 7 of the ESA, if the Lands are designated critical habitat, "consultation" among numerous government agencies will be required if the Landowners wish to develop their property. Section 7 effectively gives the FWS and other government agencies numerous chances to veto any development on the Lands if they are designated critical habitat. The DEA acknowledges that consultation will be required once the designation is made.

Perfectly demonstrating this nightmare of bureaucratic red tape that will be thrown at the Landowners in the future in an attempt to crush their plans for development is one simple glaring fact: the FWS' own **315 page long** *Consultation Handbook* detailing the many traps for landowners who wish to develop designated land and the many, many ways in which government agents can (and often will) say "No" or make the process so cumbersome and nightmarish as to effectively wear down the landowners.[6] The DEA at page 4-3 admits that consultation with the Corps of Engineers "will likely be required."

This problem is also noted by FWS representatives in an article on the subject of the designation of the lands as critical habitat on Sunday, November 20, 2011 in the New Orleans *Times-Picayune*, a copy of which is attached hereto and made a part hereof as Exhibit "D" (quoting Ms. Cary Norquist of the FWS as saying that designation will "require.[the Landowners] to go through an extra step during the development process should the project require a federal permit, such as a permit to fill wetlands, or involve the use of federal funding."). This glancing reference to the "extra step" is the hellish "consultation process".

In effect, the *Consultation Handbook* is a mini-IRS Code filled with rules, regulations and procedures that make for a costly labyrinth for unwary landowners as once a critical designation is made government agents step in and apply the principles noted to either stop development or make it so difficult and expensive that an affected landowner just gives up on development plans for his or her lands.

That consultation is a bed of hot coals upon which the Landowners will be made to dance if CHU #1 is designated as critical habitat is clear as much of the Lands are likely jurisdictional "wetlands" that will require a Clean Water Act Section 404 permit from the US Army Corps of Engineers. See, DEA at pages A-5, ES-4, and 4-3. In turn, this permit will automatically invoke the "consultation" process and force the Landowners to negotiate with at least two bureaucracies, each of which has the right to veto (or effectively veto them by making them so cumbersome and limited as to be unfeasible) the Landowners' development plans.

This nightmare awaiting the Landowners is also a certain job-killer for St. Tammany Parish and the State of Louisiana and is another very heavy economic burden that will be unfairly and unjustifiably thrust onto their backs by the FWS' Proposed Rule. For example, once the designation is made, if the State wishes to use and federal money to widen Highway 36 or

---

[6] See, http://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf.

001879

improve it, consultation will be required, which would likely doom the proposal as the critical habitat would be "adversely modified." In these days of 9% unemployment, no economy can afford such a body-blow.

"Consultation" is the awful fate awaiting the Landowners should the Proposed Rule for CHU #1 be adopted. That the FWS fails to seriously consider the extreme difficulties that consultation will place on the Landowners is telling and shows once again that common sense has not been applied to this proposal. Establishment of critical habitat will effectively stop development of the entire 1,649 acres in CHU#1 dead in its tracks.

(viii)   **Designation of the Lands as Critical Habitat Would be a Taking Under the U.S. Constitution**

By particularly burdening private land, designation of CHU #1 as critical habitat would create a taking. Adding insult to injury, however, the FWS insists that its proposal for CHU #1 does not constitute a "taking" under the US Constitution (Proposed Rule at page 59792), which it is by any realistic, common sense measure. This position is also wrong for two reasons.

First, to the extent that the federal government might attempt to force translocation of the MGF to CHU #1 or force habitat management through burning, there would be a physical taking of CHU #1, triggering the need for compensation.  Second, the diminution in economic value that designation of CHU #1 would cause would create a regulatory taking requiring compensation.

In the Proposed Rule, the FWS has not proposed to pay the Landowners anything if the Lands are designated as critical habitat for the MGF.  Virtually all of the caselaw under the ESA confirms this. See, *The Endangered Species Act (ESA) and Claims of Property Rights "Takings."*[7] Thus, designation of CHU #1 as critical habitat for the MGF will effectively sound the death knell for any effective development of the Lands for which the FWS will not pay the Landowners, which will then mean that the entire economic burden will be borne entirely by the small entity Landowners, St. Tammany Parish and the State of Louisiana in the ways noted above.

(ix)   **Conclusions on Negative Economic Impacts**

The direct and indirect economic burdens of designating CHU #1 as critical habitat far outweigh the benefits of doing so. Moreover, the additional economic burdens noted above of making the designation on the Landowners, the Parish of St. Tammany and the State of Louisiana, along with the inability of the Landowners to develop their Lands (and the non-payment by reason of the taking of it by the FWS) if a designation is made, and the very real attendant health and safety issues also addressed above, are not addressed by the DEA or by the Proposed Rule. They cannot and should not be ignored. To do so is to refuse to apply common sense to the FWS' proposal to designate the Lands as critical habitat.

---

[7] Published at http://www.nationalaglawcenter.org/assets/crs/RL31796.pdf.

001880

Forcing the Landowners to face the nightmare of "consultation" if a designation is made is also an economic burden that will linger for many years and effectively take the Lands out of commerce due to the burden, time and expense of doing so. Adding to this burden is the fact that the FWS does not intend to pay the Landowners for the taking that would surely be involved.

Placing the entire $36.2+ million direct impact of the proposed designation of CHU #1 as critical habitat onto the backs of the five Landowners, with the attendant highly negative economic impact on the government of St. Tammany Parish and its residents and the State of Louisiana, is utterly wrong, unjust and unfair. This action is especially glaring because the FWS has failed to both exhaust all other alternatives to expand habitat in Mississippi on Forest Service land using restorative and pond creation techniques and because the Proposed Rule is deeply flawed both legally and factually for the reasons noted hereafter in this letter of comment.

The proposed action is also wrong because the DEA fails to quantify any "economic benefits" arising from the proposed designation. See, DEA Chapter 5, pages 5-1 through 5-3. Significantly, the DEA admits that there are no studies "that estimate the value the public places on preserving the gopher frog" (page 5-1) and grasps to find speculative and highly subjective "ancillary benefits", all of which depend upon "avoidance of development" (pages 5-2 and 5-3).

Finally, Landowners point out that both Louisiana Senators (Sen. David Vitter, R-LA and Sen. Mary Landrieu-D-LA) are so alarmed that the negative economic consequences to one Louisiana family and one Louisiana community  so far outweigh the (non-existent) economic benefits that they are making comments to the FWS asking that the Proposed Rule not be adopted in support of Landowners.

The Secretary of the Interior has the ability under ESA Sec. 4 to avoid this injustice by deciding that these economic burdens on the Landowner, St. Tammany Parish and the State of Louisiana are simply too great when weighed in the balance. A decision by the Secretary and the FWS to avoid the economic injustice that a designation would create for the Landowners and the government of St. Tammany Parish and its residents and the State of Louisiana would also be appropriate in light of the legal and factual errors in the Proposed Rule for the Lands.

<u>If CHU #1 does not present a case of the economic burdens of not designating critical habitat, then what does? The Secretary and the FWS owe the Landowners a detailed explanation of this, as common sense and reason dictate otherwise.</u>

Taken, together, all of these economic burdens require that the designation not be made. The FWS acknowledges this partially at page 59790 of the Proposed Rule where it states as follows:

> We may revise the rule or supporting documents to incorporate it address information we receive during the public comment period. In particular, we may exclude an area from critical habitat if we determine that the benefits of excluding the area outweigh the benefits of including the area, provided the exclusion will not result in the extinction of the species.

Again, the question must be asked:  If CHU #1 does not present a case of the economic burdens of not designating critical habitat, then what does? The MGF is already protected in its

Page 9

001881

critical habitat in Harrison County, Mississippi and the Proposed Rule will add many thousands of other acres for its protection. Moreover, because (i) the $36.2+ million economic burden far outweighs the speculative and unquantified economic "benefit" of making the designation (that depends solely on avoidance of development of the Lands); (ii) as shown below, the MGF does not actually occupy the Lands; (iii) as also shown below, the critical habitat is gone and will not return (and the FWS cannot re-create it); and (iv) the FWS has not shown that exclusion of the Lands will result in the extinction of the MGF. Exclusion of the Lands from the Proposed Rule is fully warranted.

**B.    SUMMARY   OF   LANDOWNERS'   OTHER   REASONS   OPPOSING DESIGNATION OF CHU #1 AS CRITICAL HABITAT**

Based on the Landowners' review of the Proposed Rule, the administrative record and related materials made available by the Service, CHU #1 fails to meet the statutory criteria set forth in the ESA for critical habitat designation. Accordingly, the proposal in the Proposed Rule is impermissibly speculative and is therefore arbitrary and capricious. The Landowners thus request that the Service not designate CHU #1 as critical habitat for these additional reasons. The Landowners make no comment on the balance of the Proposed Rule.

The reasons why CHU #1 fails to meet the required criteria for the MGF are explained in more detail below and are summarized as follows:

1. CHU #1 contains none of the primary constituent elements of MGF habitat, is and will remain subject to impacts identified by the Service as significant threats to habitat, in fact likely becoming less habitat-like far into the future.

2. CHU #1 is not "essential" to the conservation of the MGF.

3. The MGF does not "actually occupy" the Lands.

4. Imposition of a very significant ($36.2+ million) and grossly disproportionate economic impact on a single family (the Landowners) strongly militates against the designation of CHU #1 as critical habitat.

5. The FWS has failed to show the "benefit" of designating the Lands as critical habitat for the MGF other than by conclusory statements to that effect.

6. Designation of CHU #1 as critical habitat conflicts with local land use planning efforts, as St. Tammany Parish has identified this area as being in the path of growth, which land use plans will be severely frustrated by this designation.

7. Even if CHU #1 is considered "essential" (which it is not), under ESA §4(b), the FWS should exercise its discretion and decline to designate CHU #1.

001882

8. The FWS has failed to meet the "prudent and determinable" standard of ESA §4 in connection with its proposal to designate the Lands as critical habitat and has wrongly based its decision on conclusory statements in the Proposed Rule.

(i)      **CHU #1 Does Not Have the PCEs Required for the MGF**

In making a critical habitat designation, the FWS must consider "those physical and biological features... essential to the conservation of a given species and that may require special management considerations." 50 CFR §424.12(b); 16 U.S.C. §1532(5)(a). Those features include (1) space; (2) food, water, air, light, minerals, or other nutritional or physiological requirements; (3) cover or shelter; (4) breeding and nesting sites; and (5) habitats protected due to their historic geographic or ecological distribution of the species. 50 CFR §424.12(b)(1)-(5). These "primary constituent elements" are known as "PCEs", and are so referred to in this letter of comment.

In addition, in order for the FWS to designate critical habitat outside of the geographic area that was occupied by the MGF at the time of listing (such as CHU#1), it must document that CHU #1 is "essential" to the conservation (recovery) of the species. 16 U.S.C. §1532(5)(b).

Finally, in determining the "prudent and determinable" standard of ESA §4, US courts will take a "hard look" at the FWS' decision on critical habitat to assure that conclusory statements (such as those made by the FWS in the Proposed Rule) are not used to support its determination, and they will require that a species "actually occupy" an area before it can be designated as critical habitat[8].

The following represents the entirety of the FWS' rationale in the Proposed Rule in support of its conclusion that CHU #1 should be designated as critical habitat:

A. *"We believe this unit is essential because it provides additional habitat for population expansion outside of the core population areas in Mississippi."*

This conclusory statement is merely a "more is better" statement. For CHU #1 to be essential, the FWS must demonstrate that the other 5,513 acres of proposed critical habitat in Mississippi is insufficient to recover the species (which it has not) and that the area of CHU #1 will make it so and other alternatives have not been arbitrarily ignored (which has also not been demonstrated). 76 FR 59783.

B. *"The uplands associated with [five] ponds do not currently contain the essential biological and physical features of critical habitat; however, we believe them to be restorable with reasonable effort. We believe this unit provides potential for*

---

[8] *Otay Mesa Property L. P. v. United States Dept. of Interior*, 646 F.3d 914 (D.C. Cir. 2011), a copy of which is attached hereto and made a part hereof as Exhibit "E".

001883

*establishing new breeding ponds and metapopulation structure which will support recovery."* Id.[9]

This conclusory statement is simply another variation of the FWS' "more is better" conclusory statement in A above. Moreover, the conclusion that the PCEs do not exist in CHU #1 is amply demonstrated in the Proposed Rule.

> *C. "Maintaining these breeding ponds as suitable breeding habitat, into which Mississippi gopher frogs could be translocated, is essential to decrease the risk of extinction of the species resulting from stochastic events and to provide for the species eventual recovery." Id.*

This conclusory statement is wrong for two reasons. First, while it is logical that more habitat and locations for MGFs decreases "risks", this conclusion is irrelevant to a proper showing by the FWS that the Lands are essential for critical habitat designation as the ESA requires a demonstration that they are "essential to conservation", not essential to merely decrease "risks." Second, the FWS has failed to provide a proper factual basis to its conclusion that CHU #1 is essential to provide for recovery. It is simply another conclusory statement by FWS.

**(ii)      Application of PCEs to CHU #1**

**(a) Legal Background**

As noted, in order to properly classify CHU #1 as critical habitat, the FWS must determine that CHU #1 has the required PCEs, as they are "essential for the conservation" of the MGF. Here, as the record demonstrates that CHU #1 does not have the requisite PCEs, it is therefore not essential for the conservation of the MGF, and so designating it as critical habitat would be arbitrary and capricious.

Moreover, when a species does not occupy an area, the ESA only permits designation of critical habitat in that area when it is "essential for the conservation of the species". This is a more exacting standard than that required of areas occupied by endangered species. See, e.g., *Home Builders Ass'n of Northern Cal. v. U.S. Fish and Wildlife Service,* 616 F.3d 983 (9th Cir. 2010) ("Essential for conservation is the standard for unoccupied habitat, ESA § 3(5)(A)(ii), 16 U.S.C. § 1532(5)(A)(ii), and is a more demanding standard than that of occupied critical habitat. *Arizona Cattle Growers' Ass'n v. Salazar,* 606 F.3d 1160, 1163 (9th Cir.2010).") Specifically, Section 3 of the ESA defines "critical habitat" as "[s]pecific areas outside the geographical area occupied by the species at the time it is listed, upon a determination that such areas are *essential*

---

[9] It appears that the FWS has considered five ponds on CHU #1 as posing potential for rehabilitation – Hyla Pond, Amy's Pond, Sevosa Pond, Small Pond and Dry Pond.  All of these ponds have been encroached upon by hardwood species (some more than others) and that encroachment will accelerate as the hardwoods begin to dominate the pond sites in the absence of prescribed fire.  Two of the ponds – Small and Dry-- were previously altered by bedding; although pine trees did not survive in the bedded pond areas, the bedding will likely accelerate the hardwood growth.

001884

*for the conservation* of the species." See, e.g., 16 USC 1532(5)(a)(ii); 76 FR 59776 (Sept. 27 2011) (emphasis added).

In helping to identify when land outside of an area occupied by a species at the time it is listed might be "essential for the conservation" of the species, the record in the Proposed Rule offers the following guidance: "an area currently occupied by the species but that was not occupied at the time of listing may be essential to the conservation of the species." See, e.g., 76 FR 59776 (Sept. 27 2011). Thus, as FWS indicates, the presence of the species itself remains the key touchstone for whether an area is essential for the conservation of a species. FWS also considers "physical and biological features" in determining whether an area is "essential for the conservation" of a species, but to designate critical habitat under such a theory, the FWS must also demonstrate that PCEs are actually currently present on the land.

Finally, the FWS may not designate critical habitat on the grounds that PCEs may become present in the future. See, e.g., *Cape Hatteras Access Preservation Alliance v. U.S. Dept. of Interior*, 344 F.Supp.2d 108, 122-124 (D.D.C. 2004). Put another way, "PCEs must be 'found' on occupied [and especially unoccupied] land before that land can be eligible for critical habitat designation." *Id.* (citing 16 U.S.C. § 1532(5)(A)(i); *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 268 F.Supp.2d 1197, 1214 (E.D.Cal.2003) (distinguished on other grounds).

As will be discussed in detail below, the Lands do not currently contain the requisite PCEs, the MGF does not currently occupy the Lands, and any proposed designation of CHU #1 as critical habitat impermissibly relies on speculation that these PCEs may be developed in the future. See, Proposed Rule at page 59780 for FWS' speculative musings on this issue.

### (iii)[10] Application of Legal Principles to CHU #1

*None of the PCEs Required for the MGF Exist on the Lands, and the Overall PCE Trend is and Will Remain Negative Based on Service-Identified Threats for Many Years.*

The record in the Proposed Rule further stresses the need for an "open canopy" for frog breeding. 76 FR 59778.[11] MGFs also need "ephemeral . . . isolated ponds" for breeding. 76 FR 59777-78.

In the Proposed Rule, FWS identified the following three "primary constituent elements of physical and biological features that . . . are essential to the conservation of the species." 76 FR 59779. First, the frogs require "ephemeral wetland habitat" that is "dominated by longleaf

---

[10]   Landowners adopt the comments made by Weyerhaeuser Company to the Proposed Rule.

[11]   Absence of these elements is confirmed by the letter dated September 16, 2011 to the Landowners' attorney attached hereto and made a part hereof as Exhibit "F".

Page 13

001885

pine communities" that include an "open canopy." 76 FR 59779.[12]  Second, the MGF require "upland forested nonbreeding habitat" that is "dominated by longleaf pine" and "maintained by fires frequent enough to support an open canopy." 76 FR 59779.[13]  Third, MGF require "upland connectivity habitat" which is "characterized by an open canopy." 76 FR 59780.[14]

The record in the Proposed Rule directly states that these elements are **not** present in CHU #1, and that CHU #1 does **not** contain the physical and biological constituent elements essential for the conservation of the MGF.  Specifically, the proposed designation states "All of the other units/subunits proposed as critical habitat are currently unoccupied, but contain sufficient primary constituent elements to all the life-history functions essential to the conservation of the species *with the exception of CHU #1*." 76 FR 59780 (emphasis added).  See also 76 FR 59783 (directly stating that in CHU #1 "the uplands associated with the ponds *do not currently contain the essential biological and physical features of critical habitat*." (emphasis added)).  Thus, there is no ground for designating CHU #1 as critical habitat essential to the conservation of the MGF.  Thus, because CHU #1 does not contain these PCEs, it is "*unsuitable as habitat for gopher frogs*." See 76 FR 59777 (emphasis added).

The Service admits that PCEs 1, 2 and 3 are not present within CHU#1.  That is correct, and Landowners agree with this conclusion.  Moreover, additionally and significantly, based on the threats to habitat identified by the Service, many elements identified in all three PCEs will continue to be less favorable for many years to come.

The record in the Proposed Rule also dictates that, for the MGF to live on the Lands, modification of the Lands will be required, and that habitat for the MGF "could be created"; and

---

[12] The record states that this is a "longleaf pine ecosystem" consisting of "fire-maintained open-canopied woodlands historically dominated by longleaf pines." 76 FR 59777.  The record also states that "much of this original habitat has been converted to pine (often loblolly . . . or slash pine) plantations and has become a closed canopy forest unsuitable as habitat for gopher frogs" 76 FR 59777 (emphasis added).

[13] PCE Element 2 requires forests surrounding the open breeding ponds that were historically dominated by longleaf pine that are "maintained by fires frequent enough to support an open canopy and abundant herbaceous ground cover and gopher tortoise burrows, small mammal burrows, stump holes, or other underground habitat." 76 FR 59779.  Virtually all of CHU #1 has been in intensive plantation management since at least 1953, growing loblolly or slash pine (currently, loblolly only), not longleaf pine.  All five ponds are surrounded by bedded plantations, many established in 2007 or 2008 (post-Katrina).  In its listing decision, the Service identified bedding as a practice likely to disturb or destroy burrows and underground habitat.  Thus, in the areas of the five ponds, the pine forests do not qualify as PCE Element 2 today.  The FWS acknowledges this.

[14] PCE Element 3 focuses on the suitability of the habitat between the ponds and underground burrows to facilitate movement between breeding habitat and non-breeding habitat.  That habitat must have an open canopy with "abundant herbaceous species and subsurface structure which provides shelter for Mississippi gopher frogs during seasonal movements, such as that created by deep litter cover, clumps of grass, or burrows." 76 FR 59780.  The pine stands within CHU #1-- particularly those around the five ponds-- have relatively high "tree per acre" counts, and were planted so as to quickly form closed canopies that will concomitantly shade out most herbaceous ground cover.  These plantations will further shade the ponds.  The FWS acknowledges CHU #1 fails to meet the requirements of PCE Element 3.  As the pine plantations grow, conditions will move further away from that constituting PCE Element 3.  The Landowners will continue this practice after the timber lease expires in 2043 if the lands cannot be developed because of the looming designation.

001886

that "[w]ithin CHU #1, the other primary constituent elements <u>could</u> be restored with a reasonable level of effort." 76 FR 59780. (Emphasis added.) This again confirms that, in their present state, the Lands do not and cannot provide the PCEs necessary for the MGF habitat.

### a.   PCEs and the Requirement to Burn the Lands

In its MGF listing decision, the FWS concludes that prescribed burning around the ponds on the Lands is essential to maintain an open tree canopy around the ponds, permitting the growth of herbaceous vegetation for egg attachment. In fact, the Service acknowledged that "<u>fire is the only known management tool</u> that will maintain the existing breeding pond as suitable habitat." 66 FR 62999 (emphasis added).

Most notably, prescribed fire is not part of the recent, present or likely future management regime for CHU #1. It is not a management tool used by Weyerhaeuser Company in growing saw timber plantations. Moreover, bisected as CHU #1 is by LA Highway 36, liability issues alone make prescribed burning on CHU #1 impracticable, and the ever-present (and real) looming danger of drifting smoke and leaping flames will certainly create a terrible safety hazard for drivers on LA Highway 36 and will also clearly devalue the Landowners' other lands near CHU #1.[15][16]

Even if CHU #1 were to be designated as critical habitat and the property is never significantly developed, the lands around it will be, so cost, smoke management and liability concerns make it very unlikely that the Lands will ever be successfully burned on a frequent basis. This problem was noted in the listing decision with respect to MGF habitat on the DeSoto National Forest, see 66 FR 62999. It would be a much more serious factor on CHU #1.

