# UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF LOUISIANA

## NEW ORLEANS

| | |
|---|---|
| MARKLE INTERESTS, LLC, | CIVIL ACTION |
|     Plaintiff, | CASE NO. 13-234 |
|              v. | PERTAINS TO ALL CASES |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | SECTION: F |
|     Defendants. | JUDGE: MARTIN L.C. FELDMAN |
| | MAG. JUDGE: SALLY SHUSHAN |

---

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR OPPOSITION TO PLAINTIFF MARKLE'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendants, through undersigned counsel, respectfully submit the following memorandum in support of their Opposition to Plaintiff Markle's Motion for Summary Judgment and Cross-Motion for Summary Judgment.

## TABLE OF CONTENTS

PAGE

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 1

I.   THE ENDANGERED SPECIES ACT ................................................................. 1

II.  NATIONAL ENVIRONMENTAL POLICY ACT ("NEPA") ....................................... 3

III. DUSKY GOPHER FROG CRITICAL HABITAT RULE ........................................... 3

IV. STANDARD OF REVIEW—ADMINISTRATIVE PROCEDURE ACT
     ("APA") ................................................................................................... 6

ARGUMENT ........................................................................................................... 6

I.   PLAINTIFF LACKS ARTICLE III STANDING TO PURSUE ANY OF ITS
    ESA CLAIMS ............................................................................................ 6

II.  MARKLE LACKS PRUDENTIAL STANDING TO BRING A NEPA
     CLAIM ...................................................................................................... 8

III. UNIT 1 MEETS THE STATUTORY DEFINITION OF "CRITICAL HABITAT":
    FWS MADE A REASONABLE DETERMINATION THAT UNIT 1 IS ESSENTIAL
    FOR THE CONSERVATION OF THE FROG ........................................................ 9

IV. UNOCCUPIED AREAS NEED NOT CONTAIN PCEs TO BE
     DESIGNATED ............................................................................................ 12

V.  FWS CONSIDERED ALL POTENTIAL ECONOMIC IMPACTS TO
     UNIT 1 .................................................................................................... 16

    a.   The Method Used To Analyze Economic Impacts is Irrelevant;
        Unit 1 is Unoccupied ........................................................................ 17

    b.   The Decision Not to Exclude Unit 1 is Unreviewable and Within
        FWS' Discretion .............................................................................. 19

VI. FWS HAS THE CONSTITUTIONAL AUTHORITY TO DESIGNATE UNIT 1 AS
    CRITICAL HABITAT ................................................................................... 22

VII. NEPA DOES NOT APPLY TO CRITICAL HABITAT
     DESIGNATIONS ......................................................................................... 24

CONCLUSION.................................................................................................................... 25

## INTRODUCTION

Plaintiff Markle Interests ("Markle" or "Plaintiff") challenges U.S. Fish and Wildlife Service's ("FWS") designation of 1,544 acres[1] in St. Tammany Parish, Louisiana ("Unit 1"), as critical habitat to conserve the highly endangered dusky gopher frog ("frog") under the Endangered Species Act ("ESA"). 77 Fed. Reg. 35118 (June 12, 2012) (hereafter, "Rule"). With about 100 adult frogs left in the wild, the need for protection and conservation of the species cannot be overstated. Markle raises various challenges to the Rule, all of which fail as a matter of fact and law. Underlying Markle's arguments is its belief that private property should never be designated without the landowner's approval; however, that is not the law. Under the ESA, Congress requires FWS to designate critical habitat and has expressly provided FWS with the discretion to designate "unoccupied" areas, including private property, when necessary. The Rule and administrative record show that FWS carefully considered all relevant factors and ultimately arrived at a reasoned decision that Unit 1, which in its totality contains the best frog breeding habitat in the species' range, must be designated critical habitat as essential to the conservation of this highly endangered species. Moreover, Plaintiff has failed to demonstrate standing. Accordingly, this Court should dismiss Plaintiff's Complaint or, in the alternative, grant summary judgment in favor of the Defendants.

## BACKGROUND

### I.  The Endangered Species Act

The ESA was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation" of such species. 16 U.S.C. § 1531(b); s*ee Sierra Club v. FWS*, 245 F.3d 434, 438 (5th Cir. 2001) (The purpose of the ESA "is to enable listed species not merely to survive, but to recover from their endangered or threatened status."). The statute defines "conservation" as the

---

[1]  Markle, together with the P&F Lumber Plaintiffs and Plaintiff Weyerhaeuser, collectively "Landowner Plaintiffs," own approximately 45,000 acres in St. Tammany Parish.

"use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3). A species is listed as "endangered" if it is "in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6).

One key method for conserving listed species is the designation of critical habitat, which is generally required. *See id.* § 1533(a)(3)(A). FWS may designate as critical habitat both occupied and unoccupied areas. *Id.* § 1532(5)(A). Areas outside the geographical area occupied by the species at the time it is listed may be designated "upon a determination by the Secretary that such areas are essential for the conservation of the species," *id.* § 1532(5)(A)(ii), and only "when a designation limited to its present range would be inadequate to ensure the conservation of the species." 50 C.F.R. § 424.12(e). The designation must be "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). After considering the various impacts of designation, FWS "<u>may</u>" at its discretion exclude an area from the designation, unless the agency determines that the failure to designate such area as critical habitat will result in the extinction of the species concerned. *Id.*

Critical habitat receives protection under ESA Section 7, which requires federal agencies to consult with the expert agency, here FWS, on any actions "authorized, funded, or carried out by" the agency to ensure that their actions are not likely to destroy or adversely modify critical habitat. *Id.* § 1536(a)(2).[2] If FWS finds that an agency action, such as the issuance of a permit, is likely to adversely modify critical habitat, FWS must suggest reasonable and prudent alternatives that would avoid adverse modification. 50 C.F.R. § 402.14(h)(3). "Reasonable and prudent alternatives" must be "economically and technologically feasible."*Id*. § 402.02.

---

[2] As Markle appears to concede, ECF No. 69-1, ("Br.") at 3, private property designated as unoccupied critical habitat is not per se regulated by the ESA. Markle's citations to provisions that are applicable only when the listed species is present have no bearing on this case because, as all parties agree, there are no frogs in Unit 1. *See, e.g.,* Br. at 3-4 (citing 16 U.S.C. § 1536(a)(3), which applies only when the listed species "may be present in the area affected" and discussing requirements that apply when an action will cause the "take" of a listed species).

If a private party's action has no federal nexus, i.e., it is not authorized, funded, or carried out by a federal agency, it is not affected by a critical habitat designation.[3] *See Fisher v. Salazar*, 656 F. Supp. 2d 1357, 1359 (N.D. Fla. 2009); *see also* 77 Fed. Reg. at 35121 (explaining that timber management activities on non-federal lands have no federal nexus and, thus, would not be affected). Critical habitat designation does not impose any legally binding duties on private parties, affect land ownership, or establish a refuge, wilderness, reserve, preserve, or other conservation area. *Id*. at 35122; 35128. Nor does designation require implementation of restoration, recovery, or enhancement measures by non-federal landowners. *Id*. at 35128.

