# UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF LOUISIANA

# NEW ORLEANS

| | |
|---|---|
| MARKLE INTERESTS, LLC,<br><br>    Plaintiff,<br><br>            v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE, et al.,<br><br>    Defendants. | CIVIL ACTION<br><br>CASE NO. 13-CV-00234<br><br>PERTAINS TO 13-CV-00234<br><br>SECTION: F<br><br>JUDGE: MARTIN L.C. FELDMAN<br><br>MAG. JUDGE: SALLY SHUSHAN |

**DEFENDANTS' RESPONSE TO MARKLE'S STATEMENT OF MATERIAL FACTS AND DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to L.R. 56.2, Defendants file this response to Plaintiff's Statement of Material Facts, ECF No. 69-2, and hereby provide a statement of material facts, as contained in the administrative record[1] filed on August 19, 2013, in support of their Cross-Motion for Summary Judgment. For the reasons stated below, however, there are no issues of material fact in this case.

Markle seeks judicial review of agency actions pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The Court's task is to review the administrative record that was before the federal agency at the time it made the challenged decision to determine whether, as a matter of law, the record supports the agency's decision. 5 U.S.C. § 706; *Fla. Power & Light Co. v. Lorion*,

---

[1] Citations to the U.S. Fish & Wildlife Service's ("FWS") administrative record are cited as "R####."

470 U.S. 729, 743-44 (1985). Thus, there are no material facts for the Court to resolve in the first instance. The facts necessary for the resolution of this case are set forth in the administrative record already lodged with the Court. The "Statement of Material Facts" submitted by the parties should be viewed as their summary and characterization of materials in the record that are relevant to their legal arguments under the APA standard of review.

1. Federal Defendants do not dispute that Robin Rockwell's declaration makes that assertion. Otherwise, Federal Defendants are without information or knowledge sufficient to form a belief as to the truth of these assertions.

2. Undisputed.

3. Disputed in part. As Markle has already conceded in its Memorandum, unoccupied areas designated as critical habitat are not per se subject to regulation. ECF No. 69-1 ("Br.") at 3. Critical habitat receives protection under Endangered Species Act ("ESA") Section 7, which requires <u>federal agencies</u> to consult with the expert agency, in this case FWS, on any actions "authorized, funded, or carried out by" the agency to ensure that their actions are not likely to destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2). If an action has no federal nexus, i.e., it is not authorized, funded, or carried out by a federal agency, it is not affected by a critical habitat designation. *See Fisher v. Salazar*, 656 F. Supp. 2d 1357, 1359 (N.D. Fla. 2009); *Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior*, 344 F. Supp. 2d 108, 115 (D.D.C. 2004). Markle's actions are not otherwise subject to any other ESA provisions. Nor is Plaintiff presently at risk of any ESA civil or criminal liability because there are no frogs present in Unit 1, as all parties concede.

With regard to the possible economic impacts, Defendants do not dispute that one of the three hypothetical scenarios analyzed within the FEA estimated the economic impacts to be $33.9 million. However, the final rule made clear that, although this scenario is possible, it is unlikely, noting that in FWS' experience, virtually all projects can be implemented successfully with, at most, the adoption of reasonable and prudent alternatives. Reasonable and prudent alternatives must, by definition, be economically feasible and within the scope of authority of the federal

2

agency involved in the consultation. 77 Fed. Reg. 35118, 35123 (June 12, 2012).

4. Undisputed.

5. Disputed. Unit 1 contains physical and biological features essential to breeding and reproduction, represented by Primary Constituent Element ("PCE") 1. 76 Fed. Reg. 59774, 59781 (Sept. 27, 2011).

6. Disputed. Unit 1 contains the habitat characteristics for PCE 1. 76 Fed. Reg. 59781.

7. Disputed in part. The area within Unit 1 is currently suitable frog breeding habitat. *See* R1567 at 1568; R1090 at 1099.

8. Disputed in part. First, "transplanting of frogs" has no effect on habitat suitability. Second, with regard to "change of land use," the statement is disputed in part as the land could be used for timber harvesting with some modifications to provide protections for the frog. *See, e.g.,* 66 Fed. Reg. 62993, 62997 (Dec. 4, 2001) ("Timber management that avoids adverse effects to important habitat characteristics is compatible with maintenance of the [frog,] as evidenced by its continued occurrence on the DeSoto National Forest"). With regard to the "controlled burns," although prescribed burning is the preferable method of maintaining upland habitat for the frog, it is not the only method available. R2460 (example of trees being cut rather than burned); *see also* 77 Fed. Reg. 35129 ("Optimal habitat is created when management includes frequent fires…."). Finally, as to "revegetation," the statement is disputed as the Rule does not identify revegetation as necessary to restore the site, and Plaintiff does not provide a citation to a page in the Rule that states the contrary.

