**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF LOUISIANA**
**NEW ORLEANS**

| | |
|---|---|
| MARKLE INTERESTS, LLC, | CIVIL ACTION |
| Plaintiff, | CASE NO. 13-234 |
| v. | PERTAINS TO 13-362 |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | SECTION: F |
| Defendants. | JUDGE: MARTIN L.C. FELDMAN |
| | MAG. JUDGE: SALLY SHUSHAN |

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR OPPOSITION TO P&F LUMBER PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendants, through undersigned counsel, respectfully submit the following memorandum in support of their Opposition to P&F Lumber Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment.

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 3

BACKGROUND AND STANDARD OF REVIEW ................................................... 4

I.      The Endangered Species Act ....................................................................... 4

II.     National Environmental Policy Act ("NEPA") .......................................... 5

III.    Dusky Gopher Frog Critical Habitat Rule ............................................... 6

IV.    Standard of Review—Administrative Procedure Act ("APA") ......................... 8

ARGUMENT ...................................................................................................... 8

I.      The Court Lacks Jurisdiction over Plaintiffs' Claims for Relief ......................... 8

        A.     FWS' Critical Habitat Designation Does Not Result in an Unconstitutional Fifth Amendment Taking .......................................................... 8

        B.     Plaintiffs Fail to Demonstrate Standing ................................................. 9

        C.     Plaintiffs Lack Prudential Standing to Bring a NEPA Claim ................... 11

II.     FWS Has the Constitutional Authority to Designate Unit 1 as Critical Habitat ....... 12

III.    Unit 1 Meets the Statutory Definition of "Critical Habitat" ............................. 13

        A.     FWS Made a Reasonable Determination That Unit 1 is Essential ............... 13

        B.     Unoccupied Areas Need Not Contain PCEs to be Designated ................... 16

IV.    FWS Considered All Potential Economic Impacts to Unit 1 ............................. 19

V.     NEPA Does Not Apply to Critical Habitat Designations ................................ 20

VI.    The "Significant Portion of its Range" Inquiry is for Species Listing Purposes and Does Not Involve Critical Habitat Designations ............................ 21

VII.   FWS' Methodology for Designating Unit 1 as Critical Habitat is Reasonable and Entitled to Deference .................................................... 23

VIII.  The Dusky Gopher Frog is Listed as an Endangered Species ............................. 25

CONCLUSION .................................................................................................... 27

## INTRODUCTION[1]

There are about 100 remaining dusky gopher frogs ("frog") in the wild. It is a species that is undeniably endangered and without protection it will go extinct. Under the Endangered Species Act ("ESA"), the U.S. Fish and Wildlife Service ("FWS") is obligated to designate critical habitat that will, hopefully, allow the frog to recover to the point where it can be delisted. But at this point, with merely 100 remaining adults, the need for habitat conservation cannot be overstated.

The Poitevent Landowners ("Poitevent" or "Plaintiffs"), challenge FWS' final rule designating critical habitat for the frog. 77 Fed. Reg. 35118 (June 12, 2012) (hereafter, "Rule"). Plaintiffs raise numerous arguments and objections, but their complaint can be distilled down to one common theme. They firmly believe that, under the ESA, FWS may not designate private property as critical habitat when the species is not located in that geographical area. This reading of the ESA is incorrect. Congress expressly provided FWS with the discretion to designate "unoccupied" critical habitat, including private property, when necessary to conserve the species. Indeed, that is the very premise of designating critical habitat for a species that hovers at critically low abundance—it provides future habitat for increasing numbers of imperiled species.

To provide at least a chance at recovery, FWS exercised its discretion to designate 1,544 acres of private property in St. Tammany Parish ("Unit 1"), among other tracts of land. This location was not chosen haphazardly. It contains unique ephemeral ponds that in the past supported breeding populations; in fact it was the last known location of the frog in Louisiana. While the current condition of this habitat has been altered by existing land use and by the land's owners, there is no question that these ponds can support a population. In FWS' scientific judgment, these frogs need these ponds if they are to recover.

It is understandable that the Poitevent Landowners are concerned that their economic interests may be affected by FWS' designation of critical habitat in Unit 1. But as explained below, their concerns are either exaggerated or extremely speculative. This designation does not impose any

---

[1] If the Court permits Plaintiffs to rely on each other's briefs to support their claims, then Defendants incorporate by reference the arguments and authorities set forth in their cross-motions filed in response to the motions filed by Plaintiffs Markle Interests and Weyerhaeuser.

new immediate regulatory burdens, nor does it subject them to threat of civil liability or criminal prosecution. There is no mandate to change the existing uses now, or for the foreseeable future. Plaintiffs' timber lease can continue until 2043 without interruption. In short, Plaintiffs overstate their case and, in part, this may be why their proffered declaration fails to demonstrate standing. This Court lacks jurisdiction over Plaintiffs' claims. To the extent the Court reaches the merits, the Rule and administrative record demonstrate that FWS carefully considered all relevant factors and ultimately arrived at a reasoned and rational decision that Unit 1 must be designated critical habitat as essential to the conservation of this highly endangered species. Accordingly, this Court should grant Defendants' cross-motion for summary judgment, deny Plaintiffs' motion for summary judgment, and enter judgment on Defendants' behalf.

## BACKGROUND AND STANDARD OF REVIEW

### I.     The Endangered Species Act

The ESA was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation" of such species. 16 U.S.C. § 1531(b). As the Fifth Circuit has reiterated, the objective of the ESA "is to enable listed species not merely to survive, but to recover from their endangered or threatened status." *Sierra Club v. FWS*, 245 F.3d 434, 438 (5th Cir. 2001).

A species is listed as "endangered" if it is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). One key method for conserving listed species is the designation of critical habitat, which is required, except in limited circumstances. *See id.* § 1533(a)(3)(A). The ESA provides that FWS may designate as critical habitat both occupied and unoccupied habitat. *Id.* § 1532(5)(A). Areas outside the geographical area occupied by the species at the time it is listed may be designated "upon a determination by the Secretary that such areas are essential for the conservation of the species," *id.* § 1532(5)(A)(ii), and only "when a designation limited to its present range would be inadequate to ensure the conservation of the species." 50 C.F.R. § 424.12(e). The designation must be "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security,

and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). After considering the various impacts of designation, FWS <u>may</u> at its discretion exclude an area from the designation, unless the agency determines that the failure to designate such area as critical habitat will result in the extinction of the species concerned. *Id.*

Critical habitat receives protection under ESA Section 7, which requires federal agencies to consult with the expert agency, here FWS, on any actions "authorized, funded, or carried out by" the agency to ensure that their actions are not likely to destroy or adversely modify critical habitat. *Id.* § 1536(a)(2).[2] If FWS finds that an agency action, such as the issuance of a permit, is likely to adversely modify critical habitat, FWS is required to suggest reasonable and prudent alternatives that would avoid adverse modification. 50 C.F.R. § 402.14(h)(3). "Reasonable and prudent alternatives" must be "economically and technologically feasible."*Id.* § 402.02.

