**UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF LOUISIANA**

**NEW ORLEANS**

| | |
|---|---|
| MARKLE INTERESTS, LLC, | CIVIL ACTION |
| Plaintiff, | CASE NO. 13-234 |
| v. | PERTAINS TO 13-413 |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | SECTION: F |
| Defendants. | JUDGE: MARTIN L.C. FELDMAN |
| | MAG. JUDGE: SALLY SHUSHAN |

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR OPPOSITION TO PLAINTIFF WEYERHAEUSER'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendants, through undersigned counsel, respectfully submit the following memorandum in support of their Opposition to Plaintiff Weyerhaeuser's Motion for Summary Judgment and Cross-Motion for Summary Judgment.

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

I.    The Endangered Species Act ...................................................................... 2

II.   National Environmental Policy Act ("NEPA") ......................................... 3

III.  Dusky Gopher Frog Critical Habitat Rule ................................................. 3

IV.  Standard of Review—Administrative Procedure Act ("APA") ................. 5

ARGUMENT ....................................................................................................... 6

I.    Plaintiff Fails to Demonstrate Standing to Pursue Any of its ESA Claims ...................... 6

II.   Plaintiff Lacks Prudential Standing to Bring a NEPA Claim ................... 7

III.  Unit 1 Meets the Statutory Definition of "Critical Habitat": FWS Made a Reasonable Determination that Unit 1 is Essential for the Conservation of the Frog .......................... 8

IV.  Unoccupied Areas Need not Contain PCEs to be Designated ................. 12

V.   FWS Considered All Potential Economic Impacts to Unit 1 ................... 17

     a.    The Method Used To Analyze Economic Impacts is Irrelevant; Unit 1 is Unoccupied ....................................................... 17

     b.    FWS Considered All Probable Economic Impacts ........................ 19

VI.  FWS Has the Constitutional Authority to Designate Unit 1 as Critical Habitat .............. 21

VII. NEPA Does Not Apply to Critical Habitat Designations ........................ 23

CONCLUSION ................................................................................................... 25

# INTRODUCTION

Plaintiff Weyerhaeuser Company ("WH" or "Plaintiff") challenges the U.S. Fish and Wildlife Service's ("FWS") designation of 1,544 acres in St. Tammany Parish, Louisiana ("Unit 1") as critical habitat to conserve the highly endangered dusky gopher frog ("frog") under the Endangered Species Act ("ESA"). 77 Fed. Reg. 35118 (June 12, 2012) (hereafter, "Rule"). With about 100 frogs left in the wild, the need for protection and conservation of the species cannot be overstated. Under the ESA, Congress requires FWS to designate critical habitat and expressly provides FWS with the discretion to designate "unoccupied" areas, including private property, when "such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). The ESA does not require these areas to be in optimal, or even suitable, condition at the time of designation. Rather, ESA implementing regulations require a finding that "a designation limited to [the species'] present range would be inadequate to ensure the conservation of the species." 50 C.F.R. § 424.12(e).

FWS came to that reasonable conclusion here. The frog is currently limited to one viable breeding population occurring in Mississippi. Unit 1 contains at least two historical frog breeding ponds and optimal frog breeding habitat,[1] which is extremely rare in the frog's historical range, a fact that WH does not challenge. The Rule and administrative record show that FWS carefully considered all relevant factors and ultimately arrived at a reasoned decision that Unit 1, which contains the best frog breeding habitat, in its totality, in the species' range, must be designated critical habitat as essential to the conservation of this highly endangered species.

WH's various arguments may be distilled down to one point: WH believes that FWS is only permitted to designate unoccupied areas that not only meet the tests articulated in the ESA, but are also currently in optimal condition to conserve the species. However, that is not the law. It is readily apparent that WH's arguments lack merit as WH is forced to read requirements into the

---

[1] Unsurprisingly, WH fails to provide any citation to the record to support its baseless assertion that FWS determined that Unit 1is "not actually habitat at all." ECF No. 67-1 ("Br.") at 1. In fact, the record shows that FWS determined that Unit 1 is "critical habitat" essential to the frog's conservation. Defendants' Statement of Facts ("DSoF") ¶¶48, 50, 51, 57, 59, 63, 65-67.

ESA that are contrary to its plain language, that have no support in the law, and in a number of cases have been explicitly rejected by other courts addressing these very issues. Plaintiff has also failed to provide any evidence demonstrating its standing, thus the Court need not even reach the merits of Plaintiff's claims. Accordingly, this Court should dismiss Plaintiff's Complaint or, in the alternative, grant summary judgment in favor of the Defendants.

## BACKGROUND

### I. The Endangered Species Act

The ESA was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation" of such species. 16 U.S.C. § 1531(b). The statute defines "conservation" as the "use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3). A species is listed as "endangered" if it is "in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). One key method for conserving listed species is the designation of critical habitat, which is required, except in limited circumstances. *See id.* § 1533(a)(3)(A). The ESA provides that FWS may designate as critical habitat both occupied and unoccupied areas. *Id.* § 1532(5)(A). Areas outside the geographical area occupied by the species at the time it is listed may be designated "upon a determination by the Secretary that such areas are essential for the conservation of the species," *id.* § 1532(5)(A)(ii), and only "when a designation limited to its present range would be inadequate to ensure the conservation of the species." 50 C.F.R. § 424.12(e). The designation must be "on the basis of the best scientific data available and after taking into consideration the economic [and other impacts] of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2).

Critical habitat receives protection under ESA Section 7, which requires federal agencies to consult with the expert agency, here FWS, on any actions "authorized, funded, or carried out by" the agency to ensure that their actions are not likely to destroy or adversely modify critical habitat.

*Id.* § 1536(a)(2).[2] If FWS finds that an agency action, such as the issuance of a permit, is likely to adversely modify critical habitat, FWS must suggest reasonable and prudent alternatives that would avoid adverse modification. 50 C.F.R. § 402.14(h)(3). "Reasonable and prudent alternatives" must be "economically and technologically feasible." *Id.* § 402.02. If a private party's action has no federal nexus, i.e., it is not authorized, funded, or carried out by a federal agency, it is not affected by a critical habitat designation. *See Fisher v. Salazar*, 656 F. Supp. 2d 1357, 1359 (N.D. Fla. 2009); *see also* 77 Fed. Reg. at 35121 (explaining that timber management activities on non-federal lands have no federal nexus and, thus, would not be affected).

## II.   National Environmental Policy Act ("NEPA")

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To meet these dual purposes, NEPA requires that an agency prepare a comprehensive environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). For over three decades, FWS has maintained the consistent position that a NEPA analysis is not required for critical habitat designations. *See* 48 Fed. Reg. 49244-02 (Oct. 25, 1983).