### b.   PCEs and the Requirement to Modify the Lands

As admitted by the FWS in the Proposed Rule (page 59780), modification will certainly be required to create MGF habitat on the Lands. However, as the record also indicates, the government has no power to perform such modification and the Landowner is unwilling to do so. The FWS cannot compel a private landowner to create habitat or "translocate" an endangered species. As noted in the Proposed Rule, "The designation of critical habitat does not affect land ownership or establish a refuge, wilderness, reserve, preserve, or other conservation area. Such designation also does not allow the government or public to access private lands and does not require the implementation of restoration, recovery, or enhancement measures by non-Federal landowners." 76 FR 59776.

Given all of this, how does the FWS propose to "modify" the Lands if they are designated as critical habitat for the MGF? And who will pay for this in these days of enormous federal deficits?

---

[15]  This is acknowledged by the Resolution of the St. Tammany Parish Council, attached as Exhibit "C".

[16]  The DEA does not address any of these highly negative consequences in the Proposed Rule.

001887

c.      **Conclusions From Lack of PCEs**

Given the admitted facts in the record of the Proposed Rule that the three required PCEs needed for MGF critical habitat is present on the Lands, the need to modify the Lands which will not occur and the need to burn them in the highly unlikely event that this were ever to occur, the Lands are clearly not "essential to the conservation of the [MGF] species." Thus, the Lands should not be designated as critical habitat for the MGF as set forth in the Proposed Rule.

(iv)     **CHU #1 is not "essential" to the conservation of the MGF as the MGF does not "Actually Occupy" the Lands.**

All of the available data indicates that CHU #1 has not been actually occupied by the MGF since the 1960s, and this was the only known occurrence ever within the State of Louisiana.  The FWS has stated that the last known sighting of a MGF on CHU #1 was in either 1965 or 1967, over 45 years ago, and a number of years before the enactment of the ESA. See, DEA, page ES-9 (CHU #1 "is not occupied by the gopher frog") See also, Proposed Rule at page 59783 (the Lands are "currently unoccupied") and for speculation on "translocating" the MGF to CHU #1, and FWS brochure attached hereto and made a part hereof as Exhibit "G" (the MGF "has not been seen in Louisiana since 1967. . . .")

Accordingly, as of the listing of the MGF on December 4, 2001, CHU #1 was "outside of the geographical area occupied by the species". Thus, it can only be designated as critical habitat "upon a determination by the Secretary [of Interior] that such area ... [is] essential for the conservation of the species." 16 U.S.C. §1532(5)(A)(ii).

The Proposed Rule confirms that CHU #1 was outside the geographic area occupied as of listing.  76 FR 59783.  The Proposed Rule also acknowledges that "essential to conservation of the species" is the standard that must be met for a lawful designation of CHU #1 as critical habitat.

a.      **The *Otay Mesa* Case and its Application to CHU #1**

As noted recently by the Court of Appeals in *Otay Mesa*, if the Service believes a property "is 'essential for the conservation of the species,' then it must...justify that determination", citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943).

In *Otay Mesa*, the DC Circuit Court of Appeals held that the FWS failed to demonstrate that the land in question there designated was in fact "occupied," as required by the ESA. The court noted that the FWS erroneously based its critical habitat designation on one isolated sighting of four San Diego fairy shrimp found in a tire rut on a heavily travelled dirt road, which was the only sighting, despite numerous visits to the property both before and after the one isolated sighting. The FWS then tried to bolster its non-existent "evidence" for the presence of fairy shrimp by pointing to the finding of another shrimp (the Riverside fairy shrimp) on the property, speculating that some of that fairy shrimp could be "presumed" to be San Diego fairy shrimp. The court of appeals rejected this, and concluded that "presumed occupied" is not the

001888

same as "actually occupied", which is required by the ESA for a proper designation of critical habitat. [17]

In the case of the Lands, by the FWS' own research and findings in the Proposed Rule, the MGF does not "actually occupy" CHU #1 and has not been seen on the Lands since at least 1965, some eight years before the enactment of the ESA in 1973.  Proposed Rule at page 59781.  Thus, it is improper for the FWS to designate the Lands as critical habitat as it cannot meet the standards required to do so by the ESA.

Although the Proposed Rule dutifully recites a conclusion that CHU #1 is "essential" for the conservation of the MGF, this conclusory statement is devoid of any factual or analytical support.  The Service is required to base its critical habitat decisions on the "best scientific data available" and thus is not necessarily compelled to collect any particular data in this case.  However, as admonished by the *Otay Mesa* court, the FWS has <u>no</u> "authorization to act without data to support its conclusions…" 646 F.3d at 918.

Without a scientifically-based recovery plan to guide it, and without any demographic analysis of the viability of the MGF populations that will be developed on other CHUs, the Service has no basis (scientific or otherwise) for its conclusion that, without CHU #1, the MGF cannot be conserved (recovered).  The FWS is thus left to argue that "more can only be better than less."   That is clearly a thin reed on which to base this critical habitat designation and is also a legally insufficient basis to conclude that CHU #1 is "essential", particularly where (as here) the Lands are not "actually occupied" by the MGF.

(v)    **More Flaws in the FWS' Conclusory Statements**

What the conclusory statements by the FWS also show plainly and simply is that (i) the MGF is not present on CHU #1 and (ii) the MGF's critical habitat does not exist there.  Thus, the FWS has absolutely no data whatsoever in order to make a proper finding about CHU #1, and that it has therefore relied on purely conclusory statements in violation of ESA §4 and its own regulations at 50 CFR §424.12 to make the proposed designation on the Lands.

This failure is further glaringly demonstrated when the rationale used by the FWS to completely disregard potential MGF breeding ponds in Alabama is considered.  There is nothing more supporting the Service's conclusion that CHU #1 is essential to MGF conservation than there is to its assertion that the potential breeding ponds in Alabama are not essential – "[N]o Mississippi gopher frogs have been found at these sites, and at this time, we do not consider

---

[17] *Otay Mesa* is discussed in detail in Exhibit "E" hereto as it perfectly illustrates the critical mistakes made by the FWS here and the overreaching and straining to "find" a critical habitat for the MGF that there is no proof that the MGF "actually occupied" the Lands when it was listed in 2001 and even prior to ESA enactment in 1973.  Quite to the contrary, by the FWS' own findings in the Proposed Rule the MGF has "not been seen on CHU #1 since 1965".  Another FWS publication (attached as Exhibit "G") flatly states that the MGF "has not been seen in Louisiana since 1967." Both of these findings are direct precedent for this issue and present clear and convincing evidence of why the FWS is wrong and the critical habitat designation as proposed for CHU #1 should not occur, along with the other reasons noted in this letter of comment.

001889

them to be essential to the conservation of the species." 76 FR 59781. The same thing could be said of the Louisiana sites in CHU#1.

Moreover, the proposal does not explain why possible sites in Alabama were not considered essential whereas similar sites in Louisiana were considered essential, when both states lacked the biological and physical characteristics essential for the conservation of the species. The record indicates that numerous surveys have been unable to document the continued existence of the Mississippi Gopher Frog in Louisiana or Alabama for more than 40 years. See 66 FR 62994 (December 4, 2001) ("The last observation of a gopher frog in Louisiana was in 1967. In Alabama it was last seen in 1922" (internal citations omitted)). The record indicates that possible sites in Alabama were not considered essential in spite of the presence of "longleaf pines" and "ponds that have potential as breeding sites for the Mississippi Gopher Frog," apparently simply because (as the FWS concludes without justification) "no Mississippi Gopher Frogs have been found at these sites . . .[and therefore] we do not consider them to be essential to the conservation of the species." 76 FR 59781.

The record indicates a similar situation in Louisiana, but the FWS offers no explanation of why it was included as possible critical habitat over the Alabama sites. The record states that the Louisiana site contained only a "pond, and a series of others" that might offer only one of three primary constituent elements for the Mississippi Gopher Frog. 76 FR 59781. However, according to this assessment, the Louisiana site has less habitat potential than the excluded Alabama site. The Louisiana site has only "a pond" and no frogs currently occupying the site and no longleaf pine habitat. The Alabama site has both "ponds that have potential as breeding sites for the Mississippi Gopher Frog" and "longleaf pines." Thus, according to the record in the Proposed Rule, the Alabama site has more of the essential elements than does the Louisiana site, but inexplicably CHU #1 in Louisiana was proposed as critical habitat whereas the Alabama site was not. This is unexplained and contrary to the factual record, and is another reason why the Proposed Rule for CHU #1 is arbitrary and capricious and should not be adopted.

Accordingly, the FWS in making the proposed designation has utterly failed to meet the ESA's "prudent and determinable" standard and its own regulations at 50 CFR for the Lands and the proposed designation cannot stand.

(vi). **Designation of CHU #1 as critical habitat conflicts with local land use planning and will create economic loss for St. Tammany Parish and its residents**

For the reasons noted above due to Hurricane Katrina and for other reasons, St. Tammany Parish has identified this area as being in the path of growth, and its land use plans, will be severely frustrated by this designation. See DEA, pages 4-2 and 4-3 for a detailed report on the efforts that the Landowners have gone to with their partner, Weyerhaeuser Real Estate Development Company. These plans would be halted if the designation as set forth in the Proposed Rule is carried out. See also, Exhibit "C" (Resolution by the St. Tammany Parish Council opposing the Proposed Rule) and a similar Resolution from the Northshore Business Council attached hereto and made a part hereof as Exhibit "H, which similarly opposes the Proposed Rule.

001890

The record also notes the loss of development revenue that St. Tammany Parish, Louisiana would suffer as a result of designating CHU #1 as critical habitat. Even under the most conservative estimation, the record notes that designating CHU #1 as critical habitat would cause $102,000 in impacts, and it is more likely that it would cause between $21.8 million to $36.2+ million in impacts. Proposed Rule at page 59790. This is an enormous impact; especially compared to the complete lack of benefit that listing would create, which is unjustified by any facts in the record itself.

The record also indicates that designating CHU #1 as critical habitat would have a disproportionate impact on small entities and families. CHU #1 is owned by four small entities and one individual. Proposed Rule at page 59791. The impacts are likely to be between $2 million and $3.4 million per year on these small entities. *Id.* CHU #1 is the only proposed area that would bear this scope of burden. This is utterly unjust and unfair and provides the reason why the Secretary and the FWS should not make the designation under Section 4 of the ESA.

## C.   CONCLUSIONS

As amply demonstrated in this letter of comment, the FWS has not established the legal or factual predicate for designating CHU #1 as critical habitat under the ESA. Given the non-existence of the MGF on the Lands, the lack of PCEs and the critical need for frequent fire to maintain MGF habitat, and the need to modify it to bring it to habitat status, CHU #1 is not today, and will not ever be, suitable MGF habitat. Thus, as CHU #1 has not been demonstrated to be "essential", its designation by the FWS is improper.

However, even if it is assumed for purposes of argument that CHU #1 is deemed to be "essential", and all of the other necessary elements of designating critical habitat were met by the FWS (which they have not), the economic burdens of designating CHU #1 are simply too great. The direct and indirect financial price tag -- falling on the backs of the Landowner small family group -- and the disruption of the St. Tammany Parish land use planning efforts are so significant that the Secretary should exercise his discretion under ESA §4(b)(2) and not designate CHU#1. The Secretary's discretion in this regard is very broad. Pushing a $32+ million impact onto any single landowner without first exhausting all other alternatives to expand habitat in Mississippi on Forest Service land using restorative and pond creation techniques clearly justifies the exclusion of CHU #1. The FWS in the Proposed Rule sweeps this enormous economic impact on the Landowners and St. Tammany Parish under the rug by deeming it "statistically insignificant". However, this is only because the Service is considering the $36.2+ million economic impact as part of its <u>entire</u> 7,015 acre proposal. As CHU #1 is the only land in Louisiana, it must be viewed in isolation to be seen in its proper and correct text. Viewed in that light, the $36.2+ million negative direct and indirect economic impact of the Proposed Rule is <u>100%</u>.

The only limitation under ESA §4(b)(2) is if the Secretary finds that failing to designate CHU #1 will result in "extinction" for the MGF. No such proof has been shown by the FWS, and, indeed, it is wholly unwarranted. The species has remained in Mississippi and even expanded there in the absence of CHU #1 being occupied for the past 50 or so years. Common sense dictates nothing less.

001891

The Landowners appreciate the opportunity to comment. Please feel free to contact the undersigned attorney for the Landowners if there are any questions about these comments.

Very truly yours,

Edward B. Poitevent, II, Member and Manager, P&F Lumber Co. (2000), LLC and attorney for St. Tammany Land Co. LLC, PF Monroe Properties, LLC and Donald Markle, III

cc:   Ms. Carey Norquist
     U. S. Fish and Wildlife Service
     6578 Dogwood View Parkway
     Jackson, MS. 39213

     Mr. William B. Rudolf (w/o enc.)

     Mr. Robin Rockwell (w/o enc.)

     Ms. Donna Roebke (w/o enc.)

Page 20

001892

**POITEVENT LANDOWNERS**

C/O Edward B. Poitevent, II
201 St. Charles Avenue
Suite 3600
New Orleans, LA  70170

 MAR ‑2 2012

February 28, 2012

Submitted **UNDER PROTEST AND WITH A FULL RESERVATION OF ALL RIGHTS**
via **www.regulations.gov** and by hand delivery to Public Comments Processing, Attn:
Docket No. FWS-R4-ES-2010-0024; Division of Policy and Directives Management; U.S.
Fish and Wildlife Service; 4401 N. Fairfax Drive, MS 2042-PDM; Arlington, VA 22203

Division of Policy and Directives Management
U. S. Fish and Wildlife Service
4501 N. Fairfax Drive
MS 2042-PDM
Arlington, VA 22203
Attn: Docket No. FWS-R4-ES-2010-0024

Re: Letter of Comment
Docket No. FWS-R4-ES-2010-0024
Proposed Critical Habitat Designation
Mississippi Gopher Frog
76 Fed. Reg 59774 (September 27, 2011), as revised
77 Fed. Reg.2254 (Tuesday, January 17, 2012)

Dear Sir or Madam:

This letter of comment is submitted to the United States Fish and Wildlife Service
("FWS") by the undersigned landowner, as a Member and Manager of P&F Lumber Co. (2000),
LLC, and as the attorney for P&F Lumber Co. (2000), LLC, St. Tammany Land Co. LLC, PF
Monroe Properties, LLC, Markle Interests, LLC and Donald Markle, III (collectively, the
"Landowners") in the captioned matter. As noted in more detail below, the Landowners own
approximately 90% of the lands in proposed critical habitat number 1 described in the matter, all
of which are located in St. Tammany Parish, Louisiana (the "Lands").

The Landowners welcome the opportunity to comment again on, and object once more
to, FWS' proposal to designate their Lands as critical habitat under §4 of the Endangered Species
Act, 7 U.S.C. § 136, 16 U.S.C. § 1531, et seq, ("ESA") for the Mississippi gopher frog (*Rana
capito sevosa*) (the "MGF" or the "frog") noticed at 76 Fed. Reg.  59774-59802 (September 27,
2011) and revised at 77 Fed. Reg. 2254 (January 17, 2012) (collectively, the "Proposed Rule").

**EXHIBIT
"G"**

001852

# POSITIONS OF LANDOWNERS AND FWS

Simply put, the Proposed Rule boils down to whether the FWS should declare the Lands to be critical habitat for the MGF under the ESA, given the following:

1. The frog has not occupied or been seen on the Lands since at least 1965.[1] The FWS admits this in the Proposed Rule.[2]

2. The frog will never be present on the Lands as the FWS cannot move the frog there and the Landowners will not allow them to be moved there, as the FWS will then require that the Lands be burned periodically to maintain the frogs' habitat.[3] The FWS admits this in the Proposed Rule and in its Economic Analysis for the Proposed Rule.[4] Burning the Lands will also create a terrible potential for loss of life and injury as smoke and flames will drift onto LA Highway 36, which bisects the Lands. See also 66 FR 62999 where FWS says that "…fire is the only known management tool that will maintain [MGF habitat]." (Emphasis added).

3. Designating the Lands as critical habitat for the frog will utterly destroy all of the value of the Lands and Landowners' adjacent lands and will cost the Landowners at least $36.3 million. [5] The FWS admits this in the Proposed Rule and in its Economic Analysis for the Proposed Rule.[6]

4. The Lands do not now, and will not in the future, contain the required "primary constituent elements" the FWS says are needed for the frog to live on the Lands.[7] The FWS admits this in the Proposed Rule.[8]

---

[1] For detailed reasons on this point, see Landowners' comments of November 23, 2011 at pages 16 and 17.

[2] See, Proposed Rule at page 59783.

[3] For detailed reasons on this point, see Landowners' comments of November 23, 2011 at pages 5,6,8, 15 and 16, and Weyerhaeuser's comments of November 28, 2011 at page 6.

[4] See, Proposed Rule at page 59783. See, Draft Economic Analysis page 4-3 ("The Service has indicated that in order to properly manage the breeding sites [on the Lands], prescribed burns would be necessary ").

[5] For detailed reasons on this point, see Landowners' comments of November 23, 2011 at pages 5, 6,9,10 and 19, and Weyerhaeuser's comments of November 28, 2011 at pages 13 and 14.

[6] See, Proposed Rule at pages 59789 and 509790. See, Draft Economic Analysis, Chapter 4.

[7] For detailed reasons on this point, see Landowners' comments of November 23, 2011 at pages 4, 10, 11, 13,14, 15,and 18, and Weyerhaeuser's comments of November 28, 2011 at pages 4-9.

[8] FWS admits that the Lands do not "contain sufficient PCEs to support… the [MGF]." 76 FR 59780. Also see proposed Rule at page 59777.

Page 2

001853

5. There are many other lands also available for designation as critical habitat for the frog in Alabama which the FWS ignores in the Proposed Rule. Those lands, in fact, have more of the "primary constituent elements" needed for the frog to survive than the Lands.[9]

6. The Lands are not "essential" to the survival of the frog as the FWS will designate some 5,500 acres, most of which is in the DeSoto National Forest (where the lands are out of commerce and no economic harm will be done to any private landowners), where the frogs can thrive.[10]

7. The Lands are only about 24% of the area the FWS has selected to declare as critical habitat for the MGF, and yet the Landowners will suffer a grossly disproportionate economic penalty of shouldering 100% (or nearly this) of the economic burden the Proposed Rule will create.[11] The FWs' own analysis shows that there is a shockingly gross disparity between the impact of designating the Lands as critical habitat and designating all of the other lands the Proposed Rule seeks to designate as critical habitat-- a negative $100,000 impact for all other lands in CHU#s2-12, but a negative impact of up to $36,300,000 for the Lands, averaging only $18.3 per acres for all of the other lands affected by the proposed Rule and up to $21,900 per acre for the Lands. This produces a 1,000 fold greater impact on the Lands than on the other lands impacted by the Proposed Rule. The FWS admits this in the Proposed Rule.[12]

8. The Proposed Rule, insofar as concerns the Lands is deeply flawed for many legal, factual and scientific reasons enumerated in the Landowners' prior comments on why the Proposed Rule should not be imposed on them, as detailed therein and below.[13]

In light of these compelling reasons why the FWS should not declare the Lands to be habitat for the frogs, as well as the many other overwhelming legal, factual and scientific reasons why the FWS should not do so, the FWS persists in its illogical quest to do just that. The question, then, that any reasonable person must ask is: "Why"? As the basis for declaring the

---

[9] For detailed reasons on this point, see Landowners' comments of November 23, 2011 at pages 17 and 18, and Weyerhaeuser's comments of November 28, 2011 at pages 12 and `15.

[10] For detailed reasons on this point, see Landowners' comments of November 23, 2011 at pages 10-19, and Weyerhaeuser's comments of November 28, 2011 at pages 10-13.

[11] For detailed reasons on this point, see Landowners' comments of November 23, 2011 at pages 5, 6,9,10 and 19, and Weyerhaeuser's comments of November 28, 2011 at pages 13 and 14.

[12] See, Proposed Rule at pages 59789 and 509790. See, Draft Economic Analysis, Chapter 4.

[13] For detailed reasons on this point, see Landowners' comments of November 23, 2011 and January 31, 2012, and Weyerhaeuser's comments of November 28, 2011.

001854

Lands to be habitat are so utterly wrong in the face of the foregoing reasons, the only answer that reasonably can be given by FWS is this: "Because we can."

The Proposed Rule is illogical on its face, and is replete with numerous *ipse dixit* conclusions of the FWS that are completely unsupported by applicable facts, law and science. It is therefore wholly illegal, arbitrary and capricious. Thus, it should not be carried out for the Lands.

## A. BACKGROUND

### (i) Landowner Prior Comments

The Landowners have already submitted detailed comments dated November 23, 2011 in this matter, which are incorporated by reference in this letter of comment. A copy of Landowners' November 23, 2011 comments is attached hereto and made a part hereof as Exhibit "A".

Landowners also attended and made comments at the January 31, 2012 hearing held by FWS on the Proposed Rule in Gulfport, Mississippi. These comments were submitted for inclusion in the hearing record at that time. However, in spite of the fact that the Landowners were the only Landowners affected by the Proposed Rule to speak at the hearing, and in spite of the fact that their Lands will be penalized by suffering almost 100% of the economic burden that the Proposed Rule will impose (and yet are only about 24% of the lands impacted by it), Landowners undersigned attorney was wrongfully given a scant 5 minutes to state the many detailed reasons for their objection to the Proposed Rule and to show why it is arbitrary, capricious and wrong. A copy of Landowners' comments made at the January 31 hearing is attached hereto and made a part hereof as Exhibit "B".[14]

Landowners also adopt the comments made by Weyerhaeuser to the Proposed Rule. A copy of Weyerhaeuser's comments is attached hereto and made a part hereof as Exhibit "C".