## II.  National Environmental Policy Act ("NEPA")

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To meet these dual purposes, NEPA requires that an agency prepare a comprehensive environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). For over three decades, FWS has maintained the consistent position that a NEPA analysis is not required for critical habitat designations. *See* 48 Fed. Reg. 49244-02 (Oct. 25, 1983).

## III. Dusky Gopher Frog Critical Habitat Rule

The dusky gopher frog is at "high risk of extinction." 75 Fed. Reg. 31387, 31394. There are about 100 adult frogs left in the wild and only one viable breeding population, which is located in Mississippi. Defendants' Statement of Facts ("DSoF") ¶20. In 2001, FWS listed the frog as endangered due to its low population size, ongoing threats such as habitat destruction and degradation resulting from development, and vulnerability to environmental stressors such as drought. DSoF ¶14. Fragmentation and destruction of the frog's habitat has caused the species'

---

[3] Habitat modification or degradation does not expose property owners to citizen suit liability where the species is not present. Markle cites 50 C.F.R. § 17.3, but omits the key limiting language, which defines harm, in part, as "significant habitat modification or degradation <u>where it actually kills or injures wildlife</u>." (emphasis added). Br. at 7.

small, isolated populations to become genetically isolated and has reduced the space available for reproduction, development of young, and population maintenance. 77 Fed. Reg. at 35130.

At the time of listing, FWS determined that the designation of critical habitat was prudent but, due to budgetary and workload constraints, the agency deferred designation. DSoF ¶22. In June 2010, FWS published a proposed rule to designate critical habitat. DSoF ¶¶25-26. The rule proposed to designate the 96 acres occupied at the time of listing and 1861 acres[4] unoccupied at the time of listing. DSoF ¶27. Based on the best available scientific data on the frog's biological needs, FWS determined that the frog's optimal habitat includes small, isolated, ephemeral ponds for breeding (Primary Constituent Element ("PCE" 1)); upland pine forested habitat that has an open canopy (PCE 2); and upland connectivity habitat (PCE 3).[5] This habitat contains the "physical and biological features necessary to accommodate breeding, growth, and other normal behaviors of the [frog] and to promote genetic flow within the species." 76 Fed. Reg. 59774, 59778. FWS first considered the area occupied by the species at the time of listing, but determined that a designation of unoccupied areas was necessary because "[t]he range of the [frog] has been severely curtailed, occupied habitats are limited and isolated, and population sizes are extremely small and at risk of extirpation and extinction from stochastic events that occur as periodic natural events or existing or potential human-induced events." 77 Fed. Reg. at 35132; 35133.

The proposed rule underwent an independent peer review by six individuals with scientific expertise that included familiarity with the species, the geographic region in which the species occurs, and conservation biology principles. DSoF ¶41. Every peer reviewer concluded that the amount of habitat proposed was insufficient for the conservation of the species, with several suggesting that FWS consider other locations within the frog's historical range. *Id.* ¶44. One peer

---

[4] Of the 1861 acres proposed, 289 acres were considered <u>currently</u> occupied at the time of the June 2010 proposal. 75 Fed. Reg. at 31395.

[5] FWS considered the physical and biological features essential to the frog's conservation, which include, *inter alia*, space for individual and population growth; nutritional and physiological requirements; breeding sites; and habitat representative of the historical or geographical distribution of a species. 75 Fed. Reg. at 31391. FWS derives the PCEs from consideration of these biological needs. The elements of each PCE are described in detail in DSoF ¶79.

4

reviewer suggested the area in Unit 1, well-known to those studying the frog as containing at least two historical breeding sites for the frog. *Id.* ¶54-55. Based on all comments received, FWS reanalyzed the "current and historic data for the species, including data from Alabama and Louisiana," to determine if additional habitat qualified as critical habitat. 77 Fed. Reg. at 35124. FWS identified additional critical habitat in Mississippi and Louisiana and included those areas within the revised proposed rule published for comment on September 27, 2011. 76 Fed. Reg. 59774. FWS was unable to identify critical habitat in Alabama. DSoF ¶¶52-53; R1588.

Before FWS finalized the Rule it considered the potential economic impacts of the designation in a draft and then final economic analysis ("DEA" and "FEA"). 77 Fed. Reg. at 35140. The FEA quantified impacts that may occur in the 20 years following the designation. *Id.* It analyzed the economic impacts of designating Unit 1 based on the following three hypothetical scenarios: (1) development occurring in Unit 1 avoids impacts to jurisdictional wetlands and, thus, does not trigger ESA Section 7 consultation requirements[6]; (2) development occurring in Unit 1 requires a permit from the Army Corps of Engineers due to potential impacts to jurisdictional wetlands, which triggers ESA Section 7 consultation between the Corps and FWS, and FWS works with landowners to keep 40% of the unit for development and 60% managed for the frog's conservation; and (3) development occurring requires a federal permit, triggering ESA Section 7 consultation, and FWS determines that no development can occur in the unit. DSoF ¶76. Information on the value of Unit 1 land was provided by Landowner Plaintiffs. R6666 (FEA 4-6).

The June 2012 final Rule was the culmination of a series of proposed rules, economic analyses, three rounds of notice and comment, and a public hearing. DSoF ¶¶26, 72-73. The Rule designated 6,477 acres in Mississippi and Louisiana, including the 1,544 acres in Unit 1 which FWS considers to be, in its totality, the highest quality breeding habitat anywhere in the frog's range. 77 Fed. Reg. at 35124; *see also* R1588; 3615. The ephemeral wetlands in Unit 1 contain the physical or

---

[6] Similarly, if Unit 1 continues to be used for timber harvesting as Mr. Poitevent has stated it would be, there would be no federal nexus and thus no economic impacts. R2216; 2220; *see also* R2065; 6662 (FEA4-2 & n.68); 6663 (FEA 4-3 & n.78). This scenario is also supported by the fact that Weyerhaeuser holds a lease to continue such operations until 2043.

biological features that make up PCE 1. DSoF ¶¶ 54, 56, 59, 60, 61, 62, 63.

## IV. Standard of Review—Administrative Procedure Act ("APA")

The challenged Rule is reviewed under the arbitrary and capricious standard set forth in the APA, 5 U.S.C. § 706; s*ee Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998). This standard is "highly deferential" and the agency's decision is afforded a strong presumption of validity. *Hayward v. U.S. Dep't of Labor*, 536 F.3d 376, 379 (5th Cir. 2008); *see also Balt. Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 105, (1983). The court may not "reweigh the evidence or substitute its judgment for that of the administrative fact finder." *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *see also Texas Oil & Gas*, 161 F.3d at 933-34. Courts must be particularly deferential to agency determinations made within the scope of the agency's expertise. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000); *see Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006).

## ARGUMENT

Unit 1 is essential to the conservation of the highly endangered frog. FWS used the best available scientific data, carefully considered every factor and made all determinations required by the ESA to designate Unit 1 as critical habitat for the frog. Plaintiff's arguments, which do not challenge FWS' scientific analysis, lack merit. FWS' Rule clearly passes muster under the applicable, deferential standard of review. Accordingly, Defendants are entitled to summary judgment in their favor as a matter of law.