9. Undisputed.

10. Undisputed.

11. Statement disputed. Markle's statement is not a fact; rather, it is argumentative. In any event, the breeding ponds in Unit 1 are suitable habitat in their current condition. *See* 77 Fed. Reg. 35123; R1567 at 1568; R1090 at 1099.

12. Statement partially disputed. Plaintiff is referring to the ESA's definition of "critical habitat," which states the following:

3

> The term "critical habitat" for a threatened or endangered species means--
>
> **(i)** the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological <u>features (I) essential</u> to the conservation of the species and (II) which may require special management considerations or protection; and
>
> **(ii)** specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such <u>areas are essential</u> for the conservation of the species.

16 U.S.C. § 1532(5)(A) (emphasis added).

13. Undisputed.

14. Disputed. To the extent that Plaintiff intended to assert that the Secretary "did [not]" determine a viable population or habitat size for the frog, that statement would be undisputed.

15. Undisputed.

16. Statement partially disputed. The figure cited by Markle refers to the estimate in the third hypothetical set out in the FEA. The final rule made clear that this scenario, although possible, is unlikely to occur because in FWS' experience "virtually all projects…can be implemented successfully with, at most, the adoption of reasonable and prudent alternatives. Reasonable and prudent alternatives must, by definition, be economically feasible and within the scope of authority of the Federal agency involved in consultation." 77 Fed. Reg. 35123. Moreover, Landowner Plaintiffs' statements also establish that this scenario is unlikely. In that context, FWS considered the possible economic impacts and, in its discretion, decided not to exclude Unit 1 from the designation. 77 Fed. Reg. 35141. Plaintiff's statement also represents one of its legal arguments, to which Federal Defendants respond in their brief. *See* Argument section V(b).

17. Undisputed.

18. Disputed in part. The Rule states that Landowner Plaintiffs' economic activities that have a federal nexus may be regulated pursuant to ESA Section 7. *See* 77 Fed. Reg. at 35122-23.

19. Undisputed.

20. Disputed in part. According to Landowner Plaintiffs, current economic activity affects

4

gopher frog habitat. *See, e.g.,* ECF No. 67-1 at 4 ("Moreover, as those [pine] plantations grow, they will become more closed-canopy in nature."). This habitat has been determined to be essential for the conservation of the frog. 77 Fed. Reg. 35124. Thus, actions that negatively affect the habitat the frog needs to recover from its endangered status necessarily affect the frog.

**Federal Defendants' Statement of Facts**

**I.   The dusky gopher frog ("frog")—taxonomy**

1. The dusky gopher frog was first described in 1940 as a new species of frog, *Rana sevosa*, that inhabited the lower coastal plain between the Mississippi River in Louisiana and the Mobile River delta in Alabama. R15; 66 Fed. Reg. 62993 (Dec. 4, 2011).

2. Subsequent studies determined that the dusky gopher frog was a subspecies of the gopher frog, *Rana capito sevosa*, and later, a subspecies of the crayfish frog, *Rana areolata sevosa*. 66 Fed. Reg. 62993.

3. Based on a genetic analysis published in 2001 just prior to the publication of the final listing rule, it was recommended that the Mississippi population of gopher frogs be considered a separate species, *Rana sevosa,* the dusky gopher frog. However, because the recommendation and supporting data had been published shortly before the issuance of the final listing rule, it was unclear if the suggested taxonomy would be accepted by the herpetological scientific community. 66 Fed. Reg. 62993.

4. In its final listing rule, FWS identified the gopher frog in Mississippi as the Mississippi gopher frog, *Rana capito sevosa*, a distinct population segment of the gopher frog, *Rana capito*. However, FWS stated that the listing determination would have been the same if the frog had been a distinct species, and stated that if the species name *Rana sevosa* was accepted by the scientific community, it would revise the name of the listed entity accordingly. 66 Fed. Reg. 62993.

5. In the proposed rule designating critical habitat for the frog, FWS acknowledged that the listed entity warranted acceptance as a species, *Rana sevosa*, and sought public comment on revising the List of Endangered Wildlife accordingly. However, FWS continued to identify the listed entity as the Mississippi gopher frog to avoid confusion with the other populations of *Rana*

5

*capito* having the common name dusky gopher frog. 75 Fed. Reg. 31387, 31388 (June 3, 2010).