If a private party's action has no federal nexus, i.e., it is not authorized, funded, or carried out by a federal agency, it is not affected by a critical habitat designation.[3] *See Fisher v. Salazar*, 656 F. Supp. 2d 1357, 1359 (N.D. Fla. 2009); *see also* 77 Fed. Reg. at 35121 (explaining that timber management activities on non-federal lands have no federal nexus and, thus, would not be affected). Critical habitat designation does not impose any legally binding duties on private parties, affect land ownership, or establish a refuge, wilderness, reserve, preserve, or other conservation area. *Id.* at 35122; 35128. Nor does designation require implementation of restoration, recovery, or enhancement measures by non-federal landowners. *Id.* at 35128.

## II. National Environmental Policy Act ("NEPA")

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is

---

[2] As Plaintiffs appear to concede, private property designated as unoccupied habitat is not per se regulated by the ESA. ECF No. 80-1 ("Br.") at 5.

[3] Contrary to Plaintiffs' assertions, habitat modification or degradation does not expose property owners to citizen suit liability. Br. at 5. Plaintiffs cite 50 C.F.R. § 17.3, but omit the key limiting language, which defines harm, in part, as "significant habitat modification or degradation <u>where it actually kills or injures wildlife</u>." (emphasis added). There are no frogs in Unit 1 and, thus, this provision would not apply to any of Plaintiffs' activities within the unit.

made available to the public. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To meet these dual purposes, NEPA requires that an agency prepare a comprehensive environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). For over three decades, FWS has maintained the consistent position that a NEPA analysis is not required for critical habitat designations. *See* 48 Fed. Reg. 49244-02 (Oct. 25, 1983).

### III. Dusky Gopher Frog Critical Habitat Rule

The dusky gopher frog is at "high risk of extinction." 75 Fed. Reg. 31387, 31394 (June 3, 2010). There are about 100 adult frogs left in the wild and only one viable breeding population, which is located in Mississippi. Defendants' Statement of Facts ("DSoF") ¶20. In 2001, FWS listed the frog, at that time known as the Mississippi gopher frog, as endangered due to its low population size and ongoing threats, including habitat destruction and degradation resulting from urbanization and associated development and vulnerability to environmental stressors such as drought. *Id.* ¶14. Fragmentation and destruction of the frog's habitat has caused the species' small, isolated populations to become genetically isolated and has reduced the space available for reproduction, development of young, and population maintenance. 77 Fed. Reg. at 35130.

In June 2010, FWS published a proposed rule to designate critical habitat. DSoF ¶¶25-27. Based on the best available scientific information on the frog's biological needs, FWS determined that the frog's optimal habitat includes small, isolated, ephemeral ponds for breeding (Primary Constituent Element ("PCE") 1); upland pine forested habitat that has an open canopy (PCE 2); and upland connectivity habitat (PCE 3). This habitat contains the "physical and biological features necessary to accommodate breeding, growth, and other normal behaviors of the [frog] and to promote genetic flow within the species." 76 Fed. Reg. at 59778. FWS first considered areas occupied by the species at the time of listing, but determined that a designation of unoccupied habitat was necessary because "[t]he range of the [frog] has been severely curtailed, occupied habitats are limited and isolated, and population sizes are extremely small and at risk of extirpation and extinction from stochastic events that occur as periodic natural events or existing or potential

human-induced events." 77 Fed. Reg. at 35132, 35133.

The proposed rule underwent an independent scientific peer review by six individuals with scientific expertise that included familiarity with the species, the geographic region in which the species occurs, and conservation biology principles. DSoF ¶41. Every peer reviewer concluded that the amount of habitat proposed was insufficient for the conservation of the species, with several suggesting that FWS consider other locations within the frog's historical range. *Id.* ¶44. One peer reviewer suggested the area in St. Tammany Parish (Unit 1), well-known to those studying the frog, as containing at least two historical breeding sites. 77 Fed. Reg. at 35123. Based on all comments received, FWS reanalyzed the "current and historic data for the species, including data from Alabama and Louisiana," to determine if additional habitat qualified as critical habitat. *Id.* at 35124. FWS identified additional critical habitat in Mississippi and Louisiana and included those areas within the revised proposed rule published for comment on September 27, 2011. 76 Fed. Reg. 59774. FWS was unable to identify critical habitat in Alabama. DSoF ¶¶52-53; R1588.

Before FWS finalized the Rule, it considered the potential economic impacts of the designation in a draft and then a final economic analysis ("DEA" and "FEA"), which were prepared by a private contractor. 77 Fed. Reg. at 35140. The FEA quantified those impacts that may occur in the 20 years following the designation. *Id.* It evaluated those impacts in each unit separately because most of the estimated impacts related to possible lost development value in Unit 1 and, at the same time, there was considerable uncertainty regarding the likelihood of a federal nexus for any such development activities.  R6625. The FEA analyzed the economic impacts of designating Unit 1 based on the following three hypothetical scenarios: (1) development occurring in Unit 1 avoids impacts to jurisdictional wetlands and, thus, does not trigger ESA Section 7 consultation requirements[4]; (2) development occurring in Unit 1 requires a permit from the Army Corps of Engineers due to potential impacts to jurisdictional wetlands, which triggers ESA Section 7

---

[4] If Unit 1 continues to be used for timber harvesting, there would be no federal nexus and thus no economic impacts. This scenario appears to be the most likely possibility in light of Weyerhaeuser's contract to continue such operations until 2043 and Mr. Poitevent's own statements. R2216; 2220; *see also* R2065; 6662 & n.68; 6663 & n.78.

consultation between the Corps and FWS, and FWS works with landowners to keep 40% of the unit for development and 60% managed for the frog's conservation; and (3) development occurring requires a federal permit, triggering ESA Section 7 consultation, and FWS determines that no development can occur in the unit. DSoF ¶76. Information on the value of Unit 1 land was provided by Landowner Plaintiffs. R6666 (FEA 4-6).

The June 2012 final Rule was the culmination of a series of proposed rules, economic analyses, three rounds of notice and comment, and a public hearing. DSoF ¶¶26, 72-73. The Rule designated 6,477 acres in Mississippi and Louisiana, including the 1,544 acres in Unit 1 which FWS considers to be, in its totality, the highest quality breeding habitat anywhere in the frog's range. 77 Fed. Reg. at 35124; *see also* R1588; 3615. The ephemeral wetlands in Unit 1 contain all of the physical or biological features that make up PCE 1. DSoF ¶¶ 54, 56, 59, 60, 61, 62, 63. *Contra* Br. at 12.

## IV. Standard of Review—Administrative Procedure Act ("APA")

FWS' designation of critical habitat for the frog is reviewed under the standard set forth in the APA, 5 U.S.C. § 706. The APA standard is "highly deferential" and the agency's decision is afforded a strong presumption of validity. *Hayward v. U.S. Dep't of Labor*, 536 F.3d 376, 379 (5th Cir. 2008). The court may not "reweigh the evidence or substitute its judgment for that of the administrative fact finder." *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Courts must be particularly deferential to agency determinations made within the scope of the agency's expertise. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000).

## ARGUMENT

## I. The Court Lacks Jurisdiction over Plaintiffs' Claims for Relief

### A. FWS' Critical Habitat Designation Does Not Result in an Unconstitutional Fifth Amendment Taking

Although Plaintiffs do not have a claim for relief in their complaint alleging that the Rule constitutes an unconstitutional taking under the Fifth Amendment, they nevertheless argue that FWS' designation is an unlawful "'extortionate' demand" which constitutes "grand theft real estate." Br. at 7. Claims alleging an unconstitutional taking must be brought in the Court of Federal

Claims, and this Court lacks jurisdiction over Plaintiffs' none-too subtle arguments. 28 U.S.C. § 1491(a)(1); *Chichakli v. Szubin*, 546 F.3d 315, 317 (5th Cir. 2008) (recognizing that district courts lack jurisdiction under the Tucker Act if the claim is over $10,000).