## III. Dusky Gopher Frog Critical Habitat Rule

The dusky gopher frog is at "high risk of extinction." 75 Fed. Reg. 31387, 31394 (June 3, 2010). There are about 100 adult frogs left in the wild and only one viable breeding population, which is located in Mississippi. DSoF ¶20. In 2001, FWS listed the frog as endangered due to its low population size and ongoing threats, including habitat destruction and degradation resulting from urbanization and associated development and vulnerability to environmental stressors such as drought. *Id.* ¶14. Fragmentation and destruction of the frog's habitat have caused the species' small, isolated populations to become genetically isolated and have reduced the space available for

---

[2] As Plaintiff appears to concede, private property designated as unoccupied habitat is not per se regulated by the ESA. Br. at 10.

reproduction, development of young, and population maintenance. 77 Fed. Reg. at 35130.

In June 2010, FWS published a proposed rule to designate critical habitat for the frog. DSoF ¶25-26. The rule proposed to designate the 96 acres occupied at the time of listing and 1,861 acres unoccupied at the time of listing. DSoF ¶27. Based on the best available scientific data on the frog's biological needs, FWS determined that the frog's optimal habitat includes small, isolated, ephemeral ponds for breeding (Primary Constituent Element ("PCE" ) 1); upland pine forested habitat that has an open canopy (PCE 2); and upland connectivity habitat (PCE 3).[3] This habitat contains the "physical and biological features necessary to accommodate breeding, growth, and other normal behaviors of the [frog] and to promote genetic flow within the species." 76 Fed. Reg. 59774, 59778 (Sept. 27, 2011). At that time, FWS determined that a designation of unoccupied areas was necessary because "[t]he range of the [frog] has been severely curtailed, occupied habitats are limited and isolated, and population sizes are extremely small and at risk of extirpation and extinction from stochastic events that occur as periodic natural events or existing or potential human-induced events." 77 Fed. Reg. at 35132, 35133.

The proposed rule underwent an independent peer review by six individuals with scientific expertise that included familiarity with the species, the geographic region in which the species occurs, and conservation biology principles. DSoF ¶41. Every peer reviewer concluded that the amount of habitat already proposed, which included occupied and unoccupied areas in Mississippi, was insufficient for the conservation of the species, with several suggesting that FWS consider other locations within the frog's historical range. *Id.* ¶44. One peer reviewer suggested the area in Unit 1, well-known to those studying the frog as containing at least two historical breeding sites for the frog. *Id.* ¶54-55. Based on all comments received, FWS reanalyzed the "current and historic data for the species, including data from Alabama and Louisiana," to determine if additional

_____

[3] FWS considered the physical and biological features essential to the frog's conservation, which include, *inter alia*: space for individual and population growth; nutritional and physiological requirements; breeding sites; and habitat representative of the historical or geographical distribution of a species. 75 Fed. Reg. at 31391. FWS derives the PCEs from consideration of these biological needs. The elements of each PCE are described in detail in DSoF ¶79.

habitat qualified as critical habitat. 77 Fed. Reg. at 35124. FWS identified additional critical habitat in Mississippi and Louisiana and included those areas within the revised proposed rule published for comment on September 27, 2011. 76 Fed. Reg. 59774. FWS was unable to identify critical habitat in Alabama. DSoF ¶52-53; R1588.

Before FWS finalized the Rule it considered the potential economic impacts of the designation. 77 Fed. Reg. at 35140. The Final Economic Analysis ("FEA") quantified impacts that may occur in the 20 years following the designation. *Id.* It analyzed the economic impacts of designating Unit 1 based on the following three hypothetical scenarios: (1) development occurring in Unit 1 would avoid impacts to jurisdictional wetlands and, thus, would not trigger ESA Section 7 consultation requirements[4]; (2) development occurring in Unit 1 would require a permit from the Army Corps of Engineers due to potential impacts to jurisdictional wetlands, which would trigger ESA Section 7 consultation between the U.S. Army Corps of Engineers ("Corps") and FWS, and FWS would work with landowners to keep 40% of the unit for development and 60% managed for the frog's conservation; and (3) development occurring would require a federal permit, triggering ESA Section 7 consultation, and FWS determines that no development can occur in the unit. DSoF ¶76. Information on the value of Unit 1 land was provided by Landowner Plaintiffs. R6666 (FEA 4-6).

The final June 2012 Rule designated 6,477 acres in Mississippi and Louisiana, 5,281 acres of which is unoccupied habitat, including the 1,544 acres in Unit 1 which FWS considers to be, in its totality, the highest quality breeding habitat anywhere in the frog's range. 77 Fed. Reg. at 35124; *see also* R1588; 3615. The ephemeral wetlands in Unit 1 contain all of the physical or biological features that make up PCE 1. DSoF ¶¶54, 56, 59, 60, 61, 62, 63.

## IV. Standard of Review—Administrative Procedure Act ("APA")

The challenged Rule is reviewed under the "arbitrary and capricious" standard set forth in the

---

[4] Similarly, if Unit 1 continues to be used for timber harvesting as Mr. Poitevent has stated it would be, there would be no federal nexus and thus no economic impacts. R2216;2220; *see also* R2065 FEA4-2 & n.68; 4-3 & n.78. This scenario is also supported by the fact that Weyerhaeuser holds a lease to continue such operations until 2043.

APA, 5 U.S.C. § 706; s*ee Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998). This standard is "highly deferential" and the agency's decision is afforded a strong presumption of validity. *Hayward v. U.S. Dep't of Labor*, 536 F.3d 376, 379 (5th Cir. 2008); *see also Balt. Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 105, (1983). The court may not "reweigh the evidence or substitute its judgment for that of the administrative fact finder." *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *see also Texas Oil & Gas*, 161 F.3d at 933-34. Courts must be particularly deferential to agency determinations made within the scope of the agency's expertise. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000); *see Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006).

## ARGUMENT

Unit 1 is essential to the conservation of the highly endangered frog. FWS used the best available scientific data, carefully considered every factor and made all determinations required by the ESA to designate Unit 1 as critical habitat for the frog. FWS' Rule clearly passes muster under the applicable, deferential standard of review. Accordingly, Defendants are entitled to summary judgment in their favor as a matter of law.

## I. Plaintiff Fails to Demonstrate Standing to Pursue Any of its ESA Claims

Before considering the merits of WH's claims, the Court must first determine whether WH has properly invoked the Court's jurisdiction. *Raines v. Byrd*, 521 U.S. 811, 820 (1997). Plaintiff has failed to meet its burden to prove Article III standing by showing that: (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). At the summary judgment stage, plaintiff cannot rest on "mere allegations," but must set forth by affidavit or other evidence specific facts to establish each element of standing. *Id.* at 561; *Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 496-97, 498 (5th Cir. 2007) (standing to sue must be proven, not merely asserted).