### (ii) Brief Factual Summary

The Landowners are virtually all descendants of John Poitevent, one of the founders of the Poitevent & Favre Lumber Co., who acquired the Lands starting in the 1880s. The Lands have thus largely been in family hands for well over 100 years. The current owners wish to have

---

[14] Of the approximately 18 speakers at the January 31 hearing, the Landowners were the only landowner affected by the Proposed Rule that spoke. FWS limited the hearing to 3 hours and then unnecessarily spent approximately 2 hours reviewing the Proposed Rule. Because it had then eaten up some 2/3 of the allotted time for the hearing by repeating what was already of public record, FWS then limited all speakers time to a mere 5 minutes. When Landowners asked for more time due to the impact of the Proposed Rule on the Lands, the administrative hearing officer violated her own rules announced at the start of the hearing by asked for "objections" from the audience (in effect, inviting them in order to shut down Landowners' reasonable request). Upon receiving one "objection" (based on the word "Objection!" loudly shouted anonymously from the audience, and without giving Landowners' attorney time to respond), the hearing officer then summarily denied Landowners' request for more time to make their presentation.

001855

their children and grandchildren take over ownership of the Lands in the future. This goal will be thwarted by the designation of the Lands as critical habitat for the MGF.[15]

Weyerhaeuser leases the Lands from the Landowners under a long term timber lease expiring in 2043 to grow and harvest loblolly pine sawtimber, which is not a part of the frogs' critical habitat of longleaf pine. The Landowners will continue employing the same silviculture methods and techniques employed by Weyerhaeuser after the timber lease expires in 2043, and will thus maintain the Lands in loblolly or slash pine, or some other timber other than the longleaf pine that is the frogs' habitat if the Lands are designated as critical habitat so that the Landowners may obtain some economic benefit from them, unless they are developed by the Landowners sooner if the Lands do not become critical habitat for the MGF.

Thus, as is amply demonstrated in this letter of comment and in Landowners' other comments and the comments of Weyerhaeuser (all of which are of record in this docket), because the Lands do not now contain the "primary constituent elements" to permit the MGF to exist on the Lands-- and, indeed, the FWS in the Proposed Rule concludes that (by its own investigation of the Lands[16]) the MGF does not now actually occupy the Lands-- and the FWS cannot require that the MGF be "translocated" onto the Lands (as it speculates in the Proposed Rule), and the Landowners will not agree to do so voluntarily, it is certain that both the critical habitat and the MGF will never exist on the Lands.

## B. COMMENTS MADE UNDER PROTEST AND WITH RESERVATION OF RIGHTS

### (i) Landowners' Freedom of Information Act Requests and Lawsuit

To obtain the details behind the Proposed Rule, Landowners made a request in the summer of 2011 (prior to publication of the Proposed Rule in the Federal Register) under the Freedom of Information Act, 5 USC § 552 ("FOIA"). Subsequently, some of the requested material was produced by FWS, but it then also refused to disclose a significant amount of documents under a wrongful claim of "privilege" under FOIA. An appeal of this wrongful withholding and redaction has been filed by Landowners.  See Exhibit "D" attached hereto and made a part hereof.

The purpose of the request for documents was obvious: Landowners need and want all materials to assist in the preparation of their comments and for the January 31 hearing, as well as

---

[15] Landowners are a "small entity" under applicable federal law. See, Draft August 17, 2011 Economic Analysis of Critical Habitat Designation for the Mississippi Gopher Frog for the Proposed Rule, Federal Register Docket ID: FWS-R4-ES-2010-0024, (the "DEA") at page A-5. The provisions of the DEA are of record in this docket and are incorporated herein.

[16] The FWS has admitted that it did not obtain the Landowners' prior permission for its site visit, and thus it trespassed on the Lands. The FWS told the Landowners about the trespass by its representatives months after it occurred.

001856

for these comments and any future legal proceedings challenging the proposal if the designation is made. Yet, in spite of this obvious need, the violation of FOIA, and the fundamental due process requirement of a full and fair discovery and the transparency required by President Obama's Executive Order of January 21, 2009 (attached and made a part hereof as <u>Exhibit "E"</u>), and for the other reasons noted in Landowners' emails of January 21 and 24, 2012 to Ms. Cary Norquist of the FWS' Jackson, Mississippi office (attached and made a part of Landowners' comments of November 23, 2011 as an exhibit thereof), Landowners have been unfairly, arbitrarily and improperly denied access to the documents sought and have been seriously hampered in the preparation of their comments and in connection with the January 31 hearing.

As a consequence of the wrongful withholding of these materials by FWS, the Landowners are completely unaware of what is in them. The FWS' withholding of the materials puts the Landowners at a serious, improper and unfair disadvantage as they cannot fully analyze the critical habitat proposal for the Lands without them. It is patently unfair and improper for the FWS to propose that the Lands be designated as critical habitat on the one hand and then refuse to disclose perhaps vital information and details on the Proposed Rule to the affected Landowners on the other hand.[17] The FWS continues to stubbornly refuse to let Landowners see these materials (thus raising the suspicion that there is something in them that the FWS wants to hide from Landowners), without explanation.[18]

### (ii) Protest and Reservation of Rights

The FWS' withholding of the materials in question and its redaction of other materials-- and its continued refusal to provide these materials to Landowner-- is not only unfair and legally incorrect for the clear and unambiguous reasons set forth in Exhibits "D" "E" and "F", but it also denies Landowners their constitutionally-protected right to due process and to a full disclosure so that they may respond fully to the Proposed Rule. Therefore, until this material is disclosed, the Landowners are unable to prepare an adequate response to the critical habitat designation in the Proposed Rule.

As a result of the foregoing, Landowners object to these proceedings and request that they be stayed until resolution of the Landowners' FOIA appeal and they have had adequate time to review them and prepare a supplemental response to the proposed critical habitat in the Proposed Rule.

As the FWS has refused to do this, Landowners therefore file this letter of comment under protest and reserve the right to supplement it when their FOIA appeal is resolved. Landowners again request that FWS make no decision insofar as concerns the Lands until the

---

[17] Landowners also requested a stay of the FWS administrative proceedings and the January 31 hearing as to the Lands on January 21, 2012 for these reasons. This request was improperly denied by Ms. Norquist. Landowners then requested the reasons behind this denial but have never been given them.

[18] See, FWS' Affirmative Defenses and Answer to Complaint for Declaratory and Injunctive Relief attached hereto and made a part hereof as <u>Exhibit "F"</u>.

Page 6

denied documents are provided to the Landowners and they have adequate time to review them and prepare a supplemental response to the proposed critical habitat in this Proposed Rule.

## C. ADDITIONAL REASONS FOR LANDOWNERS' OPPOSITION

Landowners once again oppose the designation of the Lands as critical habitat for the MGF for the many detailed reasons set forth in their November 23, 2011 comments and in the Weyerhaeuser comments and the Landowners' comments submitted into the record of this matter at the January 31, 2012 hearing, each of which is attached hereto and is hereby adopted in full (collectively, the "Landowners' Prior Comments").

Simply put, the legal and factual elements of the Proposed Rule and its background, insofar as they relate to the Lands, show that the FWS' reasons for justifying critical habitat for the MGF on the Lands are non-existent, deeply flawed, arbitrary, capricious and just plain wrong for the reasons detailed in both the Landowners' Prior Comments, and for the following additional reasons:

### (i) FWS failed to comply with the National Environmental Policy Act, 42 U.S.C. §4321, et seq. ("NEPA")

The plain language of NEPA makes clear that "to the fullest extent possible" all federal agencies (including FWS) must comply with NEPA and must prepare an environmental impact statement when its actions significantly affect the environment.  42 U.S.C. § 4332(C).[19]

In *Catron County Board of Comm'rs v. U.S. Fish and Wildlife Service*, 75 F.3d 1429, 1435-36 (10th Cir. 1996), the Tenth Circuit Court of Appeal held that all designations of critical habitat are subject to the requirements of NEPA, and that the Secretary of the Interior must comply with NEPA when designating critical habitat under the Endangered Species Act, 16 U.S.C. §§ 1531-44, as Congress contemplated and intended secretarial compliance with NEPA when designating habitat. See also, *Cape Hatteras Access Preservation Alliance v. U.S. Dep't of*

---

[19] Specifically, NEPA requires all federal agencies, including  FWS, that propose  a "major Federal action significantly affecting the quality of the human environment" to first prepare an Environmental Impact Statement ("EIS") detailing (i) the environmental impact of the proposed action; (ii) any unavoidable adverse environmental effects; (iii) alternatives to the proposed action; (iv) the relationship between the short-term uses and long-term productivity of the affected environment; and (v) any irretrievable and irreversible commitments of resources should the action be implemented.  42 U.S.C. § 4332(2)(C)(i)-(v).   See, e.g., *Weinberger v. Catholic Action of Hawaii*, 454 U.S. 139, 143, 102 S.Ct. 197, 201, 70 L.Ed.2d 298 (1981).  An EIS enables critical evaluation of an agency's actions by those outside the agency.  *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346, 351 (8th Cir.1972).   For proposed actions the environmental effects of which are uncertain, an agency must also prepare an Environmental Assessment ("EA") to determine whether a significant effect will result from the proposed action.  42 U.S.C. § 4332(2)(E); see also 40 C.F.R. § 1508.9, and *Oregon Natural Resources Council v. Lyng*, 882 F.2d 1417, 1421-22 (9th Cir.1989). Based upon the EA, the proposing agency must then either make a "finding of no significant impact" or determine if a significant environmental impact will result, thus requiring the preparation of an EIS.  *Committee to Preserve Boomer Lake Park v. Dept. of Transp.*, 4 F.3d 1543, 1554 (10th Cir.1993).

001858

*the Interior*, 344 F.Supp.2d 108 (D. D.C. 2004), holding that FWS must consider the impacts of its critical habitat designation in accordance with NEPA.

FWS has flaunted the requirements of NEPA and has therefore improperly ignored its clear requirements in connection with the promulgation of the Proposed Rule. See, Proposed Rule at p. 59793 ("...we do not need to prepare environmental analyses pursuant to [NEPA] in connection with designating critical habitat under the Act."). The Proposed Rule is therefore improper for this additional reason.

### (ii) The DEA Is Fatally Flawed As it Ignores Obvious Economic Impacts on Landowners

In *New Mexico Cattle Growers Assn. v. U.S. Fish and Wildlife Service*, 248 F.3d 1277 (10th Cir. 2001), plaintiffs challenged the FWS' designation of critical habitat for the southwestern willow flycatcher arguing, among other things, that the FWS' "baseline" approach to measuring the economic impacts of critical habitat designation was erroneous under the ESA.

The Tenth Circuit Court of Appeal rejected the FWS' "baseline" economic analysis approach and held that the FWS is required to analyze all impacts of critical habitat designation, regardless of whether those impacts are co-extensive with those of the listing. The Court stated that the FWS' analysis of the critical habitat designation is meaningless if it employs only a baseline approach, as the baseline approach fails to give effect to the US Congress' directive in the ESA. Thus, the economic analysis in *New Mexico Cattle Growers* failed to comply with the requirements of the ESA.

Here, the DEA gives lip service to applying a comprehensive approach (see, DEA at page 2-2 and 2-3), but then fails to consider the major negative effects on Landowners of (a) the requirement to burn the Lands to maintain MGF habitat[20] and (b) the impact that critical habitat designation will have on future contemplated oil and gas activities, such as oil and gas drilling, on the Lands. The DEA is thus fatally flawed as it fails to take into account these negative economic impacts on the Landowner, and the Proposed Rule is therefore improper for this additional reason.

### (a) The Requirement to Burn the Lands

The FWS in the DEA and in the Proposed Rule indicates that frequent burning of the Lands for the proposed critical habitat will be required upon designation of the Lands as critical habitat for the frogs. [21] These burnings will have an enormously negative economic impact on

---

[20] As the FWs knows, the Lands are subject to a long-term timber lease with Weyerhaeuser expiring in 2043, under which Weyerhaeuser has the exclusive right to use the Lands to grow and harvest timber. The Landowners would thus breach the timber lease (and be required to pay damages for the breach) by turning the Lands over to support "translocated" frogs on the modified habitat. Both the habitat modification and the burnings would make the Lands wholly unusable and unsuitable for timber growing and harvesting.

[21] See, DEA at pages 1-4 and 4-3 ("The Service has indicated that in order to properly manage...the lands, prescribed burnings would be necessary") and Proposed Rule at page 59780 and 59788.

Page 8

Landowners that is completely ignored by FWS and the DEA. Because the FWS completely ignores them, the Proposed Rule is therefore improper, arbitrary and capricious.

### (i) Loss of Life and Injury Caused By Burning

As can be seen from the map accompanying the Proposed Rule, the Lands are bisected by LA Highway 36, a major east-west artery in St. Tammany Parish. See, DEA at page 4-2 and map of the lands attached hereto and made a part hereof as Exhibit "G". Burning the Lands will create a safety nightmare for people driving on the highway which will cause accidents and loss of life or grievous injury. The Landowners will then be liable for allowing the burning to occur and thereby cause the loss of life or injury. This economic burden has also been ignored by FWS and the DEA. [22]

This nightmare is one of the main reasons the St. Tammany Parish Council (the Parish governing body), the St. Tammany Economic Foundation (the Parish's economic development arm) and the Northshore Business Council (which represents most of the prominent businesses in the Parish and the surrounding areas) all oppose the designation of the Lands as critical habitat.[23] Thus, as the DEA fails to take this highly negative economic impact on Landowners into account, it is fatally flawed for this additional reason.

### (ii) Destruction of Landowners' Adjacent Land Value Caused by Burning

In addition to the direct impact of $36.2+ million to the Landowners set forth in the DEA, the Landowners will also clearly suffer economic harm to their adjacent lands in the vicinity of the Lands by virtue of the required burnings the FWS will impose on Landowners should their Lands be designated by it as critical habitat for the frogs. Smoke and flames from these burnings will drift and flames will imperil homes and businesses nearby and will also destroy the value of the entirety of the Land. Indeed, the very real presence of such burnings will also very halt all development of Landowners' adjacent lands as the danger and health hazards from the smoke

---

[22] Recently, this horrific potential was realized not far from the lands. On I-10 (not far from the Lands), smoke from marsh fires killed 2 people in December 2011 and January of this year, and injured over 40 people in 3 separate incidents. The following is an excerpt from a New Orleans *Times-Picayune* article of January 25, 2012 (attached hereto and made a part hereof as Exhibit "H"), which gruesomely demonstrates this very real problem:

> On Dec. 29, a 40-vehicle pileup on Interstate 10 near the Michoud Boulevard exit, triggered by what was thought to be a combination of smoke from the fire and fog, killed two men and injured dozens more. A second fatal accident, also linked to smoke, occurred Wednesday at 8 p.m. near the same location. A third smoke-related accident, resulting in a minor injury to one passenger, happened in the same location on the morning of Jan. 4.

[23] See the Resolutions of the St. Tammany parish council and the Northshore Business Council attached to Landowners' November 23, 2011 comments as Exhibits "C" and "H", respectively. The St. Tammany Economic Development Foundation submitted its Resolution opposing the Proposed Rule after the record in this docket was reopened by FWS in January 2012. A copy is attached hereto and made a part hereof as Exhibit "I"..

001860

and flames will prevent any residents or businesses from locating there. Common sense compels this conclusion. The DEA is therefore fatally flawed for this additional reason.

In spite of the fact that common sense dictates otherwise, the FWS believes that people actually <u>do</u> want to live next to smoke and flames. On page 4-3 of the DEA, the following astonishing statements are made, without any citation of fact to support them:

> <u>The Service has indicated that in order to properly manage the breeding sites within Unit 1, prescribed burns would be necessary. Development would make burning more problematic, but not impossible.</u> If this area is developed, burns would likely be less frequent than without development. During consultation, the Service strives to work with Federal action agencies and landowners to minimize the impacts of a particular action. In this case, if the landowners agree to allow the Service to re-introduce the gopher frog in a portion of the unit, the Service anticipates the remainder would be available for development activities. (Emphasis added.)

By publishing the DEA with this statement (and other similar statements in it as noted in this comment and in Landowners' Prior Comments), the FWS shows that it supports this nonsense, which is quite alarming as it calls into question the competence of the FWS. Does the FWS truly believe that people will either live on the Lands or on Landowners' adjacent lands or locate businesses there, knowing that there will be smoke and flames periodically to maintain frog habitat, or live near to such lands? Did it actually read the DEA? How could the FWS approve publication of this document?

The FWS' publication of the DEA containing the statement that "development would make burning more problematic, but not impossible" shows either that the FWS has utterly lost its way, or that it has chosen to blind itself to this obvious problem in a desperate attempt to get the designation for the Lands made so that it can satisfy the consent order it signed when it caved into the Center for Biological Diversity's suit begun in late 2007 to establish MGF habitat.[24] In either event, the statement is laughable and illogical in the extreme, and demonstrates another reason why the DEA is wrong to ignore the very real negative economic impacts on the Lands and on Landowners' adjoining lands flowing directly from the FWS' requirement that the Lands be burned to maintain frog habitat on them.

No one, including the FWS biologists behind the critical habitat designation of the Lands, will ever live either on the Lands or next to them, and they would certainly never establish a commercial business there. Common sense is utterly absent from this conclusion. Yet, the FWS makes it with a straight face.[25]

---

[24] For background on this, see the Proposed Rule at page 59776.

[25] Although the point is obvious and needs no proof, see further the quote from one New Orleans East resident who has lived near the marsh fires that have occurred there recently, such as this quote from <u>Exhibit "H"</u>:

> Janice Glover remembers feeling like a prisoner in her West Cavelier Drive home in August, wheezing for breath indoors and fighting bouts of nausea as the smoke from "marsh" fires nearly three miles away enveloped her eastern New Orleans neighborhood. "I would wake up early in ... (continued on next page)

Page 10

001861

Additional negative economic consequences of the burning include the loss of revenue from the Lands and the Landowners' adjacent lands and lost ad valorem property tax and sales taxes that would have gone to St. Tammany Parish and the State of Louisiana. None of these additional items was considered in the DEA. The DEA is therefore fatally flawed for this additional reason.

### (b) The Impact of Critical Habitat Designation on Oil and Gas Activities

When asked by the Landowners' attorney to address the very real negative economic impacts of habitat designation on future oil and gas activities on the Lands, the FWS threw up its hands and ignored them in the DEA. The following is the brush-off of this important issue from the DEA at pages 4-4 and 4-5:

> The current landowners are concerned that, in addition to limiting development, critical habitat designation will restrict all future uses of the land, including…potential oil and gas development. However, <u>critical habitat only affects activities with a Federal nexus</u>, as described in Chapter 2 of this report. Private activities on private lands are not subject to section 7 consultation regarding potential impacts on critical habitats. As such, absent Federal funding, permitting, or oversight, certain future uses of the land would not be precluded.

*****

> The landowners of Unit 1 have also expressed interest in developing the land for oil and gas. St. Tammany and adjacent Parishes contain Tuscaloosa marine shale. Recent consultation with a geologist has shown that Tuscaloosa Marine Shale exists within proposed critical habitat Unit 1. Landowners indicate that a geologist recently determined that there may be 20 million bbls or recoverable oil within the landowners' total land area. Approximately 3.8 percent of the landowners' land overlaps the 1,649 acres within the unit. As noted above, the landowners are concerned that the Service may restrict the use of the land for oil and gas development, resulting in further impacts (above and beyond losses associated with residential and commercial development restrictions). As no oil and gas development has yet occurred within the proposed critical habitat area for the gopher frog, the Service has not considered potential conservation measures that may be relevant to this activity. In many cases, impacts of oil and gas exploration and development on habitats may be avoided by implementing conservation efforts such as directional drilling to avoid surface disturbance. These conservation efforts, however, would result in some incremental operational costs even in the case that oil and gas development is not precluded. <u>It is therefore possible that, in the case oil and gas</u>

---

the morning at 3 or 4 a.m., and smell the smoke in my bedroom, and at night after 12," she said. "It was all through the house, on our clothes, our hands, everything smelled of smoke. I was literally crying on a daily basis because I couldn't breathe," she said.

Page 11

development occurs on this land, and a Federal nexus is present triggering section 7 consultation, that there may be economic impacts of critical habitat designation for the gopher frog on this activity.

The striking and utterly dumbfounding thing about these statements is that the DEA's 3 "Scenarios" for the impact of habitat designation on the Lands either (i) assume that a large amount of the Lands are jurisdictional wetlands requiring a Section 404 Clean Water Act permit, which creates a "Federal nexus" (Scenarios 2 and 3) or (ii) requires "consultation", which is only invoked if there is a "Federal nexus" (Scenario 1).[26] Yet, and in spite of the fact that the DEA admits the "possibility" of there being an economic impact because a Section 7 "consultation" will be "triggered", the DEA ignores its own conclusions and the negative economic impact of these conclusions on the oil and gas potential of the Lands. Thus, as the DEA fails to take into account this negative economic impact, it is fatally flawed for this additional reason.[27]

### (c) Conclusions on the DEA's Failure to Account for Negative Economic Impacts

Given the above reasons, the DEA is fatally flawed as it fails to take into account the additional negative economic impacts on the Landowner and on the citizens of St. Tammany parish, Louisiana. The Proposed Rule is therefore improper, arbitrary and capricious for this additional reason.

### (iii) FWS' Action Will Result in an Unconstitutional Taking without Compensation

Designation of the Lands as critical habitat will create a taking as once the designation is made the Landowners will derive virtually no economic value from the Lands in connection with their carefully made, expensive development plans.