## I. Plaintiff Lacks Article III Standing to Pursue Any of its ESA Claims

Before considering the merits of Markle's claims, the Court must first determine whether Markle has properly invoked the Court's jurisdiction. *Raines v. Byrd*, 521 U.S. 811, 820 (1997). Plaintiff has failed to meet its burden to prove Article III standing by showing that it (1) has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). At the

summary judgment stage, plaintiff cannot rest on "mere allegations," but must set forth by affidavit or other evidence specific facts to establish each element of standing. *Id.* at 561.

Markle has failed to establish an actual or imminent injury. Markle relies on *American Petroleum Institute* to assert a presumption of standing; however, the district court in that case held that a regulated party may establish standing when its declaration establishes that regulatory influences "give rise to cognizable economic injuries or even a 'sufficient likelihood' of such injuries." 541 F. Supp. 2d 165, 177 (D.D.C. 2008). Markle claims that it "may be required" to request federal approval for activities that may affect the species, including adverse habitat modification and that the economic impacts of the Rule "could be as high as $33.9 million," which refers to the third scenario analyzed in the FEA. [7] ECF No. 69-3 at 1-2. Markle does not set forth any evidence that there are concrete and imminent plans to use the land in a way that would trigger ESA Section 7 consultation requirements and thus any need for "federal approval" or any possibility of an economic impact.

"Federal courts consistently deny standing when claimed anticipated injury has not been shown to be more than uncertain potentiality." *Prestage Farms v. Bd. of Supervisors of Noxubee Cnty., Miss.*, 205 F.3d 265, 268 (5th Cir. 2000). When an injury depends on the "occurrence of a number of uncertain events," the future injury is "too conjectural and hypothetical to provide Article III standing." *Id.* Unit 1 is currently being used for timber harvesting, a use that neither implicates a federal nexus nor triggers ESA Section 7 consultation. 77 Fed. Reg. at 35122. The use takes place under a lease agreement that does not expire until June 30, 2043. ECF No. 67-2. Markle does not dispute that timber operations have no federal nexus and are not affected by the designation of Unit 1 as critical habitat. Markle provides no evidence of other concrete development plans that would have a federal nexus sufficient to trigger ESA Section 7 consultation requirements. Moreover, as Markle emphasizes, even after issuing the designation, the "government cannot compel the landowners, including Markle, to manage Unit 1 for the conservation of the gopher

---

[7] As discussed above in footnote 3, Plaintiff does not face any risk of violating ESA Section 9 as a result of any "habitat modification," or risk liability under the ESA's citizen suit provision.

frog." ECF No. 69-2 at 2; Br. at 5. Markle has not shown that the designation will imminently cause an injury and, thus, Markle has not met its burden of establishing standing to challenge the designation.

## II.  Markle Lacks Prudential Standing to Bring a NEPA Claim

In order to demonstrate prudential standing, a party must show that the injury complained of "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for [the] complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *see also Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 675 (5th Cir. 1992). Economic harms are not within the zone of interests protected by NEPA. *See Nevada Land Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) ("The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions."); *Hurd v. Urban Dev., L.C. v. FHA*, 33 F. Supp. 2d 570, 573-74 (S.D. Tex. 1998).

Here, Plaintiff asserts solely economic injuries. *See* Br. at 7 (claiming that the designation will cause $33.9 million in economic impacts); ECF No. 69-3. Plaintiff also claims that it has suffered an environmental injury because the designation of Unit 1 as critical habitat "requires a physical change to the environment," including pond management and controlled burns. Br. at 7-8. Plaintiff submits no affidavits supporting these claimed changes to the environment that allegedly affect its interests, and therefore this argument fails as a matter of law. *Lujan*, 497 U.S. at 884-85 (prudential standing must be supported by sufficient affidavits at the summary judgment stage). Moreover, FWS has no authority to implement any management measures to maintain or improve the habitat on the private land in Unit 1 without the approval of the landowners, a fact highlighted by Plaintiff. *See* ECF No. 69-2 ¶9; *see also* 77 Fed. Reg. at 35128. Plaintiff has made clear that it would never authorize such management of the land. *See* ECF No. 69-3 ¶ 7. Accordingly, Plaintiff's claims of environmental harm are without basis and, therefore, it lacks prudential standing. *See Bldg. Indus. Ass'n v. U.S. Dep't of Commerce*, No. 11-4118, 2012 WL 6002511, at *7 (N.D. Cal. Nov. 30, 2012) (holding that property owners lacked prudential standing under NEPA to challenge a critical habitat designation).

8

### III. Unit 1 Meets the Statutory Definition of "Critical Habitat": FWS Made a Reasonable Determination that Unit 1 is Essential for the Conservation of the Frog

After considering the best available science and the importance of ephemeral ponds to the recovery of the frog, FWS reasonably determined that Unit 1 is essential for the conservation of the species. Unable to show that FWS' finding is arbitrary and capricious, Markle bases its arguments on inapplicable standards and requirements that simply do not exist.

An unoccupied area may be designated if FWS determines that it is "essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). As Markle concedes, Br. at 10, Congress did not define "essential" or set forth any specific requirements in the ESA for determining what areas are "essential," but rather delegated to the Secretary the authority to make that determination on a case-by-case basis. FWS is not required to explicitly define "essential"; rather, it must explain its considerations for assessing what areas are essential. *See Cape Hatteras Access Pres. Alliance* ("*CHAPA*") *v. U.S. Dep't of the Interior*, 344 F. Supp. 2d 108, 120 (D.D.C. 2004) (rejecting plaintiffs' argument that FWS was required to define "occupied"). FWS did so here: it applied a rational interpretation of "essential" and provided a reasonable explanation for its determination that Unit 1 is essential for the conservation of this highly endangered species. Therefore, its determination must be upheld as a permissible interpretation of the statute under *Chevron*. *See id.*; *see also Texas Oil & Gas*, 161 F.3d at 934.

After reviewing the June 2010 proposed rule, all peer reviewers noted that, in their expert opinion, the already proposed designation was inadequate to ensure the conservation of the frog. DSoF ¶¶43-44. They also noted the importance of spreading populations out over a wider geographic area to decrease the risk that the frog will go extinct due to localized threats, such as droughts, disease, and pollution. *Id.* ¶¶44-45, 47. Given the "high risk of extirpation from stochastic events," FWS determined that the already proposed habitat was inadequate to ensure the conservation of the frog and began considering sites throughout the frog's historic range. *Id.* ¶¶48-63. In identifying areas that are essential for the conservation of the frog, FWS considered the following criteria: "(1) The historic distribution of the species; (2) presence of open-canopied, isolated wetlands; (3) presence of open-canopied, upland pine forest in sufficient quantity around

each wetland location to allow for sufficient survival and recruitment to maintain a breeding population over the long term; (4) open-canopied, forested connectivity habitat between wetland and upland sites; and (5) multiple isolated wetlands in upland habitat that would allow for the development of metapopulations." 76 Fed. Reg. at 59780-81.