6. FWS again specifically sought public comment on the proposed taxonomic and common name changes at the January 31, 2012 hearing that Mr. Poitevent attended. R2331.

7. In the final rule designating critical habitat for the frog ("Rule"), FWS adopted the proposal to revise the scientific name of the listed entity to acknowledge that it is a species, *Rana sevosa*. Based on recommendations received during the comment periods, FWS also changed the frog's common name from Mississippi gopher frog to dusky gopher frog. 77 Fed. Reg. 35118 (June 12, 2012). FWS amended the List of Endangered and Threatened Wildlife to reflect this change. *Id.* at 35145.

## II. The dusky gopher frog—biology

8. Dusky gopher frog habitat includes both upland sandy habitats historically forested with longleaf pine and isolated temporary wetland breeding habitat, specifically isolated ponds, embedded within the forested landscape. 66 Fed. Reg. 62994.

9. Adult frogs leave the pond site after breeding during major rainfall events. Adults of both sexes use specific migratory corridors when exiting the breeding pond. 66 Fed. Reg. 62994.

10. Adult and sub-adult frogs spend the majority of their lives underground, using active and abandoned gopher tortoise burrows, abandoned mammal burrows, and holes in and under stumps as refugia. 66 Fed. Reg. 62994.

## III. The dusky gopher frog—historic range, listing

11. The historic range of the species is from east of the Mississippi River in Louisiana to the Mobile River delta in Alabama. 66 Fed. Reg. 62993.

12. Historical records for the frog exist in two or possibly three parishes in Louisiana, six counties in Mississippi, and one county in Alabama. 66 Fed. Reg. 62994.

13. No dusky gopher frogs have been observed in Louisiana since 1967 or in Alabama since 1922. 66 Fed. Reg. 62994. *Compare* R500-03 (last observation in Louisiana was in 1965). The last known location in Louisiana is also the last known breeding pond for the species in Louisiana, the Sevosa pond located in Unit 1. 76 Fed. Reg. 59774, 59781, 59783 (Sept. 27, 2011); R500-03; 554-

57.

14. The frog was listed as endangered in 2001 based on the following listing factors: habitat destruction and modification due to fragmentation and conversion of the longleaf pine ecosystem, development, and fire suppression; and the fact that only one small population of the frog remained, increasing its vulnerability to the other threats. 66 Fed. Reg. 62997-62300.

15. Impediments to recovery include fragmentation of habitat, which precludes connectivity which is necessary for genetic variation and diversity, 75 Fed. Reg. 31392; small population size, caused by limited, isolated habitat, 75 Fed. Reg. 31395; and rarity of isolated ephemeral breeding ponds, 77 Fed. Reg. 35124.

**IV. The dusky gopher frog—current range**

16. At the time the frog was listed, only one population was known, centered on Glen's Pond located within DeSoto National Forest, Harrison County, Mississippi. 66 Fed. Reg. 62997; 75 Fed. Reg. 31396.

17. Between the time the species was listed and critical habitat was proposed, two more naturally occurring populations were discovered, and one additional population established through translocation, in Jackson County, Mississippi. 75 Fed. Reg. 31389, 31397.

18. The current range of the frog consists of one site in Harrison County (Glen's Pond) and three in Jackson County (Mike's Pond, McCoy's Pond, and TNC Pond), Mississippi. 77 Fed. Reg. 35133.

19. Glen's Pond is an upland, winter-filling, ephemeral pond with an open canopy located in a primarily longleaf pine ecosystem. Although most of the surrounding habitat is part of DeSoto National Forest, the land approximately 200 m north of the pond was managed as a pine plantation until 1999, when it was acquired by a private company for residential development. R871.

20. The Glen's Pond site supports the vast majority of dusky gopher frogs that currently exist in the wild. 77 Fed. Reg. 35136. Of the four occupied sites, it is the only one where measurable numbers of adult gopher frogs have been documented, ranging from 50 to 100 since the frog was listed. 66 Fed. Reg. 63000 (final listing rule; 100 adults); R961 at 963 (fewer than 100 adults);

R1020 at 1027 (89 adults, estimated). At the other three ponds (Mike's, McCoy, and TNC), no adult dusky gopher frogs have been observed, occasionally calling males have been heard, and the presence of at least two adult frogs could only be inferred on several occasions based on the presence of egg masses and tadpoles. R1020 at 1022, 1029; R1113 at 1126-27; R1358 at 1364.

21. The range of the frog has been reduced as a result of habitat destruction and modification. Longleaf pine forested habitat has been reduced to less than two percent of its original distribution. 66 Fed. Reg. 62997.