Even though this Court clearly lacks jurisdiction, Plaintiffs' inaccurate factual assertions warrant a response. Plaintiffs badly misconstrue the nature of the designation and FWS' explanation in the final rule. The designation of critical habitat does not affect Plaintiffs' current economic interests. As explained by FWS, the final rule does not "restrict the uses of lands that have been designated as critical habitat, but only imposes restrictions under section 7(a)(2) on Federal agency actions that may result in destruction or adverse modification of critical habitat." 77 Fed. Reg. 35121; *see also id.* ("The Act does not authorize the Service to regulate private actions on private lands or confiscate private property . . . ."). This means that any regulatory burden is contingent on future Federal agency actions that are far from certain to occur.

For example, *if* Plaintiffs decide to develop their land, and *if* Plaintiffs decide to seek a permit from the Corps, and *if* the Corps determines that it must consult under Section 7 of the ESA, Plaintiffs *may* be involved in an administrative process that, in any event, must be reasonable under applicable laws (and that Plaintiffs could readily challenge if it was not). But, as Plaintiffs make so very clear, there is no current intent to develop the land and no intent to approach the Corps; and their land interests appear to be secure in a "long-term timber lease with Plaintiff Weyerhaeuser Company," an agreement they apparently have no intention of breaching or ending until 2043. Poitevent Decl. ¶8 (ECF 80-2 at ¶8); *see also* Br. at 4 n.4; 77 Fed, Reg. 35123 ("According to the landowners, the timber lease on their property does not expire until 2043."). Even if this Court had jurisdiction over a takings claim (which it does not), Plaintiffs' property interests have not been affected by this designation and any assertions of immediate economic harm are extremely speculative and find no support in the record.

## B.  Plaintiffs Fail to Demonstrate Standing

Before considering the merits of Plaintiffs' ESA and NEPA claims, the Court must first determine whether Plaintiffs properly invoked the Court's jurisdiction. *Raines v. Byrd*, 521 U.S.

9

811, 820 (1997). Plaintiffs have failed to meet their burden to prove Article III standing by showing that: (1) they have suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). At the summary judgment stage, Plaintiffs cannot rest on "mere allegations," but must set forth by affidavit or other evidence specific facts to establish each element of standing. *Id.* at 561.

To the extent Plaintiffs rely on the Declaration of Edward B. Poitevent in Support of Motion for Summary Judgment, ECF 80-2 at 46-49, to establish standing, it is insufficient. First, Mr. Poitevent is serving as the attorney for Plaintiffs, and "[a]s a rule, attorneys should not testify as witnesses in the same cases in which they serve as advocates." *United States v. Atkin*, 29 F.3d 267, 269 (7th Cir. 1994). As one court recognized, "[t]he practice of an attorney testifying on behalf of his client, is, however, universally frowned upon. . . . The dual relation of attorney and witness . . . is not compatible with the conception of an attorney as an officer of the court and inclines to disrupt the normal balance of judicial machinery." *Alexander v. Watson*, 128 F.2d 627, 631 (4th Cir. 1942). Further, Plaintiffs' counsel does not have firsthand knowledge of the purported injuries for all of the named Plaintiffs. *Leggieri v. Mealo*, 484 F. Supp. 719, 721 (E.D. Pa. 1980) ("[T]he assertion by an attorney ... 'that he has discovered witnesses who can and will testify,' is not itself evidence, nor may it substitute for the presentation of evidence, cognizable by the court . . . ."). *But see* Poitevent Decl. ¶2 ("I am the manager of P&F Lumber Company (2000), LLC, one of the Plaintiffs . . . *and the attorney for two other Plaintiffs in this matter* . . . .") (emphasis added); *see* Fed. R. Civ. P. 56(e); Fed. R. Evid 701, 702 (declaration must be based on personal knowledge to be admissible and carry weight at the summary judgment stage).  At most, Mr. Poitevent can testify for P&F Lumber, but certainly not for the other Plaintiffs.

Second, even if the declaration is admissible testimony, its substance is deficient. The assertion of injury-in-fact is premised on at least two future agency actions: (1) an unknown Federal permit

or license, and (2) a consultation under ESA Section 7. *See* Poitevent Decl. ¶4 ("This critical habitat designation in the Rule imposes significant regulatory burdens on the property as federal approval *may* be required for any activity that may affect the species . . . .") (emphasis added). Alleging injury-in-fact based on two subsequent agency actions (that have no evidentiary, factual predicate) is too speculative for standing purposes. "Federal courts consistently deny standing when claimed anticipated injury has not been shown to be more than uncertain potentiality." *Prestage Farms v. Bd. of Supervisors of Noxubee Cnty., Miss.*, 205 F.3d 265, 268 (5th Cir. 2000). When an injury depends on the "occurrence of a number of uncertain events," the future injury is "too conjectural or hypothetical to provide Article III standing." *Id.* Finally, Mr. Poitevent's blanket assertion that the designation "seriously limits or excludes the usability and saleability of that land . . ." is nothing more than conjecture. Poitevent Decl. ¶7. Mr. Poitevent provides no evidence that this has or will occur, nor does he state that these Plaintiffs intend to sell the land in the foreseeable future. Conclusory statements are not sufficient to establish standing.

Here, Plaintiffs do not provide any affidavits or declarations demonstrating that there is imminent harm. Unit 1 is currently being used for timber harvesting under a lease agreement that does not expire until June 30, 2043. ECF No. 67-2. With a secure lease for the next three decades, there is nothing in the Poitevent Declaration demonstrating an imminent injury to all of these Plaintiffs, much less causation and redressability. Defendants are not arguing that standing is impossible to prove. Rather, Plaintiffs have failed to carry their burden at the outset and the Court should dismiss these claims for lack of jurisdiction. *Sierra Club v. EPA*, 292 F.3d 895, 901 (D.C. Cir. 2002) (party seeking review has obligation to submit evidence appurtenant to standing from the outset, to ensure a "fair and orderly process" for resolution of the claims).

**C.  Plaintiffs Lack Prudential Standing to Bring a NEPA Claim**

Even if the Court finds Article III standing, Plaintiffs have failed to demonstrate prudential standing for their NEPA claim. To demonstrate prudential standing, a party must show that the injury complained of "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for [the] complaint." *Lujan v. Nat'l Wildlife*

*Fed'n*, 497 U.S. 871, 883 (1990); *see Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 675 (5th Cir. 1992).  Economic harms are not within the zone of interests protected by NEPA. *See Nevada Land Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) ("The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions."); *Hurd v. Urban Dev., L.C. v. FHA*, 33 F. Supp. 2d 570, 573-74 (S.D. Tex. 1998).