WH has not provided any evidence beyond mere assertions that it can establish each element of

standing. At best, WH asserts that it <u>may</u> be subject to regulatory burdens if federal approval is required for some yet-to-be-determined future action.[5] ECF No. 67-2. WH also asserts that the financial impact to all landowners "could be as high as $33.9 million."[6] *Id.* Even if WH could establish harm by "mere assertions," any harm asserted by WH is conjectural and certainly not imminent. *See Prestage Farms v. Bd. of Supervisors of Noxubee Cnty., Miss.*, 205 F.3d 265, 268 (5th Cir. 2000) ("Federal courts consistently deny standing when claimed anticipated injury has not been shown to be more than uncertain potentiality."). Unit 1 is currently used for timber harvest, a use that neither implicates a federal nexus nor triggers ESA Section 7 consultation. 77 Fed. Reg. at 35122. WH, moreover, holds a lease to continue such operations until 2043. ECF No. 67-2 ¶5. Thus, the designation of Unit 1 as critical habitat has no effect whatsoever on Plaintiff Landowners' current or foreseeable use of the land. WH does not set forth any evidence that there are concrete and imminent plans to use the land in a way that *would* trigger ESA Section 7 consultation requirements and thus any need for "federal approval" or any possibility of an economic impact. To the contrary, WH asserts that FWS has designated an area that "will not become usable absent a series of events that the record establishes are <u>not</u> likely to happen." Br. at 18. WH has failed to meet its burden of establishing standing and, therefore, its Complaint should be dismissed. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

## II. Plaintiff Lacks Prudential Standing to Bring a NEPA Claim

Even if the Court finds Article III standing, WH has failed to demonstrate prudential standing for its NEPA claim. In order to demonstrate prudential standing, a party must show that the injury complained of "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for [the] complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *see also Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 675 (5th Cir.

---

[5] To the extent that WH's brief may be interpreted as requesting the Court to vacate the entire designation, WH has not made any attempt to establish standing outside of Unit 1.

[6] WH makes other vague allegations that designation is likely to expose it to increased regulatory burdens and risk of lawsuits, but provides no support for such claims. Such claims certainly do not meet the requirements for establishing standing at the summary judgment stage. Br. at 6.

1992). Economic harms are not within the zone of interests protected by NEPA. *See Nevada Land Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) ("The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions."); *Hurd v. Urban Dev., L.C. v. FHA*, 33 F. Supp. 2d 570, 573-74 (S.D. Tex. 1998).

Here, Plaintiff asserts solely economic injuries. *See* Br. at 6 (claiming that the economic impact "could be as high as $33.9 million"). Plaintiff claims that the designation of critical habitat "is likely to expose Weyerhauser to increased regulatory burdens, risk of lawsuits, and loss of property value." *Id.* None of these are environmental harms that fall within the zone of interests of NEPA. Accordingly, Plaintiff's NEPA claim should be dismissed for lack of prudential standing. *See Bldg. Indus. Ass'n v. U.S. Dep't of Commerce*, No. 11-4118, 2012 WL 6002511, at *7 (N.D. Cal. Nov. 30, 2012) (property owners lacked prudential standing under NEPA to challenge a critical habitat designation); *Hurd v. Urban Dev.*, 33 F. Supp. 2d at 572-76 (landowners lacked prudential standing under NEPA to challenge highway realignment).

## III. Unit 1 Meets the Statutory Definition of "Critical Habitat": FWS Made a Reasonable Determination that Unit 1 is Essential for the Conservation of the Frog

After considering the best available science, including the input of six experts, and the importance of ephemeral ponds to the recovery of the frog, FWS reasonably determined that Unit 1 is essential for the conservation of the species. Unable to show that FWS' finding is arbitrary and capricious, Plaintiff bases its unsupported arguments on an interpretation of the statute that contradicts the ESA's plain language and is at odds with the relevant case law.

An unoccupied area may be designated if FWS determines that it is "essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). As WH concedes, Br. at 11, Congress did not define "essential" or set forth any specific requirements in the ESA for determining what areas are "essential." WH urges the Court to rely on Plaintiff's dictionary definition of "essential." However, Congress delegated to the Secretary the authority to make that determination on a case-by-case basis. FWS is not required to explicitly define "essential"; rather, it must explain its considerations for assessing what areas are essential. *See Cape Hatteras Access Pres. Alliance*

("*CHAPA*") *v. U.S. Dep't of Interior*, 344 F. Supp. 2d 108, 120 (D.D.C. 2004) (rejecting plaintiffs' argument that FWS was required to define "occupied"). FWS did so here: it applied a rational interpretation of "essential" and provided a reasonable explanation for its determination that Unit 1 is essential for the conservation of this highly endangered species. Therefore, its determination must be upheld as a permissible interpretation of the statute under *Chevron*. *See id.*; *see also Tex. Oil & Gas*, 161 F.3d at 934.

After reviewing the June 2010 proposed rule, all peer reviewers noted that, in their expert opinion, the already proposed designation was inadequate to ensure the conservation of the frog. DSoF ¶¶43-44. They also noted the importance of spreading populations out over a wider geographic area to decrease the risk that the frog will go extinct due to localized threats, such as droughts, disease, and pollution. *Id.* ¶¶ 44-45, 47. Given the "high risk of extirpation from stochastic events," FWS determined that the already proposed habitat was inadequate to ensure the conservation of the frog and began considering sites throughout the frog's historical range. *Id.* ¶¶48-63. In identifying areas that are essential for the conservation of the frog, FWS considered the following criteria: "(1) The historical distribution of the species; (2) presence of open-canopied, isolated wetlands; (3) presence of open-canopied, upland pine forest in sufficient quantity around each wetland location to allow for sufficient survival and recruitment to maintain a breeding population over the long term; (4) open-canopied, forested connectivity habitat between wetland and upland sites; and (5) multiple isolated wetlands in upland habitat that would allow for the development of metapopulations." 76 Fed. Reg. at 59780-81.

FWS considered the best available scientific information on sites throughout the frog's range, but could not identify any locations outside Mississippi that contained all of these elements or even all three PCEs. DSoF ¶53. "As a result of the rarity of open-canopied, isolated ephemeral ponds within the historic range of the gopher frog, and their importance to the survival of the species, identifying more of these ponds throughout the species' range was the primary focus of" FWS' analysis of potential sites. *Id.* ¶50; *see also* ¶¶45-51. In FWS' expert judgment, the recovery of the frog "will not be possible without the establishment of additional breeding populations of the

species. Isolated, ephemeral ponds that can be used as the focal point for establishing these populations are rare, and this is a limiting factor in" the frog's recovery. 77 Fed. Reg. at 35124.

A peer reviewer suggested Unit 1 as a potential site. Based on the reviewer's research and recent site visits, he found that Unit 1 contains at least two historical frog breeding ponds. DSoF ¶56. The same peer reviewer and a FWS biologist with over 20 years of experience "assessed the habitat quality of ephemeral wetlands in [Unit 1] and found that a series of five ponds contained the habitat requirements for PCE 1."[7] 77 Fed. Reg. at 35123; R2320. The ponds were "intact and of remarkable quality" despite the fact that the area is not currently being managed to achieve what FWS would consider to be optimal conditions for the frog. DSoF ¶59; *contra* Br. at 5, 6. Moreover, FWS found that the "five ponds [in Unit 1] are in close proximity to each other, which provides metapopulation structure[8] and increases the unit's value to the long-term survival and recovery of the frogs over an area with a single breeding pond." 77 Fed. Reg. at 35124; *see also id.* at 35133 ("Multiple breeding sites protect against catastrophic loss at any one site and provide opportunity for recolonization. This is an especially important aspect of critical habitat for [the frogs] due to their limited population numbers."). FWS determined that "the five ponds in Unit 1 provide breeding habitat that in its totality is not known to be present elsewhere within the historic range." *Id.* at 35124. As the Rule explains, FWS determined that Unit 1 is essential to the conservation of the frog "because it provides: (1) Breeding habitat for the [frog] in a landscape where the rarity of that habitat is a primary threat to the species; (2) a framework of breeding ponds that supports metapopulation structure important to the long-term survival of the [frog]; and (3) geographic distance from extant [frog] populations, which likely provides protection from environmental stochasticity." 77 Fed. Reg. at 35124. Contrary to WH's assertions, Br. at 17, FWS clearly articulated the factors it considered when identifying "essential" areas and provided a

---

[7] Contrary to WH's assertions, the record establishes that, based on best available science, ponds in Unit 1 meet the requirement that they be wet at least 195 days per year. *See* DSoF ¶56.