FWS, however, insists that its proposal for the Lands does not constitute a "taking" under the Fifth Amendment to the US Constitution, which it is by any realistic, common sense measure. In the Proposed Rule, FWS' adopts a circular *ipse dixit* on this point and says:

[W]e have analyzed the potential takings implications of designating critical habitat for the Mississippi gopher frog in a takings implications assessment. The takings implications assessment concludes that this designation of critical habitat for the Mississippi gopher frog does not pose significant takings implications for lands within or affected by the designation. Critical habitat designation does not affect landowner actions that do not require Federal funding or permits, nor does it preclude development of habitat conservation programs or issuance of incidental take permits to permit actions that do require Federal funding or permits to go forward. (Emphasis added).

---

[26] See, DEA, pages ES-2 through ES-5.

[27] Forcing the Landowners to face the nightmare of "consultation" between the FWS and the US Corps of Engineers if a designation of critical habitat is made for the Lands is another economic burden untallied by the DEA that will linger for many years and effectively take the Lands out of commerce due to the burden, time and expense of doing so.

Page 12

001863

See, Proposed Rule at page 59792.

The highlighted statement needs to be read a few times and carefully considered in order to catch its full and deeply troubling implications. What the FWS concludes is that "there is no taking because we say there probably isn't a taking, or at least a 'significant' one." This statement's errors in judgment are bested only by its presumptions. It is for the federal courts, not the self-supporting judge and jury of the FWS, to determine whether there is or is not a taking here.

Importantly, FWS does not say directly that there is no taking, because it cannot do this. Instead, it hedges its bet by saying that its actions do not have "significant" takings implications for the Lands.

In making this statement, the FWS also makes yet another illogical conclusion. A taking is a taking, whether it is "significant" (as here) or "insignificant." There is no such thing as a "harmless, insignificant, little ole taking." Accordingly, the FWS concludes that its actions will result in a taking of the Lands, but in its blindness to the facts it then ignores this conclusion.

### (a) *Lucas v. South Carolina Coastal Council* Shows the FWS Will "Take" the Lands and Landowners' Adjacent Lands Through the Proposed Rule

That the FWS' decision to designate the Lands as critical habitat will result in a compensable "significant" taking in violation of the Fifth Amendment to the US Constitution and require full compensation the Landowners is confirmed by the holding of the US Supreme Court in *Lucas v. South Carolina Coastal Council*, 304 S.C. 376 (S.C. 1991), that deprivation of "economically beneficial use of land" is a deprivation of the property itself and results in a regulatory taking for which the landowner must be compensated. The Supreme Court also noted that regulations that restrict the economically beneficial use of land are often a guise of pressing that land into public service, and that the government may not regulate away a property's economically beneficial use.

This is precisely what is about to happen to the Landowners in this matter. Under the Proposed Rule, the Landowners will have to burn their Lands[28] and will also be prohibited from "disturbing" the soil of the Lands, either one of which will clearly prohibit all economically beneficial use of the Lands and result in a total taking.[29] [30]

---

[28] The burn requirement the FWS will impose constitutes yet another form of uncompensated taking of the Lands and the adjacent lands that will be rendered utterly unusable.

[29] The Proposed Rule at page 59788 makes this clear by stating that "ground disturbance" will be prohibited." See also DEA at page 59,790: "[Under Scenario 3] the assumption was made that due to the importance of Unit 1 to the conservation and recovery of the species, the Service would recommend no development within the unit during consultation."

[30] The DEA in Section 4.1 (page 4-1) also provides as follows:" The Service has stated that development activities that disturb the soil and result in habitat fragmentation are considered a potential threat... (continued on next page)

Page 13

In addition to the FWS' pre-announcing in the Proposed Rule and the DEA its intention not to allow development on the Lands, or to so restrict it as to preclude it in any economically feasible way, when there is added to this burden the fact that the Lands will have to be burned to maintain habitat for frogs, there is only one conclusion that can be made: all economically beneficial use of the Lands and Landowners' adjoining lands will be utterly destroyed by the regulatory taking result from the designation under the Proposed Rule. See full discussion of the implications of the burning requirement on pages 2, 8, 9-11 and 13-14 of this comment.

In effect, the critical habitat designation of the Lands under the Proposed Rule will be social engineering of the rankest and worst kind as the regulation of the Lands in this way will destroy all economically beneficial use of the Land and the Landowners' adjacent lands impacted by the burn requirement for the Lands by pressing them into "public service." The FWS cannot do this without paying compensation to the Landowners.

Accordingly, because the Landowners will be deprived of all economically beneficial use of the Lands and their adjacent lands by reason of the designation of the Lands as critical habitat for the MGF, they will thus be deprived of these lands themselves. The FWS' Proposed Rule will clearly restrict any economically beneficial use of all of these lands and press them into public service without compensation.

The FWS cannot regulate away all of the lands' economic benefits use by prohibiting their development for people and requiring that they be burned periodically to maintain frog habitat there without paying for the Lands and without paying for the collateral impacts of the burning to the adjoining lands of Landowners. The Proposed Rule is therefore improper for this additional reason.

### (iv) FWS Must Exercise the Discretion Granted by ESA and Not Make the Designation of Habitat Due to the Crushing Economic Burden Imposed on Landowners

Taken together, all of the economic burdens noted in the DEA and above fall almost exclusively on the Landowners. In fact, as was stated at the January 31, 2012 hearing by the FWS itself, although the Lands are only about 24% of the proposed critical habitat under the Proposed Rule, they comprise 100% (or nearly 100%) of the economic burden of the Proposed Rule. Such a result is grossly disproportional on Landowners as a small family entity. Making the Lands bear virtually 100% of the economic penalty of the proposed designation of critical habitat is obscenely unfair and wrong and beyond all reason.

The FWS acknowledge this highly troubling aspect of its own proposal at page 59790 of the Proposed Rule as follows:

> We may revise the rule or supporting documents to incorporate it address information we receive during the public comment period. In particular, we may

---

to the gopher frog and its habitat." Can it be seriously doubted that FWS will seek no development on the Lands if they are designated habitat for a frog that hasn't been on the Lands since at least 1965 and for which the "primary constituent elements" are not present and will not be present?

Page 14

001865

In *United States v. Lopez*, 514 U.S. 549, 556-57, 115 S. Ct. 1624, 131 L.Ed.2d 626 (1995); the US Supreme Court defined the limits of the Commerce Clause by mandating that (i) Congress may only regulate an activity that "substantially affect(s)" interstate commerce, and (ii) there must be a rational basis for Congress' conclusion that the regulated activity sufficiently affects interstate commerce.

The Supreme Court has also clearly stated that the Commerce Clause cannot be extended to embrace effects upon interstate commerce that are merely indirect and remote. *NLRB v. Jones and Laughlin Steel*, 301 U.S. 1, 37, 57 S. Ct. 615, 81 L. Ed. 893 (1937).

The FWS' attempt to regulate the "ecosystem" of the Lands in this wholly intrastate setting for the MGF, which has no known commercial, scientific, tourism, food, medical or other value, and where (as here) the MGF do not now and will not ever exist in the future, and where the elements of its critical habitat do not now exist and will not ever exist in the future, defies all logic and reason. Thus, the FWS' attempt to designate the Lands as critical habitat is plainly unconstitutional as it constitutes an attempt by the FWS to regulate a frog that does not occupy or exist on the Lands. The FWS goes beyond *Jones and Laughlin Steel*'s "indirect and remote" standard of in this matter as it attempts to regulate nothingness and no commerce or commercial link to the Lands.

The FWS does not cite any link of any sort between the frog or the designation of the Lands as critical habitat to commerce of any nature whatsoever, be it travel, tourism, scientific research, or agriculture. Indeed, the FWS cannot do this because there is absolutely no such link and no commercial tie between the designation of the Lands as critical habitat under the ESA and the Commerce Clause. In turn, this means that the FWS' powers under ESA to designate the Lands as critical habitat do not pass constitutional muster.

Under the ESA there is no "market" at all for the MGF that applies to the Lands. Thus, this essential element necessary to justify exertion of the Commerce Clause power is missing. In this wholly intrastate context, as the frog is not present on the Lands and the frogs' habitat does not exist-- and the FWS cannot "translocate the frogs to the Lands without the Landowners' approval (which they will not give) or recreate the frogs' habitat without the landowners' approval (which they also will not give)[33], the Proposed Rule neither has nor demonstrates any

---

*Endangered Species Act's Precarious Perch: A Constitutional Analysis Under The Commerce Clause And The Treaty Power*, 27 Ecology L. Q. 215 (2000); Bradford C. Mank, *Protecting Intrastate Threatened Species: Does The Endangered Species Act Encroach On Traditional State Authority And Exceed The Outer Limits Of The Commerce Clause?*, 36 Ga. L. Rev. 723 (Spring 2002).

[33] The Landowners will not do this for two primary reasons: (i) doing so will destroy the value of the lands and the value of the Landowners' adjacent lands due to habitat modification and required burnings to maintain it and (ii) as the FWs knows, the Lands are subject to a long-term timber lease with Weyerhaeuser expiring in 2043, under which Weyerhaeuser has the right to use the Lands exclusively to grow and harvest timber. The Landowners would thus breach the timber lease (and be required to pay damages for the breach) by turning the Lands over to support "translocated" frogs on the modified habitat. Both the habitat modification and the burnings would make the Lands wholly unusable and unsuitable for timber growing and harvesting

Page 17

001866

economic or commercial nexus to the Lands. The MGF is not hunted for its skin, it is not consumed for its nutritional value, and it is neither used for medical products or the subject of medicinal or biological research. Clearly and simply put, no market or commercial value whatsoever exists for the frog.

Moreover, should the FWS designate the Lands as habitat for the frog under the Proposed Rule, it will gain functional control over the Lands, which will thus "result in a significant impingement of the States' traditional and primary power over land and water use." It cannot do this, however, unless this effective control is justified by a federal interest in regulating interstate commerce. *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, at 173-174, 121 S. Ct. 675, 148 L.Ed.2d 576 (2001). In effect, designation of the Lands as habitat will regulate their use for no effective purpose or end whatsoever and to such an extent that the regulation will become a perverse device to thwart the Landowners' prospects to develop the Lands and their adjoining lands and will also thwart the active land use planning efforts for the Lands and the adjacent lands by St. Tammany Parish, Louisiana.

Finally, by making this proposal, the FWS has, in the ultimate irony, ensured that there will never be a commercial link between the frog on the Lands and commerce of any sort. The ESA in section 9 makes it a crime to create a market for the frog or to "take" the frog from the Lands in any way and describes a series of "prohibited acts". These prohibitions are in place in order to <u>prevent</u> commerce in species, and their movement in interstate commerce> Section 9(a)(1)(B) of the ESA also makes it unlawful for any "person" to "take any such species within the United States or the territorial sea of the United States."[34]

For the reasons noted in this letter of comment, the ESA as applied here is unconstitutional under the Commerce Clause as the FWS seeks to apply it to what is a wholly intrastate fact scenario where there is <u>no</u> frog and <u>no</u> habitat, and where <u>no</u> frog and <u>no</u> habitat will ever exist. This wholly and purely pristine intrastate scenario has no tie whatsoever to any aspect of economic life and the FWS has not shown (and cannot show) any tie or relation whatsoever to any interstate travel, tourism, commerce, medical use, market or commercial need for the frog, and the ESA itself entirely eliminates any potential interstate market for the species because to "use" or "take" the frog in the future for any use is a crime under the ESA.

## D. CONCLUSIONS

The Proposed Rule is illogical, arbitrary and capricious and should not be enacted by the FWS for the Lands for the reasons set forth in greater detail in the Landowners' Prior Comments and in this letter of comment, as follows:

1.      The Lands contain none of the "primary constituent elements" that comprise the habitat for the frog. This is the state of the Lands now and they will remain in this condition far into the future due to Weyerhaeuser timbering and the timbering activities the landowners will conduct once the Weyerhaeuser timber lease ends in 2043.

---

[34] See, 16 U.S.C. §1538(a)-(b); 16 U.S.C. §1540(a)-(b), 16 U.S.C. §1538 and 16 U.S.C. §1538(a)(1)(B).

001867

14.     The DEA is fatally flawed as it ignores obvious negative economic impacts to Landowners and St. Tammany Parish. These ignored but obvious impacts include the highly negative economic impacts on Landowners of (i) burning the Lands, (ii) the destruction of any economic benefits that Landowners will be able to obtain from their adjoining lands and (iii) the negative economic impact on oil and gas drilling on the Lands.

15.     FWS' action designating the Lands as critical habitat for a non-existent frog that has not been present on the Lands since at least 1965, will not be present on the Lands in the future and for which the primary constituent elements of its habitat do not, and will not exist, will result in a taking without compensation in violation of the Fifth Amendment to the US Constitution.

16.     FWS must exercise the discretion granted to it under the ESA and not make the designation of habitat due to the crushing economic burden of doing so on the Landowners.

17.     The Commerce Clause of the US Constitution empowers Congress "to regulate commerce" not "ecosystems." The FWS' attempt to regulate the "ecosystem" of the Lands in a wholly intrastate setting for a species (the MGF), with no known commercial, scientific, touristic, or medical value, especially where (as here) the MGF do not now and will not ever exist, and where the elements of their critical habitat do not and will not ever exist on the Lands, defies all logic and reason and is plainly unconstitutional as an invalid attempt by the FWS. The ESA as applied here is unconstitutional under the Commerce Clause as the FWS seeks to apply it to what is a wholly intrastate fact scenario where there is no frog and no habitat, and where no frog and no habitat will ever exist. This wholly and purely pristine intrastate scenario has no tie whatsoever to any aspect of economic life and the FWS has not shown (and cannot show) any tie or relation whatsoever to any interstate travel, tourism, commerce, medical use, market or commercial need for the frog, and the ESA itself entirely eliminates any potential interstate market for the species because to "use" or "take" the frog in the future for any use is a crime under the ESA

The MGF is already protected in its critical habitat in Harrison County, Mississippi and the Proposed Rule will add many thousands of other acres for its protection. Moreover, because (i) the $36.3+ million economic burden far outweighs the speculative and unquantified economic "benefit" of making the designation (that depends solely on avoidance of development of the Lands); (ii) the MGF does not actually occupy the Lands; (iii) the frogs' critical habitat is gone from the Lands and will never return (and the FWS cannot re-create it, nor will the Landowners do this); and (iv) the FWS has not shown that exclusion of the Lands will result in the extinction of the MGF, exclusion of the Lands from the Proposed Rule is justified and is fully warranted.

For all of these reasons and for the additional reasons set forth in the Landowners' Prior Comments and in Weyerhaeuser's comments of November 28, 2011, FWS has utterly failed to comply with the Endangered Species Act's requirements. Furthermore, the Secretary of the Interior and the Director of the FWS should decline to designate the Lands as critical habitat for the MGF due to the $36.3+ million negative economic impact and the other indirect negative economic impacts earlier discussed on the Landowners.

Page 20

001868

The Landowners appreciate the opportunity to comment. Please contact the undersigned attorney for the Landowners if there are any questions about these comments.

Very truly yours,

Edward B. Poitevent, II, Member and Manager, of Landowner P&F Lumber Co. (2000), LLC, and Attorney for Landowners

cc:   Ms. Carey Norquist
      U. S. Fish and Wildlife Service
      6578 Dogwood View Parkway
      Jackson, MS. 39213

      Mr. William B. Rudolf (w/o enc.)

      Mr. Robin Rockwell (w/o enc.)

      Ms. Donna Roebke (w/o enc.)

Page 21

**POITEVENT LANDOWNERS**
Letter of Comment
**Docket No. FWS-R4-ES-2010-0024**
**Proposed Critical Habitat Designation**
**Mississippi Gopher Frog**
76 Fed. Reg. 59774 (September 27, 2011), as revised
77 Fed. Reg. 2254 (Tuesday, January 17, 2012)

# EXHIBIT BOOK

Submitted <u>UNDER PROTEST AND WITH A FULL RESERVATION OF ALL RIGHTS</u>
via <u>www.regulations.gov</u> and by hand delivery to Public Comments Processing,
Attn: Docket No. FWS-R4-ES-2010-0024; Division of Policy and Directives Management;
U.S. Fish and Wildlife Service; 4401 N. Fairfax Drive, MS 2042-PDM; Arlington, VA 22203

**FEBRUARY 28, 2012**

Exhibit A     Landowners' November 23, 2011 Comments to FWS

Exhibit B     Landowners' Remarks to FWS at January 31, 2012 Hearing

Exhibit C     Weyerhaeuser's November 28, 2011 Comments to FWS

Exhibit D     Complaint for Declaratory and Injunctive Relief for Violation of the Freedom of Information Act, 5 U.S.C. § 552; *P & F Lumber Co. (2000), LLC and Edward B. Poitevent, II vs. United States Department of the Interior and the United States Fish and Wildlife Service*, C.A. No. 12-00178 "L" (3), pending in the United States District Court for the Eastern District of Louisiana

Exhibit E     President Obama's Executive Order of January 21, 2009

Exhibit F     FWS' Affirmative Defenses and Answer to Complaint for Declaratory and Injunctive Relief

Exhibit G     Map of lands under Proposed Rule

Exhibit H     Excerpt of article in the *Times Picayune* published January 25, 2012

Exhibit I     Resolution of St. Tammany Economic Development Foundation opposing Proposed Rule

**POITEVENT LANDOWNERS**

C/O Edward B. Poitevent, II
201 St. Charles Avenue
Suite 3600
New Orleans, LA  70170

October 19, 2012

**CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**

Kenneth L. Salazar
Secretary of the Interior
United States Department of the Interior
1849 C Street NW
Washington, DC  20240

Daniel M. Ashe
Director, U.S. Fish & Wildlife Service
United States Department of the Interior
1849 C Street NW
Washington, DC  20240

Re:   60-Day Notice of Intent to Bring a Citizen Suit Under the Endangered Species
      Act to Challenge the Designation of Critical Habitat for the Dusky Gopher Frog
      (Previously Mississippi Gopher Frog), 77 Fed. Reg. 35188 (June 12, 2012) (the
      "Rule")

Dear Secretary Salazar and Director Ashe:

Pursuant to Section 11(g) of the Endangered Species Act ("ESA" or the "Act"), 16 U.S.C. § 1540(g), this letter provides notice from P&F Lumber Co. (2000), L.L.C., St. Tammany Land Co., L.L.C. and PF Monroe Properties, L.L.C. (collectively, the "Poitevent Landowners") of their intent to commence civil litigation against the U.S. Department of the Interior (the "Department") and the U.S. Fish and Wildlife Service (the "Service") for violating, among others, Section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2), and the Service's rules and regulations under the ESA, governing the designation of Critical Habitat for listed species.

For the reasons set forth in more detail below, the Service has unlawfully issued the Rule, which designates a sprawling 1,544 acres of land in Township 17 South, Range 14 East, Sections 19, 20, 29, 30 and 32, and in Township 14 South, Range 13 East, Section 24, St. Tammany Parish, Louisiana (identified in the Rule as Unit 1)[1] as Critical Habitat for the Dusky Gopher

---

[1] The plat attached hereto and made a part hereof as Exhibit "A" shows the location of the 1,544 acres in question.



Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

Frog in spite of the facts that, among others, no frogs have occupied the 1,544 acres for at least some 47 years and there is no habitat on the land to support the frogs, and there will be no frogs on the land or any habitat to support them in the future.

Of the 1,544 acres in Unit 1, approximately 95% of the land is owned in indivision by the Poitevent Landowners.[2]  The remaining 5% of the 1,544 acres is owned by Weyerhaeuser Company ("Weyerhaeuser"), which also holds a lease for timber production on the 95% of the land in Unit 1 owned by the Poitevent Landowners and Markle.

The Poitevent Landowners will bring a citizen suit under the ESA and will also sue under the Administrative Procedure Act, 5 U.S.C. 500, *et seq.*, after 60 days if the Department and the Service do not revise the Critical Habitat for the Dusky Gopher Frog as set out in the Rule to exclude Unit 1 from the designation for the reasons noted hereinafter.  Markle has indicated a similar intention to sue for the reasons set forth in the letter from its counsel, The Pacific Legal Foundation, dated September 27, 2012.[3]

## INTRODUCTION

In the Rule, the Service issued a highly controversial Critical Habitat designation for a new species known as the Dusky Gopher Frog (formerly the Mississippi Gopher Frog[4]) in the Gulf Coast.  The controversy involves the inclusion of 1,544 acres of wholly private land in Louisiana, with a potential negative economic impact of $34+ million dollars on the Poitevent Landowners and Markle, that the agency admits contains **no** frogs and is **not** suitable habitat, and will **never** become suitable habitat, for the species and will **never** have any frogs occupy it.

While the Act requires the Service to designate "critical habitat" for protected species, it also expressly requires that "critical habitat" be limited to those areas that are "essential to the conservation of [a] species." The Act also prohibits the Service from designating as habitat lands that were not occupied by a species at the time it is listed under the Act as "endangered". Yet, with the Dusky Gopher Frog, the Service has now decided that areas unoccupied by the frog currently and at the time of its listing as an "endangered species" in 2001 (and that will never by occupied by it in the future), and that are manifestly unusable as frog habitat (and will never be

---

[2] The other undivided owner of the 1,544 acres in Unit 1 is  Markle Interests, LLC ("Markle"), which is separately represented by The Pacific Legal Foundation.

[3] See, Pacific Legal Foundation Demand letter: http://www.pacificlegal.org/document.doc?id=677 ; press release: http://www.pacificlegal.org/releases/Feds-leapt-over-the-law-in-grabbing-private-property-for-Dusky-Gopher-Frog; and blog post: http://blog.pacificlegal.org/2012/washington-epidemic/

[4] For more on this "new and different species", and how the Service's failure to properly list it under the ESA before adopting the Rule fatally impacts the Rule, see item 9, pages 27-29 below.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

used or usable by it in the future), are its Critical Habitat. Common sense and the ESA dictate a different conclusion.