FWS considered the best available scientific information on sites throughout the frog's range, but could not identify any locations outside Mississippi that contained all of these elements or even all three PCEs. DSoF ¶53 "As a result of the rarity of open-canopied, isolated, ephemeral ponds within the historic range of the dusky gopher frog, and their importance to the survival of the species, identifying more of these ponds was the primary focus of" FWS' analysis of potential sites. *Id.* ¶50; *see also* ¶¶45-51; R2408 (although very little longleaf pine habitat currently exists in the frog's range, it is easier to restore terrestrial habitat than it is restore or create breeding ponds). In FWS' expert judgment, the recovery of the frog "will not be possible without the establishment of additional breeding populations of the species. Isolated, ephemeral ponds that can be used as the focal point for establishing these populations are rare, and this is a limiting factor in" the frog's recovery. 77 Fed. Reg. at 35124.

A peer reviewer suggested that FWS consider Unit 1 based on the fact that it contains at least two historical frog breeding ponds and on the results of that peer reviewer's research and visits to those ponds in recent years. DSoF ¶56. The same peer reviewer and a FWS biologist with over 20 years of experience visited the area, "assessed the habitat quality of ephemeral wetlands in [Unit 1] and found that a series of five ponds contained the habitat requirements for PCE 1." 77 Fed. Reg. at 35123. The ponds were "intact and of remarkable quality." DSoF ¶59; *see also* Exhibit 1. Moreover, FWS found that the "five ponds [in Unit 1] are in close proximity to each other, which provides metapopulation structure[8] and increases the unit's value to the long-term survival and recovery of the frogs over an area with a single breeding pond." 77 Fed. Reg. at 35124; *see also id.*

---

[8] A metapopulation structure is defined as neighboring local populations close enough to one another that dispersing individuals could be exchanged at least once per generation, i.e., allowing for gene flow among local populations. 76 Fed. Reg. at 59778. Historically, frog populations were locating within metapopulations. R1554.

at 35132; 35133 ("Multiple breeding sites protect against catastrophic loss at any one site and provide opportunity for recolonization. This is an especially important aspect of critical habitat for [the frogs] due to their limited population numbers."). FWS determined that "the five ponds in Unit 1 provide breeding habitat that in its totality is not known to be present elsewhere within the historic range." 77 Fed. Reg. at 35124. FWS determined that Unit 1 is essential to the conservation of the frog "because it provides: (1) Breeding habitat for the [frog] in a landscape where the rarity of that habitat is a primary threat to the species; (2) a framework of breeding ponds that supports metapopulation structure important to the long-term survival of the [frog]; and (3) geographic distance from extant [frog] populations, which likely provides protection from environmental stochasticity."*Id*. FWS provided a detailed, rational explanation for its determination, and that determination is entitled to deference.

Reading additional requirements into the ESA that do not exist, Markle argues that FWS cannot identify what habitat is essential to the conservation of the frog without first identifying the "point" at which the frog would be considered conserved. Br. at 10. Plaintiff relies solely on the holding from a district court decision that was explicitly rejected by the Ninth Circuit. *See Home Builders Ass'n v. FWS*, 616 F.3d 983, 989 (9th Cir. 2010) (rejecting court's adoption of this argument "because it lacks legal support and is undermined by ESA's text"). Plaintiff's argument was also rejected in *Arizona Cattle Growers v. Kempthorne*. 534 F. Supp. 2d 1013, 1025 (D. Ariz. 2008) ("While tempting in its logical simplicity…the language of the ESA requires a point of conservation to be determined in the recovery plan, not at the time of critical habitat designation."). The ESA requires the Secretary to develop and implement a recovery plan in which it identifies, "to the maximum extent practicable," "objective, measurable criteria" for determining the point at which the species will be conserved, but that requirement is set forth in a different subsection of the statute, 16 U.S.C. § 1533(f)(1)(B)(ii). No similar requirement is mentioned in the provisions related to designating critical habitat, *see id.* § 1533(b)(2); 534 F. Supp. 2d at 1025 (noting that a "negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute" (quoting *Hamdan v. Rumsfeld*,

548 U.S. 557, 578 (2006))). Had Congress intended FWS to define recovery criteria before designating critical habitat it would have stated so.

Markle does not address FWS' analysis beyond vague generalities, let alone establish that the bases for FWS' determination were arbitrary and capricious. FWS made the required finding that, based on the best available science, Unit 1 is essential for the conservation of the frog, and that finding is well-supported by the record and entitled to deference.

## IV. Unoccupied Areas Need not Contain PCEs to be Designated

Plaintiff asserts, without support, that presence of the requisite PCEs is necessary for designation of critical habitat. Br. at 9. Markle's interpretation of the requirements for designating critical habitat contradicts the plain language of the ESA and lacks any support in the relevant case law. The ESA defines "critical habitat" as:

> (i)  the specific <u>areas within the geographical area occupied by the species</u>, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

> (ii) specific <u>areas outside the geographical area occupied by the species</u> at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such <u>areas are essential</u> for the conservation of the species.

16 U.S.C. § 1532(5)(A). In other words, critical habitat may consist of "occupied" areas, *id.* § 1532(5)(A)(i), and "unoccupied" areas, *id.* § 1532(5)(A)(ii). Here, Markle concedes that the frog was not present in Unit 1 at the time of the frog's listing in 2001, Br. at 5, and thus, on its face, subsection (i) does not apply. Rather, Unit 1 is an area outside the geographic area occupied by the species at the time it was listed, and thus subsection (ii) provides the applicable standard.

The statutory language is unambiguous: there are two types of critical habitat, each with a separate standard and scope of analysis. To designate "occupied" habitat, FWS must identify <u>features</u> in the area <u>that are essential</u> to the conservation of the species, whereas, to designate "unoccupied" habitat, FWS must determine that the <u>area itself is essential</u> to the conservation of the species. Moreover, the ESA makes clear that unoccupied areas designated as critical habitat do not need to contain any PCEs. It is a well-established principle of statutory construction that,

"[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Had Congress intended to restrict [this subsection as Petitioner suggests], it presumably would have done so expressly as it did in the immediately following subsection…."); *see United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972). The fact that Congress specifically included language requiring an assessment of physical and biological features in subsection (i) but excluded that language in subsection (ii) shows that Congress intentionally omitted the requirement of a showing of PCEs for designating unoccupied areas. As Congress must have recognized, depending on the specific needs of and threats to a listed species, areas that do not contain PCEs at the time of designation may still be essential to the conservation of the species.

As a practical matter this makes sense. The purpose of the ESA is to conserve listed species by, in part, protecting their habitat. 16 U.S.C. § 1531(b). If the biggest threat to a critically endangered species is the destruction of habitat, as is the case with the frog, it does not make sense to hamstring FWS' efforts to conserve the species by limiting the designation of habitat to only those areas that contain optimal conditions for the species. Presumably, if such habitat was readily available, the frog would not be reduced to 100 individuals. *Cf. Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1275 (11th Cir. 2007) (rejecting plaintiff's Commerce Clause challenge, stating "[u]nder the Coalition's theory, Congress is free to protect a commercially thriving species that exists in abundance across the United States because it has economic worth, but once economic exploitation has driven that species so close to the brink of extinction that it desperately needs the government's protection, Congress is powerless to act.").