**V. Post-listing management of the frog and proposed critical habitat designation**

22. At the time of listing the frog, FWS found that designation of critical habitat was prudent and determinable, but it was unable to make a determination on critical habitat due to budget limitations. 66 Fed. Reg. 63000.

23. Recognizing the importance of seeking additional ponds that could be used as breeding sites, FWS has studied translocation of immature frogs to establish populations in unoccupied ponds for years. *See* R2453 at 2454; R2456. The location of additional habitat has been a priority for FWS since the species was listed. 75 Fed. Reg. 31389.

24. On November 27, 2007, the Center for Biological Diversity and Friends of Mississippi Public Lands brought a lawsuit challenging FWS' failure to timely designate critical habitat for the Mississippi gopher frog. 75 Fed. Reg. 31389; R2421.

25. The lawsuit was settled by a court-approved agreement in which FWS agreed to submit to the Federal Register a new prudency determination, and if designation was found to be prudent, a proposed designation of critical habitat, by May 30, 2010, and a final designation by May 30, 2011. 75 Fed. Reg. 31389; R2435.

26. Consequently, FWS published a prudency determination and proposed critical habitat rule in the Federal Register on June 3, 2010. 75 Fed. Reg. 31387.

27. The rule proposed to designate the 96 acres occupied at the time of listing and 1,861 acres unoccupied at the time of listing. 75 Fed. Reg. 31395.

28. FWS began its determination of which areas to propose as critical habitat for the frog with

8

an assessment of the critical life-history components of the frog, as they relate to habitat, to determine what portion of its range still contained the physical and biological features that are essential to the conservation of the species. FWS reviewed available information pertaining to historic and current distributions, life histories, and habitat requirements of the species. The analysis focused on the identification of ephemeral wetland habitats because they are requisite sites for population survival and conservation and their rarity is one of the primary reasons that the frog is endangered. 77 Fed. Reg. 35132.

29. In accordance with information quality requirements of the ESA and other authorities, FWS considered information from many different sources, including articles in peer-reviewed journals, scientific status surveys and studies, other unpublished materials, and experts' opinions or personal knowledge. FWS also requested comments or other information from concerned governmental agencies, the scientific community, industry, and other interested parties. 77 Fed. Reg. 35125 (response to Comment 20).

30. FWS determined that dusky gopher frogs require small, isolated, ephemeral, acidic, depressional standing bodies of freshwater for breeding; upland pine forested habitat that has an open canopy maintained by fire (preferably) for nonbreeding habitat; and upland connectivity habitat areas that allow for movement between nonbreeding and breeding sites. 77 Fed. Reg. 35132.

31. FWS considered the following criteria: (1) the historic distribution of the species; (2) presence of open-canopied, isolated wetlands; (3) presence of open-canopied, upland pine forest in sufficient quantity around each wetland location to allow for sufficient survival and recruitment to maintain a breeding population over the long term; (4) open-canopied, forested connectivity habitat between wetland and upland sites; and (5) multiple isolated wetlands in upland habitat that would allow for the development of metapopulations. 75 Fed. Reg. 31394.

32. Frog populations were historically located within metapopulations. R1539 at 1554.

33. FWS defined metapopulations as neighboring local populations close enough to one another that dispersing individuals can exchange gene flow at least once each generation. 76 Fed.

9

Reg. 59778.

34. Genetic variation and diversity within a species are essential for recovery, adaptation to environmental changes, and long-term viability, which in turn is founded on the existence of numerous interbreeding local populations throughout the range. 76 Fed. Reg. 59778.

35. Loss of metapopulations through fragmentation of habitat results in isolated local populations, which have a high probability of extinction. R1539 at 1554.

36. Connectivity of breeding and nonbreeding habitat must be maintained to support species survival, both within areas occupied by the species and between those areas and those not occupied by the species. This connectivity increases the likelihood of metapopulation persistence and recolonization of sites lost due to drought, disease or other factors. 76 Fed. Reg. 59778.

37. FWS identified four sites in Mississippi that were currently occupied by the frog, one of which (in DeSoto National Forest, Harrison County) was occupied at the time of listing. 75 Fed. Reg. 31394.

38. FWS found that the currently occupied habitat of the frog was highly localized and fragmented. With such limited distribution, the frog is at high risk of extinction and highly susceptible to stochastic events. Pond-breeding amphibians are particularly susceptible to drought, and isolated populations are highly susceptible to random events. Protection of a single, isolated, minimally viable population risks extirpation or extinction of the species as a result of harsh environmental conditions, catastrophic events, or genetic deterioration over several generations. To reduce the risk of extinction through these processes, FWS determined that it was important to establish multiple protected populations across the landscape. 75 Fed. Reg. 31394.