Here, Plaintiffs assert solely economic injuries. *See* Br. at 5 (claiming that the designation will cause $33.9 million in economic impacts); Poitevent Decl. ¶5. In addition, Mr. Poitevent claims that the designation of critical habitat will impose "significant regulatory burdens," result in "a drastic reduction in value of their lands," will "seriously limit[] or exclude[] the usability and saleability of [the] land.  Poitevent Decl. ¶¶4, 7. None of these are environmental harms that fall within the zone of interests of NEPA. Accordingly, Plaintiffs' NEPA claim should be dismissed for lack of prudential standing.  *See Bldg. Indus. Ass'n v. U.S. Dep't of Commerce*, No. 11-4118, 2012 WL 6002511, at *7 (N.D. Cal. Nov. 30, 2012) (holding that property owners lacked prudential standing under NEPA to challenge a critical habitat designation); *Hurd*, 33 F. Supp. 2d at 572-76.

## II.  FWS Has the Constitutional Authority to Designate Unit 1 as Critical Habitat

Plaintiffs argue that FWS' designation of critical habitat is "invalid under the Commerce Clause of the U.S. Constitution…" Br. at 14. Plaintiffs' brief is noticeably devoid of almost any discussion of the relevant case law, which is not surprising given that every Commerce Clause challenge to a provision or application of the ESA has been rejected. Six Circuits, including the Fifth Circuit, have evaluated and dismissed post-*Lopez* (514 U.S. 549 (1995)) Commerce Clause challenges to applications of the ESA. *See San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163 (9th Cir. 2011); *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1272-73 (11th Cir. 2007); *Wyoming v. U.S. Dep't of Interior*, 442 F.3d 1262 (10th Cir. 2006) (affirming without discussion lower court's analysis); *GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622, 639 (5th Cir. 2003); *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062 (D.C. Cir. 2003); *Gibbs v. Babbitt*, 214 F.3d 483 (4th Cir. 2000). Plaintiffs make no attempt to distinguish those cases from the present

case. Moreover, Plaintiffs fail to even mention the relevant standards for assessing a Commerce Clause challenge to an application of a comprehensive scheme that has a substantial relation to interstate commerce, in this case, the ESA. *See Gonzales v. Raich*, 545 U.S. 1, 17 (2005).

Every Circuit to have reached the issue, including the Fifth Circuit, has concluded that the ESA is a comprehensive scheme that has a substantial relation to interstate commerce. *Alabama-Tombigbee*, 477 F.3d at 1272-73; *see also San Luis*, 638 F.3d 1163; *GDF*, 326 F.3d at 639. Because ESA Section 4's mandate to designate critical habitat for listed species is an integral component of the ESA, this particular application of Section 4 is a constitutional exercise of Congress' authority and, therefore, FWS' action is permissible under the Commerce Clause.[5] *See Alabama-Tombigbee*, 477 F.3d at 1272-73 (noting that "when 'a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence'"). Thus, even if Defendants agreed that this particular application of the ESA is noncommercial in nature, which we do not, the Supreme Court has rejected such attempts to excise a noncommercial application of a comprehensive regulatory scheme that has a substantial relation to commerce. *See Raich*, 545 U.S. at 26.

## III.    Unit 1 Meets the Statutory Definition of "Critical Habitat"

After considering the best available science, including the input of six experts, and the importance of ephemeral ponds to the recovery of the frog, FWS reasonably determined that Unit 1 is essential for the conservation of the species. Unable to show that FWS' finding is arbitrary and capricious, Plaintiffs base their arguments on inapplicable standards and requirements that simply do not exist.

### A.  FWS Made a Reasonable Determination That Unit 1 is Essential

Unoccupied areas may be designated as "critical habitat" if FWS determines that those areas are "essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). Congress did not

---

[5] There is no requirement that FWS make an explicit finding that every application of the ESA regulates economic activity and Plaintiffs cite no support suggesting otherwise. *See Raich*, 545 U.S. at 26; *Alabama-Tombigbee,* 477 F.3d at 1272-73; *see also GDF*, 326 F.3d at 629.

define "essential" or set forth any specific requirements in the ESA for determining what areas are "essential," but rather delegated to the Secretary the authority to make that determination on a case-by-case basis. FWS is not required to explicitly define "essential," but rather must explain its considerations for assessing what areas are essential. *See Cape Hatteras Access Pres. Alliance* ("*CHAPA*") *v. U.S. Dep't of Interior*, 344 F. Supp. 2d 108, 120 (D.D.C. 2004) (rejecting plaintiffs' argument that FWS was required to define "occupied"). FWS did so here: it applied a rational interpretation of "essential" and provided a reasonable explanation for its determination that Unit 1 is essential for the conservation of this highly endangered species. Therefore, its determination must be upheld as a permissible interpretation of the statute under *Chevron v. Natural Res. Def. Council*, 467 U.S. 837 (1984). *See id.*; *see also Tex. Oil & Gas*, 161 F.3d at 934.

After reviewing the June 2010 proposed rule, all peer reviewers noted that, in their expert opinion, the proposed designation was inadequate to ensure the conservation of the frog. DSoF ¶¶43-44. They also noted the importance of spreading populations out over a wider geographic area to decrease the risk that the frog will go extinct due to localized threats, such as droughts, disease, and pollution. *Id.* ¶¶44-45, 47. Given the "high risk of extirpation from stochastic events," FWS determined that the already proposed habitat was inadequate to ensure the conservation of the frog and began considering sites throughout the frog's historical range. *Id.* ¶¶48-63. In identifying areas that are essential for the conservation of the frog, FWS considered the following criteria: "(1) The historical distribution of the species; (2) presence of open-canopied, isolated wetlands; (3) presence of open-canopied, upland pine forest in sufficient quantity around each wetland location to allow for sufficient survival and recruitment to maintain a breeding population over the long term; (4) open-canopied, forested connectivity habitat between wetland and upland sites; and (5) multiple isolated wetlands in upland habitat that would allow for the development of metapopulations."[6] 76 Fed. Reg. at 59780-81.

---

[6] A metapopulation structure is defined as neighboring local populations close enough to one another that dispersing individuals could be exchanged at least once per generation, i.e., allowing for gene flow among local populations. 76 Fed. Reg. at 59778. Historically, frog populations were located within metapopulations. R1554.

FWS considered the best available scientific information on sites throughout the frog's range, but could not identify any locations outside Mississippi that contained all of these elements or even all three PCEs. *See* DSoF ¶53. "As a result of the rarity of open-canopied, isolated ephemeral ponds within the historic range of the gopher frog, and their importance to the survival of the species, identifying more of these ponds throughout the species' range was the primary focus of" FWS' analysis of potential sites. *Id.* ¶50; *see also* ¶¶45-51; R2408 (although very little longleaf pine habitat currently exists in the frog's range, it is easier to restore terrestrial habitat than it is restore or create breeding ponds). In FWS' expert judgment, the recovery of the frog "will not be possible without the establishment of additional breeding populations of the species. Isolated, ephemeral ponds that can be used as the focal point for establishing these populations are rare, and this is a limiting factor in" the frog's recovery. 77 Fed. Reg. at 35124.