[8] A metapopulation structure is defined as neighboring local populations close enough to one another that dispersing individuals could be exchanged at least once per generation, i.e., allowing for gene flow among local populations. 76 Fed. Reg. at 59778.

detailed, rational explanation for its determination, and that determination is entitled to deference.

WH makes much ado about the fact that longleaf pine forests, an element of PCE 2, were harvested from Unit 1 years ago. Br. at 4. As discussed in detail below, there is no requirement that unoccupied areas contain any PCEs to be designated critical habitat. Moreover, longleaf pine forests have been reduced to approximately two percent of their historic range and, thus, would in any event be difficult to find. DSoF ¶21. In any event, the record shows that one peer reviewer determined that, although very little longleaf pine habitat currently exists in the frog's range, it is easier to restore terrestrial habitat than it is to restore or create breeding ponds. R2408. Given that no additional areas in the frog's historic range contain all identified PCEs, the Rule and record show that FWS made the rational decision to focus on identifying breeding habitat and reasonably determined that Unit 1 is essential for the conservation of the frog.

Reading additional requirements into the ESA that do not exist, WH argues that FWS cannot identify what habitat is essential to the conservation of the frog without first identifying the "point" at which the frog would be considered conserved. Br. at 17. Plaintiff relies solely on the holding from a district court decision that was explicitly rejected by the Ninth Circuit. *See Home Builders Ass'n v. FWS*, 616 F.3d 983, 989 (9th Cir. 2010) (rejecting court's adoption of argument "because it lacks legal support and is undermined by ESA's text"). WH's argument was also rejected in *Arizona Cattle Growers v. Kempthorne*. 534 F. Supp. 2d 1013, 1025 (D. Ariz. 2008) ("While tempting in its logical simplicity…the language of the ESA requires a point of conservation to be determined in the recovery plan, not at the time of critical habitat designation."). The ESA requires the Secretary to develop a recovery plan in which it identifies, "to the maximum extent practicable," "objective, measurable criteria" for determining the point at which the species will be conserved, but that requirement is set forth in a different subsection of the statute, 16 U.S.C. § 1533(f)(1)(B)(ii). No similar requirement is mentioned in the provisions related to designating critical habitat, *see id.* § 1533(b)(2). 534 F. Supp. 2d at 1025-26 (A "negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute."). "[W]here Congress includes particular language in one section of

a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). Had Congress intended FWS to define recovery criteria before designating critical habitat it would have stated so.

## IV. Unoccupied Areas Need not Contain PCEs to be Designated

Plaintiff asserts, without support, that "presence of the requisite PCEs is necessary for designation of critical habitat." Br. at 9. WH's interpretation of the requirements for designating critical habitat contradicts the plain language of the ESA and lacks any support in the relevant case law. The ESA defines "critical habitat" as:

(i) the specific <u>areas within the geographical area occupied by the species,</u> at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific <u>areas outside the geographical area occupied by the species</u> at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such <u>areas are essential</u> for the conservation of the species.

16 U.S.C. § 1532(5)(A) (emphasis added). In other words, critical habitat may consist of "occupied" areas, *id.* § 1532(5)(A)(i), and "unoccupied" areas, *id.* § 1532(5)(A)(ii). WH's interpretation reads out of the statute the introductory clauses, which specify the geographic areas to which the requirements apply. *See United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972) ("[W]ords in statutes should not be discarded as 'meaningless' and 'surplusage' when Congress specifically and expressly included them, particularly where the words are excluded in other sections of the same act."). Here, WH concedes that the frog "was not present in Unit 1 at the time of the frog's listing in 2001," Br. at 1, and thus, on its face, subsection (i) does not apply. Rather, Unit 1 is an "area[] outside the geographic area occupied by the species at the time it [was] listed," and thus subsection (ii) provides the applicable standard.

The statutory language is clear and unambiguous: there are two types of critical habitat, each with a separate standard and scope of analysis. To designate "occupied" areas, FWS must identify <u>features</u> in the area <u>that are essential</u> to the conservation of the species, whereas, to designate

"unoccupied" habitat, FWS must determine that the <u>area itself is essential</u> to the conservation of the species. Moreover, the ESA makes clear that unoccupied areas designated as critical habitat do not need to contain any PCEs. As noted above, "it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" of particular statutory language. *Russello*, 464 U.S. at 23 ("Had Congress intended to restrict [this subsection as Petitioner suggests], it presumably would have done so expressly as it did in the immediately following subsection…."); *see Wong Kim Bo*, 472 F.2d at 722. The fact that Congress specifically included language requiring an assessment of physical and biological features in subsection (i) but excluded that language in subsection (ii) shows that Congress intentionally omitted the requirement of a showing of PCEs for designating unoccupied areas. As Congress must have recognized, depending on the specific needs of and threats to a listed species, areas that do not contain PCEs at the time of designation may still be essential to the conservation of the species.

As a practical matter this makes sense. The purpose of the ESA is to conserve listed species by, in part, protecting their habitat. 16 U.S.C. § 1531(b). If the biggest threat to a critically endangered species is the destruction of habitat, as is the case with the frog, it does not make sense to hamstring FWS' efforts to conserve the species by limiting the designation of habitat to only those areas that contain optimal conditions for the species. Presumably, if such habitat was readily available, the frog would not be reduced to 100 individuals.