The Service admits that Unit 1, which is almost entirely family-owned Poitevent Landowners and Markle, is unoccupied by the Dusky Gopher Frog and is unusable as its habitat. The Service also knew before it issued the Rule that the land was unoccupied when the ESA became law in 1973, when the frog was listed in 2001 and when the notice of proposed rulemaking was issued in 2011, and that it would never be occupied by the frog and become usable habitat for the frog in the future. Yet, it issued the Rule anyway, "hoping" that the tree landowners who collectively own the 1,544 acres in Unit 1 (the Poitevent Landowners, Markle and Weyerhaeuser) would then knuckle under to the Service's coercion after they realized there would be no realistic chance of ever developing any of the lands in Unit 1 as the Service had already announced that it would veto them, all of which is explained in more detail in item 4, pages 20-23 below.

As the Poitevent Landowners' land in Unit 1 contains neither the frog nor the necessary elements to sustain the frog (and it will never contain either the frog or its habitat), it cannot by definition and common sense lead to the conservation of the frog; nor will the Rule do so simply by designating the land in Unit 1 as the frog's habitat. Moreover, the Service has also acknowledged, as it must, that it cannot compel the Poitevent Landowners to change the landscape of their lands so that they include all three required elements of the frog's habitat or to require the Poitevent Landowners to reintroduce the frog to their lands.[5] Nevertheless, the Service designated the 1,544 acres of private land in Unit 1 as "critical habitat" for the frog based on the false, one-sided hope--which was only communicated to the Poitevent Landowners and Markle **after** the Rule was issued--that the 1,544 acres might somehow, someday, some way become a "conservation bank" and then be populated by the frogs, and then somehow, someday, some way be physically transformed (by whom and paid for by whom is unknown) into "essential" habitat for the frog.

The only way to make the lands in Unit 1 suitable for frog habitat is through regular controlled burns and revegetation--things that the Service admits and knows that it cannot mandate on private land and that it also knows the Poitevent Landowners will not and cannot do. These regular burns will cause air pollution and drive away other species, as well as destroy the value of Unit 1, the Poitevent Landowners' adjoining lands and will additionally endanger the lives and property of others. The Poitevent Landowners also cannot convert their land to frog habitat or allow the frog to be moved to the 1,544 acres because doing so will force them to breach their timber contract with their timber lessee, Weyerhaeuser.

---

[5] The Poitevent Landowners told Service representatives **before** the Rule was issued on a number of occasions and in their comments objecting to the issuance of the Rule that they would not allow their lands to be turned into a conservation habitat for the frogs and allow frogs to be moved there. The Service ignored these warnings and issued the Rule in spite of them.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

The aerial map of the 1,544 acres prepared by the Service and attached hereto as Exhibit "B" plainly shows that LA Highway 36 runs through the land, and that Unit 1 is located only a few miles to the west of the town of Pearl River, LA, which has experienced great growth over the last decade or more. Burning the land will thus create a very real life-threatening event for drivers on Highway 36 and the inhabitants of Pearl River.

Moreover, the cost of the Service's mandate that the Poitevent Landowners' land be burned periodically to control the (non-existent) frogs' habitat on their land, and the burden of doing so, will also destroy all economic value in the Unit 1 lands and the Poitevent Landowners' adjacent lands. The Service has no intention of paying for any of this or compensating the Poitevent Landowners for any of these damages.

And for what reason has the Service required that Unit 1 be burned? To support land on which the frogs do not exist and which does not contain their habitat, and which will never contain either the frog or its habitat? The mere statement of these questions shows how very wrong including Unit 1 in the Rule is.

The Service has calculated that the economic impact of designating this unusable, unoccupied area of 1,544 acres as "critical habitat" will cost the Poitevent Landowners some $34+ million.[6]  To add insult to injury, the Service then absurdly proclaimed that its own economic analysis of damages and costs that the Poitevent Landowners would incur in connection with the Rule "did not identify any disproportionate costs that are likely to result from the designation." (Emphasis added.) Thus, in the Service's warped view, imposing a $34+ million burden primarily on a single family (the Poitevent Landowners) when Unit 1 provides no benefit to the species (and never will as the frog does not now, and never will, occupy the land), and where the habitat that is "essential" for the survival of the species does not exist, isn't a disproportionate cost on the Poitevent Landowners for one reason-- and one reason alone: because the Service says there isn't one.  Such callous, unsupported, arbitrary, capricious and reckless disregard for the obvious consequences of agency decision-making cannot be tolerated in a free and an orderly society such as ours.

Given the foregoing, under the Service's startlingly wrong and distorted interpretation of its powers under the ESA, the Service can now designate **any land anywhere** with **no** species on it and **no** habitat to support it as "critical habitat", hoping that somehow, some day, some way the species might reappear on it and the land would then somehow be transformed to meet the species' requirements, This interpretation of the Service's powers under the ESA shows a gross

---

[6] This huge cost to the Poitevent Landowners also did **not** include the certain economic devaluation of the Poitevent Landowners' adjacent lands, take into account the obvious damages the Poitevent Landowners would incur by breaching their timber lease with Weyerhaeuser or account for the clear danger to life and property in Pearl River, LA or  the real danger to drivers on LA Highway 36, all of which will occur if the Poitevent Landowners lands in Unit 1 must be burned. These are very real costs.

Page 4

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

misunderstanding of the limits imposed on the Service that is far outside the Act's meaning or intent.

For these reasons and those set forth below, the Rule is an unprecedented, unconstitutional, unwarranted and illegal expansion of the Endangered Species Act and is contrary to the Service's rules and regulations thereunder, and is also an improper, arbitrary and capricious action by the Service under the Administrative Procedure Act, 5 U.S.C. 500, *et seq.* Therefore, the Service must revise the Critical Habitat designation for the Dusky Gopher Frog to exclude Unit 1 from the Rule.

## NATURE OF THE CHALLENGE

### 1.     The Service Failed To Make the Threshold Determinations Required for Critical Habitat Designation

Critical Habitat is defined in the ESA as those areas "essential to the conservation of the species." 16 U.S.C. § 1532(5). In turn, the ESA defines "conservation" as the use of all methods and procedures necessary to bring a "threatened" or "endangered" species to "the point" at which the protections of the Act are no longer required. 16 U.S.C. § 1532(3).

The Act does not define "essential"[7], but it is axiomatic that, to determine what is "essential to the conservation of the species," the Service must first identify "the point" when a particular species is not "threatened" or "endangered." In turn, that point can be identified only if and when the Service identifies a viable population size and the minimum habitat necessary to sustain that population. Yet, the Service has failed in the Rule to either identify a viable population for the Dusky Gopher Frog or to find the minimum habitat needed to sustain that population on Unit 1.

In the case of Unit 1, the Service concludes in summary, unsupported fashion that Unit 1 is "essential to the conservation of the species" as it **might** someday contain the ESA's required three Primary Constituent Elements ("PCEs") that are the frog's habitat (and the frog itself). Yet, even the Service cannot validly claim that all areas that contain the frog's three PCEs are "essential to the conservation of" species. Moreover, what is "essential to the conservation of the species" is also a function of a viable population, which the Service has also utterly failed to determine.

The practical effect of the Service's failure to determine a viable population and minimum habitat size is that the Service cannot then determine which areas are "essential to the conservation of the species" and whether the designation of Unit 1 is required.[8] In this case, there

---

[7] Dictionary.com defines "essential" as "absolutely necessary; indispensable." http://dictionary.reference.com.

[8] See 50 CFR. § 424.12(e) ("[t]he Secretary shall designate as Critical Habitat areas outside the geographical area presently occupied by a species only when a designation limited to its present range would be inadequate to ensure

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

are no facts found in the Rule from which to draw a rational connection as to the size or location of the Critical Habitat area in Unit 1, or that it is "absolutely necessary [and] indispensable" to the conservation of the Dusky Gopher Frog.[9] Thus, as these threshold determinations are entirely missing from the Rule, it was improperly issued under the ESA and is illegal, arbitrary and capricious and therefore violates the Administrative Procedure Act.

## 2.    No PCEs

Pursuant to §4 of the ESA, the Service must designate Critical Habitat on the basis of the "best scientific data available . . . after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. §1533(b)(2). Even if otherwise justified, the Secretary of Interior may nevertheless exclude an area from designation "if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as critical habitat, unless he determines ... that the failure to designate such area as Critical Habitat will result in the extinction of the species concerned." *Id.*; 50 CFR §424.19.

In making a Critical Habitat designation, the Service "shall consider those physical and biological features that are essential to the conservation of a given species and that may require special management considerations." 50 CFR §424.12(b); 16 U.S.C. §1532(5)(a). Those features include (1) space; (2) food, water, air, light, minerals, or other nutritional or physiological requirements; (3) cover or shelter; (4) breeding and nesting sites; and (5) habitats protected due to their historic geographic or ecological distribution of the species. 50 CFR §424.12(b)(1)-(5).

The Service is also directed "to focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species." 50 CFR §424.12(b). "Known primary constituent elements may include . . . roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dry land, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types." Id.

In addition, in order to properly designate Critical Habitat outside of the geographic area that was occupied by a species at the time of its listing, the Service must document that the area is "essential" to the conservation of the species. 16 U.S.C. §1532(5)(b). The Service acknowledges that Unit 1 was not occupied at the time of listing (2001) and remains unoccupied today. 76 FR 59783.[10]

---

the conservation of the species.").

[9] Indeed, the conclusion that Unit 1 is "essential to the conservation of the" frog is shown to be absurd when one realizes that the three PCEs for the frog's very existence and the frog itself are no longer on Unit 1 and never will be. Unit 1 cannot possibly be "essential to the conservation of the" frog in these circumstances.

[10] As noted below in more detail, Unit 1 contains none of the PCEs of the frog's habitat. Thus, it cannot be validly

Page 6

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

Based on the administrative record for the Rule and related materials made available by the Service, Unit 1 does not meet the minimum mandatory statutory criteria for Critical Habitat designation. Unit 1 contains none of the PCEs of the Dusky Gopher Frog's habitat, and is and will remain subject to adverse impacts identified by the Service as significant threats to habitat, with the result that Unit 1 will continue to remain a very unfavorable habitat for the frog in the future.

A.   **Unit 1 Does Not Have any PCEs for the Dusky Gopher Frog, and Will Have None in the Future, Based on Service-Identified Threats to the Dusky Gopher Frog's Habitat.**

"The Service may not statutorily cast a net over tracts of land with the mere hope that they will develop PCEs and be subject to designation." *Cape Hatteras Access Preservation Alliance v. U.S. Dept. of Interior,* 344 F. Supp.2d 108, 122 (D.C.C. 2004).

The Secretary does not have unfettered discretion to designate any or all unoccupied areas as Critical Habitat. Rather, as noted, in order to be properly designated, unoccupied areas must be "essential for the conservation of the species." 16 U.S.C. § 1532(5)(ii). In turn, this mean areas that contain those physical and biological features that are "essential to the conservation of the species", which are the frog's PCEs.

The Service requires that land have the three following PCEs for the Dusky Gopher Frog:

1)   ephemeral wetland habitat;

2)   upland forest non-breeding habitat; and

3)   upland connectivity habitat.

*See,* 77 Fed. Reg. 35131.

The Service maintains that these three PCEs are "essential to the conservation of the species." By definition, therefore, **all three** PCEs must be present for an area to qualify as "essential." If an area is designated as Critical Habitat that contains fewer than all identified

---

claimed that Unit 1 lands (and they alone in the State of Louisiana or elsewhere) are "essential to the conservation of the species". If that were true, then all land in the State of Louisiana (indeed, in the entire United States), wherever situated, is "essential" for the frog's conservation. But, because this conclusion creates an intolerably vast, unprecedented and unwarranted expansion of the ESA, and because the Service cannot prove that all areas in the State of Louisiana or elsewhere are "essential" to the frog's conservation, Unit 1 then is also not "essential" for its conservation. Simply put, why is Unit 1 any more "essential" to the frog's conservation than any other land in Louisiana, or indeed elsewhere, that either has or does not have the frog's three PCEs? And how can Unit 1 "absolutely necessary [and] indispensable" to the conservation of the Dusky Gopher Frog if it has none of the frog's PCEs? The Service's targeting of Unit 1 is thus exposed as utterly illogical, arbitrary and capricious.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

PCEs, then the area is incapable of serving the conservation goals of the species because essential elements to that goal are absent.

As a general proposition, the presence of the requisite PCEs is a predicate to designation of critical habitat. As the *Cape Hatteras* court noted:

> That PCEs must be "found" on an area is a prerequisite to designation of that area as critical habitat. The Service's argued-for interpretation, essentially that designation is proper merely if PCEs will likely be found in the future, is simply beyond the pale of the statute. 344 F. Supp. 2d 108, 123 (emphasis added).

The Service acknowledges, however, that Unit 1 does **not** "contain sufficient PCEs to support all of the life-history functions essential for the conservation of the species." 76 FR 59780. Specifically, the Service notes that PCEs 2 and 3 are **not** currently present within Unit 1; that is certainly a correct conclusion, as discussed below.

The Service is somewhat less clear in its discussion of the characteristics required for PCE 1, but a careful review of the facts in the record shows that PCE 1 is also absent from Unit 1.[11] Accordingly, as the three required PCEs for the frog are not present in Unit 1, the Rule violates the requirements of the ESA and is also arbitrary and capricious and in violation of the Administrative Procedure Act.

It is also significant that many primary threats to frog habitat that are identified by the Service on the land in Unit 1 will continue to operate within Unit 1 over time, so that many elements of all three PCEs will decline further in terms of habitat "suitability" over time. The Service cannot prevent these threats from occurring, and yet it deems the land in Unit 1 to be "essential" for the frog's conservation.

The Service's summary description of the biological and physical environment that gopher frogs require illustrates these threats and demonstrates vividly why Unit 1 is utterly unsuitable Dusky Gopher Frog habitat:

> [Dusky] gopher frogs are terrestrial amphibians endemic to the longleaf pine ecosystem. They spend most of their lives underground in forested habitat consisting of fire-maintained, open-canopied woodlands historically dominated by longleaf pine (naturally occurring slash pine . . . in wetter areas).

***

---

[11] At 76 FR 59780, the Service says "[Unit 1] contains one primary constituent element (ephemeral wetland habitat)." However, the Notice does not address whether the essential characteristics of PCE 1 are present or absent, and focuses primarily on the existence of ponds. As is discussed below, the Unit 1 ponds are not "ephemeral" and thus PCE 1 is also not present.

Page 8

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

> Historically, fire tolerant longleaf pine dominated the uplands; however, much of original habitat has been converted to pine (often loblolly ... or slash pine) plantations and has become a closed-canopy forest unsuitable as habitat for gopher frogs.

76 FR 59777.

This pattern of land transformation is true for Unit 1. The open-growth natural longleaf forests that formerly occupied the land disappeared from Unit 1 many decades ago, before the ESA was enacted and before the Poitevent Landowners' and Markle's timber lease with Weyerhaeuser's predecessor was executed in 1953.[12]

After a period of management for slash pine pulpwood, most of Unit 1 was planted with loblolly pine. Today, approximately 90% of Unit 1 is devoted to loblolly pine plantations ranging from recently-replanted to 31 years old. Overall, the pine plantations on Unit 1 average about 290 trees per acre (or, roughly one every 12.2 feet). Almost half of the plantations are less than 5 years old (*i.e.*, they are post-Hurricane Katrina plantations) and contain over 400 trees per acre. In sum, Unit 1 is dominated by a combination of closed canopy loblolly forest, and younger plantations that will very quickly grow into a closed canopy of trees, which the Service concludes is antithetical to the frog's existence.[13]

Without the presence of PCEs in Unit 1 sufficient to support the life cycle of the Dusky Gopher Frog, the frog cannot survive there. The Service thus lacks a sound legal basis under the ESA for Critical Habitat designation of Unit 1, which requires both that the species' PCEs be present, and that the Service demonstrate that its designation as Critical Habitat is "essential" for the frog's conservation.

### (i)     Lack of PCE Element 1 -- ephemeral wetland habitat.

Dusky Gopher Frogs need geographically isolated breeding ponds that are small, "ephemeral' and acidic. 76 FR 59779. The following physical characteristics for land suitable for frog habitat are also necessary: (a) an open canopy with emergent herbaceous vegetation for egg attachment; (b) absence of large predatory fish; (c) high water quality; and (d) surface water that lasts for a minimum of 195 days during the breeding season. *Id.*

### (a)     Ponds

As the Poitevent Landowners understand it, the Service considers that five ponds within Unit 1 as posing potential for rehabilitation - Hyla Pond, Amy's Pond, Sevosa Pond, Small Pond

---

[12] For more on the significant change in the status of the land based on the Service's own conclusions, see footnote 45, page 23.

[13] See also, comments of counsel for Weyerhaeuser, in the administrative record of Docket No. FWS-R4-ES-2010-0024 which may be viewed at www.regulations.gov.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

and Dry Pond. All of these ponds have been altered to one degree or another in recent decades and do not appear to constitute suitable habitat for the Dusky Gopher Frog at this time, as follows:

(i) Hyla Pond does not have an open canopy; canopy closure was measured in 2003 as 74%,[14] and 77% in 2005.[15]

(ii) Amy's Pond, bordered by two paved roads was recently noted as being very deep (12 feet), suggesting that its hydro-period may have been altered and is unsuitable for Dusky Gopher Frog habitat. Amy's Pond also does not exhibit an open canopy - canopy closure was measured in 2003 at 74%,[16] and had increased by 2005 to 85%.[17]

(iii) Sevosa Pond is adjacent to a hunt club, and a portion of the pond has been deepened significantly, and has been used for crawfish production. In 2003, it was measured to have 85% canopy closure.[18]

(iv) Small Pond was bedded following the post-Hurricane Katrina harvest operation and planted to loblolly pine. While the pine seedlings did not survive within the pond perimeter, the bedding likely will affect pond hydrology and will also no doubt lead to rapid reestablishment of hardwoods in this pond.

(v) Dry Pond was likewise bedded and will also be likely quickly closed in by hardwoods.

Notably, Chinese tallow tree (Sapiurn sebifera) , an invasive species that can negatively impact native vegetation, has established itself at all five of the ponds, along with several other hardwood tree species.[19]

Currently, all of these ponds are surrounded by loblolly pine plantations (not the longleaf pine trees the frog need to survive), mostly of post-Hurricane Katrina vintage. As these stands grow taller and denser, they will increasingly affect the ponds by creating more and deeper

---

[14] N. Leonard et al, Survey for Critically Imperiled (S1) Pond=Breeding Amphibians in St. Tammany Parish, Louisiana, June 2003 ("Leonard (2003)").

[15] J. Pechmann et al., Survey for Critically Imperiled (S1) Pond=Breeding Amphibians in St. Tammany Parish, Louisiana, June 2006 ("Pechmann (2006)").

[16] Leonard (2003).

[17] Pechmann (2006).

[18] Leonard (2003).

[19] Pechmann (2006).

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

shade, further reducing the ability of herbaceous vegetation to maintain itself in the ponds and around their margins. This is supported by other data in the record that indicate high canopy closure and low or absent herbaceous vegetation in various ponds embedded within older pine plantations.

**(b)     The Ponds Are Not "Ephemeral"[20]**

The FWS fails to demonstrate that the ponds on Unit 1 currently have a hydro-period suitable for Dusky Gopher Frog reproduction and are thus not "ephemeral"[21] as the Service has claimed. Yet, an appropriate hydro-period is stated by the Service to be a key element of PCE 1 (a minimum of 195 days but not permanent so as to support predatory fish (*e.g.*, bluegill and bass).[22] The growth of pine plantations surrounding the ponds will further reduce the hydro-period, particularly of the smaller ponds, as bedded pine plantations have considerable ability to transpire water as they grow.

---

[20] In its listing decision describing an existing frog breeding site in Mississippi, which generally can be used to describe the criteria used for the Critical Habitat decision in the Rule, the Service noted as follows:

> The Mississippi gopher frog breeding site is an isolated pond (not connected to any other water body) that dries completely on a cyclic basis. Faulkner (unpub. data 2000) recently conducted hydrologic research at the site. He described the pond as a depressional feature on a topographic high. The dominant source of water to the pond is rainfall within a small, localized watershed that extends 61 to 122 meters (m) (200 to 400 feet (ft.)) from the pond's center. Substantial winter rains are needed to ensure that the pond fills sufficiently to allow hatching, development, and metamorphosis (change to adults) of larvae. The timing and frequency of rainfall are critical to the successful reproduction and recruitment of Mississippi gopher frogs.....Adult frogs move to this wetland breeding site during heavy rain events, usually from January to late March (Richter and Seigel 1998b). The breeding pond is approximately 1.5 hectares (3.8 acres) when filled. It attains a maximum depth of 1.1 m (3.6 ft.). The pond is hard-bottomed, has an open canopy, and contains emergent and submergent vegetation. Female Mississippi gopher frogs attach their eggs to the rigid vertical stems of emergent vegetation (Young 1997,Richter and Seigel 1998a, 1998b).

See, Federal Register , Vol. 66, No. 233, Tuesday, December 4, 2001, page 62994.

[21] "Ephemeral" means " lasting a very short time; short-lived; transitory". See http://dictionary.reference.com

[22] The Rule notes the following on the critical nature of pond ephemerality in order to support frog life: "[P]onds have to hold water long enough to allow for tadpole development and metamorphosis, but if they hold water too long they become permanent ponds and no longer have value for ephemeral pond-breeding amphibians." 77 FR 35118-01, 2012 WL 2090270 (F.R.), page 11.

See, also, Thurgate, Nicole, "The Ecology of the Endangered Dusky Gopher Frog (Rana Sevosa) and a Common Congener, the Southern Leopard Frog (Rana Sphenocephala)" (2006), page 5. University of New Orleans Theses and Dissertations. Paper 433. http://scholarworks.uno.edu/td/433 ("R. sevosa... breed in semi-permanent or ephemeral wetlands that regularly dry completely (Semlitsch et al. 1995, USFWS 2001, Jensen et al. 2003). Ponds are generally hard-bottomed, open canopy and contain emergent and submerged vegetation (USFWS 2001). Ponds fill in late winter or early spring when gopher frog breeding occurs and dry in mid to late summer (Palis 1998).") (Emphasis added.)