Plaintiff not only fails to identify any support for its novel interpretation of the statute, but it also fails to mention that this argument has been rejected. *See Fisher v. Salazar*, 656 F. Supp. 2d 1357, 1368 (N.D. Fla. 2009) (holding that "FWS was not required to identify PCEs" to designate unoccupied habitat)). Markle relies on *Alaska Oil & Gas Ass'n v. Salazar* ("*AOGA*"), 916 F. Supp. 2d 974 (D. Alaska 2013), which is inapposite because the designation at issue in that case included

13

only occupied habitat and, thus, was based on a different standard, 16 U.S.C. § 1532(5)(A)(i). Markle's reliance on *Arizona Cattle Growers* is likewise misplaced. Br. at 13. As an initial matter, that case did not involve a challenge to a critical habitat designation. 273 F.3d 1243-44 (9th Cir. 2001). Markle quotes in part the court's discussion on the designation of unoccupied habitat and once again omits key language in its quotation. Br. at 13. In fact, the court, referring to the designation of unoccupied habitat, 16 U.S.C. § 1532(5)(A)(ii), stated "[a]bsent this procedure, however, there is no evidence that Congress intended to allow [FWS] to regulate any parcel of land that is merely capable of supporting a protected species." 273 F.3d at 1244 (emphasis added).

Markle's remaining arguments also lack merit. Without citation, Markle claims that Unit 1 is "incapable" of supporting a protected species. Br. at 13. As is evident by the plain language of the ESA (and Plaintiff's failure to cite any support for its claim), there is no requirement that unoccupied areas be in optimal condition to conserve the species at the time of designation. To the extent that Plaintiff argues the frog could not survive in Unit 1, that statement is incorrect and the inquiry irrelevant. In any event, as discussed in section III(a), *supra*, the breeding habitat in Unit 1 is in very good condition and could support the frog's conservation *today*.[9] Moreover, the uplands in Unit 1 contain underground refugia that would allow for survival of the species, which is a key component of PCE 2. DSoF ¶66. Finally, the uplands are restorable to support the *conservation* of the species with reasonable effort. *Id.* ¶65. Thus, Markle's assertion is simply incorrect.

Without discussion or support, Markle also argues that the designation of critical habitat is imprudent in this case because it would "not be beneficial to the species." Br. at 13. FWS has determined that, not only is Unit 1 beneficial to the frog, but it is essential to the species' conservation. Moreover, Markle does not address, let alone specifically challenge FWS' prudency determination, which the ESA and implementing "regulation clearly show…merely sets the outer bounds in determining areas to designate." *AOGA*, 916 F. Supp. 2d at 996 (rejecting plaintiffs'

---

[9] Markle is wrong in suggesting that Unit 1 does not contain any PCEs. Br. at 12. FWS found that Unit 1 contains all the physical or biological features of PCE 1 (ephemeral ponds).

contentions that FWS must make express prudency finding). Markle's argument lacks any merit and must be rejected.

Markle also argues that if the ESA prohibits FWS "from designating all areas that *can* be occupied by the species," then it follows that the Secretary cannot designate *any* geographic area that "cannot be occupied by the species." Br. at 13-14. Besides employing faulty logic, Markle's argument contains several fundamental flaws. First, Markle cited 16 U.S.C. § 1532(5)(C), which states in its entirety: *Except in those circumstances determined by the Secretary*, critical habitat shall not include the entire geographical area which <u>can be</u> occupied by [the species]. (emphasis added). Thus, the statutory basis undermines, rather than supports, Markle's novel theory. Markle's unsupported argument also equates "can be occupied" with the presence of all identified PCEs, thereby ignoring the clear distinction Congress made between the definition of occupied and unoccupied habitat, as discussed in more detail above. *See Russello*, 464 U.S. at 23. Additionally, as discussed above and established by the record, Unit 1 *is* capable of supporting the frog and, thus, *can* be occupied by the species.[10] *See* DSoF ¶¶ 59, 61, 62, 66. Unit 1's breeding habitat is in excellent condition and, in FWS' expert opinion, the uplands habitat can be restored with reasonable effort. As the *Arizona Cattle Growers* court explained in the passage cited by Markle, Congress provided a mechanism for designating such habitat where it is essential to the conservation of the species. 273 F.3d at 1244.

Markle also argues without support that "essential" should be defined by whether Landowner Plaintiffs intend to manage the habitat for the benefit of the endangered species. Br. at 12. To the contrary, the ESA mandates the use of the "best available science" to determine whether habitat is essential. 16 U.S.C. § 1533(b)(2). The fact that Landowner Plaintiffs choose not to maintain the habitat for the benefit of the frog does not make Unit 1 less essential to this frog; rather, that fact simply means that this highly endangered species is that much closer to extinction. Markle's reading of the statute would leave FWS powerless to act where the only remaining habitat essential

---

[10] Federal Defendants reiterate that the frog could survive in Unit 1. However, with only 100 frogs left in the wild, FWS would not risk translocating frogs in less than optimal conditions.

to the conservation of the species is located on private land. The ESA imposes no such limitation.

The absence of a requirement to show that unoccupied habitat contains all PCEs does not lessen the standard for designating such habitat. As the *CHAPA* court explained, designation of unoccupied habitat is a "more extraordinary event" because, by regulation, such designations are prohibited unless designation of occupied land, which must contain the identified PCEs, is insufficient. 344 F. Supp. 2d at 125. FWS made that reasonable determination here. Although not required by the ESA for designation, Unit 1 not only contains PCE 1—the frog's breeding habitat—but the five breeding ponds in Unit 1 represent the *best breeding habitat anywhere in the frog's historic range*, a fact that Markle does not seriously challenge.[11] 77 Fed. Reg. at 35124 (emphasis added). The frog is currently limited to one viable breeding population occurring at one pond. Because this highly endangered frog cannot survive without breeding habitat, which has very specific requirements that are both uncommon and difficult to recreate, FWS reasonably determined that Unit 1 is essential to the conservation of the species. Plaintiff fails to meet its high burden of showing that this finding was arbitrary or capricious. FWS' designation of Unit 1 as critical habitat is within the statutory definition of critical habitat, well supported by the record and best available science, and is entitled to deference.

## V.  FWS Considered All Potential Economic Impacts to Unit 1

The ESA only requires FWS to "take into consideration" probable economic and other impacts, before designating critical habitat. 16 U.S.C. § 1533(b)(2). FWS fulfilled its statutory obligation, and Markle does not argue to the contrary. Furthermore, FWS appropriately relied on the "baseline" method to assess the economic impacts and, in any event, as to Unit 1, attributed all potential impacts in Unit 1 to the designation. Thus, the results of the incremental analysis and Plaintiff's preferred coextensive analysis would be the same.

---

[11] Markle provides no record support for its baseless claim that Unit 1 does not contain PCE 1. Br. at 15. It is unclear what Markle means by "speculative" habitat because no such term exists, but the record shows that this breeding habitat is "intact and of remarkable quality" and frogs could be translocated there with the Landowners' permission.