39. FWS used its own data, as well as surveys and reports prepared by other researchers and agencies of Mississippi, Louisiana, and Alabama, to search for locations with the potential to be occupied, by the frog, beyond the four occupied areas. After reviewing the available information in the three states, FWS determined that most of the potential restorable habitat was in Mississippi. 75 Fed. Reg. 31389.

40. The proposed critical habitat rule included, in addition to the four occupied units, seven

units that were unoccupied but were determined to be essential to the conservation of the frog. All seven units were located in Mississippi. 75 Fed. Reg. 31395-99.

**VI. Public comment on the proposed critical habitat rule**

41. In accordance with FWS policy published in the Federal Register on July 1, 1994 (59 Fed. Reg. 34270), the agency sought the expert opinions of seven knowledgeable and independent specialists regarding the proposed rule. The purpose of the peer review is to ensure that a proposed action is based on scientifically sound data, assumptions, and analyses. 77 Fed. Reg. 35119. The expertise of the peer reviewers included familiarity with the species, the geographic region in which the species occurs, and conservation biology principles. 77 Fed. Reg. 35125 (response to Comment 20); *see, e.g.*, R1539 (Richter, studied frog since 1995); R1101 (Pechmann, amphibian biologist). The peer reviewers were invited to comment during the public comment period on specific assumptions and conclusions regarding the proposed designation. Six of the peer reviewers submitted comments. 77 Fed. Reg. 35119.

42. All of the reviewers were supportive of the proposed rule to designate critical habitat. 77 Fed. Reg. 35119.

43. Many comments submitted by the peer reviewers during the public comment period, challenged the sufficiency of the 350 m upland habitat buffer around the breeding sites. R1511, 1543, 1567, 1652, 1656. The rule stated that the purpose of the buffer is to incorporate sufficient upland habitat, including where appropriate all associated PCEs, and to ensure connectivity between the ponds. *See* 75 Fed. Reg. 31395. Based on the comments, FWS changed the buffer to 650 m, which was the mean farthest distance movement from data collected during multiple studies of gopher frogs generally. 76 Fed. Reg. 59781. In the final rule, FWS reduced this buffer to 621 m, by using the median rather than the mean distance movement, which FWS believed to be more accurate. 77 Fed. Reg. 35120 (response to comment 2), 35134.

44. Several of the peer reviewers, as well as the Center for Biological Diversity, stated in their comments that FWS needed to go beyond the proposed critical habitat units in Mississippi and investigate sites in Louisiana and Alabama as well. R1537 at 1538; R1539 at 1541; R1567 at

11

1568; R1656 at 1658.

45. The most extensive rationale for this request was provided by Pechmann, who stated:

> [I]t is essential for the conservation of the species to designate critical habitat in Louisiana, and in Alabama if possible, in addition to the habitat proposed for designation in Mississippi. As noted in the proposed rule, climate change may lead to increased frequency and duration of droughts in the southeastern U.S. . . . *Rana sevosa* do not breed well when drought prevents the breeding pond from filling to an adequate depth . . . . Even if breeding occurs, juvenile recruitment fails or if drought causes the pond to dry before larvae can reach the minimum size for metamorphosis, as happens frequently at Glen's Pond . . . . Disease is also a threat to *R. sevosa*. . . . Due to the low number of remaining populations and its very restricted range, *R. sevosa* may be at risk of extirpation from events such as drought or disease which vary over space and time. Maintaining sites over the entire range of *R. sevosa* into which it could be translocated is essential to decrease the potential risk of extinction of the species from events such as these, and provide for the species' eventual recovery. Potential *R. sevosa* translocation sites must be spread out over as wide a geographic area as possible because events such as droughts and disease tend to be spatially autocorrelated. Therefore, *Rana sevosa* will be less at risk of extinction if populations of *R. sevosa* are established across its range in Louisiana and Alabama, rather than just in southern Mississippi.

R1568 (internal citations omitted)

In later comments, Pechmann elaborated: "Spreading populations out over a wider geographic area decreases the likelihood that the species will go extinct. Misfortunes such as droughts, diseases, and pollution are most likely to occur at the same time in nearby ponds than in ponds that are located far away from each other." R2315 at 2407 (comments at public hearing on critical habitat designation).

46. Peer reviewer Richter stated that, in his expert opinion, additional sites now unoccupied by the frog are "essential to the conservation of the species," and "absolutely necessary because without establishing new populations, the species will not recover." R1582.