A peer reviewer suggested Unit 1 as a potential site based on the fact that it contains at least two historical frog breeding ponds and on the results of his research and visits to those ponds in recent years. DSoF ¶56. The same peer reviewer and a FWS biologist with over 20 years of experience "assessed the habitat quality of ephemeral wetlands in [Unit 1] and found that a series of five ponds contained the habitat requirements for PCE 1." 77 Fed. Reg. at 35123; R2320. The ponds were "intact and of remarkable quality." DSoF ¶59. Moreover, FWS found that the "five ponds [in Unit 1] are in close proximity to each other, which provides metapopulation structure and increases the unit's value to the long-term survival and recovery of the frogs over an area with a single breeding pond." 77 Fed. Reg. at 35124; *see also id.* at 35133 ("Multiple breeding sites protect against catastrophic loss at any one site and provide opportunity for recolonization. This is an especially important aspect of critical habitat for [the frogs] due to their limited population numbers."). FWS determined that "the five ponds in Unit 1 provide breeding habitat that in its totality is not known to be present elsewhere within the historic range." *Id.* at 35124. As the Rule explains, FWS determined that Unit 1 is essential to the conservation of the frog "because it provides: (1) Breeding habitat for the [frog] in a landscape where the rarity of that habitat is a primary threat to the species; (2) a framework of breeding ponds that supports metapopulation

structure important to the long-term survival of the [frog]; and (3) geographic distance from extant [frog] populations, which likely provides protection from environmental stochasticity." *Id*. FWS provided a detailed, rational explanation for its determination, and that determination is entitled to deference.

Instead of addressing the factual or scientific bases of FWS' conclusions, Plaintiffs create a novel legal standard where habitat only becomes "essential" after the species is translocated to the specific geographical location. Br. at 15 ("this will only happen if the frog is moved there and if land ever contains the requisite PCEs"). But this runs directly counter to the language in 16 U.S.C. § 1532(5)(A)(ii), which recognizes that FWS can designate unoccupied areas as critical habitat. Re-writing a statute is not a compelling argument. FWS' conclusion is clear: Unit 1 contains very unique ponds that are necessary for the recovery of the frog; these ponds and the surrounding habitat are, in every sense of the word, essential for the frog. Thus, FWS' finding is a faithful application of the ESA, is supported by the record, and is entitled to deference.

**B. Unoccupied Areas Need Not Contain PCEs to be Designated[7]**

In a very similar argument, Plaintiffs contend that critical habitat must contain PCEs in order for the designation to be lawful under the ESA.[8] Br. at 16-17. This is incorrect. The ESA defines "critical habitat" as:

> (i) the specific <u>areas within the geographical area occupied by the species</u>, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

---

[7] Plaintiffs do not explain what they mean by "suitable" habitat. Br. at 17. To the extent that they equate "suitable" with containing all PCEs or habitat in optimal condition to conserve the species at the time of designation, that interpretation is contrary to the plain language of the ESA and is addressed in this section. Furthermore, it is unclear what Plaintiffs mean by "speculative" habitat because no such term exists. But the record shows that the areas in Unit 1 are breeding habitat and that habitat, in its totality, is "intact and of remarkable quality." 77 Fed. Reg. at 35133.

[8] As is evident from section III(A) above, FWS did "consider" all of the identified PCEs, but, based on the best available science, could not identify any unoccupied areas that contained all three PCEs. *See* Br. at 16 (asserting that FWS was required to "consider" all PCEs); *see also* DSoF ¶¶52-53.

(ii) specific <u>areas outside the geographical area occupied by the species</u> at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such <u>areas are essential</u> for the conservation of the species.

16 U.S.C. § 1532(5)(A) (emphasis added). In other words, critical habitat may consist of "occupied" areas, *id.* § 1532(5)(A)(i), and "unoccupied" areas, *id.* § 1532(5)(A)(ii). The statutory language is clear and unambiguous: there are two types of critical habitat, each with a separate standard and scope of analysis. To designate occupied habitat, FWS must show that physical or biological features contained in designated areas are essential to the conservation of the species and may require special management considerations or protections. *Id.* § 1532(5)(A)(i). In contrast, with unoccupied habitat, FWS must show that the areas themselves (not the features contained in those areas) are essential for the conservation of the species. *Id.* § 1532(5)(A)(ii); *see CHAPA*, 344 F. Supp. 2d at 119. It is a well-established principle of statutory construction that, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Had Congress intended to restrict [this subsection as Petitioner suggests], it presumably would have done so expressly as it did in the immediately following subsection…."); *see also United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972). The fact that Congress specifically included language requiring an assessment of physical and biological features in the subsection setting forth the standard for designating occupied habitat but excluded that language in the very next subsection establishing the standard for designating unoccupied habitat makes clear that Congress intentionally omitted the requirement of a showing of PCEs for designating unoccupied habitat. *See Fisher v. Salazar*, 656 F. Supp. 2d 1357, 1366, 1368 (N.D. Fla. 2009) (holding that "FWS was not required to identify PCEs" to designate unoccupied habitat). Here, Plaintiffs concede that the frog was not present at the time of listing, Br. at 17, and thus, on its face, subsection (i) does not apply. Unit 1 is an "area[] outside the geographic area occupied by the species at the time it [was] listed," and thus subsection (ii) provides the applicable standard.

As a practical matter the structure of this statutory provision makes sense. The purpose of the ESA is to conserve listed species by, in part, protecting their habitat. 16 U.S.C. § 1531(b). If the biggest threat to a critically endangered species is the destruction of habitat, as is the case with the frog, it does not make sense to hamstring FWS' efforts to conserve the species by limiting the designation of habitat to only those areas that contain optimal conditions for the species. If such habitat was readily available, the frog would not be reduced to 100 individuals. *Cf. Alabama-Tombigbee*, 477 F.3d at 1275 (rejecting plaintiff's Commerce Clause challenge, stating "[u]nder the Coalition's theory, Congress is free to protect a commercially thriving species that exists in abundance across the United States because it has economic worth, but once economic exploitation has driven that species so close to the brink of extinction that it desperately needs the government's protection, Congress is powerless to act.").

Plaintiffs' reliance on *Alaska Oil & Gas Ass'n v. Salazar* ("*AOGA*"), 916 F. Supp. 2d 974 (D. Alaska 2013), is misplaced. The designation at issue in that case included only occupied habitat and, thus, was based on a different statutory standard, 16 U.S.C. § 1532(5)(A)(i).[9] Moreover, that case is factually inapposite because each designated unit was defined by a single and different PCE. *See* 916 F. Supp. 2d at 995. Plaintiffs incorrectly imply that the court vacated the designation because the agency failed to show that each unit contained all the PCEs. Br. at 12. Instead, the court explained that in its view the record did not establish that particular units contained all features of the relevant PCE. 916 F. Supp. 2d at 1001-02.  Furthermore, Plaintiffs are incorrect when they contend that there is no PCE in Unit 1. DSoF ¶¶54, 56, 59, 60, 61, 62, 63. Rather, FWS found that Unit 1 contains all of the physical or biological features that make up PCE 1.  Indeed, Plaintiffs seem to concede that the existence of one PCE negates their entire argument. Br. at 18.

---

[9] Plaintiffs' reliance on *Home Builders Ass'n v. FWS*, 268 F. Supp. 2d 1197, 1214-17 (E.D. Cal. 2003), is similarly misplaced.  That case also involved *occupied* habitat.  *Id.* at 1209 n.1 ("In this case, in the Final Rule establishing the critical habitat for the Alameda whipsnake, the Service designates all the critical habitat lands as occupied by the snake.").  Moreover, the Ninth Circuit has expressly disagreed with the reasoning in that opinion. *Home Builders Ass'n v. FWS*, 616 F.3d 983, 989 (9th Cir. 2010)  ("We disagree with that court's reasoning because it lacks legal support and is undermined by ESA's text.").