Ignoring the plain language of the statute, WH attempts to create out of whole cloth a standard that combines the requirements for designating occupied and unoccupied areas. Br. at 11, 12. Courts have rejected this very argument. *See Fisher v. Salazar*, 656 F. Supp. 2d 1357, 1366, 1368 (N.D. Fla. 2009) (holding that "FWS was not required to identify PCEs" to designate unoccupied habitat). Plaintiff relies on *CHAPA*, which in fact supports Defendants' position. The *CHAPA* court described the designation of "unoccupied" areas as a "more extraordinary event," because, by regulation, FWS must show that the designation of occupied areas—which contain the identified PCEs—is insufficient to conserve the species. 344 F. Supp. 2d at 125; *contra* Br. at 2. Plaintiff relies on the portion of the court's opinion that analyzes the designation of occupied

habitat. Br. at 9 (citing *CHAPA*, 344 F. Supp. 2d at 121-122); Br. at 13[9] (citing *CHAPA*, 344 F. Supp. 2d at 122). *CHAPA* does not state, as WH asserts, that unoccupied areas must contain all PCEs. Br. at 2. In fact, the *CHAPA* court pointed, in part, to FWS' assertion that "critical habitat is found only where PCEs are present" as evidence that FWS had not analyzed the designated areas at issue as "unoccupied" habitat. 344 F. Supp. 2d at 125. Thus, the Court could not fill in the gaps where FWS' record lacked the separate analysis needed to designate unoccupied areas. *See id.*

The remaining cases cited by Plaintiff are similarly inapposite because the designations at issue included only occupied habitat and thus were based on a different standard, 16 U.S.C. § 1532(5)(A)(i). *See Alaska Oil & Gas Ass'n v. Salazar* ("*AOGA*"), 916 F. Supp. 2d 974, 989 (D. Alaska 2013); *Home Builders Ass'n v. FWS*, 268 F. Supp. 2d 1197, 1213-14 (E.D. Cal. 2003) (referring to ESA requirements under Section 1532(5)(A)(i)); 1215 (explaining that FWS cannot designate areas "that are 'likely to develop' essential habitat components, but do not contain them now [because] the ESA defines critical habitat for the area <u>occupied</u> by the species as the specific areas on which *are* found the features essential to the conservation of the species").

In a related argument, WH argues that there is a separate requirement to show that an area is "habitat." Br. at 2. The ESA does not separately define "habitat," let alone equate the term with the areas that contain "those physical or biological features essential to the conservation of the species." Plaintiff fails to provide any support for its strained reading of the statute beyond its own parenthetical insertion of the word "habitat" into the definition of critical habitat. Br. at 15. Plaintiff cites 16 U.S.C. § 1533(a)(3)(A)(i), which states that the Secretary shall "designate any habitat of such species which is then considered to be critical habitat." Given that "critical habitat" is a subset of "habitat," it stands to reason that the definition of "habitat" would not be narrower than, or even co-extensive with, the definition of "critical habitat." "It is an elemental rule of

---

[9] It is clear from the opinion that the court's assertion that FWS cannot "statutorily cast a net over tracts of land with the mere hope that they will develop PCEs and be subject to designation" pertains only to the process for designating occupied areas, 344 F. Supp. 2d at 122, and yet Landowner Plaintiffs repeat this statement without clarification. *See also* ECF No. 80-1 at 3.

statutory construction that if a 'statute admits a reasonable construction which gives effect to all of its provisions,' a court 'will not adopt a strained reading which renders one part a mere redundancy." *Meltzer v. Bd. of Pub. Instruction of Orange Cnty., Fla.*, 548 F.2d 559, 578 n.38 (5th Cir. 1977). Based on a reasonable construction of the statute, FWS is required to "designate critical habitat," and "critical habitat" is defined by the statute as explained above. There is no separate or additional requirement to show the area is "habitat," beyond meeting the applicable requirements under the definition of "critical habitat." *See In re Camp*, 631 F.3d 757, 759 (5th Cir. 2011) ("In interpreting a statute, we 'always turn first to one, cardinal canon before all others': 'courts must presume that a legislature says in a statute what it means and means in a statute what it says there.'"). Plaintiff's argument lacks any merit and should be rejected.

WH makes a related, and similarly unsupported, argument that the ESA requires unoccupied areas to be "suitable" for the conservation of the species at the time of designation. Br. at 5. The term "suitable," defined by WH as containing all PCEs, is not found anywhere in the provisions on critical habitat designation. WH's reference to "suitable" habitat is just another attempt to graft the requirements for designating occupied areas onto the requirements for designating unoccupied areas. Moreover, Plaintiff appears to concede that there is no such requirement, citing *Arizona Cattle Growers v. FWS*, which states: "Absent this procedure [for designating unoccupied areas]…there is no evidence that Congress intended to allow [FWS] to regulate any parcel of land that is merely capable of supporting a protected species." Br. at 11 (citing 273 F.3d 1229, 1244 (9th Cir. 2001)). Nor has WH pointed to any requirement that the designated area be managed to restore the habitat to optimal conditions. *Contra* Br. at 5-6 (emphasizing that prescribed fire is not being used in Unit 1). To the extent that WH argues that the area within Unit 1 is currently "unusable by the species," that assertion is both irrelevant and factually incorrect. Br. at 18. As discussed in section III(a) and established by the record, the breeding habitat in Unit 1 is in very good condition and could support the frog's conservation today. *See also* Exhibit 1. Moreover, the Unit 1 uplands contain underground refugia that would allow for survival of the species, which is a key component of PCE 2. DSoF ¶66. Thus, WH's assertion is simply incorrect.

Plaintiff also cites 16 U.S.C. § 1532(5)(C) to support its assertion that the standard for designating unoccupied areas is more demanding.[10] Br. at 12. The provision states in its entirety: "Except in those circumstances determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species." Neither this provision nor the cases cited in any way support WH's interpretation of the statute. Moreover, it appears that, in citing this provision, Br. at 18, Plaintiff equates "can be occupied" with the presence of all identified PCEs, thereby ignoring the clear distinction Congress made between the standard for designating occupied and unoccupied areas, as discussed above. *See Russello*, 464 U.S. at 23. WH's assertions are also contradicted by *Arizona Cattle Growers* in the passage cited by Plaintiff, Br. at 11, in which the court affirmed that Congress provided a mechanism for designating areas "merely capable of supporting a protected species" where it is essential to the conservation of the species. 273 F.3d at 1244.

WH also suggests without support that an unoccupied area can only be considered critical habitat if the landowners intend to manage the habitat for the benefit of the endangered species. Br. at 14. In other words, Plaintiff argues that designation of critical habitat should be based on the subjective view of landowners. *See* Br. at 18. The ESA mandates the use of the best scientific information available to FWS at the time of the designation to determine whether areas are essential. 16 U.S.C. § 1533(b)(2). The fact that Landowner Plaintiffs choose not to maintain the habitat for the benefit of the frog does not make Unit 1 less essential to the frog; rather, their choice simply means that this highly endangered species is that much closer to extinction.

The absence of a requirement to show that unoccupied habitat contains all PCEs does not lessen the standard for designating such habitat. As the *CHAPA* court explained, designation of unoccupied habitat is a "more extraordinary event" because, by regulation, such designations are prohibited unless designation of occupied land, which must contain the identified PCEs, is

---

[10] Plaintiff cites *Northern Spotted Owl v. Lujan*, 758 F. Supp. 621 (W.D. Wash. 1991). There, the court interpreted in dicta 16 U.S.C. § 1532(5)(A)(i), the standard for designating <u>occupied</u> areas, which is irrelevant here. *Id.* at 623.

insufficient. 344 F. Supp. 2d at 125. FWS made that reasonable determination here. At issue is a critically endangered species whose greatest threats include insufficient habitat and potential for stochastic events to wipe out the remaining population. This highly endangered frog cannot survive without additional breeding habitat, which has very specific requirements that are both uncommon and difficult to recreate. FWS rationally concluded that Unit 1, which, in its totality, represents the best breeding habitat in the frog's entire historic range, is essential for the frog's conservation. Beyond repeating its mantra that the standard for designating unoccupied areas is "more onerous," WH does not meaningfully challenge FWS' "essential" determination let alone meet its high burden of showing that this finding was arbitrary or capricious. FWS' determination is well-supported by the record and science, and is entitled to deference.