Page 11

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

Other than its mere conclusory statements that the ponds are "ephemeral", the Service has utterly failed to show by any evidence in the record in the Rule that any of the noted ponds is truly "ephemeral" so that it will support the frog. In fact, the record contains no evidence that the ponds are ephemeral, and the Service could not possibly have proven this to any degree of scientific or legal certainty on its one-day site visit to Unit 1 in March 2011.

Conversely, the Service's own conclusions and data show that the ponds are **not** "ephemeral", but permanent. The Rule itself leads to this conclusion, as follows:

In Louisiana, the dusky gopher frog was last observed in 1965. The Service visited the area of historic dusky gopher frog occurrence in St. Tammany Parish, Louisiana, and conducted a habitat assessment in March 2011. The area is managed for timber by a company conducting industrial forestry. Although the surrounding uplands are poor-quality terrestrial habitat for dusky gopher frogs, we visited at least five ephemeral ponds, including the last known record of the species in Louisiana. These ponds were intact… This same area was surveyed for gopher frogs in the 1990s and 2000s. During those visits, the ephemeral ponds were considered similar in appearance (water clarity, depth, vegetation) to ponds in Mississippi used for breeding by the dusky gopher frog (Thomas and Ballew 1997, p. 6; Leonard et al. 2003, pp. 7-8; Pechmann et al. 2006, pp. 8, 10). Our observations in 2011 indicated the Louisiana ponds were little changed from the descriptions provided by the previous surveyors. 77 FR 35118-01, 2012 WL 2090270 (F.R.), page 27 (Emphasis added.)

The "ephemeral" nature of the Unit 1 ponds is a critical and key element of PCE 1.[23] If the ponds were (to quote the Service) "intact" in 2011, and they were "little changed from the descriptions provided by the previous surveyors" during the "other surveyors' visits" in the 1990s and 2000s, it can only be concluded that they have remained intact during all of these periods and have not dried up annually, unless the Service proves in the Rule that the ponds "fill in late winter or early spring when gopher frog breeding occurs and dry in mid to late summer". The Service simply cannot prove-- and has not proved-- that the Unit 1 ponds are "ephemeral" as the record is devoid of any factual or analytical support whatsoever to show this. It has thus completely failed to prove that the ponds have the required filled hydro-period and dry pattern on an annual basis.[24] Moreover, the previous evidence seen on the Service's site visit is to the contrary, and the record is devoid of any showing that the ponds filled in late winter or early spring and then dried up entirely in the summer of any intervening year when others visited the site in the 1990s and 2000s and the Service's visit in March 2011.

---

[23] See 77 FR 35118-01, 2012 WL 2090270 (F.R.), pages 49 and 50.

[24] The Service's site visit to Unit 1 was for **one day** in March 2011 (see, photographs of Service visit to Unit 1 in March 2011, attached as Exhibit "C"). The Service apparently has never determined if the ponds dried up in the late summer of 2011 nor is it evident from the record that the ponds had a similar hydro-period on prior visits or in the intervening years by the other surveyors. The Service just assumes this pattern of pond ephemerality, but it cannot do so and still maintain that it used the "best scientific data."

Page 12

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

Ironically, as the frogs require "ephemeral" ponds to support their very existence on Unit 1, the absence of the frogs from Unit 1 **proves** that the ponds are **not** "ephemeral." Were the ponds actually "ephemeral", it is likely that the frog may still occupy the land. But they do not. The frogs are gone from Unit 1 and so is their habitat. The ponds on Unit 1 are, then, not "ephemeral" as they apparently have existed on the land in their present state since at least the 1990s and 2000s by the Service's own admission.[25]

As the ponds on Unit 1 are not "ephemeral", and the "ephemeral" nature of the ponds is a necessary element of the frog's habitat, the Rule was improperly issued under the Act and is also arbitrary and capricious under the Administrative Procedure Act, as far as it concerns Unit 1.

### (c)    Conclusions on PCE 1

In conclusion, both the landscape of Unit 1 and the permanency of the ponds mean that there is unsuitable habitat on Unit 1 for the Dusky Gopher Frog and that of its required PCEs are utterly lacking at the site and will remain so. The only logical conclusion to be drawn from the data in the record is that, while there are ponds located within Unit 1, they are not "ephemeral", and the terrain landscape will require a virtually wholesale make-over as well as extensive and intensive management efforts focused on Dusky Gopher Frog habitat characteristics at the ponds as well as the surrounding forests.[26] The Rule was therefore improperly issued under the Act and is also arbitrary and capricious under the Administrative Procedure Act, as far as it concerns Unit 1.

### (ii)    Lack of PCE Element 2 -- upland forested nonbreeding habitat

This element requires forests surrounding the open-canopied breeding ponds that were historically dominated by longleaf pine that are "maintained by fires frequent enough to support an open canopy and abundant herbaceous ground cover and gopher tortoise burrows, small mammal burrows, stump holes, or other underground habitat." 76 FR 59779. These conditions and management regimes provide habitat needed by the Dusky Gopher Frog during its nonbreeding seasons. As the Service notes, the absence of prescribed fire (and there is presently no fire-management of the lands and never will be for the reasons noted elsewhere) will permit

---

[25] This conclusion further belies the Service's oft-asserted mantra in the Rule that it used the "best scientific data available" as required by the Act. This did not happen, or the Service was either so eager to include Unit 1 as Critical Habitat for the frog to get the Center for Biological Diversity off its back under the lawsuit the Center filed to find habitat for the frog and the Consent Decree it signed (see item 9, pages 27-29 below), or it was so blind to its own data for Unit 1 that it ignored this critical point. This crucial mistake further calls into question the viability of any of the so-called "best scientific data available" underlying all conclusions made by the Service to support the Rule, at least insofar as concerns Unit 1. See 77 FR 35118-01, 2012 WL 2090270 (F.R.), page 26 ("As required by section 4(b)(1)(A) of the Act, we use the best scientific and commercial data available to designate critical habitat.")

[26] The Poitevent Landowners assume that this will mean a total transformation of the ponds by completely draining them periodically during each year as well as a transformation of the terrain to include the.. (continued on next page) the two other PCEs. Who will pay for this and how it will be done and managed later are unstated by the Service.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

continued encroachment by hardwood species. Encroachment will then accelerate as the hardwoods further dominate the pond sites. See 76 FR 59780.

The vast bulk of Unit 1 has been in intensive plantation management since at least 1953, growing loblolly or slash pine (currently, loblolly only), not longleaf pine. All five ponds are surrounded by bedded pine plantations, many established in 2007 or 2008 (post-Hurricane Katrina). In its listing decision for the Dusky Gopher Frog, the Service also identified clear-cut timber harvesting and bedding as two practices likely to disturb or destroy burrows and underground habitat. 66 FR 62997-98. Thus, in the areas surrounding the five ponds, the pine forests do not qualify as constituting PCE Element 2, as the Service acknowledges. The Rule was therefore improperly issued under the Act and is also arbitrary and capricious under the Administrative Procedure Act, as far as it concerns Unit 1.

### (iii)    Lack of PCE Element 3 — upland connectivity habitat

PCE Element 3 involves the suitability of the habitat between the ponds and underground burrows to facilitate movement between breeding habitat and non-breeding habitat. That habitat, too, must have an open canopy with "abundant herbaceous species and subsurface structure which provides shelter for Mississippi gopher frogs during seasonal movements, such as that created by deep litter cover, clumps of grass, or burrows." 76 FR 59780. As noted above, the pine stands within Unit 1 — particularly those around the five ponds-- have high "tree per acre" counts, and will quickly form closed canopies. Closed canopies will then limit development of significant herbaceous ground cover.

The Service has acknowledged the failure of Unit 1 with respect to the characteristics of PCE Element 3. As the pine plantations grow in the future, conditions will move further away from what would constitute PCE 3. The Rule was therefore improperly issued under the Act and is also arbitrary and capricious under the Administrative Procedure Act, as far as it concerns Unit 1.

### B.    The Service's Requirement to Burn The Lands in Unit 1 Is Untenable

It is undisputed from the record for the Rule that "[f]requent fires are necessary to maintain the open canopy and ground cover vegetation of their **aquatic and terrestrial** habitat." 76 FR 59775 (emphasis added). This is further supported by the Service's statement that ". . . fire is the **only** known management tool that will maintain the existing breeding pond as suitable habitat."[27] for an existing Dusky Gopher Frog breeding pond in Mississippi.

Although the Service may believe that the use of prescribed fire in and around the breeding ponds is **essential** to maintain the required open tree canopy around the ponds, in order to permit the continued growth of herbaceous vegetation for Dusky Gopher Frog egg

---

[27] 66 FR 62999 (emphasis added).

Page 14

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

attachment and thus successful reproduction, fires cannot be used on the land for the following reasons:

1. Weyerhaeuser does not presently use or plan to use prescribed fire as a forest management tool in this area.[28] Fire is simply not a standard management tool used by Weyerhaeuser in growing saw timber plantations such as exist on Unit 1.

2. Unit 1 is divided by Louisiana Highway 36 and is located only a few miles from its intersection with Louisiana Highway 41, where the growing town of Pearl River, LA is located. Burning the land is certain to create smoke-related liability and health issues that make prescribed burnings of Unit 1 a highly impracticable, risky requirement venture for the private landowners. It also poses health and safety concerns to our neighbors and the public travelling these highways.

3. Due to the proximity of Unit 1 and the Poitevent Landowners' lands around it to the growing town of Pearl River, LA,[29] development of the lands in Unit 1 and the Poitevent Landowners' adjacent lands is very likely, so cost, smoke management and liability concerns will only increase over time, making it very unlikely that this property will ever be successfully burned at a frequency necessary to keep the ponds and near-pond habitat open. These types of problems were noted in the listing decision with respect to Dusky Gopher Frog habitat on the DeSoto National Forest in Mississippi (see 66 FR 62999), and would be a serious concern if one were attempting to regularly burn Unit 1. These concerns affect all three PCEs.

4. Forcing Weyerhaeuser to burn the lands according to the Service's requirement will cause the Poitevent Landowners to breach their existing long term timber contract with Weyerhaeuser.

The Service ignored all of these facts in connection with issuing the Rule and in the EA developed for it. Its requirement that fire must be used to maintain the frog's habitat is, and will continue to be, utterly incompatible with the land and the surrounding area. The Rule was therefore improperly issued under the Act and is also arbitrary and capricious under the Administrative Procedure Act, as far as it concerns Unit 1.

**C.    Conclusions on PCEs**

In conclusion, Unit 1 does not contain any of the three PCEs to qualify for consideration as Critical Habitat. Instead, about the most that can be said about Unit 1 (as is also true for countless other acres in the US) is that it has the "potential" for rehabilitation back into Dusky

---

[28] See, comments of counsel for Weyerhaeuser in the administrative record of Docket No. FWS-R4-ES-2010-0024 which may be viewed at www.regulations.gov.

[29] See, FWS aerial map attached as Exhibit "B".

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

Gopher Frog habitat. But, the presence of three merely "potential" PCEs does not rise to the level of three actual PCEs. And even the "potential" for the three PCEs is greatly qualified by the fact that the five ponds on Unit 1 are permanent, and by the existence of the bedded pine plantations on the lands-- along with the absence of any fire required for the Critical Habitat to be maintained-- will prohibit the land in Unit 1 from ever becoming suitable Critical Habitat for the frogs.

Absent the existence of the requisite three PCEs, especially the only one that the Service believes is present on Unit 1, but is not (PCE 1-- the five so-called "ephemeral" ponds), the Service incorrectly designated Unit 1 as Critical Habitat for the Dusky Gopher Frog. The Rule was therefore improperly issued under the Act and is also arbitrary and capricious under the Administrative Procedure Act, as far as it concerns Unit 1.[30]

### 3.    Additional Reasons Why Unit 1 is Not "Essential" to the Conservation of the Dusky Gopher Frog

As noted, the Service acknowledges that Unit 1 is not currently occupied by the Dusky Gopher Frog and was not occupied at the time of its listing.[31] The data indicate it is most likely that Unit 1 has not been occupied by the Dusky Gopher Frog since at least the 1960s, based on historic Dusky Gopher Frog detections and the history of timber management on the property.[32] Accordingly, as of the listing of the Dusky Gopher Frog on December 4, 2001, Unit 1 was "outside of the geographical area occupied by the species"[33]. Accordingly, Unit 1 only be designated as Critical Habitat "upon a determination by the Secretary [of Interior] that such area ... [is] essential for the conservation of the species." 16 U.S.C. §1532(5)(A)(ii).

The Notice of Proposed Rulemaking for the Rule confirms that the "essential to conservation of the species" test is the applicable standard for a lawful designation of Unit 1 as frog Critical Habitat. 76 FR 59776. Recent caselaw underscores the applicability of this standard and the Service's obligation to establish that the standard is met and supported by the record.

Congress intended that the Service "be circumspect" in the designation of unoccupied critical habitat. *Arizona Cattle Grower's Ass'n U. Salazar*, 606 F.3d 116o (9th Cir.

---

[30] In the most ironic and illogical twist of all, the Secretary apparently believes that land that was "occupied at the time the frog was listed" must have **all three PCEs**, but "unoccupied areas" (such as Unit 1) need have **only one PCE** to qualify as Critical Habitat. But, even that lone PCE is not present on Unit 1. This absurd conclusion shows how deeply flawed the Rule is.

[31] See Rule, Table 1, 77 FR 35118-01, 2012 WL 2090270 (F.R.), page 29 and page 31.

[32] The FWS indicates that the last documented detection of a Dusky Gopher Frog on Unit 1 was in 1965. 76 FR 59783. See also Exhibit "D".

[33] St. Tammany Parish is at the extreme edge of the historic range of the Dusky Gopher Frog. Pechmann (2006).

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

2010), fn 5. To that end, the designation of unoccupied habitat as critical is a more demanding, onerous exercise than that applicable to the designation of occupied habitat. 606 F. 2d 1160, 1163; *Home Builders Ass'n of Northern California v. U.S. Fish & Wildlife Service,* 616 F.3d 983, 990 (9th Cir. 2011). And, as noted by the D.C. Circuit Court of Appeals in Otay *Mesa Property v. U.S.,* 646 F.3d 914, 918 (D.C. Cir. 2011), where the Service believes a property "is 'essential for the conservation of the species,' then it must say so in its agency decision and justify that determination" (emphasis added).

In addition, by regulation, the Service has limited itself to designating Critical Habitat only "in areas outside the geographic area occupied by the species only when a designation limited to its range would be inadequate to ensure the conservation of the species." 50 CFR § 424.12(e); 76 FR 59776. Thus, to properly support designation of Unit 1 as Critical Habitat, the FWS must have shown the two following things in the Rule:

> 1) designation of all areas within the species' range as of the time of listing is inadequate to ensure conservation of the Dusky Gopher Frog; and

> 2) in selecting Unit 1 as an area outside its "as-of-listing" range to be designated, the Service must show that designation of Unit 1 is essential.

While the Notice of the proposed Rule duly states the conclusion that Unit 1 is essential for the conservation of the Dusky Gopher Frog (76 FR 59783), this conclusory statement is, however, devoid of any factual or analytical support whatsoever. The Service is thus compelled to base its Critical Habitat decision here on the "best scientific data available." While it may not necessarily be compelled to collect any particular additional data in a particular case, as admonished by the *Otay Mesa* Court, "the absence of a requirement for the Service to collect more data on its own is not the same as an authorization to act without data to support its conclusions, even acknowledging the deference to agency expertise." 646 F. 3d at 918.

That is precisely the Service's dilemma here. As noted above, the Service failed in the Rule to create a scientifically-based recovery plan for the frog to guide it and to perform a demographic analysis of the viability of the Dusky Gopher Frog populations that could be implemented in other areas covered by the Rule. Thus, the Service has no basis (scientific or otherwise) for its conclusion that, without Unit 1, the frog cannot be conserved (recovered). It is thus reduced to making the oft-proffered, tautological argument that "more can only he better than less." That, the Poitevent Landowners submit, is a legally insufficient basis to conclude that Unit 1 is "essential" for the frog.

The Service explains in the Rule that the addition of Unit 1 and expansion of the Critical Habitat designation in its revised proposal was based on peer review and public input.[34] Peer reviewer Joseph Pechmann opined that designating critical habitat in Louisiana and Alabama

---

[34] See, 76 FR 59776.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

was "essential" in his view. However, his actual conclusion is that designating additional areas is essential to reducing the risks to the Dusky Gopher Frog. Setting aside the very real problem that Unit 1 does not contain the PCEs necessary to support Dusky Gopher Frogs in the first place, this conclusion is just a "more is better" argument. it is not the legally sufficient proof the Service is required to show to properly designate Unit 1 as Critical Habitat. On its face, then, the "more is better" test does not meet the statutory test for designating Critical Habitat outside the frog's population at the time of its 2001 listing, which is the case for the frog and Unit 1. Moreover, the record does not reveal what efforts, if any, the Service made to evaluate potential habitat in Alabama.[35]

The following summarizes the entirety of the Service's arguments in support of its conclusion that Unit 1 is "essential" to the conservation of the frog:

1. "We believe this unit is essential because it provides additional habitat for **population expansion** outside of the core population areas in Mississippi." 76 FR 59783 (Emphasis added.)

This statement is merely repeats the "more is better" fallacy adopted by the Service. For Unit 1 to be validly determined to be "essential", however, the Service must do more than just "believe" that Unit 1 provides "additional habitat for population expansion". It must demonstrate that the Critical Habitat lands in Mississippi are insufficient to conserve the species **and** that Unit 1 will make it so, and that other alternatives have not been arbitrarily ignored, neither of which have been demonstrated).

2. "The uplands associated with the five ponds do not currently contain the essential biological and physical features of critical habitat; however, we believe them to be restorable with reasonable effort. We believe this unit provides **potential** for establishing new breeding ponds and metapopulation structure which will support recovery." *Id.* (Emphasis added.)

This statement, too, is simply a "more-is-better" conclusion. There is a critical distinction between Unit 1 having the "potential" to support recovery of the frog and its designation being "essential" to recovery of the frog.

3. "Maintaining these breeding ponds as suitable breeding habitat, into which Mississippi gopher frogs could be translocated, is essential to decrease the risk of extinction of the species resulting from stochastic events and to provide for the species eventual recovery." *Id.*

This statement does not prove that Unit 1 is "essential" to support the frog as it is virtually axiomatic that more habitat and more locations and numbers of individuals will

---

[35] See also, footnote 38 below.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

decrease "risks" to the population. This is not, however, the standard for critical habitat designation the Service is required to use under the ESA, which requires a demonstration that a designation be proven to be "essential to conservation", **not** essential to decrease "risks."[36]

Moreover, the fallacy of this unsupported "conclusion" by the Service is glaringly demonstrated by the fact that it is premised on another wholly inaccurate "conclusion": that frogs "could be translocated", *i.e.*, moved, to Unit 1.[37] This is simply not going to happen as the Poitevent Landowners cannot do so as this will destroy all economic value in the lands in Unit 1 and require burnings with the attendant problems noted above. The Service also does not have the power to require that frog be moved to the land.

In addition, the Service has failed to cite any factual basis stated to support its conclusion that Unit 1 is "essential" to provide for frog recovery, and as the Service has no facts in the record that support its conclusion that designation of Unit 1 is "essential", this "finding" is merely an empty conclusory statement. It is quite clear from the Rule and the proceedings leading up to it that the Service plainly does not have the data or quantitative analysis it is required to have under the ESA in order to make and support the required statutory finding about Unit 1.[38]

Even if Unit 1 were somehow to be properly deemed to be "essential", the impacts of designating Unit 1 as Critical Habitat are simply too great. The financial price tag -- largely falling on a private family -- and the disruption of the St. Tammany Parish land use planning efforts[39]-- are so significant that the Secretary should have exercised his discretion under ESA §4(b)(2) and not designated Unit 1. The Secretary's discretion in this regard is very broad, and

---

[36] Even if decreasing "risks" to the frog were the applicable standard (which it is not), how does designating Unit 1 as Critical Habitat for the frog decrease "risks" to the frog when the frog is not on the land and will not be in the future, and the habitat it needs to support its life is not on the land and will not be there in the future. Absent the acquisition of Unit 1 by the Service, is no likelihood that the frog will ever occupy the land and the habitat conditions on Unit 1 will ever change, as under continued timber management regimes conducted by either Weyerhaeuser or the Poitevent Landowners the PCEs and the frog will never exist on the land.

[37] For more on the reason the Service designated Unit 1 as Critical Habitat for the frog in spite of the overwhelming evidence to the contrary that it cannot do so legally under the ESA, see item 4, pages 20-23, below.

[38] This conclusion is further illuminated by considering the rationale used to disregard potential breeding ponds in Alabama. There is nothing more supporting the Service's conclusion that Unit 1 essential to Dusky Gopher Frog conservation than there is to the assertion that the potential breeding ponds in Alabama are not essential — "[N]o Mississippi gopher frogs have been found at these sites, and at this time, we do not consider them to be essential to the conservation of the species." 76 FR 59781. The same thing is true for Unit 1. See, comments of counsel for the Poitevent Landowners and Markle dated November 23, 2011 and February 28, 2012 and comments of Weyerhaeuser, all of which are contained in the record of the administrative proceedings here in Docket No. FWS-R4-ES-2010-002.

[39] See, comments of counsel for the Poitevent Landowners and Markle dated November 23, 2011 and February 28, 2012 and comments of Weyerhaeuser, all of which are contained in the record of the administrative proceedings here in Docket No. FWS-R4-ES-2010-002.