**a.  The Method Used To Analyze Economic Impacts is Irrelevant; Unit 1 is Unoccupied**

Plaintiff disagrees with FWS' use of the "baseline" method for analyzing economic impacts, insisting that FWS should have considered those impacts co-extensive with ESA listing as required by the Tenth Circuit. *N.M. Cattle Growers Ass'n* ("*NMCG*") *v. FWS*, 248 F.3d 1277 (10th Cir. 2001). The Court need not reach this issue because, in the absence of any frogs in Unit 1, and thus any impacts related to ESA listing, FWS attributed all potential economic impacts in Unit 1 to the designation. R6626 ("Because this unit is unoccupied by the gopher frog, limitations on development would be attributable to the critical habitat designation alone and therefore would be considered incremental impacts."). The "baseline" method focuses on the costs attributable solely to the designation of critical habitat above and beyond the baseline costs. 77 Fed. Reg. at 35140. The "baseline" costs are the quantified impacts of conservation protections for the frog that are already in place, such as ESA listing, and that would be incurred regardless of whether critical habitat is designated. *Id.* Where, as here, the designation is of unoccupied habitat, there are no impacts related to listing, as Markle concedes. Br. at 7 (emphasizing, "[w]ere it not for the designation of Unit 1 as critical habitat, Markle would not be subject to the ESA at all because the gopher frog is not found in Unit 1").

Even if the Court considers Markle's argument, FWS reasonably relied on the "baseline" method to identify and assess potential economic impacts. The ESA requires the agency to "tak[e] into consideration the economic impact" of designation, but does not mandate any particular method of analysis. 16 U.S.C. § 1533(b)(2); *see also Fisher*, 656 F. Supp. 2d at 1368. FWS has issued a final rule, after notice and comment, revising the ESA regulations on impact analyses conducted for critical habitat designations and formally adopting the "baseline" method for analyzing economic impacts. 78 Fed. Reg. 53058, 53059.[12] Formal agency actions, such as those resulting from notice-and-comment rulemaking, generally warrant *Chevron* deference. *Christensen*

---

[12] That final rule, which Markle does not challenge here, thoroughly explains the genesis behind the Tenth Circuit decision and justification for adopting the "baseline" approach for economic impact analyses. *Id.* at 53062.

*v. Harris Cnty.*, 529 U.S. 576, 587 (2000).

Additionally, the baseline method has been approved by the U.S. Office of Management and Budget for assessing the costs of regulations. R6639. Moreover, courts outside the Tenth Circuit have approved the baseline method and rejected the co-extensive approach. *See Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1173 (9th Cir. 2010) (describing the baseline approach as "more logical than the co-extensive approach"); *Fisher*, 656 F. Supp. 2d at 1371  ("To the extent the Tenth Circuit's co-extensive approach permits consideration of costs not attributable to the designation, it is inconsistent with the mandate of the ESA."); *CHAPA*, 344 F. Supp. 2d at 130 ("[FWS] must not allow the costs below the baseline to influence its decision to designate or not designate areas as critical habitat.").

With little elaboration, Markle urges the Court to adopt the Tenth Circuit's approach, but fails to mention that the circumstances behind that court's decision no longer exist and, for that reason, courts outside the Tenth Circuit have not adopted that Circuit's approach. *See, e.g, Fisher*, 656 F. Supp. 2d at 1368-71 (thoroughly explaining *NMCG* and the court's decision to reject the Tenth Circuit's approach). One court described the Tenth Circuit's holding as follows:

> Apparently hamstrung by its inability to consider the validity of 50 C.F.R. § 402.02, the Tenth Circuit found another way to require the Service to perform a more rigorous economic analysis. This is an instance of a hard case making bad law.

*CHAPA*, 344 F. Supp. 2d at 130. After *NMCG* was decided, the Ninth Circuit invalidated 50 C.F.R. § 402.02, *Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059 (9th Cir. 2004), thereby calling into question the continuing validity of the Tenth Circuit's decision.

The circumstances before this Court are exactly the opposite of those before the Tenth Circuit, which led that Court to reject the economic impacts analysis prepared for that designation. *See* 78 Fed. Reg. at 53068 (noting that an economic analysis of the designation of unoccupied habitat "may more frequently identify higher probable impacts [because] any project modifications stemming from [an ESA Section 7] consultation process would be due solely to the designation of critical habitat and the requirement of avoiding its adverse modification, because the species is not present in the area"). Here, all potential economic impacts in Unit 1 were attributed to the

designation of critical habitat alone and, thus, the potential economic impacts would be the same whether quantified using the baseline method or the coextensive method. Accordingly, the Court should reject Plaintiff's arguments.

Markle also attempts to discredit the approach by asserting that "the provision requiring the consideration of all relevant economic impacts" is the "most significant provision in the entire [ESA]." Br. at 18. It is unclear how this statement supports Markle's argument, but in any event, Markle conveniently replaced the word "bill" in the original text with "ESA."[13] In fact, the legislative history cited by Markle pertains to the 1978 ESA amendments and the representative was explaining his opinion that of the provisions included in the House bill, the provision requiring the Secretary to consider the economic impact of designating critical habitat was the most significant. *Id.* Markle also makes an unsupported claim that *Bennett v. Spear*, 520 U.S. 154 (1997), mandates the Tenth Circuit's approach. In *Bennett*, the Supreme Court reiterated the need to take into consideration economic impacts, where provided under the ESA, but Plaintiff fails to show where in the decision the Supreme Court mandated any particular approach. The baseline method appropriately considers economic impacts as required by the ESA. In light of this case law and the deference that must be given to an agency's interpretation of a statute it administers, the Court should approve the "baseline" method for analyzing economic impacts.

### b. The Decision Not to Exclude Unit 1 is Unreviewable and Within FWS' Discretion

The plain language of the ESA and implementing regulations make clear that FWS' only obligation is to "consider" economic impacts, an obligation FWS carried out. Markle does not argue that FWS failed to consider the potential economic impacts from the designation of Unit 1, nor could it persuasively do so. The Rule and record reflect extensive consideration of potential impacts to Unit 1 and, thus, FWS fulfilled its statutory requirement. Instead, Markle improperly asks the Court to weigh the potential economic impacts of the designation and determine that Unit 1 should have been excluded, a task Congress left entirely within FWS' discretion. Because FWS'

---

[13] Legislative History of the Endangered Species Act of 1973, as amended in 1976, 1977, 1978, 1979, and 1980: together with a Section-by-Section Index (Comm. Print) (1982) at 1221.

decision not to exclude Unit 1 is unreviewable, the Court should reject Markle's argument.

Under the APA, agency actions "committed to agency discretion by law" are unreviewable. 5 U.S.C. § 701(a)(2). An agency action is committed to its discretion if the underlying "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Here, Congress provided a standard for assessing a decision to exclude an area from critical habitat—the balancing test that Markle refers to. However, Congress did not provide a standard for assessing FWS' decision *not* to exclude an area. Thus, this decision is committed to agency discretion by law, and the APA precludes any court review of FWS' decision. *See AOGA*, 916 F. Supp. 2d at 994[14]; *Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior*, 731 F. Supp. 2d 15, 29 (D.D.C. 2010); *see also Building Indus. Ass'n of Bay Area v. U.S. Dep't of Commerce*, No. 11-4118, 2012 WL 6002511, at *7 (N.D. Cal. Nov. 30, 2012); *Home Builders Ass'n v. FWS*, 2006 WL 3190518, at *20 (E.D. Cal. Nov. 2, 2006), modified on other grounds, 2007 WL 201248 (E.D. Cal. Jan. 24, 2007). Because FWS' decision not to exclude Unit 1is unreviewable, Markle's argument must be rejected.