47. A third commenter identified the necessity of multiple established breeding ponds for the frog: "[W]ithout other [besides Glen's Pond] well-established breeding ponds the [frog] will be at risk of being [wiped] out by a natural disaster, drought, or relatively newly discovered fungi that have been devastating to juvenile amphibians." R1585 (Blihovde).

48. FWS determined that recovery of the frog will not be possible without the establishment of additional breeding populations of the species. Isolated, ephemeral ponds that can be used as the

focal point for establishing these populations are rare, and this is a limiting factor in dusky gopher frog recovery. 77 Fed. Reg. 35124 (response to comment 16).

49. "[B]ecause [ephemeral] wetlands are very shallow, they are easily filled in and have been (sic) become very rare in the range" of the frog. "Gopher frogs require this type of wetland." R2315 at 2336 (hearing transcript).

50. As a result of the rarity of open-canopied, isolated ephemeral ponds within the historic range of the gopher frog, and their importance to the survival of the species, identifying more of these ponds throughout the species' range was the primary focus of FWS' analysis. 77 Fed. Reg. 35124 (response to comment 16).

51. High quality habitat would include several wetlands in close proximity to the forest to protect against extirpation at any one breeding site. R2337.

**VII. Consideration of sites in Alabama**

52. In investigating possible sites in Alabama, FWS determined that the only historic record for the frog in Alabama was from 1922 at a location in Mobile County near Mobile Bay. The upland terrestrial habitat at this location has been destroyed and replaced by residential development; no breeding site has ever been found; and the only ponds identified have been found to not contain habitat that would provide a conservation benefit for the frog. 77 Fed. Reg. 35124 (response to comment 17). The ponds contained woody shrubs and trees, were occupied by fish, occurred within farm fields, or were surrounded by structures. 77 Fed. Reg. 35124.

53. FWS has not been able to identify any areas in Alabama that are essential for the conservation of the frog. Additional possible ponds in Alabama were identified through remote sensing. 77 Fed. Reg. 35124, 35132-33. One researcher conducted field assessments of several sites, but was unable to locate any habitat that was suitable for the frog. 77 Fed. Reg. 35133.

**VIII. Consideration of sites in Louisiana**

54. As to Louisiana, the comments of one peer reviewer (Pechmann) specifically called to FWS' attention one site in Louisiana that became Unit 1 because of its history and suitability:

13

> The pond where *Rana sevosa* was last documented…in 1967, located near Florenville, retains the required characteristics necessary to serve as a breeding pond (PCE1) as described in the proposed rule. . . . Another pond located nearby also retains these characteristics. . . . Although the terrestrial habitat surrounding those ponds is currently in commercial pine plantations, it retains some stump holes and could be restored to suitable upland habitat for *R. sevosa* (PCE's 2 and 3) . . . .

R1568 (internal citations omitted).

55. Pechmann also commented that this unit "contains the best remaining collections of breeding ponds for gopher frogs in Louisiana and some of the best ponds available anywhere in the historic range of the frog. It also contains two ponds which historically supported gopher frogs." R2315 at 2408 (comments at public hearing on critical habitat designation).

56. Based on the best available science, FWS determined that the habitat characteristics of the wetlands in Unit 1 were consistent with those at Glen's Pond and, thus, the five ponds in Unit 1 contain PCE 1. 77 Fed. Reg. 35133 (noting that the Unit 1 ephemeral ponds were considered similar in appearance (water clarity, depth, vegetation) to ponds in Mississippi used for breeding by the frog). Because it was not possible to measure hydroperiod of all wetlands within the frog's historic range, FWS used wetland (hydrophytic) vegetation as a metric for hydroperiod, R392, which is standard practice in wetland delineation, using Glen's Pond as a reference, 77 Fed. Reg. 35133 (comparing vegetation at Unit 1 ephemeral ponds to that at the Mississippi breeding ponds). FWS also relied on peer reviewer comments, R1568, and research, R1097, 3099-3102, as well as site visits by a FWS biologist with over 20 years of experience analyzing such habitat. R392, 3080-82.

57. FWS found that habitat in Louisiana is distant from the extant populations of the frog in Mississippi. For this reason, the Louisiana site would likely be affected by different environmental variables than sites in Mississippi. Thus, the site would provide a refuge for the frog should the other sites be negatively affected by environmental threats or catastrophic events. 77 Fed. Reg. 35124 (response to comment 16).