Plaintiffs also rely on *CHAPA*, which in fact supports Defendants' position. Plaintiffs' position is based on an implausible reading of the ESA and should be rejected. The *CHAPA* court made clear that its assertion that FWS cannot "statutorily cast a net over tracts of land with the mere hope that they will develop PCEs and be subject to designation" pertained only to the processes for designating occupied areas. 344 F. Supp. 2d at 122. After determining that FWS had not met the standard for designating occupied areas as critical habitat, that court turned to FWS' alternative argument that the areas also met the standard for designating unoccupied areas. *Id.* at 125. In rejecting that argument, the court noted that FWS had analyzed the areas at issue only under the "occupied" habitat standard, citing in part FWS' assertion that "critical habitat is found only where PCEs are present." *Id.* In other words, the court found that FWS' recognition of the requirement that PCEs be present in the areas designated as critical habitat supported the conclusion that FWS intended to designate only occupied areas and not unoccupied areas. *See id.* Thus, the Court could not fill in the gaps where FWS' record lacked the separate analysis needed to designate unoccupied areas. Plaintiffs' position is not supported by *CHAPA*, is based on an implausible reading of the ESA, and should be rejected.

## IV. FWS Considered All Potential Economic Impacts to Unit 1

The ESA only requires FWS to "take into consideration" probable economic and other impacts before designating critical habitat. 16 U.S.C. § 1533(b)(2). Moreover, "the legal hurdle regarding the Service's analysis of the economic impacts of designation is fairly low." *AOGA*, 916 F. Supp. 2d at 993. The record shows that FWS made every effort to consider any economic impacts that could be attributed to the designation, giving Plaintiffs numerous opportunities to participate in the process. DSoF ¶¶70-73, 75. FWS fulfilled its statutory obligation, and Plaintiffs do not argue to the contrary. *See Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1174 (9th Cir. 2010) (presumption that FWS carried out duty to consider economic information in designating critical habitat).

Rather, Plaintiffs misrepresent FWS' economic analysis, stating that the designation "cost the Poitevent Landowners, Weyerhauser and Markle some $34 million." Br. at 19. This is not

accurate.  This figure represents a possible but remote hypothetical scenario where there is no development as a result of future agency actions. DSoF  ¶76.[10]  But if Plaintiffs continue to use their land for timber harvesting, as Mr. Poitevent has indicated a number of times they will do, then the designation would not impact them at all. *See* R2216; 2220; *see also* R6662-63. And even if Plaintiffs develop concrete plans to proceed with development projects located in part in Unit 1 and the project has a federal nexus, the FEA makes clear that, if the federal agency action is likely to adversely modify critical habitat, FWS believes it could identify reasonable and prudent alternatives.[11] R6663-64; *contra* Br. at 5. Based on the information presented to FWS, there is no basis to conclude that there is disproportionate impact warranting exclusion from the designation.

## V.  NEPA Does Not Apply to Critical Habitat Designations

FWS' consistent position that critical habitat designations are not subject to NEPA was upheld by the court in *Douglas County v. Babbitt*, 48 F.3d 1495, 1501-08 (9th Cir. 1995). The Ninth Circuit explained that NEPA analysis is not required because: (1) the ESA displaced the procedural requirements of NEPA with respect to critical habitat designation; (2) NEPA does not apply to actions that do not alter the physical environment; and (3) critical habitat designation serves the purposes of NEPA by protecting the environment from harm due to human impacts. *See id.* Further, the court found that NEPA should not be used as "an 'obstructionist tactic' to prevent environmental protection." *Id.* at 1508 (citing *Pac. Legal Found. v. Andrus*, 657 F.2d 829, 838 (1981)); *see also Bldg. Indus. Ass'n v. U.S. Dep't of Commerce*, 2012 WL 6002511, at *7.[12]

---

[10] If Unit 1 continues to be used for timber harvesting, there would be no federal nexus and thus no economic impacts. This scenario appears to be likely in light of Weyerhaeuser's contract to continue such operations until 2043 and Mr. Poitevent's statements that Landowner Plaintiffs will continue timbering activities in Unit 1 beyond the 2043 termination of the timber lease. R2216; 2220; *see also* R2065; R6662 & n.68; R6663 & n.78.

[11] At that time, there would be administrative proceedings and a final agency action related to Landowner Plaintiffs' specific, concrete plans that Landowner Plaintiffs could challenge if they wished to do so.

[12] The process for designating critical habitat may also be considered the functional equivalent of a NEPA analysis, thus providing further support for the principle that such designations are not subject to NEPA. *See Pac. Legal Found.*, 657 F.2d at 835 (noting in *dicta* that the "ESA may now provide the functional equivalent of an impact statement when a critical habitat is designated"); *see also Tex. Comm. on Natural Res. v. Bergland*, 573 F.2d 201, 207 (5th Cir. 1978) (noting that courts have held that "NEPA compliance has not been required when the agency's organic

The only other circuit to have addressed this precise issue was the Tenth Circuit in *Catron County Bd. of Comm'rs v. FWS*, 75 F.3d 1429, 1436-39 (10th Cir. 1996). Significant to the court's ruling was its finding that, unlike in the *Douglas County* case, the designation of critical habitat would harm the environment by limiting the county's ability to engage in flood control efforts. *See id.* at 1437-38; *see also CHAPA*, 344 F. Supp. 2d at 136 (finding that NEPA applied to a critical habitat designation, in part, because the designation would "significantly affect the quality of the human environment"). Although the Fifth Circuit has not addressed whether NEPA applies to critical habitat designations, it has held that NEPA does not apply to actions that do not alter the physical environment. *See Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 679 (5th Cir. 1992) ("[T]he acquisition of the [negative conservation] easement by [FWS] did not effectuate *any* change to the environment which would otherwise trigger the need to prepare an EIS."); *see also City of Dallas v. Hall*, 562 F.3d 712, 721-23 (5th Cir. 2009) (holding that setting an acquisition boundary for a wildlife refuge did not alter the physical environment and thus did not require the preparation of an EIS).

Here, the designation of critical habitat does not alter the physical environment and requires no action by private landowners. *See* 77 Fed. Reg. at 35128. Further, Plaintiffs have made clear that they will never authorize FWS to implement management measures to improve the habitat. ECF No. 80-2 ¶14. Therefore, there is no basis for Plaintiffs' assertion that FWS' action will impact the environment. Moreover, Plaintiffs' land is unoccupied, and therefore the only way that Plaintiffs might be required in the future to take conservation actions to protect the frog would be if Plaintiffs were to undertake a project with a federal nexus. *See* 16 U.S.C. § 1536. If that were to occur, an appropriate NEPA analysis could be conducted at that time.

## VI. The "Significant Portion of its Range" Inquiry is for Species Listing Purposes and Does Not Involve Critical Habitat Designations

Plaintiffs argue that FWS' critical habitat designation was improper because Unit 1 includes

legislation mandated specific procedures for considering the environment that were 'functional equivalents' of the impact statement process").