## V. FWS Considered All Potential Economic Impacts to Unit 1

The ESA only requires FWS to "take into consideration" probable economic and other impacts, before designating critical habitat. 16 U.S.C. § 1533(b)(2). FWS fulfilled its statutory obligation here. The record shows that FWS made every effort to consider any economic impacts that could be attributed to the designation, giving Landowner Plaintiffs numerous opportunities to participate in the process. DSoF ¶73. Furthermore, FWS appropriately relied on the "baseline" method to assess the economic impacts and, in any event, as to Unit 1, attributed all potential impacts in Unit 1 to the designation and, thus, the results of the incremental analysis and Plaintiff's preferred coextensive analysis would be the same.

### a. The Method Used To Analyze Economic Impacts is Irrelevant; Unit 1 is Unoccupied

Plaintiff disagrees with FWS' use of the "baseline" method for analyzing economic impacts, insisting that FWS should have considered those impacts co-extensive with ESA listing as required by the Tenth Circuit. *N.M. Cattle Growers Ass'n* ("*NMCG*") *v. FWS*, 248 F.3d 1277 (10th Cir. 2001). The Court need not reach this issue because, in the absence of any frogs in Unit 1, and thus any impacts related to ESA listing, FWS attributed all potential economic impacts in Unit 1 to the designation. R6626 ("Because this unit is unoccupied by the gopher frog, limitations on development would be attributable to the critical habitat designation alone and therefore would be

considered incremental impacts."). The "baseline" method focuses on the costs attributable solely to the designation of critical habitat above and beyond the baseline costs. 77 Fed. Reg. at 35140. The "baseline" costs are the quantified impacts of conservation protections for the frog that are already in place, such as ESA listing, and that would be incurred regardless of whether critical habitat is designated. *Id.* Where, as here, the designation is of unoccupied habitat, there are no impacts related to listing, as Plaintiff suggests. Br. at 19.

Even if the Court considers WH's argument, FWS reasonably relied on the "baseline" method to identify and assess potential economic impacts. The ESA requires the agency to "tak[e] into consideration the economic impact" of designation, but does not mandate any particular method of analysis. 16 U.S.C. § 1533(b)(2); *see also Fisher*, 656 F. Supp. 2d at 1368. FWS has issued a final rule, after notice and comment, revising the ESA regulations on impact analyses conducted for critical habitat designations and formally adopting the "baseline" method for analyzing economic impacts. 78 Fed. Reg. 53058, 53059 (Aug. 28, 2013).[11] Formal agency actions, such as those resulting from notice-and-comment rulemaking, generally warrant *Chevron* deference. *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). Additionally, the baseline method has been approved by the U.S. Office of Management and Budget for assessing the costs of regulations. R6639. Moreover, courts outside the Tenth Circuit have approved the baseline method. *See Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1173 (9th Cir. 2010) (describing the baseline approach as "more logical than the co-extensive approach"); *Fisher*, 656 F. Supp. 2d at 1371 ("To the extent the Tenth Circuit's co-extensive approach permits consideration of costs not attributable to the designation, it is inconsistent with the mandate of the ESA."); *CHAPA*, 344 F. Supp. 2d at 130.

With little elaboration, WH urges the Court to adopt the Tenth Circuit's approach, but fails to mention that the circumstances behind that court's decision no longer exist and, for that reason, courts outside the Tenth Circuit have not adopted that Circuit's approach. *See, e.g, Fisher*, 656 F.

---

[11] That final rule thoroughly explains the genesis behind the Tenth Circuit decision and justification for adopting the "baseline" approach for economic impact analyses. 78 Fed. Reg. at 53062.

Supp. 2d at 1368-71 (thoroughly explaining *NMCG* and the court's decision to reject the Tenth Circuit's approach). One court described the Tenth Circuit's holding as follows:

> Apparently hamstrung by its inability to consider the validity of 50 C.F.R. § 402.02, the Tenth Circuit found another way to require the Service to perform a more rigorous economic analysis. This is an instance of a hard case making bad law.

*CHAPA*, 344 F. Supp. 2d 130. After *NMCG* was decided, the Ninth Circuit invalidated 50 C.F.R. § 402.02, *Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059 (9th Cir. 2004), thereby calling into question the continuing validity of the Tenth Circuit's decision.

The circumstances before this Court are exactly the opposite of those before the Tenth Circuit and which led that Court to reject the economic impacts analysis prepared for that designation. *See* 78 Fed. Reg. at 53068 (noting that an economic analysis of the designation of unoccupied areas "may more frequently identify higher probable impacts [because] any project modifications stemming from [an ESA Section 7] consultation process would be due solely to the designation of critical habitat and the requirement of avoiding its adverse modification, because the species is not present in the area"). Here, all potential economic impacts in Unit 1 were attributed to the designation of critical habitat alone and, thus, the potential economic impacts would be the same whether quantified using the baseline or coextensive method. Accordingly, the Court should reject Plaintiff's arguments.WH also attempts to discredit the baseline approach by claiming that *Bennett v. Spear*, 520 U.S. 154 (1997), mandates the Tenth Circuit's approach. However, Plaintiff fails to show where in the decision the Supreme Court mandated any particular approach. In light of this case law and the deference that must be given to an agency's interpretation of its own regulations, the Court should approve the "baseline" method for analyzing economic impacts.

### b. FWS Considered All Probable Economic Impacts

The Rule and the record reflect extensive consideration of potential impacts to Unit 1; thus, FWS fulfilled its statutory requirement. In "taking into consideration" the impacts of the designation, FWS "is not required to give economics or any other 'relevant impact' predominant consideration in his specification of critical habitat." H.R. Rep. No. 95-1625, at 17 (1978), as reprinted in 1978 U.S.C.C.A.N. 9453, 9467. Instead, "[t]he consideration and weight given to any

particular impact <u>is completely within the Secretary's discretion</u>." *Id.* (emphasis added); *see also*

*Ctr. for Biological Diversity v. Salazar*, 770 F. Supp. 2d 68, 88 (D.D.C. 2011). Moreover, "the

legal hurdle regarding the Service's analysis of the economic impacts of designation is fairly low."

*AOGA*, 916 F. Supp. 2d at 993. FWS is entitled to a presumption that it considered all relevant

record information, including information regarding the economic impacts of the designation. *See*

*Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1174 (9th Cir. 2010) (presumption that

FWS carried out duty to consider economic information in designating critical habitat).