Page 19

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

has been used before *(see, e.g.,* 68 FR 46684 (September 24, 2002)). Dumping a $34+ million dollar impact onto any single landowner group without first exhausting all other alternatives to expand Dusky Gopher Frog habitat in Mississippi on Forest Service land or other set-aside lands in Alabama and Louisiana using restorative and pond creation techniques shows a callous disregard for the Poitevent Landowners and clearly justifies exclusion of Unit 1 from Critical Habitat designation.[40]

For the foregoing reasons, the Service has utterly failed to establish the statutory predicate required to designate Unit 1 as Critical Habitat for the Dusky Gopher Frog as mandated by the ESA. Given the utter lack of PCEs the frog needs to live on Unit 1 and the critical need for frequent fires to maintain Dusky Gopher Frog habitat that ignores Weyerhaeuser's timber management regime for the lands, Unit 1 is not today, and will not become, suitable Dusky Gopher Frog habitat. As Unit 1 has not been demonstrated to possess any of the three PCEs or to be "essential", its designation as Critical Habitat is thus improper under the ESA and arbitrary and capricious under the Administrative Procedure Act.

**4.      Unit 1 Will Never be Transformed into Frog Habitat or be Occupied by the Frog**

Contrary to all logic, and in spite of the fact that Unit 1 has **no** Dusky Gopher Frogs (and never will), and **no** habitat (and never will), and its designation as Critical habitat cannot withstand scrutiny under the ESA, the Secretary nevertheless included Unit 1 in the designation of Critical Habitat in the Rule. In effect, the Secretary designated Unit 1 as Critical Habitat on the wildly unrealistic hope that the area **might become** "essential for the conservation of the species," **if** it ever contained the requisite three PCEs. *See id.* 35135. And **if** it ever contains Dusky Gopher Frogs, which must be "translocated" there. And **if** it would ever somehow be practicable to burn the land in Unit 1 to maintain the frog's habitat. But **none** of this is ever going to happen. And the Service has known this all along.

The Service's motivation to incorrectly designate Unit 1 as Critical Habitat for the frog, in spite of all of the overwhelmingly numerous reasons why it should not have been so designated as set forth in this letter, is revealed glaringly in the following discussion in the Rule:

> Although we have no existing agreements with the private landowners of Unit 1 to manage this site to improve habitat for the dusky gopher frog, or to move the species there, we hope to work with the landowners to develop a strategy that will allow them to achieve their objectives for the property and protect the isolated, ephemeral ponds that exist there. According to the landowners, the timber lease on their property does not expire until 2043. The Service has a number of tools, such as habitat conservation

---

[40] The only limitation on such action under ESA §4(b)(2) is if the Secretary finds that failing to designate Unit 1 will result in extinction. No such conclusion is warranted based on the record in this proceeding. The species has remained extant in Mississippi and has expanded there in spite of the fact that Unit 1 has been unoccupied by the frog for nearly the past 50 years. For an extensive discussion of these points, see comments of counsel for the Poitevent Landowners and Markle dated November 23, 2011 and February 28, 2012 and comments of Weyerhaeuser, all of which are contained in the record of the administrative proceedings here in Docket No. FWS-R4-ES-2010-002.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

> plans, that could be used to formalize the timber management goals of the landowners and work towards recovery of the dusky gopher frog. There are also programs, such as the Healthy Forests Initiative administered through the U.S. Department of Agriculture's Natural Resources Conservation Service, that provide funding to private landowners for habitat management. However, these tools and programs are voluntary, and actions such as habitat management through prescribed burning, or frog translocations to the site, cannot be implemented without the cooperation and permission of the landowner.[41] (Emphasis added.)

In other words, it is clear that the Service proceeded here on a "hope and a prayer" that the Poitevent Landowners, Markle and Weyerhaeuser (the three landowners) would allow the Service to convert their property to frog habitat, and then would allow frogs to be placed there. To do this, of course, the Service **first** had to designate Unit 1 as Critical Habitat for the frog, likely thinking that then the three landowners would be forced to "cooperate" by doing the Service's bidding once the Rule was forced upon them.

Certainly, this is the effect of the Rule, as none of these three landowners can now use the 1,544 acres without first going through the tortuous "consultation" required as the presence of almost-certain wetlands on the lands will likely invoke Corps of Engineers jurisdiction under Section 404 of the Clean Water Act.[42] And that process is doomed to the landowners being denied any right to develop the land in Unit 1. As the Service's own EA for the proposed Critical Habitat disturbingly reveals, the Service has prejudged any attempt by the landowners for development and has decided that it must be denied, thus:

> Under the most conservation assumption (e.g., most likely to overstate rather than understate impacts) regarding the outcome of section 7 consultation, the Service would recommend complete avoidance of development within Unit in order to avoid adverse modification of critical habitat. See, EA, page 4-3. (Emphasis added.)

The Service has thus set forth its strategy: (1) designate the land in Unit 1 as Critical Habitat for the frog, which it then "hopes" will (2) effectively force the three landowners to allow the land to be transformed into frog habitat and the frogs be moved there, as they have been notified that the Service will (3) veto any development plans if any of the remaining lands are jurisdictional wetlands. The Service, of course, will deny any of this, but there is simply no other rationale that makes any sense for the Rule being imposed on Unit 1, given the many reasons why doing so is wrong, as set forth in this letter.

The Service has thus tipped its hand as to **why** it took this action. But, by implication, and quite ironically, the Service has also shown through this approach that the land in Unit 1 cannot be designated properly as Critical Habitat for the frog as the land in does not meet the ESA's

---

[41] 77 FR 35118-01, 2012 WL 2090270 (F.R.), page 11.

[42] That consultation is a bed of hot coals upon which the Landowners will be made to dance if CHU #1 is designated as critical habitat is clear as much of the lands in Unit 1 are likely jurisdictional "wetlands" that will require a Clean Water Act Section 404 permit from the US Army Corps of Engineers. See, DEA at pages A-5, ES-4, and 4-3.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

stringent requirements. If the Service had a legitimate reason for including Unit 1 in the Rule, it would have used it; not having a legitimate reason, it was forced to invent the "hope and a prayer" approach noted above. This naïve approach by the Service also shows how flawed the Service's approach to handling critical habitat designations under the Act is and reveals that it believes that it can do anything it wants even in spite of facts and law to the contrary.

The Poitevent Landowners and Markle will not convert their property to frog habitat or allow frogs to be placed there and (as the Service indicates), they cannot be compelled to do so, for the many reasons set forth in other areas of this letter. Moreover, as is reflected in the record of this proceeding, the Poitevent Landowners and Markle are obligated by their longstanding timber lease to allow Weyerhaeuser to cultivate, grow and cut the timber on Unit 1 and simply cannot convert the land or move frogs onto the lands without then breaching their contract with Weyerhaeuser. Additionally, as these actions would then take the land utterly out of commerce, and the Service has refused to compensate the Poitevent Landowners and Markle for the $34+ mill[43]ion of negative economic impact to them that will occur as a result of the Rule, the Poitevent Landowners and Markle simply cannot justify doing any of these things.

If the Secretary can designate completely unusable and uninhabited areas owned by private parties such as Unit 1 as Critical Habitat under the ESA and then "hope" that the private landowners will then "cooperate" to achieve the Service's nebulous, expensive and unproven goals in the face of such obvious reasons why it cannot and should not have done so, then, there is then absolutely no limit on agency power and the size of Critical Habitat. This is utterly contrary to the language of the ESA and the intent of Congress and is grossly unconstitutional. Congress intended to limit the size of Critical Habitat, not enlarge it without bounds or justifiable reason, or by first imposing its will unjustly on private landowners in the "hope" that they would then "cooperate". Hence, the requirement in the ESA that Critical Habitat must actually be "essential to the conservation of species" and the directive that "Critical Habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species." 16 U.S.C. § 1532(5)(ii) and (C). It follows, then, that if Congress did not want Critical Habitat to extend to all areas that can be occupied, it surely did not want Critical Habitat to extend even further to areas like Unit 1 that cannot-- and will not-- be occupied.

If the Secretary wishes to apply a different standard for identifying unoccupied areas that are "essential to the conservation of the species," the Secretary must clearly define and justify the standard under the ESA. In this case, the primary basis the Rule cites for designating Unit 1

---

[43] The Service also naively ignores (and does not address in the Rule) the cost of transforming the...(see next page) land in Unit 1 to suitable frog habitat, the difficulty of doing so on 1,544 acres (especially the difficulty of transforming the permanent ponds into "ephemeral" ponds), the cost and difficulty of managing the area to achieve its "hope," the time and cost of implementing all of its " tools and programs", the time and cost of negotiating and implementing the numerous and detailed agreements that would have to be put into place to achieve its vague "hope," apparently because it thinks that "if we hope it, the frogs will come." Reality dictates a very different conclusion.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

as Critical Habitat is merely because Unit 1 **may provide** "habitat" if the Services "hope" ever comes true. But the land in Unit 1 isn't, in fact, "habitat" at all as all three PCEs required to support the Dusky Gopher Frog aren't present, so what this conclusion really means is that the land will provide "additional habitat" only **if and when** it is ever restored and then only **if and when** frogs are moved there and then sustain themselves. See *Id.* 35135. And that is simply not going to happen. Moreover, this is not the legal standard for designating Critical Habitat. Obviously, not all potential "additional habitat" is "essential" habitat. And, as a factual matter, lands where the Dusky Gopher Frog is not now present and that are not currently suitable habitat without further enhancement, do not provide "additional habitat."

Unit 1 then constitutes at best only "potential habitat", not "essential habitat", that is, habitat which is absolutely essential and indispensable for the survival of the Dusky Gopher Frog. But even that characterization is a stretch. Whether Unit 1 will ever contain the Dusky Gopher Frog or all of the PCEs it needs is pure speculation. The Service acknowledges, as it must, that Unit 1 will only become suitable habitat if the land is managed to develop the requisite PCEs. *See* 77 Fed. Reg. 35135. The Service also acknowledges that Unit 1 is comprised entirely of private land, *id.* at 35134-35, and that private landowners cannot be compelled to manage the land for recovery purposes, *id.* at 35126. In fact, because this land is unoccupied and used for timber harvesting by Weyerhaeuser under their timber lease with the Poitevent Landowners and Markle, and has the potential for development or oil and gas exploration and other development that the EA valued at some $34+ million dollars,[44] the Poitevent Landowners cannot justify converting their land to conservation purposes or to allow the frog to be introduced on the land in Unit 1 without suffering enormous economic damage. The Service knew to a virtual certainty **before** it issued the Rule that Unit 1 would **never** be managed for species conservation and will **not** contain the frog or its habitat, and yet it issued the Rule anyway.[45] And why? For a mere "hope" that the land would someday be transformed and contain the frogs.

---

[44] The Service's EA ignores the damages to the Poitevent Landowners if they are forced to breach their timber lease with Weyerhaeuser and the cost to them for avoided oil and gas development, along with the other associated damages that will occur to them and to others due to burning as noted previously in this letter.

[45] In its listing decision describing the historic alteration of frog habitat, the Service notes as follows:

The extensive habitat alteration found during surveys of historical gopher frog localities in…Louisiana… resulted from the loss of virtually all of the natural longleaf pine forest… Presettlement longleaf pine forests were the dominant forest type of the southeastern coastal plain. Today, less than 2 percent of these forests remain (Ware et al. 1993)….. Longleaf pine forest habitat was replaced with dense pine plantations, agriculture, and urban areas. Habitat degradation has occurred as a result of alterations in the soil horizon (layering of different soil types), forest litter, herbaceous community, and occurrence of downed trees and stumps that Mississippi gopher frogs use as refugia. Fire suppression has further degraded the habitat. The hydrology of many isolated temporary wetlands, required as breeding sites for the Mississippi gopher frog, has been altered. In addition, these same factors have resulted in the decline of the gopher tortoise, whose burrows are most likely the preferred habitat for adult gopher frogs. As a result of these habitat changes, both the uplands and the pond basins previously occupied by the Mississippi gopher frog have become unsuitable." See, Federal Register, Vol. 66, No. 233, page 62995.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

These facts compel a finding that Unit 1 is not "essential for the conservation of the species." They also compel a finding that the benefits of exclusion outweigh the benefits of inclusion under Section 4(b)(2) of the Act., and mean that the Service has not met the ESA's requirements in issuing the Rule for Unit 1, and that the Rule is arbitrary and capricious under the Administrative Procedure Act

5.      **The Economic Analysis Is Woefully Flawed**

The Economic Analysis prepared by the Service for the Rule for Unit 1 (the "EA") adopts the "baseline" approach under which the Service only considers the qualitative impacts that occur "without critical habitat," such as those impacts caused by listing of the species, whereas the incremental impacts occurring "with critical habitat" are given a quantitative analysis. See 77 Fed. Reg. at 35140-41.The result of this approach is that neither the Service nor the public are ever provided a meaningful cumulative economic impacts analysis.

This approach was rejected by the Tenth Circuit in *New Mexico Cattle Growers Association v. U.S. Fish and Wildlife Service*, 248 F.3d 1277 (10th Cir. 2001). According to the Tenth Circuit, the "baseline" approach is meaningless and inconsistent with the language of the Act and the intent of Congress. Therefore, the court held that an Economic Analysis must consider all of the impacts of Critical Habitat designation, including those impacts co-extensive with the listing. In other words, to validly analyze the economic impact on the Poitevent landowners, the EA was required to have considered the cumulative impacts of the listing and the Critical Habitat designation together, not just the incremental impacts of the designation.[46]

As the EA here adopted the "baseline" approach, it utterly fails to meet the *New Mexico Cattle Growers Association* test and is therefore inadequate. Moreover, the EA failed to quantify economic and other impacts of the designation on (i) oil and gas exploration, (ii) forestry, (iii) the breach of the Poitevent Landowners' timber lease with Weyerhaeuser, and (iv) those resulting to the Poitevent Landowners, the communities adjacent to Unit 1 and the driving public, and the Poitevent Landowners' adjacent lands from conservation activities, particularly the required controlled burns on the lands in Unit 1. These failures also mean that the Service has not met the ESA's requirements, and that the Rule is arbitrary and capricious under the Administrative Procedure Act.

6.      **Failure To Exclude**

Whether Unit 1 will ever contain the frog and all of the PCEs needed to support the frog is pure speculation. In fact the best currently available evidence is that it will not as the Poitevent

---

[46] For a contrary view see *Arizona Cattle Growers' Association v. Salazar*, 606 F.3d 1160 (9th Cir 2010)). In *Home Builders Association of Northern California v. Norton*, 293 F. Supp. 2d 1 (D.D.C. 2002), the Service appears to have represented to the court that it would follow the *New Mexico Cattle Growers'* co-extensive approach in all future Critical Habitat designations. But it has not done so here.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

Landowners will not allow their land to be transformed into frog habitat and will not allow the frog to be moved there as doing so will utterly destroy all economic value they have in the lands and in their surrounding lands, cause them to breach their existing timber lease with Weyerhaeuser, and create grave dangers for drivers on Highway 36 and endanger the lives and property of the citizens of Pearl River, LA.  Thus, not only do these facts compel a finding that Unit 1 is not "essential for the conservation of the species," but they also compel a finding that the benefits of exclusion far outweigh the benefits of inclusion under Section 4(b)(2) of the Act.

As noted, the Service calculated that the economic impact of designating this unusable, unoccupied area of 1,544 acres as "critical habitat" for the frog will cost the Poitevent Landowners $34+ million.[47]  To add insult to injury, the Service then boldly proclaimed that its own economic analysis "did not identify any disproportionate costs that are likely to result from the designation."[48]  Thus, in the Service's warped view, imposing a $34+ million burden primarily on a single family (the Poitevent Landowners) when Unit 1 provides no benefit to the species (and never will as the frog does not now, and never will, occupy the land), and where the habitat that the Service says is "essential" for the survival of the species does not exist, isn't a disproportionate cost on the Poitevent Landowners for one reason, and one reason alone: because the Service says there isn't one.  Such callous, unsupported, arbitrary, capricious and reckless disregard for the obvious consequences of agency decision-making should not be tolerated in an orderly society such as ours.

Given that the Critical Habitat designation will impose tens of millions of dollars in damages and costs on the Poitevent Landowners to protect land that cannot, and will not, be used by the species, the Service's bald conclusion that the "economic analysis did not identify any disproportionate costs that are likely to result from the designation," 77 Fed. Reg. 35141, is incorrect, arbitrary and capricious  as well as irrational, and therefore invalid under the ESA and the Administrative Procedure Act. *See, Natural Resources Defense Council v. U.S. Department of Interior*, 113 F.3d 1121, 1124 (9th Cir. 1997) ("Essentially, we must ask 'whether the agency

---

[47] This calculation did **not** include the clear economic devaluation of the Poitevent Landowners' adjacent lands due to the requirement that the Critical Habitat lands be burned or take into account the danger to life and property in Pearl River, LA  or  the danger to drivers on LA Highway 36, or to damages resulting from the Poitevent Landowners' breach of their existing timber lease with Weyerhaeuser. These are all very real costs. Nevertheless, in failing to consider them, the Service violated its stated goal of quantifying all economic impacts of the Rule. ("The intent of the [EA] is to quantify the economic impacts of all potential conservation efforts for the dusky gopher frog.") See, 77 FR 35118-01, 2012 WL 2090270 (F.R.), page 40. (emphasis added.)

[48] See, 77 FR 35118-01, 2012 WL 2090270 (F.R.), page 41. ("Our economic analysis did not identify any disproportionate costs that are likely to result from the designation. Consequently, the Secretary is not exercising his discretion to exclude any areas from this designation of critical habitat for the dusky gopher frog based on economic impacts."). In addition to being unsupported  and patently untrue this "conclusion" is insulting and patronizing to the Poitevent Landowners. Common sense dictates that such an enormous cost is clearly meaningful to…(see next page) them  and  that it cannot seriously considered "disproportionate" under any circumstances. Moreover, there is no evidence in the record to show why the Service's has concluded that the $34+ million cost is not "disproportionate", or even to compare it to something that then proves that it is in fact "disproportionate."

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

considered the relevant factors and articulated a rational connection between the facts found and the choice made.' ").

### 7.     The Service Failed To Conduct a NEPA Review

Although the Tenth Circuit in *Catron County Board of Commissioners v. U.S. Fish and Wildlife Service*, 75 F.3d 1429 (1996), and the D.C. District Court, in *Cape Hatteras Access Preservation Alliance v. Department of Interior*, 344 F. Supp 2d. 108 (2004), have held that Critical Habitat designations are subject to review under the National Environmental Policy Act ("NEPA"), the Service incorrectly and arbitrarily takes the position in the Rule that it does not have to comply with this requirement outside of the Tenth Circuit. *See* 77 Fed. Reg. 35144. As authority for that position, the Service relies on *Douglas County v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995), in which the Ninth Circuit held that NEPA review was not required for Critical Habitat designations where there is no physical change to the environment. As this case is different, however, a NEPA review was required to be made by the Service before it could properly designate Unit 1 as Critical Habitat.

The Critical Habitat designation for the Dusky Gopher Frog will absolutely require human interference with the environment of, and a physical change in, the land in Unit 1 through management of the habitat by, among other things, regular controlled burns as frequent fires are necessary to maintain the open canopy and ground cover vegetation of the gopher frog's aquatic and terrestrial habitat. *See* 77 Fed. Reg. 35129-30. These burns can have significant adverse effects on the physical environment, including air pollution, water pollution, loss of forest resources and habitat for other species. But the Critical Habitat designation in the Rule ignores, and does not discuss, these effects. That can only be done through a NEPA review process.

Moreover, the **entire premise** of the Rule is based upon the Service's own conclusion that the lands in Unit 1 must be transformed  so the frog can be "translocated" there and then have the habitat they need to live there created. It belies all reason to require this and then see the Service ignore the requirement that a NEPA review be conducted. Simply put, the Service cannot have it both ways: it cannot seek to transform the land in Unit 1 into a conservation bank for the frog and ignore the fact that the land must be transformed in order to do so and also then avoid a NEPA review.

To the extent that jurisdictional wetlands are present on the 1,544 acres (which the Service knows is a high probability), a Corps of Engineers permit under Section 404 of the Clean Water Act will be required if the Poitevent Landowners wish to develop Unit 1, and if any work is done to convert their land to suitable habitat for the frog by restoring the non-existent  habitat elements for Unit 1 and to move the frog onto the land. This work will have an effect on the physical environment of the land which, in turn, will also have to be considered by the Corps of

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

Engineers. The Service admits this in the Rule.[49] In turn, this impact further mandates the need for a NEPA review.

Therefore, notwithstanding the Ninth Circuit decision, and in accordance with the decisions in *Catron County Board of Commissioners* and *Cape Hatteras Access Preservation Alliance*, a NEPA review should have been undertaken here. As it was not, the Rule, insofar as it concerns Unit 1, is fatally flawed.

## 8.    Designation of Unit 1 Exceeds Constitutional Authority

The Service cites a long list of cases that have upheld the agency's authority to regulate intrastate, noncommercial species under the commerce power.  *See* 77 Fed. Reg. 35120. However, those cases do not address whether the agency has the authority under the Commerce Clause to regulate private land with no connection to the protected species other than through the Critical Habitat designation itself.  In effect, the Service has reverse engineered "commerce" in this case by declaring Unit 1 to be Critical Habitat for the frog and then claiming that this designation provides the constitutional basis it needs under the ESA to take the action it did in the Rule.[50] This is an utterly unsupportable and unconstitutional proposition and an intolerable expansion of federal power. The Service simply cannot "create" the commerce link to the lands in Unit 1 merely by issuing the Rule, and thereby pass constitutional muster on its action.

The designation of Unit 1 as Critical Habitat for the Dusky Gopher Frog is clearly contrary to U.S. Supreme Court precedent not only because the frog is not a regulable entity as it is not present on Unit 1 and will not be present in the future, but also because the Critical Habitat designation in this case purports to *create*, rather than merely regulate, the putative commerce connection. *See United States v. Lopez*, 514 U.S. 549 (1995); *United States v. Morrison*, 529 U.S. 598 (2000); and, more recently, *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566, 2573-74 (2012) ("This Court's precedent reflects this understanding: As expansive as this Court's cases construing the scope of the commerce power have been, they uniformly describe the power as reaching "activity." *E.g.*, *United States v. Lopez*, 514 U.S. at 560, 115 S. Ct. 1624, 131 L. Ed. 2d 626. The [challenged provision], however, does not regulate existing commercial activity.").