Courts addressing this issue have agreed that FWS is not required to balance the conservation benefits of designation against the benefits of exclusion. *See AOGA*, 916 F. Supp. 2d at 994 ("The need to balance the benefits of exclusion versus inclusion arises only when the Service decides to exclude an area, not include one."); *Building Industry Ass'n*, 2012 WL 6002511, at *5; *Fisher*, 656 F. Supp. 2d at 1368. Markle does not cite any support to the contrary. In "taking into consideration" the impacts of the designation, FWS "is not required to give economics or any other 'relevant impact' predominant consideration in [its] specification of critical habitat." H.R. Rep. No. 95-1625, at 17 (1978), as reprinted in 1978 U.S.C.C.A.N. 9453, 9467. Instead, "[t]he consideration and weight given to any particular impact is completely within the Secretary's discretion." *Id.* (emphasis added).

---

[14] Markle cites *AOGA* as support for its assertion that FWS' failure to exclude Unit 1 due to potential economic impacts was arbitrary and capricious. Br. 19-20. However, the district court in that case rejected the very arguments made by Markle in this case. 916 F. Supp. 2d at 994.

Moreover, the plain language of the statute provides that, upon considering economic and other impacts of the designation, FWS "may"—but is not required to—"exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat," unless exclusion will result in the extinction of the species. 16 U.S.C. § 1533(b)(2); *see also* R1826, 1839 (Weyerhaeuser conceding FWS' "broad discretion" to exclude areas); 1820 (Poitevent Landowners urging Secretary to "exercise his discretion" under Section 4(b)(2) to exclude Unit 1). In other words, even if the benefits of exclusion outweigh the benefits of designating a particular area as critical habitat, FWS is authorized to exclude such areas, but has no obligation to do so. *See AOGA,* 916 F. Supp. 2d at 994; *Building Indus.*, 2012 WL 6002511, at *5.

Even if the Court decides that FWS' decision not to exclude an area is judicially reviewable, all that is required under the APA is for FWS to provide a non-arbitrary explanation for its decision. *See Texas Oil & Gas*, 161 F.3d at 933-34. Here, FWS had to take into consideration the fact that there are only about 100 frogs left in the wild and the primary cause of their highly endangered status is lack of habitat. Unit 1, in its totality, represents the best quality breeding habitat anywhere in the frog's historical range and the frog is on the verge of extinction. Moreover, FWS had already determined that Unit 1 was "essential" for the conservation of the frog. Thus, it was reasonable for FWS to determine that the benefit to the species of including Unit 1 outweighed the benefits of exclusion, particularly in this case in which any future development remains speculative.

Moreover, it is unlikely that the designation would result in $33.9 million in economic impact, which is the figure represented by the FEA's hypothetical Scenario 3 as discussed in the background section. If Landowner Plaintiffs continue to use their land for timber harvesting, as Mr. Poitevent has indicated a number of times they will do, then the designation would not affect them at all. *See* R2216; 2220; *see also* FEA 4-2, 4-3. Even if Landowner Plaintiffs should develop concrete plans to proceed with development projects located in part in Unit 1 and the project has a federal nexus, FWS has already indicated that if it finds that a federal agency action is likely to adversely modify critical habitat, it believes it could identify reasonable and prudent alternatives.

77 Fed. Reg. at 35123.

Thus, even if the Court concludes that determination is reviewable, Markle has not met its high burden of showing that the determination is arbitrary or capricious.

**VI. FWS Has the Constitutional Authority to Designate Unit 1 as Critical Habitat**

Markle does not seriously challenge FWS' constitutional authority to apply ESA Section 4 to designate Unit 1 as critical habitat for the frog. As an initial matter, Markle does not dispute that the passage of the ESA is a constitutional exercise of Congressional authority under the Commerce Clause. Br. at 4, 22. Moreover, Markle's brief is noticeably devoid of almost any discussion of the relevant case law, which is not surprising given that every Commerce Clause challenge to a provision or application of the ESA has been rejected. Six Circuits, including the Fifth Circuit, have evaluated and dismissed post-*Lopez* Commerce Clause challenges to applications of the ESA. *See San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163 (9th Cir. 2011); *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1272-73 (11th Cir. 2007); *Wyoming v. U.S. Dep't of Interior*, 442 F.3d 1262 (10th Cir. 2006) (affirming district court's analysis); *GDF Realty Invs., Ltd. v. Norton ("GDF")*, 326 F.3d 622, 639 (5th Cir. 2003); *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062 (D.C. Cir. 2003); *Gibbs v. Babbitt*, 214 F.3d 483 (4th Cir. 2000). Markle makes little attempt to distinguish those cases from the present case. Finally, Markle's brief fails to even mention the factors that courts consider when assessing Commerce Clause challenges. Markle's claim is not unique, lacks merit and should be rejected.

Markle incorrectly asserts that, because Congress' authority to enact the ESA is derived from the Commerce Clause, each application of the ESA itself must regulate channels of interstate commerce, things in interstate commerce, or activities that substantially affect interstate commerce. Br. at 22. This is the standard for determining whether the underlying statute or regulation—in this case the ESA—is a constitutional exercise of the Commerce Clause. *Gonzales v. Raich*, 545 U.S. 1, 16 (2005).[15] Under *Gonzales*, the Court need only find that Section's 4

---

[15] Markle's reliance on *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), is misplaced because those cases involved challenges to single-

provision requiring designation of critical habitat is essential to the ESA, a comprehensive regulatory scheme that has a substantial relation to interstate commerce. *See id.* at 9 (upholding Congress' authority under the Commerce Clause to regulate noncommercial intrastate activity essential to a comprehensive regulatory scheme).

Every Circuit to have reached the issue, including the Fifth Circuit, has concluded that the ESA is a comprehensive scheme that has a substantial relation to interstate commerce. *Alabama-Tombigbee*, 477 F.3d at 1272-73; *see also San Luis*, 638 F.3d 1163; *GDF*, 326 F.3d at 639. Furthermore, it is clear from Congress' mandate that the Secretary designate critical habitat that Congress believed designation of such habitat to be one of the most important avenues for protecting endangered species. *See id.* § 1533(b)(2); *see also id.* § 1531(b). This seems particularly obvious in this case in which there at most 100 frogs left in the wild and their most significant threat is habitat destruction. Contrary to Markle's assertions, and as the ESA affirms, the purpose of designating critical habitat is to conserve a listed species. *See* 16 U.S.C. § 1531(a)(1) (Congress finding that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation").[16] Because ESA Section 4's mandate to designate critical habitat for listed species is an integral component of the ESA, this particular application of Section 4 is a constitutional exercise of Congress' authority and, therefore, FWS' authority under the Commerce Clause.[17] *See Alabama-Tombigbee*, 477 F.3d at 1272 (noting that "when a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under [the] statute is of no consequence").