58. Based on the information received from Pechmann, FWS sought permission from Weyerhauser, the lessee of the property and whom FWS believed owned the property, to inspect the site. R3072-73. FWS' stated purpose of the visit was "assessing the habitat quality in and

14

around the last known gopher frog pond and other nearby ponds." R3073. Weyerhauser approved the visit, R3072, and issued FWS a permit for the inspection, which stated that Weyerhauser was the owner of the property. R3077. It was not until after the site visit that Weyerhauser informed FWS that another party owned the property, and that Weyerhauser was a lessee. R3105.

59. FWS inspected the site that became Unit 1 in March 2011. Although the surrounding uplands are poor quality terrestrial habitat for the frog, the five ephemeral ponds were intact and of remarkable quality, and similar in appearance to ponds in Mississippi used for breeding by frogs. 77 Fed. Reg. 35133.

60. The same area was surveyed for gopher frogs in the 1990s and 2000s. During those visits, the ephemeral ponds were considered similar in appearance (water clarity, depth, vegetation) to ponds in Mississippi used for breeding by the frog. FWS' observations in 2011 indicated the Unit 1 ponds were little changed from the descriptions provided by the previous surveyors despite the fact that the area had not been managed through controlled burns. 77 Fed. Reg. 35133.

61. Pechmann, who accompanied FWS on the inspection of the property, commented: "The five ponds of interest are open canopy ponds. And I managed [sic] the open canopy on some or all of them a few years ago. . . . they are still open canopy." R2315 at 2408. *Compare* R1090 at 1097 (Pechmann 2006 report, noting that canopy over ponds was open). They are in close proximity to each other, allowing movement of gopher frogs between ponds (no such grouping has been found in Mississippi). The multiple ponds present at this site provide metapopulation structure that supports long-term survival and population resiliency. *See* 77 Fed. Reg. 35135 ("If dusky gopher frogs are translocated to the [Unit 1] site, the five ponds are in close enough proximity to each other that adult frogs could move between them and create a metapopulation").

62. FWS photographs taken at the 2011 inspection show that Sevosa Pond and Small Pond in Unit 1 are still open canopy ponds. R6759-6763 (Sevosa Pond); R6775 and 6776 (Small Pond).

63. FWS concluded that the five breeding ponds in Unit 1 contain the characteristics set forth in PCE 1, 77 Fed. Reg. 35123 (response to comment 15), and provide breeding habitat that in its totality is not known to be present elsewhere within the historic range of the gopher frog. 77 Fed.

15

Reg. 35124 (response to comment 16).

64. In addition to breeding ponds, the frogs "require…upland pine forested habitat that has an open canopy maintained by fire (preferably) for nonbreeding habitat." 77 Fed. Reg. 35132.

65. Although the uplands associated with the ponds do not currently contain the essential physical and biological features of critical habitat, FWS concluded that they are restorable with reasonable effort. 77 Fed. Reg. 35135; *see* R2315 at 2408 (comment from peer reviewer) ("It's much easier to restore a terrestrial habitat for the gopher frog than to restore or build breeding ponds.")

66. Moreover, the uplands in Unit 1 contain underground refugia that would allow for survival of the species, which is a key component of PCE 2. R1567 at 1568; R3098 at 3099-3100 (noting that there are lots of stumps near Sevosa Pond and stumps and root mounds in terrestrial habitat, including a good gopher frog hole near Dry Pond); *see also* R6744, 6745 (photos—Dry Pond burrow).Overall, Unit 1 includes habitat for population expansion outside of the core population areas in Mississippi, a necessary component of recovery efforts for the gopher frog. 77 Fed. Reg. 35135.

67. Accordingly, FWS determined that Unit 1 was essential for the recovery of the gopher frog. 77 Fed. Reg. 35133.

**IX. Publication of the revised proposed rule.**

68. Having determined that additional critical habitat units must be proposed, FWS recognized that this would require republishing the proposed critical habitat rule. FWS asked the plaintiffs to agree to an extension for the final critical habitat determination. In an agreement entered by the court on May 4, 2011, the deadline for publishing the final critical habitat determination was extended to May 30, 2012. R2449.

69. FWS published a revised proposed rule to designate critical habitat on September 27, 2011. 76 Fed. Reg. 59774.

**X. Involvement of the Poitevent Landowners in the rulemaking process**

70. A few weeks after Weyerhaeuser informed FWS that it did not own the property around the

five ponds visited by FWS, the agency determined the identity of the actual owners of the property, R5744, and contacted the Poitevent Landowners to discuss that the land was being considered for designation as critical habitat. R5755, 5758. This communication took place in May 2011, approximately four months before FWS issued the revised proposed designation, which included Unit 1 as part of the designation, and thirteen months before the rule was finalized.

71. FWS and the Poitevent Landowners continued to communicate regarding the inclusion of the Unit 1 property throughout the development of the revised proposed rule. R5815, 6085, 6181, 6223.