"lost historical range" and "is not part of the frog's 'significant portion of its range.'" Br. at 20-21. Plaintiffs confuse the standards applicable to ESA listing decisions with the standards applicable to critical habitat designations, two entirely different statutory inquiries. Under the ESA, FWS is directed to determine "whether any species is an endangered species or a threatened species . . . ." 16 U.S.C. § 1533(a)(1). The definitions of endangered and threatened species utilize the phrase "throughout all or a significant portion of its range." *Id.* § 1532(6), (20). Thus, when making a decision whether to list a species as endangered or threatened, FWS must determine whether the species is in danger of extinction, or likely to become an endangered species, throughout all or a significant portion of its range. *Id.* To aid in this listing inquiry, FWS has developed a Draft Policy for interpreting and applying the language "significant portion of its range" when it makes its determination whether a species should be listed as endangered or threatened under the ESA. 76 Fed. Reg. 76987. But this draft guidance, to the extent it becomes final, is limited to listing determinations. *Id.* ("It is our intent to publish a final policy that will provide a consistent standard for interpretation of the phrase *and its role in listing determinations* . . . .") (emphasis added).

Once FWS decides to list a species as endangered or threatened, it then has the obligation to designate critical habitat. 16 U.S.C. § 1533(a)(3). The statutory definition of critical habitat does not utilize the "significant portion of its range" terminology. *Id.* § 1532(5). Instead, the definition speaks in terms of occupied and unoccupied geographical areas. *Id.* § 1532(5)(A)(i), (ii). Consistent with the distinction in statutory definitions, FWS' Draft Policy explicitly explains that the "significant portion of its range" inquiry does not affect critical habitat designations:

> We will use the same process for designating critical habitat for species *regardless* of whether they are listed because they are endangered or threatened in a significant portion of their range or because they are endangered or threatened throughout all of their range. *In either circumstance, we will designate all areas that meet the definition of ''critical habitat''* . . . Thus, critical habitat designations may include areas within the SPR, areas outside the SPR occupied by the species, and areas that are both outside the SPR *and outside the area occupied by the species at the time of listing*, as appropriate.

76 Fed. Reg. 77003 (emphasis added). As the draft policy makes clear, the decision to designate

critical habitat is independent of any "significant portion of its range" inquiry and instead utilizes the statutory standards for designating occupied and unoccupied areas. 16 U.S.C. § 1532(5).

Plaintiffs' attempt to conflate these two distinct statutory inquiries is unavailing. Without any justification, Plaintiffs' argument completely ignores the explicit explanation in the Draft Policy that addresses this very issue. 76 Fed. Reg. 77003. Moreover, Plaintiffs' proposed construct would render part of the statutory definition of critical habitat superfluous. According to Plaintiffs' logic, FWS could never designate "lost historical range" as critical habitat because it is not within a "significant portion of its range." Br. at 21 ("as Unit 1 was 'lost historical range' at that time [listing in 2001], it is not part of the frog's 'significant portion of its range.'"). This defeats at least one purpose of designating critical habitat, namely protecting lost historical habitat to allow recovery of the species. Further, it renders the statutory language "specific areas outside the geographical area occupied by the species at the time it is listed . . . ." superfluous and meaningless. 16 U.S.C. § 1532(5)(A)(ii). Courts must interpret statutes so as not to render statutory language superfluous. The Court should reject Plaintiffs' unreasonable reading of the ESA.

## VII.  FWS' Methodology for Designating Unit 1 as Critical Habitat is Reasonable and Entitled to Deference

Plaintiffs seem to acknowledge that at least portions of Unit 1 are essential for the conservation of the dusky gopher frog, but argue that the designation of the entire 1,544 acres in Unit 1 is overly broad. Br. at 21. [13] In support, Plaintiffs contend that the designation of 1,544 acres "assumes the false fact that frogs will someday be on the Poitevent Lands." *Id.* As explained below, this misstates the relevant inquiry and FWS' methodology for designating critical habitat for this species in general, and the 1,544 acres in Unit 1 in particular.

Even if Plaintiffs timely raised this objection,[14] FWS' methodology for delineating the

---

[13] To the extent that Plaintiffs are arguing that the boundaries of Unit 1 are improper because this was unoccupied habitat or lacked all of the PCEs, that argument is addressed in our previous briefing. *See* section III(B), *supra.*

[14] Plaintiffs did not raise this argument in their comments to FWS during the comment period and therefore have waived their opportunity to do so here. *Tex. Oil & Gas,* 161 F.3d at 933 n.7 ("To the extent that any independent challenges to the [agency action] were made, we hold that they

boundaries of Unit 1 is reasonable and entitled to deference. The methodology for delineating the critical habitat unit boundaries starts by using "digital aerial photography using ArcMap 9.3.1 to map . . . [t]hose locations of breeding sites outside the geographic area occupied by the species at the time it was listed . . . that were determined to be essential for the conservation of the species . . . ." 77 Fed. Reg. 35134. That is, FWS looked to former breeding sites and other suitable breeding sites that were determined to be essential for conservation, *i.e.*, the ephemeral ponds. From these points, FWS then created a buffer by using "a radius of 621 m (2,037 ft)." *Id.* FWS explained that it "chose the value of 621 m . . . by using the median farthest distance movement (571 m (1,873 ft)) from data collected during multiple studies of the gopher frog . . . and adding 50 m (164 ft) to this distance to minimize the edge effects of the surrounding land use . . . ." *Id.* FWS then "used aerial imagery and ArcMap to connect critical habitat areas within 1,000 m (3,281 ft) of each other to create routes for gene flow between breeding sites and metapopulation structure." *Id.* FWS further explained that it made "every effort to avoid including developed areas, such as lands covered by buildings, pavement, and other structures, because such lands lack the physical or biological features . . . ." *Id.*

   With respect to Unit 1, FWS explained that although "Unit 1 is not within the geographic area occupied by the species at the time of listing . . . the last observation of a dusky gopher frog in Louisiana was in 1965 in one of the ponds within this unit." *Id.* at 35135. FWS determined that at least two of the ponds in this immediate area were former breeding sites, *id.* at 35123, and FWS explained that "the five ponds are in close enough proximity to each other that adult frogs could move between them and create a metapopulation . . . ." *Id.* at 35135. It was from these ephemeral ponds that FWS applied its methodology (621 m buffer and routes for gene flow) to create the boundaries of Unit 1. This resulted in the designation of 1,544 acres in Unit 1.

---

were waived by Texas Petitioners' failure to raise the objections during the notice and comment period."); *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010) ("A party forfeits arguments that are not raised during the administrative process."); *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1059 (D.C. Cir. 2001) ("An agency is not required to consider issues and evidence in comments that are not timely filed.").

The decision to use a 621 m buffer and maintain corridors for gene flow which results in the designation of 1,554 acres in Unit 1 does not ignore the best available science and is exactly the type of scientific decision that was entrusted to FWS by Congress.[15] 16 U.S.C. § 1532(5)(A)(ii). FWS' methodology is inherently a scientific judgment, grounded in the available data. The Supreme Court and Fifth Circuit have been very clear that this is the precise point the Court must be at its most deferential to the agency. *Medina Cnty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010) ("Where an agency's particular technical expertise is involved, we are at our most deferential in reviewing the agency's findings.").[16] The Court should defer to FWS' methodology for delineating the boundaries of the critical habitat designation and reject Plaintiffs' argument that the Unit 1 designation is overly broad.