Plaintiff asserts that, in quantifying the potential economic impacts of designation, FWS

"ignor[ed] any impact on mineral development" and gave "short shrift" to the effects of prescribed

burning on surrounding property. Br. at 6, 19. The record shows that FWS specifically considered

both of these potential impacts and, thus, fulfilled its statutory obligation. Defendants assume that

WH's vague reference to "mineral development" is the possibility that oil and gas extraction could

take place within Unit 1. The FEA describes the information provided by the landowners on

potential oil and gas extraction and the consideration that was given to those uncertain impacts.

R6668. In the Rule, FWS directly responds to a comment about oil and gas development, and

explains that, although the impacts were considered, they were not quantified "due to considerable

uncertainty surrounding the likelihood, timing, and extent of oil and gas development within Unit

1 over the foreseeable future." 77 Fed. Reg. at 35126. Similarly, the FEA discusses landowners'

concerns regarding prescribed burns. *See* R6663, 6665. Additionally, the Rule includes FWS'

response to a comment on prescribed burning, in which it states that critical habitat designation

does not allow FWS to require burning of land parcels but should FWS request burning in relation

to a Section 7 consultation, it "would be undertaken by experts following the issuance of a permit

based on environmental conditions. In particular, wind conditions are considered when issuing a

burning permit to ensure that smoke will not drift onto other properties or across roads." 77 Fed.

Reg. at 35126. Whether the potential economic impacts were quantified or considered on a

qualitative level, the record shows that FWS met its obligation to consider all potential impacts

and, thus, the inquiry ends there. *See AOGA*, 916 F. Supp. 2d at 993 (deferring to FWS' "technical

expertise in its cost projections" even when the analysis is "far from ideal" because the ESA requires that FWS "only *consider* the economic data provided to it by the parties").

Plaintiff, without elaboration, cites FWS' statement that the economic analysis did not identify any disproportionate costs. Br. at 20. Plaintiff does not challenge FWS' decision not to exclude the area, nor could it because such determinations are committed to agency discretion by law, *see, e.g., AOGA*, 916 F. Supp. 2d at 994, a fact that WH has already conceded, *see* R1826, 1839. Rather, WH simply disagrees with how FWS weighed the benefits and potential economic impacts of the designation. Br. at 20. This disagreement does not support WH's assertion that FWS did not consider all potential impacts. As the Rule shows, FWS considered the uncertain economic impacts of Unit 1and the significant benefits of protecting a critically endangered species' rare breeding habitat and reasonably determined that the "economic analysis did not identify any disproportionate costs." 77 Fed. Reg. at 35141. The Rule and FEA establish that FWS "took into consideration" all potential economic impacts and, thus, satisfied its statutory obligation.

## VI. FWS Has the Constitutional Authority to Designate Unit 1 as Critical Habitat

Congress has the constitutional authority to apply ESA Section 4 to designate Unit 1 as critical habitat for the frog. WH does not dispute that the ESA is a constitutional exercise of Congressional authority under the Commerce Clause. Br. at 20. Moreover, WH's brief is devoid of almost any discussion of the relevant case law, which is not surprising given that every Commerce Clause challenge to a provision or application of the ESA has been rejected. *See San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163 (9th Cir. 2011); *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1272-73 (11th Cir. 2007); *Wyoming v. U.S. Dep't of Interior*, 442 F.3d 1262 (10th Cir. 2006) (affirming without discussion district court's analysis); *GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622, 639 (5th Cir. 2003)[12]; *Rancho Viejo, LLC v. Norton*, 323 F.3d

---

[12] The Fifth Circuit rejected a Commerce Clause challenge to the application of ESA Section 9 protections to six species of subterranean invertebrates on private property "at the intersection of two major highways in what is, commercially and residentially, a rapidly growing area," where the landowners "planned to develop a shopping center (including a Wal-Mart), a residential subdivision, and office buildings (commercial development)." 326 F.3d at 624-26.

1062 (D.C. Cir. 2003); *Gibbs v. Babbitt*, 214 F.3d 483 (4th Cir. 2000). WH also fails to mention the relevant standards for assessing a Commerce Clause challenge to an application of a comprehensive scheme that has a substantial relation to interstate commerce, in this case, the ESA. *See Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005). WH's claim lacks merit and should be rejected.

WH urges the Court to treat the Rule like the single-subject statutes at issue in *United States v. Lopez*, 514 U.S. 549 (1995),[13] and *United States v. Morrison*, 529 U.S. 598 (2000), rather than as an application of the ESA, a comprehensive regulatory scheme akin to the statute at issue in *Raich*.[14] *See* 545 U.S. at 38 (Scalia, J., concurring). Even if Defendants agreed that this application of the ESA is noncommercial, which we do not, the Supreme Court has rejected such attempts to excise a noncommercial application of a comprehensive regulatory scheme that has a substantial relation to commerce. *See id.* at 26. Under *Raich*, the Court need only find that Section 4's provision requiring designation of critical habitat is essential to the ESA, a comprehensive regulatory scheme that has a substantial relation to interstate commerce. *See id.* at 9.

Every Circuit to have reached the issue, including the Fifth Circuit, has concluded that the ESA is a comprehensive scheme that has a substantial relation to interstate commerce. *Alabama-Tombigbee*, 477 F.3d at 1272-73; *see also San Luis*, 638 F.3d 1163; *GDF*, 326 F.3d at 639. Furthermore, it is clear from Congress' mandate that the Secretary designate critical habitat that Congress believed designation of such areas to be important avenues for protecting endangered species. *See id.* § 1533(b)(2)[15]; *see also id.* § 1531(a)(1). Because ESA Section 4's mandate to designate critical habitat for listed species is an integral component of the ESA, this particular

---

[13] Even if the Court analyzed WH's claim under *Lopez*, WH has failed to even mention the factors set out in that decision that courts consider when analyzing Commerce Clause challenges let alone meet its burden for establishing that the Rule exceeded Congress' authority.

[14] Plaintiff also relies on *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, which is inapposite. In that case, the Supreme Court rejected the application of the agency's administrative interpretation of the statutory term "navigable waters," which was not subject to notice and comment, holding that the interpretation was contrary to Congress' intent to limit the reach of § 404(a), and read "navigable" out of the definition. 531 U.S. 159, 164, 174 (2001). Here, WH does not challenge the statutory definition of "critical habitat," which plainly provides for the designation of unoccupied areas that are essential to conservation of the species.

[15] Plaintiff does not challenge the constitutionality of ESA Section 4(b), which directs the Secretary to designate critical habitat, including unoccupied areas, where appropriate.

application of Section 4 is a constitutional exercise of Congress' authority under the Commerce Clause. *See Alabama-Tombigbee*, 477 F.3d at 1272-73 (noting that "when 'a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence'").