The uncontested facts here show that the Service is not regulating any existing commercial "activity" at all as (i) Unit 1 contains no Dusky Gopher Frogs, and neither the

---

[49] The Service notes in the Rule that "[e]xamples of actions that are subject to the section 7 consultation process are actions on ... private lands that require a Federal permit (such as a permit from the Corps under section 404 of the Clean Water Act (33 U.S.C. 1251 et seq.)." See 77 FR 35118-01, 2012 WL 2090270 (F.R.), page 40.

[50] For the evidence on how the Service "hopes" to create "activity" it can regulate in the future on Unit 1, see the discussion in item 4 above, pages 20-23. As this "activity" does not now exist by the Service's own admission, there is no "commerce" to regulate and the Service's action in issuing the rule cannot then withstand constitutional scrutiny.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

Service nor the Poitevent Landowners can (or will) place them there in the future, and (ii) Unit 1 lacks the requisite PCEs to constitute proper Critical Habitat under the ESA for the Dusky Gopher Frog, and neither the Service nor the Poitevent Landowners can (or will) modify Unit 1 to change the land's vegetative status so that it provides all of the necessary PCEs required by the Service to sustain the Dusky Gopher Frog on Unit 1. What, then, is there to regulate? The regulation of Unit 1 as Critical Habitat is therefore unconstitutional because there is no "activity" supporting the Rule as the land does **not** contain the listed species or any of the frog's habitat.

In this case, with **no** frogs and **no** PCEs on the lands in Unit 1, there is no "activity" at all and therefore no need of regulation. In fact, this situation is the very definition of the absence of "activity", which is passivity. Hence, as the required nexus to "commerce" (activity) is utterly lacking here, the Rule is fatally flawed and must be reversed for failing to comply with the US Constitution.

**9.      The Dusky Gopher Frog is Not an Endangered Species under the ESA**

Before an animal species can receive the protection provided by the ESA, it must first be added to the Federal lists of threatened and endangered wildlife. In this case, in the Rule the Service announced that a species known as the "Dusky Gopher Frog" is endangered and then designated Unit 1 as its Critical Habitat. Yet, the clear facts show the following:

1.   The species that was listed as endangered on December 4, 2001 was **not** the Dusky Gopher Frog but a "different species"-- the Mississippi Gopher Frog. 66 FR 62993.

2.   On November 27, 2007, as the Service had failed to find habitat for the Mississippi Gopher Frog, **not** the Dusky Gopher Frog, the Center for Biological Diversity and the Friends of Mississippi Public Lands sued the Service and the Secretary for its failure to timely designate Critical Habitat for the Mississippi Gopher Frog, **not** the Dusky Gopher Frog. *Friends of Mississippi Public Lands and Center for Biological Diversity v. Kempthorne* (07-CV-02073).

3.   In a court-approved settlement, the Service agreed to submit to the Federal Register a new prudency determination for the Mississippi Gopher Frog, **not** the Dusky Gopher Frog, and if the designation was found to be prudent, a proposed designation of Critical Habitat for the Mississippi Gopher Frog, **not** the Dusky Gopher Frog, by May 30, 2010, and a final designation for the Mississippi Gopher Frog, **not** the Dusky Gopher Frog, by May 30, 2011.

4.   Designation of Critical Habitat for the Mississippi Gopher Frog, **not** the Dusky Gopher Frog, was again found to be prudent, and a proposed rule to designate Critical Habitat for the Mississippi Gopher Frog, **not** the Dusky Gopher Frog, was published on September 27, 2011. Fed. Reg., Vol. 76, No. 187, page 59774.

Page 28

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

In each of its notices and determinations prior to the issuance of the Rule, the Service considered and ruled upon the Mississippi Gopher Frog. The Mississippi Gopher Frog was the subject of the Center for Biological Diversity's lawsuit against the Service, as was the court-approved settlement between the Service and the Center for Biological Diversity, the EA, the proposed Rule and the Rule itself. All comments received by the Service, including those made by the Poitevent Landowners and Markle, were directed to the Mississippi Gopher Frog.

In the Rule, however, the Service--without notice and allowing the Poitevent Landowners an opportunity to comment as is required by law-- abruptly, arbitrarily and capriciously changed its mind and ruled that the endangered species wasn't the Mississippi Gopher Frog at all, but was instead a "different...species"[51]-- the Dusky Gopher Frog. It then found in the Rule that Unit 1 is required not for the Mississippi Gopher Frog but for the Dusky Gopher Frog's conservation and included Unit 1 as part of the Dusky Gopher Frog's Critical Habitat, not for the Mississippi Gopher Frog.

The Rule notes this as follows at p. 2:

> Subsequent to the listing of the dusky gopher frog (=Mississippi gopher frog), taxonomic research was completed that indicated that the entity (which we listed as a DPS of the dusky gopher frog (Rana capito [sic] sevosa)) is different from other gopher frogs and warrants acceptance as its own species (Young and Crother 2001, pp. 382-388). The herpetological scientific community accepted this taxonomic change and the scientific name for the species was changed to Rana sevosa. In addition, all comments on taxonomy that we received during the comment periods for the revised Critical Habitat proposal were in agreement that the frog warrants acceptance as its own species.[52]

The "species" under consideration until the Rule was issued in June, 2012 was always the Mississippi Gopher Frog", **not** the Dusky Gopher Frog. Yet now, the Poitevent Landowners' land has somehow become Critical Habitat for a "different species"-- the Dusky Gopher Frog-- all without advertisement, notice or an opportunity for the Poitevent Landowners to comment, and in violation of the ESA, the Service's rules and regulations thereunder and the requirements of the Administrative Procedure Act, not to mention basic constitutional principles of due process.[53]

---

[51] The Service further confirmed this by stating in the Rule as follows: "...the listed entity has now been accepted by the scientific community as a unique species, Rana sevosa." 77 FR 35118-01, 2012 WL 2090270 (F.R.), page 4.

[52] By doing this, it can be said that, instead of "changing horses in midstream,"-- always an inadvisable action-- the Service "changed frogs in midstream."

[53] The Poitevent Landowners and Markle, and anyone else who looks will conduct a fruitless search for a species known or listed as the Dusky Gopher Frog in any of the following:

  a.    The 66 FR 62993 listing of the Mississippi Gopher Frog as an endangered species

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

The Dusky Gopher Frog is <u>not</u> an "endangered species" under the ESA because of one very simple reason: it hasn't been listed by the FWS as such. Thus, as the <u>Dusky</u> Gopher Frog is not an "endangered species" under the ESA, and as all of the rulemaking in this case covers exclusively the <u>Mississippi</u> Gopher Frog--not the <u>Dusky</u> Gopher Frog-- and all comments and decision have been made in regard to the <u>Mississippi</u> Gopher Frog, the Rule is invalid, arbitrary, capricious and illegal, and the Service acted improperly under the ESA and without notice to the Poitevent Landowners or a proper foundation for its conclusion in the Rule that the <u>Dusky</u> Gopher Frog is "endangered".

In effect, the Service has now ruled that Unit 1 is Critical Habitat for an "unendangered species" (the Dusky Gopher Frog), which the ESA does not cover and the Service does not have the power to act on. The ESA does not permit the Service to do this. Therefore, Unit 1 was improperly designated as Critical Habitat for the Dusky Gopher Frog as there is no such "endangered species", and the Rule is improper and is an illegal, arbitrary and capricious abuse of the provisions of the Act and a gross violation of the requirements of the Administrative Procedure Act.

**10.   As the Frog Was Not "Home on the Range" in Unit 1 at the Time of Its Listing, Unit 1  Was Improperly Listed as its Critical Habitat**

The Act protects species identified as either "endangered" or "threatened." A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). Similarly, a species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). The Act does not define what constitutes a significant portion of a species' range, but the Service has recently done so. As a result, applying the Service's own conclusions, as the frog was not present on Unit 1 at the time it was listed as "endangered" in 2001, the Rule improperly designates Unit 1 as its Critical Habitat.

On December 9, 2011 the FWS and the National Marine Fisheries Service jointly published draft guidance defining the phrase "significant portion of its range" for purposes of listing a species under the Endangered Species Act (Act).  See, 76 Fed. Reg. 76987 (Dec. 9,

---

b.     Any listing of endangered species under the ESA

c.     Any of the rulemakings prior to the Rule in June 2012

d.     The EA

e.     The Center for Biological Diversity's lawsuit

f.     The Court rulings on the subject in the Center for Biological Diversity's lawsuit, and

g.     All other literature on the subject, including the Service's own publications, such as <u>Exhibit "D"</u>.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

2011). While the draft policy has many parts, its key element relevant to the Rule is this: the Dusky Gopher Frog's "range" was the general geographical area in which it was found **at the time the listing decision for it was made in 2001.**[54] Thus, as Unit 1 was lost historical range at that time, it is **not** part of the frog's "significant portion of its range."[55]

The draft policy defines "range" as the general geographical area within which the species is found at the time the listing decision is made. It then excludes from this definition lost historical range, as follows:

> The [FWS] interpret[s] the term ''range'' to be the general geographical area within which the species is currently found and to include those areas used throughout all or part of the species' life cycle, even if not used on a regular basis. We consider the ''current'' range of the species to be the range occupied by the species at the time the [FWS] make[s] a determination under section 4 of the Act.

> Some have questioned whether lost historical range may constitute a significant portion of the range of a species, such that the Services must list the species rangewide because of the extirpation in that portion of the historical range. We conclude that while loss of historical range must be considered in evaluating the current status of the species, lost historical range cannot be a significant portion of the range. In other words, we cannot base a determination to list a species on the status of the species in lost historical range. We reach this conclusion based on the text of the Act. As defined in the Act, a species is endangered only if it ''is in danger of extinction'' in all or a significant portion of its range. The phrase ''is in danger'' denotes a present tense condition of being at risk of a current or future, undesired event. Hence, to say a species ''is in danger'' in an area where it no longer exists— i.e., in its historical range where it has been extirpated—would be inconsistent with common usage. Thus, ''range'' must mean ''current range,'' not ''historical range.'' This interpretation of ''range'' is further supported by the fact that when determining whether a species is an endangered species, the Secretary must consider the ''present'' or ''threatened'' (i.e., future), rather than the past, ''destruction, modification, or curtailment'' of a species' habitat or range (16 U.S.C. 1533(a)(1)(A)). Additional support for this interpretation is found in the Act's requirement that a summary of a proposed listing regulation be published in a newspaper ''in each area of the United States in which the species is believed to occur'' (16 U.S.C. 1533(b)(5)(D)). There is no requirement to publish such notice in areas where the species no longer occurs. Therefore, to determine whether a species is presently ''in danger of

---

[54] The Service agrees: " Unit 1 is not currently occupied nor was it occupied at the time the dusky gopher frog was listed." See, 77 FR 35118-01, 2012 WL 2090270 (F.R.), page 10.

[55] The service agrees: " In Louisiana, the dusky gopher frog was last observed in 1965." See, 77 FR 35118-01, 2012 WL 2090270 (F.R.), page 27.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

extinction throughout * * * a significant portion of its range,'' we must focus on the range in which the species currently exists.

****

For the reasons described above...we conclude that ... it is the conservation status of the then-current range at the time of the listing determination in question that must be evaluated (see Ctr. for Biological Diversity v. Norton, 411 F. Supp. 2d 1271 (D.N.M. 2005), vacated by No. 06–2049 (10th Cir. May 14, 2007); Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv., 2007 U.S. Dist. LEXIS 16175 (D. Colo. Mar. 7, 2007), vacated by No. 07–1203 (10th Cir, Oct. 22, 2007)). (Emphasis added.)[56]

At the time of its listing in 2001, the Service concluded that Unit 1 was **not** occupied by the frog, as follows:

Historical records for the Mississippi gopher frog exist for two or possibly three parishes in Louisiana, six counties in Mississippi, and one county in Alabama. Researchers conducting numerous surveys have been unable to document the continuing existence of the Mississippi gopher frog in Louisiana (Seigel and Doody 1992, Thomas 1996) or in Alabama (Bailey 1992, 1994). The last observation of a gopher frog in Louisiana was in 1967 (G. Lester, Louisiana Natural Heritage Program, pers. comm. 1991)...

Seigel and Doody (1992) and Thomas (1996) surveyed historical sites in Louisiana and searched for other potential sites that might be occupied by gopher frogs. They also found that longleaf pine forests in Louisiana had been severely degraded. The historical breeding and upland habitats had changed as a result of urbanization and conversion of forest to pine plantation. For example, they found three historical breeding sites that had been extensively altered. One had been converted into a permanent pond. Seigel and Doody (1992) and Thomas (1996) surveyed historical sites in Louisiana and searched for other potential sites that might be occupied by gopher frogs. They also found that longleaf pine forests in Louisiana had been severely degraded. The historical breeding and upland habitats had changed as a result of urbanization and conversion of forest to pine plantation. For example, they found three historical breeding sites that had been extensively altered. One had been converted into a permanent pond in a residential backyard. Two other ponds had been extensively altered by bedding, clearing, and nutrient loading during conversion of the surrounding habitat to pine plantation. Both survey efforts by Seigel and Doody (1992) and Thomas (1996) were unsuccessful to find any Mississippi gopher frogs in Louisiana. (Emphasis added.)

---

[56] See, Federal Register, Vol. 76, No. 237, Friday, December 9, 2011, pages 76996 and 76997.

Page 32

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

See, Federal Register, Vol. 66, No. 233, Tuesday, December 4, 2001, pages 62994 and 62995.

     As the frog was not present on Unit 1 at the time it was listed as "endangered" in 2001 and thus its habitat was "lost" at that time, by the Service's own admission, the Rule improperly designates Unit 1 as its Critical Habitat under the ESA and is therefore arbitrary and capricious under the Administrative Procedure Act. Thus, the Rule is fatally flawed.

**11.  Even Assuming It is "Essential for the Conservation of" the Frog, the Service Has Failed to Prove All of Unit 1 is Required Habitat for the Frog**

     In the Rule, the Service concludes that "the areas we are designating as critical habitat are essential for the conservation of the species based on our current understanding of the species' requirements."[57] In other words, the Service believes that all of Unit 1's 1,544 acres are "essential for the conservation of" the frog, in spite of the facts that (i) no part of the 1,544 acres contains either the frog or the habitat that is "critical" for it to exist, and (ii) Unit 1 was unoccupied by the frog in 2001 when it was listed as endangered, by which time its habitat had become "lost". Moreover, ignoring all of these vital problems for the Rule and Unit 1 for purposes of discussion, there are no facts in the Rule from which one may draw a rational connection as to the size or location of the Critical Habitat area in Unit 1. Thus, the Service's designation of the 1,544 acres is clearly arbitrary and capricious and was not founded on the "best scientific data" the Service is required to use to make its finding of Critical Habitat here.

     Thus, given the dramatically negative fact that Unit 1 contains no frogs (and never will) and that the frog's habitat is not present on the lands today (and never will be), even if it is assumed purely for purposes of argument, that this status of the land and the non-existence of the frogs on it somehow makes it "essential for the conservation of the species", and ignoring the fact that Unit 1 was unoccupied by the frog in 2001 when it was listed as endangered, by which time its habitat had become "lost", the Service has failed to show by clear and convincing evidence that all 1,544 acres in Unit 1 is required to conserve the frog. How can the Service logically conclude that all of the 1,544 acres are "essential for the conservation of" the frog when the habitat and the frog do not exist on the land, and Unit 1 was unoccupied by the frog in 2001 when it was listed as endangered, by which time its habitat had become "lost"? And why exactly 1,544 acres if Unit 1 is somehow deemed to be essential in the face of these facts? Why not half that (772 acres), or one-quarter (386 acres), or ten percent of that (154 acres)?[58] In fact, the record here shows that the Service has failed to demonstrate that its conclusions are soundly based on the "best scientific data available", and therefore they are deeply flawed and inaccurate.

---

[57] See, 77 FR 35118-01, 2012 WL 2090270 (F.R.), page 28.

[58] The only logical answer to this question, is that, given the obvious facts of no habitat and a non-existent frog, the Service requires zero (0) acres for frog habitat.

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

Pursuant to §4 of the ESA, the Service must designate Critical Habitat on the basis of the "best scientific data available . . ." 16 U.S.C. §1533(b)(2). Although the Service claims to have used the "best scientific data available" for Unit 1, it could not possibly have done so as there were no frogs and no habitat on the land when it made its site visit in March 2011, nor has is there any evidence in the record that the ponds on the land are in fact "ephemeral."[59] Therefore, the Service is forced to conclude that **if** the lands in Unit 1 are somehow transformed into suitable habitat for the frogs and **if** the frogs are ever moved there, the area they **would then** need is some portion of Unit 1. But, all of this is pure supposition and "assumption" by the Service that hardly rises to the level of its using the "best scientific data available", which it clearly failed to do, and ignores the fact that Unit 1 was unoccupied by the frog in 2001 when it was listed as endangered, by which time its habitat had become "lost". The Service is forced into this position as there is no "best scientific data available" for the Service to use, and it thus cannot justify the extent of its designation as to Unit 1. Thus, by any reasonable measure, Unit 1 must be excluded from the Rule, and its inclusion is therefore arbitrary and capricious under the Administrative Procedure Act and impermissible under the ESA as it is unsupported by the "best scientific data available."

The arbitrary and capricious nature of the Service's decision to include the 1,544 acres and not exclude them from the Rule are further shown by the fact that the Service excluded from the Rule at least one "agricultural" area that also does not contain habitat suitable for the frog.[60] Yet, here, where the land in Unit 1 is a similar "agricultural" area (a tree farm managed by Weyerhaeuser[61]) that also does not (as demonstrated above) contain habitat suitable for the frog, the Service nevertheless included Unit 1 based on the incorrect conclusion that it is "essential for the conservation of the species".[62] As the Service failed to exclude the agricultural area in Unit 1 that does not contain frog habitat similar to the area it actually excluded for this very same reason, the Rule is therefore arbitrary and capricious under the Administrative Procedure Act for this additional reason.

---

[59] See, Exhibit "C", which dramatically shows the non-"ephemeral" nature of the ponds.

[60] See, 77 FR 35118-01, 2012 WL 2090270 (F.R.), page 19 where the Service notes: "During a review of aerial photography prior to making the final maps of critical habitat for this final rule, we identified an agricultural field within critical habitat Unit 10 as it was described in the revised proposed rule. Because this agricultural area does not contain habitat suitable for the dusky gopher frog, it has been removed from the critical habitat designation. This change resulted in a further reduction of critical habitat of 35 ha (87 ac)." (Emphasis added.)

[61] See, Federal Register, Vol. 66, No. 233, page 62995, for acknowledgment by the Service that the land in Unit 1 is a "pine plantation" similar to any other agricultural venture. That the agricultural effort is for trees should make no difference.

[62] The Service is overly and inaccurately impressed with the presence of the ponds on Unit 1. See, 77 FR 35118-01, 2012 WL 2090270 (F.R.), page 31. Its conclusions are fatally flawed as the ponds are not "ephemeral" and the Service has failed to show them to be such.

Page 34

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

**12.    Additional Reasons, Including Poitevent Landowners' and Other Prior Comments Objecting to Issuance of the Rule**

Undersigned counsel for the Poitevent Landowners filed extensive comments dated November 23, 2011 and February 28, 2012, on behalf of the Poitevent Landowners and Markle in the record of the administrative proceedings in Docket No. FWS-R4-ES-2010-0024 that objected to the issuance of the then-proposed Rule. Counsel also made oral comments at the January 31, 2012 hearing held by the Service in Gulfport, Mississippi and entered written comments at that time into the record of these proceedings similarly objecting to the issuance of the proposed Rule. In addition, Weyerhaeuser commented negatively on the then-proposed Rule in Docket No. FWS-R4-ES-2010-0024 and similarly testified at the Gulfport hearing. The Pacific Legal Foundation also commented negatively on the then-proposed Rule in Docket No. FWS-R4-ES-2010-0024 and has sent a letter similar to this notice of intent to commence civil litigation on behalf of Markle[63].

The testimony and comments of counsel for the Poitevent Landowners and Markle, as well as the comments and notice of intent to commence civil litigation of the Pacific Legal Foundation, and the testimony and comments of Weyerhaeuser, is all contained in the administrative record of Docket No. FWS-R4-ES-2010-0024 and may be viewed at www.regulations.gov. The Department and the Service have the Pacific Legal Foundation's notice of intent to commence civil litigation on behalf of Markle.

As these comments and testimony already form a part of the administrative record of this matter, they will not be repeated here. Instead, they are hereby adopted as if set forth fully in this letter of intent to commence civil litigation against the Department and the Service, to the extent that comments 1-11 above do not encompass the reasons set forth in the prior comments and testimony of such parties.

Finally, to the extent any of the lands in Unit 1 were originally conveyed to predecessors in title of the Poitevent Landowners by either Spain or England grants excluding certain powers or reserving those powers to the Poitevent Landowners as successors in title, the ESA is inapplicable in this instance. See, *Summa Corp. v. California ex rel State Lands Commission, et al,*466 U.S. 198, 104 S.Ct. 1751, 80 L.Ed.2d 237 (1984).

---

[63] See, http://www.pacificlegal.org/document.doc?id=677

Page 35

Kenneth L. Salazar
Daniel M. Ashe
October 19, 2012

## CONCLUSION

For the foregoing reasons, the Service must revise the Critical Habitat designation for the Dusky Gopher Frog to exclude Unit 1 from the Rule.  Failure by the Service to so within 60 days will result in court action by the Poitevent Landowners.

·Very truly yours,

Edward B. Poitevent, II, Member and
Manager of Poitevent Landowner P&F
Lumber Co. (2000), LLC, and Attorney for
all Poitevent Landowners

cc:    Mr. William Finnegan (w/o enc.)
       Mr. William B. Rudolf (w/o enc.)
       Mr. Robin Rockwell (w/o enc.)
       Ms. Donna Roebke (w/o enc.)