Markle's remaining arguments lack merit. The fact that the frog currently exists only in

---

subject statutes rather than an application of a comprehensive regulatory scheme as in *Raich*. *See* 545 U.S. 1, 38 (2005) (Scalia, J., concurring).

[16] Markle's assertion that the designation of Unit1, which FWS in its expert opinion believes will help ensure the survival of a highly endangered species, does not have a substantial effect, whether alone or in the aggregate, on the preservation of biodiversity lacks any merit.

[17] There is no requirement that FWS make an explicit finding that every application of the ESA regulates economic activity and Markle cites no support suggesting otherwise. *See* 545 U.S. at 26; *Alabama-Tombigbee,* 477 F.3d at 1272-73; *see also GDF*, 326 F.3d at 629.

Mississippi is irrelevant because the rule regulates certain activities set forth in ESA Section 7 affecting the frog's critical habitat, which FWS determined exists in two states—Mississippi and Louisiana. Markle also incorrectly states that courts that have upheld the constitutionality of the ESA have based their decisions on the conclusion that the particular application challenged regulated economic activity. Br. at 22; *see Alabama-Tombigbee*, 477 F.3d at 1276-77 (rejecting Commerce Clause challenge to an ESA Section 4 listing decision); *see also GDF*, 326 F.3d at 639 (noting that "non-commercial, intrastate activities must be 'essential' to an *economic* regulatory scheme's efficacy in order . . . for aggregation to be appropriate"). In sum, as the Supreme Court reaffirmed in *Raich*, "where the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." 545 U.S. at 23 (citation omitted). The Rule is a constitutional exercise of Congress' authority under the Commerce Clause and must be upheld.

## VII.    NEPA Does Not Apply to Critical Habitat Designations

FWS' consistent position that critical habitat designations are not subject to NEPA was upheld by the Ninth Circuit in *Douglas County v. Babbitt*, 48 F.3d 1495, 1501-08 (9th Cir. 1995). The Ninth Circuit explained that NEPA analysis is not required because:  (1) the ESA displaced the procedural requirements of NEPA with respect to critical habitat designation, (2) NEPA does not apply to actions that do not alter the physical environment, and (3) critical habitat designation serves the purposes of NEPA by protecting the environment from harm due to human impacts. *See id.* Further, the court found that NEPA should not be used as "an 'obstructionist tactic' to prevent environmental protection." *Id.* at 1508 (citing *Pacific Legal Found. v. Andrus*, 657 F.2d 829, 838 (1981)); *see also Building Indus.*, 2012 WL 6002511, at *7.[18]

---

[18] The process for designating critical habitat may also be considered the functional equivalent of a NEPA analysis, thus providing a further support for the principle that such designations are not subject to NEPA. *See Pacific Legal Found.*, 657 F.2d at 835 (noting in *dicta* that the "ESA may now provide the functional equivalent of an impact statement when a critical habitat is designated"); *see also Texas Comm. on Natural Res. v. Bergland*, 573 F.2d 201, 207 (5th Cir. 1978) (noting that courts have held that "NEPA compliance has not been required when the agency's organic legislation mandated specific procedures for considering the environment that were 'functional equivalents' of the impact statement process.").

The only other circuit to have addressed this precise issue was the Tenth Circuit. *See Catron Cnty. Bd. of Comm'rs v. FWS*, 75 F.3d 1429, 1436-39 (10th Cir. 1996). Significant to the court's ruling was its finding that, unlike in the *Douglas County* case, the designation of critical habitat would harm the environment by limiting the county's ability to engage in flood control efforts. *See id.* at 1437-38; *see also CHAPA*, 344 F. Supp. 2d at 136 (finding that NEPA applied to a critical habitat designation, in part, because the designation would "significantly affect the quality of the human environment"). Although the Fifth Circuit has not addressed whether NEPA applies to critical habitat designations, it has held that NEPA does not apply to actions that do not alter the physical environment. *See Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 679 (5th Cir. 1992) ("[T]he acquisition of the [negative conservation] easement by [FWS] did not effectuate *any* change to the environment which would otherwise trigger the need to prepare an EIS."); *see also City of Dallas v. Hall*, 562 F.3d 712, 721-23 (5th Cir. 2009) (holding that setting an acquisition boundary for a wildlife refuge did not alter the physical environment and therefore did not require the preparation of an EIS).

Here, the designation of critical habitat does not alter the physical environment and does not require any action by private landowners. *See* 77 Fed. Reg. at 35128. Further, Plaintiff has made clear that it will never authorize FWS to implement management measures to improve the habitat. Rockwell Decl. ¶ 7. Therefore, there is no basis for Plaintiff's assertion that FWS' action will affect the environment. Moreover, Plaintiff's land is unoccupied, and therefore the only way that Plaintiff might be required in the future to take management actions to protect the frog would be if Plaintiff were to undertake a project with a federal nexus. *See* 16 U.S.C. § 1536; *see also* Background section I, *supra*. If that were to occur, an appropriate NEPA analysis could be conducted at that time.

## CONCLUSION

For the reasons stated above, the Court should deny Markle's Motion for Summary Judgment and grant Federal Defendants' Cross-Motion for Summary Judgment.

25

DATED this 21st day of February, 2014.

                                     Respectfully Submitted,

                                       ROBERT G. DREHER,
                                       Acting Assistant Attorney General
                                       SETH M. BARSKY, Chief
                                       KRISTEN L. GUSTAFSON,
                                       Assistant Chief

                                       <u>/s/ Mary Hollingsworth</u>
                                       MARY HOLLINGSWORTH
                                       Trial Attorney
                                       AZ Bar No. 027080
                                       LUTHER HAJEK, Trial Attorney
                                       U.S. Department of Justice
                                       Environment & Natural Resources Division
                                       Wildlife & Marine Resources Section
                                       Ben Franklin Station
                                       P.O. Box 7611
                                       Washington, DC 20044-7611
                                       Phone: (202) 305-0324
                                       Fax: (202) 305-0275
                                       Email: mary.hollingsworth@usdoj.gov

                                       OF COUNSEL:

                                       Michael Stevens
                                       U.S. Department of the Interior
                                       Office of the Regional Solicitor
                                       75 Spring Street, S.W.
                                       Suite 304
                                       Atlanta, Georgia 30303

                                       *Attorneys for Federal Defendants*

# UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF LOUISIANA

### NEW ORLEANS

| | |
|---|---|
| MARKLE INTERESTS, LLC, | CIVIL ACTION |
| Plaintiff, | CASE NO. 13-234 |
| v. | PERTAINS TO 13-234 |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | SECTION: F(1) |
| Defendants. | JUDGE: MARTIN L.C. FELDMAN |
| | MAG. JUDGE: SALLY SHUSHAN |
| | **CERTIFICATE OF SERVICE** |

    I hereby certify that today I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to all counsel of record.


       /s/ Mary Hollingsworth
       MARY HOLLINGSWORTH