72. FWS notified the Poitevent Landowners specifically about the issuance of the revised proposed rule, R3566, and the public hearing on the proposed rule. R3689.

73. The Poitevent Landowners provided numerous written comments on the revised proposed rule and economic analysis, all of which were considered by FWS. R1671, 1692, 1818, 1853. They also provided written input for the public hearing, R2209, 2223, as well as spoken remarks. R2370-74, 2410-18.

**XI. The economic analysis**

74. FWS prepared an economic analysis of the proposed designation of critical habitat for the frog. R6373 (draft economic analysis); R6616 (final economic analysis) (2012_04_06 Email with attachment Ludwig).

75. In preparing the final version of the draft economic analysis, FWS considered the comments of the Landowner Plaintiffs. *See* R6373 (draft economic analysis); 77 Fed. Reg. 35126-28 (responding to comments on economic analysis).

76. The draft economic analysis, as issued, considered three alternative hypothetical scenarios for incremental impacts. R6381-82.

**XII. The June 12, 2012 Rule**

77. On June 12, 2012, FWS designated 6,477 acres in Mississippi and Louisiana as critical habitat pursuant to the ESA. 77 Fed. Reg. 35118.

78. The Rule designated 5,281 acres of unoccupied habitat, including the 1,544 acres in St.

Tammany Parish described as Unit 1 in the Rule. 77 Fed. Reg. at 35124.

79. In the Rule, FWS identified three primary constituent elements in the Rule, which the agency described as follows:

(1) Primary Constituent Element 1—Ephemeral wetland habitat. Breeding ponds, geographically isolated from other waterbodies and embedded in forests historically dominated by longleaf pine communities, that are small (generally <0.4 to 4.0 ha (<1 to 10 ac)), ephemeral, and acidic. Specific conditions necessary in breeding ponds to allow for successful reproduction of dusky gopher frogs are:

(a) An open canopy with emergent herbaceous vegetation for egg attachment;

(b) An absence of large, predatory fish that prey on frog larvae;

(c) Water quality such that frogs, their eggs, or larvae are not exposed to pesticides or chemicals and sediment associated with road runoff; and

(d) Surface water that lasts for a minimum of 195 days during the breeding season to allow a sufficient period for larvae to hatch, mature, and metamorphose.

(2) Primary Constituent Element 2—Upland forested nonbreeding habitat. Forests historically dominated by longleaf pine, adjacent to and accessible to and from breeding ponds, that are maintained by fires frequent enough to support an open canopy and abundant herbaceous ground cover and gopher tortoise burrows, small mammal burrows, stump holes, or other underground habitat that the dusky gopher frog depends upon for food, shelter, and protection from the elements and predation.

(3) Primary Constituent Element 3—Upland connectivity habitat. Accessible upland habitat between breeding and nonbreeding habitats to allow for dusky gopher frog movements between and among such sites. This habitat is characterized by an open canopy, abundant native herbaceous species, and a subsurface structure that provides shelter for dusky gopher frogs during seasonal movements, such as that created by deep litter cover, clumps of grass, or burrows.

77 Fed. Reg. 35131.

DATED this 21st day of February, 2014.

                    Respectfully Submitted,

                    ROBERT G. DREHER,
                    Acting Assistant Attorney General
                    SETH M. BARSKY, Chief
                    KRISTEN L. GUSTAFSON,
                    Assistant Chief

/s/ Mary Hollingsworth
MARY HOLLINGSWORTH
Trial Attorney
AZ Bar No. 027080
LUTHER HAJEK
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044-7611
Phone: (202) 305-0324
Fax: (202) 305-0275
Email: mary.hollingsworth@usdoj.gov

OF COUNSEL:

Michael Stevens
U.S. Department of the Interior
Office of the Regional Solicitor
75 Spring Street, S.W.
Suite 304
Atlanta, Georgia 30303

*Attorneys for Federal Defendants*

# UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF LOUISIANA

# NEW ORLEANS

| | |
|---|---|
| MARKLE INTERESTS, LLC, | CIVIL ACTION |
| Plaintiff, | CASE NO. 13-234 |
| v. | PERTAINS TO 13-234 |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | SECTION: F(1) |
| | JUDGE: MARTIN L.C. FELDMAN |
| Defendants. | MAG. JUDGE: SALLY SHUSHAN |
| | **CERTIFICATE OF SERVICE** |

    I hereby certify that today I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to all counsel of record.

                                          /s/ Mary Hollingsworth
                                          MARY HOLLINGSWORTH