## VIII. The Dusky Gopher Frog is Listed as an Endangered Species

Plaintiffs argue that the dusky gopher frog is not listed under the ESA and therefore the critical habitat designation was unlawful. Br. at 22.[17] Plaintiffs' argument misconstrues, or ignores, FWS' taxonomic explanation in the Final Rule. 77 Fed. Reg. 35119. Despite changes to the common and scientific names, the listed entity has always remained the same and thus the critical habitat designation is consistent with the ESA.

Plaintiffs' argument starts from a false premise. Plaintiffs assert that FWS listed the

---

[15] One commenter suggested using a 650 m radius, but FWS determined that it was too large and unsupported by the available science, i.e., recent gopher frog studies. 77 Fed. Reg. 35120.

[16] Plaintiffs also critique FWS for excluding an "agricultural area" in Unit 10 because it did not contain habitat that was suitable for the species. Br. at 21-22. Unlike this agricultural field, FWS found the habitat in Unit 1 was "restorable with reasonable effort" and that "[m]aintaining the five ponds within this area as suitable habitat into which dusky gopher frogs could be translocated is essential to decrease the risk of extinction of the species resulting from stochastic events and provide for the species' eventual recovery." 77 Fed. Reg. 35135. The difference between a field that has no chance of restoration and five ephemeral ponds that have supported breeding populations in the past (and retain those critical attributes) illustrates Plaintiffs' failure to recognize the potential of this area and the entire reason for designating critical habitat, namely providing habitat to recover the species.

[17] Plaintiffs do not challenge the 2001 listing rule, 66 Fed. Reg. 62993, nor could they as the claim is now time barred. *See Dunn-McCampbell Royalty Interest v. Nat'l Park Serv.*, 112 F.3d 1283, 1286 (5th Cir. 1997) (APA challenges are time barred unless brought within six years of accrual).

"Mississippi gopher frog" as an endangered species under the ESA, but this is not entirely correct. Br. at 22. In 2001, FWS listed a *distinct population segment* of the gopher frog subspecies and provided a specific definition of the listed entity. 66 Fed. Reg. 62993 (Dec. 4, 2001) ("We defined the Mississippi gopher frog distinct population segment as those populations of gopher frogs in the lower coastal plain ranging from the Mississippi River in Louisiana to the Mobile River delta of Alabama."). The term "Mississippi gopher frog" refers to the common name of the distinct population segment, nothing more.[18] FWS did not list all of the dusky gopher frogs wherever they were found but rather just the distinct population segment as defined by the geographical range described in the Rule. And, at the time of listing, approximately 100 frogs, located in Harrison County, Mississippi, were the only known frogs in the DPS. *Id.* at 62995.[19]

During the listing process, FWS further explained that this population segment was so distinct that some biologists believed it should be recognized as its own species, rather than just a distinct population segment. *Id.* ("the population of gopher frogs from Harrison County, Mississippi, showed a fixed difference at a single locus (site for a specific gene on a chromosome) from all other gopher frogs east of the Mobile River drainage in Alabama. This difference is considered by many taxonomists to be significant enough to warrant elevation of the frog to its own species. . . ."). Although there was some dispute in 2001, FWS concluded that "[t]he scientific name, *Rana capito sevosa*, will be used to represent this distribution of frogs," but it prophetically explained that "[i]f the name *Rana sevosa* is ultimately accepted by the herpetological scientific community, we will revise our List . . . to reflect this change in nomenclature (scientific name)." *Id.* at 62993.

That is exactly what occurred. In the Rule, FWS explained that the scientific community

---

[18] Listing a distinct population segment, rather than an entire species, is consistent with the ESA. 16 U.S.C. § 1532(16) (defining "species" as any "subspecies of fish or wildlife or plants, and any *distinct population segment* of any species of vertebrate fish or wildlife which interbreeds when mature") (emphasis added).

[19] In the final listing rule, FWS found that: "The biological evidence supports recognition of the Mississippi gopher frog as a distinct vertebrate population segment for purposes of listing, as defined in our February 7, 1996, Policy Regarding the Recognition of Distinct Vertebrate Population Segments (61 FR 4722)." 66 Fed. Reg. 62995. FWS explained that the population segment was discrete "because it is geographically segregated from other gopher frogs by a large gap (approximately 200 km (125 mi)) of unoccupied habitat and the Mobile River delta." *Id.*

recently concluded that the entity it listed as a distinct population segment of the Mississippi gopher frog in 2001 is "different from other gopher frogs and warrants acceptance as its own species  . . .  and the scientific name for the species was changed to *Rana sevosa*." 77 Fed. Reg. 35118. Because the scientific name changed, FWS also changed the common name of the listed entity. *Id.* ("The taxonomic change meant that a change in the common name from Mississippi gopher frog to dusky gopher frog was appropriate."). A change in nomenclature, however, did not change the listed entity in any way – the protection of those same 100 frogs in Harrison County remained the same. That is, the listed entity remained the same; FWS merely changed the common name to "dusky gopher frog" to reflect the best available science.

Plaintiffs first misunderstand, and then ignore, FWS' explanation. Plaintiffs overlook the fact that FWS listed a distinct population segment, rather than an entire species. Plaintiffs then compound their mistake by ignoring FWS' explanation that the common name change from the "distinct population segment of the Mississippi gopher frog" (*Rana capito sevosa*) to the "dusky gopher frog" (*Rana sevosa*) did not affect the listed entity in any manner. Br. at 22. Contrary to Plaintiffs' contentions, FWS did not designate critical habitat for an "unendangered species."  It designated critical habitat for the entity that was listed in 2001. *Id.* Moreover, FWS alerted the public and plaintiffs to this possible name change as early as 2001, and was clear in the final rule that the listed entity never changed. Plaintiffs were fully aware of the proposed taxonomic and name change, as evidenced by their extensive comments on the revised proposed rule, in which FWS explicitly asked for comments on these proposed changes. *Id.*; 76 Fed. Reg. at 59774, 59775. FWS' explanation was clear and cogent; Plaintiffs simply ignore FWS' reasoning.

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

DATED this 21st day of February, 2014.

Respectfully Submitted,

ROBERT G. DREHER,
Acting Assistant Attorney General
SETH M. BARSKY, Chief
KRISTEN L. GUSTAFSON,
Assistant Chief

/s/ Mary Hollingsworth
MARY HOLLINGSWORTH
Trial Attorney
AZ Bar No. 027080
LUTHER HAJEK, Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044-7611
Phone: (202) 305-0324
Fax: (202) 305-0275
Email: mary.hollingsworth@usdoj.gov

OF COUNSEL:

Michael Stevens
U.S. Department of the Interior
Office of the Regional Solicitor
75 Spring Street, S.W.
Suite 304
Atlanta, Georgia 30303

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF LOUISIANA**

**NEW ORLEANS**

| | |
|---|---|
| MARKLE INTERESTS, LLC, | |
|     Plaintiff, | CIVIL ACTION |
| v. | CASE NO. 13-234 |
| UNITED STATES FISH AND WILDLIFE | PERTAINS TO 13-361 |
| SERVICE, et al., | SECTION: F(1) |
|     Defendants. | JUDGE: MARTIN L.C. FELDMAN |
| | MAG. JUDGE: SALLY SHUSHAN |
| | **CERTIFICATE OF SERVICE** |

    I hereby certify that today I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to all counsel of record.

                                                /s/ Mary Hollingsworth
                                                MARY HOLLINGSWORTH