Plaintiff's arguments do not address the *Raich* standard. Rather, WH simply argues that the frogs either must be present in Unit 1 or the area must be in "suitable" condition as defined by WH for the designation to have any effect on the species and, therefore, biodiversity. There is no requirement that every individual application of ESA Section 4 affect biodiversity or interstate commerce more generally to be upheld as constitutional but, in any event, WH's assertion that the designation has no effect on the species is factually inaccurate. *See Raich*, 545 U.S. at 23 ("[W]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class."); *contra* Br. at 20. Congress enacted the ESA to ensure "the continued existence" of species. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978). To this end, the ESA's comprehensive scheme provides numerous avenues for the protection of endangered species, including designation of unoccupied areas, including private property, when necessary for the recovery of a species. Here, the frog is critically endangered due in large part to habitat destruction and, as established by the record, the ephemeral wetlands in Unit 1 are key to the recovery of the species. FWS appropriately found that the areas within Unit 1 are essential to the conservation of the species. Thus, WH's argument that the economic activities—which could destroy the best frog habitat outside of Mississippi, thereby reducing the frog's chances of survival and recovery—do not affect the frog specifically, or biodiversity more generally, lacks any merit. Accordingly, the Rule is a constitutional exercise of Congress' authority under the Commerce Clause and must be upheld.

## VII. NEPA Does Not Apply to Critical Habitat Designations

FWS' consistent position that critical habitat designations are not subject to NEPA was upheld by the court in *Douglas County v. Babbitt*, 48 F.3d 1495, 1501-08 (9th Cir. 1995). The Ninth Circuit explained that NEPA analysis is not required because: (1) the ESA displaced the

procedural requirements of NEPA with respect to critical habitat designation; (2) NEPA does not apply to actions that do not alter the physical environment; and (3) critical habitat designation serves the purposes of NEPA by protecting the environment from harm due to human impacts. *See id.* Further, the court found that NEPA should not be used as "an 'obstructionist tactic' to prevent environmental protection." *Id.* at 1508 (citing *Pac. Legal Found. v. Andrus*, 657 F.2d 829, 838 (1981)); *see also Building Indus. v. U.S. Dep't of Commerce*, 2012 WL 6002511, at *7 (N.D. Cal. Nov. 30, 2012).[16]

The only other circuit to have addressed this precise issue was the Tenth Circuit in *Catron County Bd. of Comm'rs v. FWS*, 75 F.3d 1429, 1436-39 (10th Cir. 1996). Significant to the court's ruling was its finding that, unlike in the *Douglas County* case, the designation of critical habitat would harm the environment by limiting the county's ability to engage in flood control efforts. *See id.* at 1437-38; *see also CHAPA*, 344 F. Supp. 2d at 136 (finding that NEPA applied to a critical habitat designation in part because the designation would "significantly affect the quality of the human environment"). Although the Fifth Circuit has not addressed whether NEPA applies to critical habitat designations, it is reasonable to assume that it would reach the same conclusion as *Douglas County*. The designation of critical habitat is based on specific criteria, which renders much of the analysis that would be considered in a NEPA document superfluous. *See Douglas Cnty.*, 48 F.3d at 1503 (noting that the Secretary "*must* designate [as critical habitat] any area without which the species would become extinct," regardless of other factors). Further, the designation of critical habitat will unquestionably serve the purposes of NEPA, which include the promotion of "efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321; *see also Douglas Cnty.*, 48 F.3d at 1506-07.

---

[16] The process for designating critical habitat may also be considered the functional equivalent of a NEPA analysis, thus providing further support for the principle that such designations are not subject to NEPA. *See Pac. Legal Found.*, 657 F.2d at 835 (noting in *dicta* that the "ESA may now provide the functional equivalent of an impact statement when a critical habitat is designated"); *see also Tex. Comm. on Natural Res. v. Bergland*, 573 F.2d 201, 207 (5th Cir. 1978) (noting that courts have held that "NEPA compliance has not been required when the agency's organic legislation mandated specific procedures for considering the environment that were 'functional equivalents' of the impact statement process").

Even if the court does not rely on the first and third *Douglas County* rationales, however, it should follow the second rationale – the principle that NEPA does not apply to actions that do not alter the physical environment. *See Douglas Cnty.*, 48 F.3d at 1505-06. This principle is firmly established in the Fifth Circuit and elsewhere – indeed, the Ninth Circuit cited the Fifth Circuit's decision in *Sabine River*, among others, for that proposition. *Id.* at 1505; *see also Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 679 (5th Cir. 1992) ("[T]he acquisition of the [negative conservation] easement by [FWS] did not effectuate *any* change to the environment which would otherwise trigger the need to prepare an EIS."); *see also City of Dallas v. Hall*, 562 F.3d 712, 721-23 (5th Cir. 2009) (holding that setting an acquisition boundary for a wildlife refuge did not alter the physical environment and therefore did not require the preparation of an EIS).

Here, the designation of critical habitat will not alter the physical environment. Plaintiff claims that the designation "will require active on-the-ground management activities, which in turn will change the physical environment and have impacts not analyzed under the ESA or the EA." Br. at 23. As FWS explained in the final rule, however, the designation "does not allow the government or public to access private lands" and "does not require implementation of restoration, recovery, or enhancement measures by non-Federal landowners." *See* 77 Fed. Reg. at 35128; *see also id.* at 35122 ("The designation of critical habitat does not impose a legally binding duty on private parties."). Further, Plaintiff and the other landowners have made clear that they will never authorize FWS to implement management measures to improve the habitat. *See id.* at 35123. Therefore, there is no basis for Plaintiff's assertion that FWS' action will significantly impact the environment. Moreover, Plaintiff's land is currently unoccupied and, therefore, the only way that Plaintiff might be required in the future to take conservation actions to protect the frog would be if Plaintiff were to undertake a project with a federal nexus. *See* 16 U.S.C. § 1536. If that were to occur, an appropriate NEPA analysis could be conducted at that time.

## CONCLUSION

For the reasons stated above, the Court should deny WH's Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

DATED this 21st day of February, 2014.

Respectfully Submitted,

ROBERT G. DREHER,
Acting Assistant Attorney General
SETH M. BARSKY, Chief
KRISTEN L. GUSTAFSON,
Assistant Chief

/s/ Mary Hollingsworth
MARY HOLLINGSWORTH
Trial Attorney
AZ Bar No. 027080
LUTHER HAJEK, Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044-7611
Phone: (202) 305-0324
Fax: (202) 305-0275
Email: mary.hollingsworth@usdoj.gov

OF COUNSEL:

Michael Stevens
U.S. Department of the Interior
Office of the Regional Solicitor
75 Spring Street, S.W.
Suite 304
Atlanta, Georgia 30303

*Attorneys for Federal Defendants*

# UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF LOUISIANA

## NEW ORLEANS

| | |
|---|---|
| MARKLE INTERESTS, LLC,<br><br>    Plaintiff,<br><br>          v.<br><br>UNITED STATES FISH AND WILDLIFE<br>SERVICE, et al.,<br><br>    Defendants. | CIVIL ACTION<br><br>CASE NO. 13-234<br><br>PERTAINS TO 13-413<br><br>SECTION: F(1)<br><br>JUDGE: MARTIN L.C. FELDMAN<br><br>MAG. JUDGE: SALLY SHUSHAN<br><br><br>**CERTIFICATE OF SERVICE** |

I hereby certify that today I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to all counsel of record.

          /s/ Mary Hollingsworth
          MARY HOLLINGSWORTH