# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF LOUISIANA

# NEW ORLEANS

MARKLE INTERESTS, LLC,

      Plaintiff,

        v.

UNITED STATES FISH AND WILDLIFE
SERVICE, *et al.*,

      Defendants,

and

CENTER FOR BIOLOGICAL DIVERSITY,
GULF RESTORATION NETWORK,

      Intervenor-Defendants.

CIVIL ACTION

CASE NO. 13-cv-00234-MLCF-SS
CONSOLIDATED WITH:
13-cv-00362 & 13-cv-00413

PERTAINS TO 13-cv-00413

SECTION: F(1)

JUDGE: MARTIN L.C. FELDMAN

MAG. JUDGE: SALLY SHUSHAN

## INTERVENOR-DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO PLAINTIFF WEYERHAEUSER'S SUMMARY JUDGMENT MOTION

Intervenor-Defendants Center for Biological Diversity and Gulf Restoration Network respectfully submit the following Memorandum in Support of their Cross-Motion for Summary Judgment and in Response to Plaintiff Weyerhaeuser's Summary Judgment Motion (Docket No. 67).

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

LEGAL BACKGROUND ......................................................................................... 1

  Endangered Species Act ....................................................................................... 1

  National Environmental Policy Act ..................................................................... 2

FACTUAL AND PROCEDURAL HISTORY ......................................................... 3

  Natural History of the Dusky Gopher Frog .......................................................... 3

  Protection of the Dusky Gopher Frog under the Endangered Species Act ......................... 3

STANDARD OF REVIEW ....................................................................................... 6

ARGUMENT ............................................................................................................. 7

I.    FWS's Designation Of Unit 1 Satisfies The ESA's Substantive Requirements ................ 7

  A.   Unoccupied Critical Habitat Does Not Need PCEs ................................. 7
  B.   Unit 1 Is "Essential" ............................................................................... 10
  C.   No Threshold Viability Determination Is Required .............................. 12

II.   FWS Properly Considered The Economic Impacts Of The Critical Habitat Designation 14

III.  Designation Of Unit 1 As Critical Habitat Is Proper Under The Commerce Clause ....... 18

IV.   Weyerhaeuser's NEPA Claim Fails ...................................................... 21

  A.   NEPA Does Not Apply To The Critical Habitat Designation .............................. 21
  B.   Weyerhaeuser Lacks Prudential Standing For Its NEPA Claim .......................... 22

V.    Weyerhaeuser Fails To Establish Article III Standing .................................... 23

CONCLUSION ........................................................................................................ 24

CERTIFICATE OF SERVICE ............................................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Alabama-Tombigbee Rivers Coal. v. Kempthorne*,
    477 F.3d 1250 (11th Cir. 2007), *cert. denied*, 552 U.S. 1097 (2008)...................................... 19

*Alaska Oil & Gas Ass'n v. Salazar*, 916 F. Supp. 2d 974, 989 (D. Alaska 2013) ....................... 10

*Ariz. Cattle Growers v. Kempthorne*, 534 F. Supp. 2d 1013 (D. Ariz. 2008) ....................... 12, 13

*Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160 (9th Cir. 2010)................................. 10, 16

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229 (9th Cir. 2001) ......... 10

*Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council*, 462 U.S. 87 (1983)................................... 2, 12

*Cape Hatteras Access Pres. Alliance v. U.S. Dept. of Interior*,
    344 F. Supp. 2d 108 (D.D.C. 2004) ........................................................................ passim

*Catron Co. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429 (10th Cir. 1996) ......... 21

*City of Dallas v. Hall*, 562 F.3d 712 (5th Cir. 2009) ................................................................. 21

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115 (N.D. Cal. 2006) 16

*Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 496-497 (5th Cir. 2007) ............................ 23

*Douglas Cnty. v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995)......................................................... 3, 22

*Drakes Bay Oyster Co. v. Jewell*, 729 F.3d 967, 984 (9th Cir. 2013) ......................................... 3

*Fisher v. Salazar*, 656 F. Supp. 2d 1357 (N.D. Fla. 2009) ............................................... 9, 16, 17

*GDF Realty Inv., Ltd. v. Norton*, 326 F.3d 622 (5th Cir. 2003) ...................................... 19, 20, 21

*Gifford Pinchot Task Force v. United States Fish & Wildlife Service*,
    378 F.3d 1059 (9th Cir. 2004) ...................................................................... 9, 15, 17

*Gonzales v. Raich*, 545 U.S. 1 (2005) .............................................................................. 19, 21

*Home Builders Ass'n of N. Cal. v. United States Fish & Wildlife Serv.*,
    268 F. Supp. 2d 1197, 1208 (E.D. Cal. 2003)............................................................ 10

*Home Builders Ass'n of N. Cal. v. United States Fish & Wildlife Serv.*,
    616 F.3d 983, 989 (9th Cir. 2010) .................................................................... 13

*Hurd Urban Dev., L.C. v. Fed. Highway Admin.*, 33 F. Supp. 2d 570 (S.D. Tex. 1998) ............. 23

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................... 23

*Luminant Generation Co., LLC v. EPA*, 675 F.3d 917 (5th Cir. 2012)......................................... 6

*Maryland v. Wirtz*, 392 U.S. 183 (1968)................................................................................. 21

*Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983)........................... 3, 21

*Miss. River Basin Alliance v. Westphal*, 230 F.3d 170 (5th Cir. 2000) ....................................... 6

*N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277 (10th Cir. 2001) ........ 14

*Nat'l Ass'n of Home Builders v. Babbitt (NAHB)*, 130 F.3d 1041 (D.C. Cir. 1997), *cert. denied*,
    524 U.S. 937 (1998)........................................................................................ 19

*Pacific Legal Foundation v. Andrus*, 657 F.2d 829, 837 (6th Cir. 1981) ..................................... 3

*Prestage Farms, Inc. v. Bd. of Supervisors*, 205 F.3d 265 (5th Cir. 2000) ................................ 24

*Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 415 F.3d 1078 (9th Cir. 2005) 22

*Rancho Viejo, LLC v. Norton*, 323 F.3d 1062 (D.C. Cir. 2003), *reh'g denied*,
    334 F.3d 1158 (D.C. Cir. 2003) (en banc), *cert. denied*, 541 U.S. 1006 (2004) ...................... 19

*Russello v. United States*, 464 U.S. 16 (1983) .......................................................................... 8

*Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669 (5th Cir. 1992) ...................... 3, 21, 22

*San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163 (9th Cir. 2011)................... 19

*Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434 (5th Cir. 2001).......................... 1, 15, 17

*Tenn. Valley Authority v. Hill*, 437 U.S. 153 (1978) ................................................................... 1

*Town of Stratford, Conn. v. FAA*, 285 F.3d 84 (D.C. Cir. 2002) ................................................. 22
*United States v. Lopez,* 514 U.S. 549 (1995) ................................................................. 20, 21
*United States v. Wong Kim Bo*, 472 F.2d 720 (5th Cir. 1972) ....................................... 9
*Wyoming v. U.S. Dept. of Interior*, 442 F.3d 1262 (10th Cir. 2006) ........................... 19

## **Statutes**

16 U.S.C. § 1531(b) ................................................................................................................. 1, 9
16 U.S.C. § 1532(19) ................................................................................................................. 1
16 U.S.C. § 1532(5)(A) ............................................................................................................ 20
16 U.S.C. § 1532(5)(A)(i) ...................................................................................................... 2, 8
16 U.S.C. § 1532(5)(A)(ii) ..................................................................................................... 2, 8
16 U.S.C. § 1533(a)(3) .......................................................................................................... 2, 12
16 U.S.C. § 1533(b)(2) ............................................................................................................. 2
16 U.S.C. § 1533(b)(6)(C) .................................................................................................... 2, 12
16 U.S.C. § 1533(b)(6)(C)(ii) ................................................................................................... 2
16 U.S.C. § 1533(f) ................................................................................................................... 1
16 U.S.C. § 1533(f)(1) ............................................................................................................. 12
16 U.S.C. § 1536(a)(2) .......................................................................................................... 2, 14
16 U.S.C. § 1538(a) ................................................................................................................... 1
16 U.S.C. §§ 1531-1599 ........................................................................................................... 1
16 U.S.C. § 1533(f) ................................................................................................................. 12
42 U.S.C. § 4332(C) .............................................................................................................. 3, 22
42 U.S.C. §§ 4321-4347 ........................................................................................................... 2
5 U.S.C. § 706 .......................................................................................................................... 6
5 U.S.C. § 706(2)(A) ................................................................................................................ 6

## **Regulations**

50 C.F.R. § 17.21(c) .................................................................................................................. 1
50 C.F.R. § 17.31(a) .................................................................................................................. 1
50 C.F.R. § 402.02 ................................................................................................................... 14
50 C.F.R. § 424.12 ................................................................................................................. 2, 8
50 C.F.R. § 424.12(b) ............................................................................................................ 2, 8
50 C.F.R. § 424.17(b)(2) ........................................................................................................... 2

**INTRODUCTION**

At issue in this case is protection of critical habitat for the dusky gopher frog, a highly endangered amphibian that regularly reproduces in just one pond and has likely less than 100 adult wild frogs remaining. Through three consolidated lawsuits, Plaintiffs challenge the U.S. Fish and Wildlife Service's Final Rule designating critical habitat for the dusky gopher frog under the Endangered Species Act. 77 Fed. Reg. 35,118 (June 12, 2012). In particular, Plaintiffs challenge the agency's designation of 1,544 acres of unoccupied critical habitat in Louisiana on lands owned by Plaintiffs that contain a rare network of ponds ideal for frog reproduction. The critical habitat designation complies with all procedural and substantive requirements and is based on the expertise of agency biologists with input from other frog experts who reasonably determined that protection of this habitat in Louisiana is essential to conserve the frog.

**LEGAL BACKGROUND**

**Endangered Species Act**

The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1599, is a law enacted by Congress to conserve endangered and threatened species and the ecosystems upon which they depend. 16 U.S.C. § 1531(b). "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Authority v. Hill*, 437 U.S. 153, 184 (1978); *see Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 438 (5th Cir. 2001) ("[T]he objective of the ESA is to enable listed species not merely to survive, but to recover from their endangered or threatened status.").

The ESA requires the Secretary of Interior, through the U.S. Fish and Wildlife Service ("FWS"), to determine whether any species is "endangered" or "threatened." 16 U.S.C. § 1532(6), (20). Once a species is listed under the ESA, an array of statutory protections applies. For example, the harming or "take" of listed species is generally prohibited. 16 U.S.C. §§ 1532(19), 1538(a); 50 C.F.R. §§ 17.21(c), 17.31(a). Section 4(f) requires FWS to develop recovery plans, which identify actions necessary to save endangered species from extinction and eventually remove their protection under the ESA. 16 U.S.C. § 1533(f). In addition, Section 7

1

requires all <u>federal</u> agencies to ensure that their actions neither "jeopardize the continued existence" of any listed species nor "result in the destruction or adverse modification" of its "critical habitat." *Id.* § 1536(a)(2). Private actions that do not require federal approval or funding, such as timber harvest on private land, lack a federal nexus and do not trigger the Section 7 consultation requirement.

The ESA requires FWS "to the maximum extent prudent and determinable" to designate critical habitat for listed species. *Id.* §§ 1533(a)(3), (b)(6)(C); 50 C.F.R. § 424.12. Critical habitat is defined as those "specific areas within the geographical areas occupied by the species, at the time it is listed … on which are found those physical or biological features [that are] (I) essential to the conservation of the species and (II) which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i). These features are called "Primary Constituent Elements" or "PCEs." 50 C.F.R. § 424.12(b). FWS must also designate "specific areas outside of the geographical area occupied by the species at the time it is listed … upon a determination by the Secretary that such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii).

When promulgating a final rule designating critical habitat for a listed species, FWS must rely on the best scientific data available after "taking into consideration" the economic impact, and any other relevant impact, of specifying any particular area as critical habitat. *Id.* § 1533(b)(2). When a critical habitat decision is not made contemporaneously with the listing decision, FWS has 12 months from the date of listing to designate critical habitat. *Id.* § 1533(b)(6)(C)(ii); 50 C.F.R. § 424.17(b)(2).

## National Environmental Policy Act

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, serves dual purposes: to ensure that federal agencies consider the environmental consequences of their proposed actions in advance of a final decision, and inform the public that the agency has considered environmental concerns in its decision-making process. *See Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council*, 462 U.S. 87, 97 (1983). If a proposed federal action will have significant

environmental impacts, the acting agency must prepare an Environmental Impact Statement ("EIS"). 42 U.S.C. § 4332(C). NEPA does not apply to actions that do not alter the physical environment. *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983); *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 680 (5th Cir. 1992); *see also see also Douglas County v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir. 1995) (NEPA does not apply to critical habitat designation); *Drakes Bay Oyster Co. v. Jewell*, 729 F.3d 967, 984 (9th Cir. 2013) (environmental conservation efforts do not trigger NEPA); *Pacific Legal Found. v. Andrus*, 657 F.2d 829, 837 (6th Cir. 1981) (species listing is conservation effort that does not trigger NEPA).

**FACTUAL AND PROCEDURAL HISTORY**

**Natural History of the Dusky Gopher Frog**

The dusky gopher frog (*Rana sevosa*) is a darkly-colored, moderately-sized frog with warts covering its back and dusky spots on its belly. 66 Fed. Reg. 62,993 (Dec. 4, 2001). It lives underground in pine forests (historically those dominated by longleaf pine) and breeds in small ephemeral ponds that lack fish. *Id*. at 62,994.

The dusky gopher frog is currently known from only three sites in Harrison and Jackson counties in southern Mississippi, with only one of these sites regularly showing reproduction by the frog. 77 Fed. Reg. at 35,136. Less than 100 adult dusky gopher frogs likely remain. AR 963; AR 1027. The frog is primarily threatened by habitat loss and disease. 66 Fed. Reg. 62,997-62,300. Due to its small numbers, it is also highly susceptible to genetic isolation, inbreeding, and random demographic or human related events. *Id*. at 62,999.

**Protection of the Dusky Gopher Frog under the Endangered Species Act**

In response to litigation from the Center for Biological Diversity, FWS listed the dusky gopher frog (then known as the Mississippi gopher frog) as an endangered species in December of 2001. *Id*. at 62,993. Litigation from the Center also prompted FWS in 2010 to propose to designate 1,957 acres of critical habitat for the frog. 75 Fed. Reg. 31,387 (June 3, 2010). Based on the best available scientific data on the frog's biological needs, FWS identified the frog's three essential habitat features or "Primary Constituent Elements" ("PCEs"): 1) ephemeral

3

wetland habitat for breeding; 2) upland forested nonbreeding habitat that provides food and shelter; and 3) upland connectivity habitat. *Id*. at 31,404; *see also* 77 Fed. Reg. at 35,121 (description of PCEs in Final Rule).

The 2010 proposed rule was subjected to public comment and peer review by frog experts. Every peer reviewer concluded that amount of habitat proposed in the 2010 rule was insufficient for the conservation of the species, with several suggesting that FWS consider other locations within the frog's historical range. 76 Fed. Reg. 59,774, 59,776 (Sept. 27, 2011); *see, e.g.*, AR 1568 (comments from Joseph Pechmann, Associate Professor, Western Carolina University, who is an expert on the dusky gopher frog, explaining: "I believe that it is essential for the conservation of the species to designate critical habitat in Louisiana, and in Alabama if possible, in addition to the habitat proposed for designation in Mississippi.").[1]

In 2011, in response to comments from the peer review and others, including the Intervenor-Defendants, FWS issued a revised proposed critical habitat designation that included an unoccupied area in Louisiana and increased the 2010 proposal of 1,957 acres by more than

---

[1] *See also* AR 1538 (comments from Mike Lannoo, Professor, Indiana University, an expert on amphibian declines who has experience with closely related crawfish frogs, recommending that FWS consider "additional Units in Louisiana and Alabama"); AR 1539, 1541, 1582 (comments from Stephen Richter, Professor, Eastern Kentucky University, an expert on a closely related gopher frog, applauding "the proactive designation of multiple areas currently unoccupied by the species but that represent promising sites for reintroductions to what appear to be historic breeding ponds and surrounding uplands," explaining that these "truly are essential to the conservation of the species," and recommending that FWS "consider sites in these states [Louisiana and Alabama]."); AR 1585 (comments from William Blihovde, an experienced dusky gopher frog scientist, explaining that "it is imperative that this species be established in additional ponds . . . without other well-established breeding ponds the [frog] will be at risk of being [wiped] out by a natural disaster, drought, or relatively newly discovered fungi that have been devastating to juvenile amphibians."); AR 1588 (comments from Dr. Pechmann: "I was very pleased to see that the Service designated critical habitat in Louisiana in the revised proposed rule. . . . Maintaining sites over the entire range of *R. sevosa* into which it could be translocated is essential to decrease the potential risk of extinction of the species from events such as [drought or disease], and provide for the species' eventual recovery. . . . The critical habitat proposed in Unit 1 contains the best gopher frog habitat remaining in Louisiana, to my knowledge, and some of the best breeding ponds available anywhere in the historical range of *R. sevosa*. I strongly agree with the Service's determination that this area is essential for the conservation of *R. sevosa*.") (emphasis added).

threefold to 7,015 acres. 76 Fed. Reg. 59,774 (Sept. 27, 2011). In 2012, the agency again revised

the proposed critical habitat designation to reflect a change in its methodology for calculating

frog dispersal distances, resulting in a reduction of 477 acres from the September 2011 revised

proposed rule. 77 Fed. Reg. 2254, 2255 (Jan. 17, 2012).

On June 12, 2012, FWS issued its Final Rule designating critical habitat for the frog. 77

Fed. Reg. 35,118. That rule designates approximately 1,544 acres in St. Tammany Parish,

Louisiana ("Unit 1"), and approximately 4,933 acres in Forrest, Harrison, Jackson, and Perry

counties, Mississippi. In total, approximately 6,477 acres are designated as critical habitat for the

dusky gopher frog, all within its historic range. *Id*. FWS found that Unit 1 is essential for the

conservation of the frog:

> Unit 1 consists of five ponds (ephemeral wetland habitat) and their associated
> uplands. If dusky gopher frogs are translocated to the site, the five ponds are in
> close enough proximity to each other that adult frogs could move between them
> and create a metapopulation, which increases the chances of the long-term
> survival of the population. Although the uplands associated with the ponds do not
> currently contain the essential physical or biological features of critical habitat,
> we believe them to be restorable with reasonable effort. Due to the low number of
> remaining populations and severely restricted range of the dusky gopher frog, the
> species is at high risk of extirpation from stochastic events, such as disease or
> drought. Maintaining the five ponds within this area as suitable habitat into which
> dusky gopher frogs could be translocated is essential to decrease the risk of
> extinction of the species resulting from stochastic events and provide for the
> species' eventual recovery. Therefore, we have determined this unit is essential
> for the conservation of the species because it provides important breeding sites for
> recovery. It includes habitat for population expansion outside of the core
> population areas in Mississippi, a necessary component of recovery efforts for the
> dusky gopher frog.

*Id*. at 35,135; *see also id*. at 35,121 (similar).

FWS analyzed the economic impact of the final critical habitat designation by comparing

scenarios "with critical habitat" and "without critical habitat." AR 6622 (Economic Analysis).

The "without critical habitat" scenario represented the baseline for the analysis, considering

protections already in place for the gopher frog under the federal listing. *Id*. The baseline,

therefore, represented the costs incurred regardless of whether critical habitat is designated. The

"with critical habitat" scenario described the incremental impacts associated specifically with the designation of critical habitat for the species, including Unit 1. *Id.*

FWS analyzed three potential scenarios to reflect uncertainty as to whether there would be a federal nexus for use of Unit 1 that could lead Section 7 consultation: 1) any development occurring in Unit 1 avoids impacts to jurisdictional wetlands and does not trigger consultation, and thereby does not result in any incremental economic impact; 2) development occurring in Unit 1 requires a permit from the U.S. Army Corps of Engineers due to potential impacts to jurisdictional wetlands and triggers consultation; FWS works with the landowners to keep 40 percent of the unit for development and 60 percent managed for the frog, which results in $20.4 million in incremental economic impacts; and 3) development requires a federal permit triggering consultation and FWS determines that no development can occur, resulting $33.9 million in incremental economic impacts. AR 6625-26. After considering the uncertainty of any potential economic impacts, FWS determined that no "disproportionate costs" were likely to result from the designation and did not exercise its discretion to exclude Unit 1. 77 Fed. Reg. at 35,141.

## STANDARD OF REVIEW

FWS's designation of critical habitat is an agency action reviewed under the standards of the Administrative Procedures Act ("APA"). 5 U.S.C. § 706. Under the APA, the reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts must be particularly deferential to agency determinations made within the scope of the agency's expertise. *See Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000). "Review of agency action under § 706(2)'s 'arbitrary or capricious' standard is limited to the record before the agency at the time of its decision." *Luminant Generation Co., LLC v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012).

**ARGUMENT**

The Court should reject Plaintiff Weyerhaeuser's arguments that FWS illegally designated critical habitat in Louisiana for the dusky gopher frog. Weyerhaeuser argues that the agency should have made additional findings regarding the viability of the frog and cannot designate any lands that lack certain habitat features ("Primary Constituent Elements" or "PCEs"). But these arguments are based on Weyerhaeuser's unreasonable interpretations of the ESA that invent requirements not found in the plain language of the ESA. Weyerhaeuser's additional arguments that FWS failed to use the proper method for analyzing the economic impacts and should have done an environmental review under NEPA are outdated, as the Tenth Circuit cases on which Weyerhaeuser relies have been persuasively rejected by other circuits and should also be rejected here. Weyerhaeuser's argument that FWS lacked authority under the Commerce Clause to designate the habitat has already been rejected by six different circuits – including the Fifth Circuit. Finally, Weyerhaeuser fails to prove Article III standing. For all these reasons and others that are explained below, the Court should deny Weyerhaeuser's motion for summary judgment and grant the motions filed by Intervenor-Defendants and Federal Defendants.

**I.      FWS's Designation Of Unit 1 Satisfies The ESA's Substantive Requirements**

**A.      Unoccupied Critical Habitat Does Not Need PCEs**

Weyerhaeuser argues that "without the presence of PCEs within Unit 1 sufficient to support the life cycle of the frog, FWS lacks a legal basis under the ESA for the critical habitat designation it made in this case." Docket No. 67-1 (Weyerhaeuser Opening Brief) at 14. In other words, Weyerhaeuser claims that unoccupied lands (such as Unit 1) must contain "PCEs" because lands cannot be "essential" if they lack PCEs. Weyerhaeuser's argument, however, misinterprets the ESA's distinction between the requirements for occupied and unoccupied habitat.

In defining critical habitat, the ESA differentiates between geographical areas that are occupied and unoccupied by the species at the time of listing. For areas that are occupied, critical

habitat is limited to those areas containing "physical or biological <u>features</u> (I) essential to the conservation of the species and (II) which may require special management consideration or protection." 16 U.S.C. § 1532(5)(A)(i) (emphasis added). To satisfy this statutory definition, FWS must identify the "physical or biological <u>features</u>" of the critical habitat, which are also referred to as "Primary Constituent Elements" or "PCEs." 50 C.F.R. § 424.12 (emphasis added). PCEs are "physical or biological features that may include, but are not limited to roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types." *Id.* § 424.12(b). Thus, for <u>occupied</u> areas to be designated as critical habitat, the features identified as PCEs must be present at the time of designation.[2]

In a separate provision, the ESA provides the standard for designation of unoccupied critical habitat. <u>Unoccupied</u> habitat does not require identification of features essential to the species. Instead, it is composed of the "specific <u>areas</u> outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such <u>areas</u> are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii) (emphasis added).

Importantly, in contrast to occupied habitat, the plain language of the ESA shows that PCEs need <u>not</u> be present. That is because for unoccupied habitat the ESA's focus is on the <u>areas</u> and not the features: the ESA requires that FWS find that "such areas are essential for the conservation of the species." *Id*. Congress's difference in choice of words between these provisions cannot be ignored. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[Where] Congress includes particular language in one section of a statute but omits it in another section of

---

[2] *See Ariz. Cattle Growers' Ass'n v. Kempthorne*, 534 F. Supp. 2d 1013, 1023 (D. Ariz. 2008) ("PCEs constitute an essential component of <u>occupied</u> critical habitat and their existence is dispositive to any determination.") (emphasis added); *Cape Hatteras Access Preservation Alliance v. U S. Dep't of the Interior*, 344 F. Supp. 2d 108, 122 (D.D.C. 2004) ("PCEs must be 'found' on <u>occupied</u> land before that land can be eligible for critical habitat designation.") (emphasis added); *Home Builders Ass'n of N. California v. U.S. Fish & Wildlife Serv.*, 268 F. Supp. 2d 1197, 1215 (E.D. Cal. 2003) (same).

the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).

Congress's different approach to occupied and unoccupied habitat makes practical sense. The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species . . . ." 16 U.S.C. § 1531(b). FWS could not effectively conserve endangered species and the ecosystems on which they depend if the agency could not protect essential areas that have been already degraded by human activities. In the case of the gopher frog, its population is on the brink of extinction precisely because so few areas contain all the habitat features necessary for the frog's survival. 66 Fed. Reg. 62,997-300. FWS reasonably concluded that the frog could not survive and recover if limited to the few remaining occupied habitats that contain the essential features. 77 Fed. Reg. at 35,135.[3]

Importantly, the only court to have examined this issue followed the plain language of the ESA and held that PCEs are not required for unoccupied areas. *Fisher v. Salazar*, 656 F. Supp. 2d 1357, 1368 (N.D. Fla. 2009) ("For units 2 and 4, neither of which was known to be occupied at the time of listing, FWS was not required to identity PCEs. Instead, FWS was required to find that units 2 and 4 are 'areas essential for the conservation of the species.'") (emphasis added).

The cases relied upon by Weyerhaeuser in support of its argument to the contrary involve designation of occupied land, which is based on a different standard and requires the presence of

---

[3] Plaintiff relies upon an outdated out-of-circuit 1991 district court case to argue that critical habitat should only include "the minimum amount of habitat needed to avoid short-term jeopardy or habitat in need of immediate intervention." *Northern Spotted Owl v. Lujan*, 758 F. Supp. 621, 623 (W.D. Wash. 1991). Critical habitat is "essential for the conservation of the species," which requires recovery and not just avoidance of jeopardy. 16 U.S.C. § 1532(5)(A)(i)(I) and (ii); *id.* § 1532(3); *Gifford Pinchot Task Force v. United States Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004) ("Clearly, then, the purpose of establishing 'critical habitat' is for the government to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery."). In short, the 1991 case reflects a misunderstanding of the ESA that the Ninth Circuit has subsequently rejected and should not be followed here.

PCEs. *See Alaska Oil & Gas Ass'n v. Salazar*, 916 F. Supp. 2d 974, 989 (D. Alaska 2013); *Cape Hatteras Access Pres. Alliance v. United States DOI*, 344 F. Supp. 2d 108, 125 (D.D.C. 2004); *Home Builders Ass'n of N. Cal. v. United States Fish & Wildlife Serv.*, 268 F. Supp. 2d 1197, 1208 (E.D. Cal. 2003). Moreover, the Ninth Circuit case quoted by Weyerhaeuser actually supports FWS's designation of unoccupied areas. *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1244 (9th Cir. 2001). That case accurately relies upon the plain language of the ESA and explains that for unoccupied lands the standard is whether "such areas are essential for the conservation of the species." *Id.* (quoting 16 U.S.C. § 1532(5)(A)(ii)). As explained below, that standard is met here.

Weyerhaeuser emphasizes language from cases describing the standard for designation of unoccupied lands as more "onerous" or "demanding" than that for occupied lands. *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2009); *Home Builders Ass'n of N. Cal. v. U.S. Fish and Wildlife Serv.*, 616 F.3d 983, 990 (9th Cir. 2010). FWS met this rigorous standard by making the requisite finding that the unoccupied areas are "essential" for the conservation of the frog. The fact that Unit 1 meets the standard for unoccupied lands but does not meet the standard for occupied lands may be unusual but is in no way fatal to the designation. Here, the parties agree that Unit 1 was unoccupied at the time of listing, and FWS is therefore only required to show – as the agency did – that the area "is essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). On the law and facts, Weyerhaeuser has failed to demonstrate that FWS's designation of Unit 1 was arbitrary, capricious, or contrary to the requirements of the ESA.

**B.     Unit 1 Is "Essential"**

The ESA does not define "essential" but rather FWS uses its expertise to make that determination on a case-by-case basis. Here, FWS found that maintaining the five ponds found on Unit 1 would provide suitable habitat into which dusky gopher frogs could be translocated, which is essential to decrease the risk of extinction of the species and provide for the species'

eventual recovery. 77 Fed. Reg. at 35,135. Specifically, FWS found that the dusky gopher frog "is at high risk of extirpation from stochastic events, such as disease or drought, and from demographic factors such as inbreeding depression" and that "establishment of additional populations beyond the single site known to be occupied at listing is critical to protect the species from extinction and provide for the species' eventual recovery." 77 Fed. Reg. at 35,121.[4] Therefore, FWS concluded that Unit 1 is "essential for the conservation of the species" because it "provides important breeding sites for recovery" and "includes habitat for population expansion outside of the core population areas in Mississippi, a necessary component of recovery efforts for the dusky gopher frog." 77 Fed. Reg. at 35,135.

FWS's finding is supported by frog experts outside the agency that reviewed the proposed critical habitat designation. For example, Dr. Joseph Pechmann from Western Carolina University, who has done extensive research on the dusky gopher frog, explained in his comments on the proposed rule: "I believe that it is essential for the conservation of the species to designate critical habitat in Louisiana, and in Alabama if possible, in addition to the habitat proposed for designation in Mississippi." AR 1568; *see also* AR 1588 ("I strongly agree with the Service's determination that this area is essential for the conservation of *R. sevosa*."). He identified the area where the frog was last documented in Louisiana (that FWS ultimately designated as Unit 1) and explained that it "retains the required characteristics necessary to serve as a breeding pond . . . ." AR 1568. FWS reasonably relied upon the expertise of their own biologists and experts outside the agency in determining that designation of Unit 1 is "essential."

When an agency is acting within its expertise to make a scientific determination "a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co. v. Nat'l Res.*

---

[4] *See also* 77 Fed. Reg. at 35,125 ("[R]ecovery of the species will require populations of dusky gopher frog distributed across a broader portion of the species' historic distribution. Critical habitat will support recovery of the dusky gopher frog by protecting sites across a large area of the species' historic range and providing space for population expansion, including in areas that will provide protection from the effects of local catastrophic events.").

*Def. Council*, 462 U.S. 87, 103 (1983). FWS made the requisite determination that the designated unoccupied area is essential to the conservation of the species, and the Court must defer to this scientific determination made within the scope of the agency's expertise.

### C.   No Threshold Viability Determination Is Required

Contrary to the ESA, Weyerhaeuser argues that a finding that an area is "essential" requires a "determination of what a viable population size and distribution would be . . . ." Docket No. 67-1 (Weyerhaeuser Opening Brief) at 17. However, FWS has no such obligation because the ESA itself recognizes that FWS must designate critical habitat even if it does not know precisely how or when recovery of a viable population will be achieved.

The requirement for designation of critical habitat is separate from the requirement for preparation of a recovery plan. *Compare* 16 U.S.C. § 1533(a)(3) (designation of critical habitat) and 16 U.S.C. § 1533(f) (recovery planning). FWS is required to determine (to the extent practicable) how to recover a viable population when developing recovery plans, and not as Weyerhaeuser contends, prior to the designation of critical habitat:

> The Secretary, in developing and implementing <u>recovery plans</u>, shall, to the maximum extent practicable . . . incorporate in each plan –
>
> (i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;
>
> (ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list . . . .;

*Id.* § 1533(f)(1) (emphasis added).

Also, while Congress imposed specific deadlines for the designation of critical habitat, *id.* § 1533(b)(6)(C), it included no such deadlines for the preparation of the recovery plan, *id.* § 1533(f). *See Ariz. Cattle Growers v. Kempthorne*, 534 F. Supp. 2d 1013, 1026 (D. Ariz. 2008) (explaining that the ESA prefers the "swift designation of critical habitat" and allows FWS to explain "when a species can be deemed conserved . . . at some future date."). Nothing in the statute provides that critical habitat can only be designated after FWS first determines how to

ensure recovery to a viable population of the species; on the contrary, the ESA provides that critical habitat designation should occur concurrently with listing, while recovery planning occurs only after listing. 16 U.S.C. §§ 1533(a)(3)(A), 1533(f).

To support its argument, Weyerhaeuser relies on a district court decision that the Ninth Circuit rejected. *Home Builders Ass'n of N. Cal. v. United States Fish & Wildlife Serv.*, 616 F.3d 983, 989 (9th Cir. 2010) ("We disagree with that court's reasoning because it lacks legal support and is undermined by ESA's text."). In *Home Builders Association*, the plaintiffs argued that "[i]f FWS does not know when the species in question will be brought to this point [recovery] … it cannot know what physical or biological features are required to bring the species there." *Id*. at 989. In rejecting that argument, the Ninth Circuit stated:

> Home Builders does not explain why it is impossible to determine the elements essential to a goal without determining when the goal will be achieved. A seller of sporting goods should be able to identify which rod and reel are essential to catching a largemouth bass, but is not expected to predict when the customer will catch one.

*Id*. The court explained that requiring FWS to determine when a species would recover prior to designating critical habitat would improperly import recovery planning into "a completely different part of [the] ESA." *Id.* at 990. The Court explained:

> If Congress had intended such a requirement to apply to critical habitat designations, it would have said so . . . Congress's decision to apply the extra requirement to recovery plans but not to critical habitat designations is logical because there is no deadline for creating a recovery plan, but there is a one-year deadline for designating critical habitat.

*Id.* ; *see also Ariz. Cattle Growers*, 534 F. Supp. 2d at 1025-26 (finding that requiring FWS to determine or provide objective criteria for recovery before designating critical habitat would import improperly the recovery planning process into this separate statutory provision).

The Ninth Circuit's decision is based on a reasoned analysis of the plain language and structure of the ESA. The Court here should follow the Ninth Circuit and reject Weyerhaeuser's efforts to introduce recovery planning criteria into the critical habitat determination. All that is required is a reasonable determination that Unit 1 is "essential for the conservation of the

species," and FWS did that.

## II.    FWS Properly Considered The Economic Impacts Of The Critical Habitat Designation

Weyerhaeuser relies upon an outdated Tenth Circuit case to argue that FWS used the wrong methodology to analyze the economic impacts of the gopher frog critical habitat designation. *See N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277 (10th Cir. 2001). The issue is whether the agency appropriately considered only the potential economic impacts caused by the gopher frog's critical habitat designation ("baseline" or "incremental" approach) or whether the agency should have also considered impacts from the 2001 listing of the frog ("co-extensive" or "cumulative" approach). As explained below, the Court should not follow the Tenth Circuit's decision, which was based on a now-rejected FWS regulation. Instead, the Court should uphold the baseline approach endorsed by the Ninth Circuit, especially because the Fifth Circuit would likely also follow the baseline approach if presented with the issue.

The Section 7 consultation requirement seeks to ensure that any proposed action "is not likely to jeopardize the continued existence of any [listed] species or result in the destruction or adverse modification of [critical] habitat . . . ." 16 U.S.C. § 1536(a)(2). FWS promulgated regulations in 1986 that defined "jeopardize the continued existence" of a species and "destruction or adverse modification" of critical habitat to mean essentially the same thing. 50 C.F.R. § 402.02. This became known as FWS's policy of "functional equivalence," in which the Section 7 prohibition against actions that jeopardize listed species was virtually identical to the Section 7 prohibition against actions that adversely modify critical habitat. As result of the functional equivalence policy, FWS came to view critical habitat designations as serving "a minimal additional function separate from the listing," *Cape Hatteras Access Pres. Alliance v. U.S. Dept. of Interior*, 344 F. Supp. 2d 108, 127 (D.D.C. 2004), and as "unhelpful, duplicative, and unnecessary." *N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1283 (10th Cir. 2001). As such, when the agency applied the baseline approach and the functional equivalence policy, FWS routinely argued that critical habitat designations would have no real economic impact. *Id.* at 1284.

Within this context, the Tenth Circuit in *New Mexico Cattle Growers* found the "baseline" approach to be "virtually meaningless" because the critical habitat designation did not add any significant new protections or costs apart from those already triggered when the species was listed. *Id.* The Tenth Circuit's opinion noted that the regulation was the "root of the problem" because it essentially nullified the ESA's command in Section 4(b)(2) that FWS separately consider the economic impacts of the critical habitat designation. *Id.* at 1283, 1285. Although the Tenth Circuit noted that the regulation was likely un lawful, the court was "compelled by the canons of statutory interpretation to give some effect to the congressional directive that economic impacts be considered at the time of critical habitat designation." *Id.* at 1285. It rejected the baseline approach and held that FWS must "conduct a full analysis of all the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes." *Id.*

The circumstances that led to the Tenth Circuit's decision are no longer present. Importantly, the Fifth Circuit in *Sierra Club v. U.S. Fish and Wildlife Service*, 245 F.3d 434 (5th Cir. 2001), has now rejected FWS's functional equivalence theory in a case challenging FWS's failure to designate critical habitat for the Gulf sturgeon. The Fifth Circuit explained: "As we have concluded that the regulatory definition of the destruction/adverse modification standard is flawed, this 'functional equivalence' argument is untenable." *Sierra Club*, 245 F.3d at 445. The Ninth Circuit in *Gifford Pinchot Task Force v. United States Fish & Wildlife Service*, 378 F.3d 1059, 1069-70 (9th Cir. 2004), also found that the 1986 regulation conflicted with the text and purpose of the ESA.

The Fifth and Ninth circuit decisions prompted FWS to officially change its policy and recognize that critical habitat provides increased protection for species beyond the actual listing.[5] FWS no longer defines adverse modification of critical habitat as the "functional equivalent" of

---

[5] U.S. Fish & Wildlife Serv., Application of the "Destruction or Adverse Modification" Standard under Section 7(a)(2) of the Endangered Species Act (Dec. 9, 2004), *available at* http://www.fws.gov/midwest/endangered/permits/hcp/pdf/AdverseModGuidance.pdf (last visited February 26, 2014).

species jeopardy; rather, FWS recognizes that habitat protection may impose additional costs and benefits over and above listing. As such, now when FWS takes economics into account using the baseline method, Congress's intent for the agency to consider the additional impacts of critical habitat designation (but not listing) can be fulfilled, and the concern that prompted the Tenth Circuit's decision is no longer present.

Because the Tenth Circuit's decision in *New Mexico Cattle Growers* was inextricably based on an invalid regulation that does not accurately account for how FWS currently assesses the costs and benefits of critical habitat, its holding does not reflect the current state of the law. Indeed, now that FWS no longer applies the "functional equivalence policy" embodied in that unlawful 1986 regulation, courts within the Fifth, Ninth and D.C. circuits have unanimously concluded that the baseline approach is in fact an appropriate method for taking into account the economic impact of critical habitat designation. *See Ariz. Cattle Growers' Ass'n v. Salazar,* 606 F.3d 1160 (9th Cir. 2010); *Fisher v. Salazar,* 656 F. Supp. 2d 1357 (N.D. Fla. 2009); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115 (N.D. Cal. 2006); *Cape Hatteras Access Pres. Alliance v. U.S. DOI*, 344 F. Supp. 2d 108, 130 (D.D.C. 2004).

As these cases have held, analysis of the impacts of critical habitat logically should include only those costs that would occur as a result of its designation, and not those that would exist even if FWS did not designate any habitat. In *Cape Hatteras*, the court held that "[t]he baseline approach is a reasonable method for assessing the actual costs of a particular critical habitat designation" because logically "the world with the designation must be compared to the world without it." *Cape Hatteras*, 344 F. Supp. 2d at 130. The court  concluded that the Tenth Circuit's *New Mexico Cattle Growers* decision was "ill advised" and "an instance of a hard case making bad law." *Id.* at 129-30; *see also Ctr. for Biological Diversity*, 422 F. Supp. 2d. at 1152 (noting that *Cape Hatteras* "is particularly instructive because it was made after a careful review" of the Ninth Circuit's decision in *Gifford Pinchot*, as well as the Tenth Circuit's decision in *New Mexico Cattle Growers*). Similarly, in *Fisher v. Salazar*, the Northern District of Florida found that once FWS abandoned its "functional equivalence theory," the baseline approach

became "a reasonable method, consistent with the language and purpose of the ESA for assessing the actual costs of a particular habitat designation." *Fisher*, 656 F. Supp. 2d at 1371.

Because the Fifth Circuit in *Sierra Club* rejected the "functional equivalence" theory, it is likely that the Fifth Circuit would follow the logic of the Ninth Circuit and approve the baseline approach if presented with the issue. Indeed, now that the 1986 regulation is invalidated and no longer informs the analysis of the statute, the Tenth Circuit might also abandon the conclusion it reached in *New Mexico Cattle Growers* if a future case were to arise in that circuit.

Here, Weyerhaeuser argues that FWS should have reverted to the Tenth Circuit's outdated co-extensive approach in performing its economic analysis of the critical habitat designation. Weyerhaeuser, however, ignores the fact that since the Tenth Circuit decided *New Mexico Cattle Growers*, courts outside of the Tenth Circuit have universally rejected the rationale of the co-extensive approach because it was based upon FWS's regulatory definition of adverse modification that both the Fifth and Ninth circuits found unlawful – and which FWS no longer applies. *See Sierra Club*, 245 F.3d at 445; *Gifford Pinchot*, 378 F.3d at 1069-70. The Court should follow these persuasive cases and conclude that FWS reasonably relied upon the baseline approach. In any event, arguments about the proper methodology have no practical relevance here. Unit 1 is unoccupied, and as such, the economic impacts would be identical under the baseline method and the co-extensive method because FWS already attributed all of Unit 1's potential economic impacts to the critical habitat designation.

In addition, Weyerhaeuser challenges FWS's conclusion that the "economic analysis did not identify any disproportionate costs that are likely to result from the designation." 77 Fed. Reg. at 35,141. Yet FWS's conclusion is reasonably based on the economic analysis, which did not find that the Unit 1 landowners would necessarily suffer $34 million in economic impacts. That figure – misleadingly cited by Weyerhaeuser as the economic impact – comes from Scenario 3, the "worst case scenario," where all development includes a federal nexus and FWS recommends no development. AR 6626 (Economic Analysis). Yet under Scenario 1, development would avoid jurisdictional wetlands, which would not trigger consultation and

would result in <u>no</u> economic impacts to the landowners. AR 6663. Given the uncertainty surrounding potential economic impacts and the importance of Unit 1 to the conservation of the gopher frog, FWS reasonably concluded that the Final Rule does not result in "any disproportionate costs." 77 Fed. Reg. at 35,140-41 (discussing why the agency did not exercise its discretion to exclude lands based on economic impacts); 77 Fed. Reg. at 35,124 (explaining why "the Service believes Unit 1 is essential to the conservation of the dusky gopher frog"); *see Cape Hatteras*, 731 F. Supp. 2d at 28 n.3 (upholding a similar economic analysis). Weyerhaeuser's arguments that weigh the benefits of exclusion against the benefits of inclusion are misplaced because the ESA requires such balancing only when the agency chooses to exclude an area (and not when it chooses to <u>not</u> exclude an area). *Alaska Oil & Gas Ass'n v. Salazar*, 916 F. Supp. 2d 974, 994 (D. Alaska 2013) ("The need to balance the benefits of exclusion versus inclusion arises only when the Service decides to exclude an area, not include one.").

Weyerhaeuser further argues that the economic analysis is unreasonable because it "gives impermissibly short shrift" to the "adverse affects of prescribed burning." Docket No. 67-1 (Weyerhaeuser Opening Brief) at 19. Under the ESA, FWS is only required to "tak[e] into consideration the economic impact" of the designation, 16 U.S.C. § 1533(b)(2), which it did. FWS discusses impacts of burning in the Economic Analysis and in the Final Rule. AR 6663, 6665 n.85; 77 Fed. Reg. at 35,126. FWS considered comments that burns "may halt development of adjacent lands resulting in the loss of revenue to the landowners and tax revenue to St. Tammany Parish and the State of Louisiana." *Id*. In short, the administrative record demonstrates that FWS satisfied the requirement that it make critical habitat designations while "taking into consideration" economic costs. 16 U.S.C. § 1533(b)(2). In light of the deference afforded agency decisions, this Court should uphold FWS's determination.

## III.   Designation Of Unit 1 As Critical Habitat Is Proper Under The Commerce Clause

Six federal courts of appeals (the District of Columbia, Fourth, Fifth, Ninth, Tenth, and Eleventh Circuits) concluded that Congress's protection of endangered species – including

isolated intrastate species with little or no commercial value – under the ESA falls within the authority of the Commerce Clause.[6] Weyerhaeuser argues that because no gopher frogs are currently found within Unit 1 "there is no existing activity conducted within Unit 1 that can affect either the species or its habitat; in turn this means that there is no constitutional nexus between the activities of the Unit 1 landowners and Congress's authority to regulate endangered species under the Commerce Clause." Docket No. 67-1 (Weyerhaeuser Opening Brief) at 21. Yet this argument reflects a misunderstanding of case law on the Commerce Clause, including the Fifth Circuit's decision in *GDF Realty Inv., Ltd. v. Norton*, 326 F.3d 622 (5th Cir. 2003), and the Supreme Court's decision in *Gonzales v. Raich*, 545 U.S. 1 (2005). Because the ESA is an "economic regulatory scheme" and FWS's designation of critical habitat is "'essential' to that regulatory scheme," the effect of the gopher frog's critical habitat designation is properly aggregated with "those of all other endangered species," *GDF Realty*, 326 F.3d at 638-39. The Court has no power to "excise individual applications of a concededly valid statutory scheme." *Gonzales*, 545 U.S. at 23.

The Fifth Circuit – as with every other circuit that has reached the issue – has found that the ESA is an "economic" regulatory scheme. *GDF Realty*, 326 F.3d at 639 (finding that the "ESA's protection of endangered species is economic in nature" because of "the 'incalcuable' value of the genetic heritage that might be lost absent regulation") (citing H.R. Rep. No. 93-412, at 4); *see San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1176 (9th Cir. 2011) (summarizing how cases have found "why the protection of threatened or endangered species implicates economic concerns").

---

[6] *See San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163 (9th Cir. 2011); *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250 (11th Cir. 2007), *cert. denied*, 552 U.S. 1097 (2008); *Wyoming v. U.S. Dep't of Interior*, 442 F.3d 1262 (10th Cir. 2006); *GDF Realty Inv. v. Norton*, 326 F.3d 622 (5th Cir. 2003), *reh'g denied*, 362 F.3d 286 (5th Cir. 2004) (en banc), *cert. denied*, 545 U.S. 1114 (2005); *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062 (D.C. Cir. 2003), *reh'g denied*, 334 F.3d 1158 (D.C. Cir. 2003) (en banc), *cert. denied,* 541 U.S. 1006 (2004); *Gibbs v. Babbitt*, 214 F.3d 483 (4th Cir. 2000), *cert. denied,* 531 U.S. 1145 (2001); *Nat'l Ass'n of Home Builders v. Babbitt (NAHB)*, 130 F.3d 1041 (D.C. Cir. 1997), *cert. denied*, 524 U.S. 937 (1998).

In addition, the ESA's critical habitat provision is "essential" to this regulatory scheme. In *GDF Realty*, the Fifth Circuit examined whether the ESA's take provision is essential to the ESA's regulatory scheme. The Court concluded that the ESA "could be undercut without the particular regulation" because of the "'critical nature of the interrelationships of plants and animals between themselves and with their environment.'" *Id*. at 640 (quoting *United States v. Lopez,* 514 U.S. 549, 561 (1995); H.R. Rep. No. 93-412, at 6). The Fifth Circuit's reasoning is equally applicable to the ESA's provision for the designation of critical habitat, which are those areas "essential" for the "conservation of the species." 16 U.S.C. § 1532(5)(A); *see* 77 Fed. Reg. at 35,120 (discussing why the designation of critical habitat for the gopher frog is constitutional).

Thus, because the ESA is an "economic regulatory scheme" and FWS's designation of critical habitat is "'essential' to that regulatory scheme," the effect of the gopher frog's critical habitat designation is properly aggregated with "those of all other endangered species." *GDF Realty*, 326 F.3d at 638-39. Here, the case for an aggregate effect on interstate commerce is much stronger than in *GDF Realty*, in which the Fifth Circuit found a substantial aggregate effect from subterranean invertebrate species found only in Texas. Unlike the species at issue in *GDF Realty*, people travel across state lines to view the gopher frog. *See* Declaration of Noah Greenwald (Docket No. 22-2) ¶ 7 (travelling from Oregon to view gopher frogs in Mississippi). *Contrast GDF Realty*, 326 F.3d at 638 ("[T]here is no historic trade in the Cave Species, nor do tourists come to Texas to view them."). In addition, the gopher frog is not purely intrastate. It was historically found across three states and FWS designated critical habitat in two states: Mississippi and Louisiana. 77 Fed. Reg. at 35,118, 35,134. Thus, it cannot be seriously disputed that designation of critical habitat for the gopher frog has a substantial effect on interstate commerce when aggregated with the effects from all other endangered species.

Moreover, Weyerhaeuser's myopic focus on the designation of Unit 1 ignores the larger context of the regulation, which is critical in the Commerce Clause analysis. As the Fifth Circuit explained: "[T]he regulation of the Cave Species is part of a larger regulation of activity. The take provision as applied to the Cave Species is part of the take provision generally and ESA as a

whole." *GDF Realty*, 326 F.3d at 638-39. It follows then that the regulation of the gopher frog is also part of a larger regulation of activity. Specifically, the critical habitat provision as applied to the gopher frog is part of the critical habitat provision generally and ESA as a whole. The Supreme Court has made clear time and time again that when "'a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.'" *Gonzales*, 545 U.S. at 17 (quoting *United States v. Lopez*, 514 U.S. 549, 558 (1995); *Maryland v. Wirtz*, 392 U.S. 183, 196, n.27 (1968)). As such, the Court must "refuse to excise individual components of that larger scheme." *Gonzales*, 545 U.S. at 22, and conclude that FWS's designation of Unit 1 is proper under the Commerce Clause.

## IV.    Weyerhaeuser's NEPA Claim Fails

### A.    NEPA Does Not Apply To The Critical Habitat Designation

Binding authority from the U.S. Supreme Court and the Fifth Circuit make clear that NEPA does not apply to actions that do not cause a change to the physical environment. *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983) (holding that NEPA does not apply unless the federal action at issue is "proximately related to a change in the physical environment"); *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 680 (5th Cir. 1992) (similar); *see also City of Dallas v. Hall*, 562 F.3d 712, 723 (5th Cir. 2009) (holding that NEPA analysis was not required because the "establishment of [a refuge] boundary does not effect any change in the physical environment").

Weyerhaeuser relies on a Tenth Circuit decision that applied NEPA to a critical habitat designation that – unlike here – resulted in a physical change to the environment by affecting governmental flood control efforts. *Catron Co. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1437-38 (10th Cir. 1996). The Tenth Circuit's decision is unpersuasive here, where the record is clear that the designation of Unit 1 will not result in any change to the physical environment. FWS cannot force the landowners to take any action to modify Unit 1. 77 Fed. Reg. at 35,128 ("Such [critical habitat] designation does not allow the government or public to access private lands. Such designation does not require implementation of restoration, recovery,

or enhancement measures by non-Federal landowners."). FWS has no existing agreements with the private landowners of Unit 1 to manage the site to improve habitat for the frog, nor can any actions (such as habitat management through prescribed burning) be implemented without the cooperation and permission of the landowners, who have made clear that they will <u>not</u> manage the land for the frog. In any event, private action – even if made in collaboration with FWS – would <u>not</u> be subject to NEPA, which applies only to "major <u>Federal</u> actions." 42 U.S.C. § 4332(C) (emphasis added). If any future federal actions to restore critical habitat were proposed, those actions could <u>then</u> be subject to NEPA. But the critical habitat designation by itself does not lead to any changes in the physical environment and NEPA is therefore not triggered now.

For all these reasons, this case is analogous to *Douglas County v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir. 1995), in which the Ninth Circuit held that NEPA did not apply to a critical habitat designation in part because it would not cause a change to the physical environment. The Court should follow the Ninth Circuit's persuasive reasoning, as well as binding case law from the Supreme Court and Fifth Circuit, and hold that NEPA does not apply to the gopher frog's critical habitat designation because it does not cause any change to the physical environment.

### B.    Weyerhaeuser Lacks Prudential Standing For Its NEPA Claim

Because NEPA (unlike the ESA) does not create a private right of action, Weyerhaeuser relies on the APA, 5 U.S.C. § 702, which limits prudential standing to a plaintiff that falls within the "zone of interests" sought to be protected by the statute. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *see Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 675 (5th Cir. 1992). To assert a claim within the "zone of interests" of NEPA, "a plaintiff must allege injury to the environment; economic injury will not suffice." *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005); *Town of Stratford, Conn. v. FAA*, 285 F.3d 84, 88 (D.C. Cir. 2002) ("[W]e have squarely held that a NEPA claim may not be raised by a party with no claimed or apparent environmental interest."); *Sabine River Auth.*, 951 F.2d at 675-76 (finding that harmful effects on a water supply fall within NEPA's zone of interests because the statute "was designed to protect the environment."); *Hurd Urban Dev., L.C.*

*v. Fed. Highway Admin.*, 33 F. Supp. 2d 570, 574 (S.D. Tex. 1998) (summarizing cases across numerous circuits and holding that "all NEPA claims based on economic harm must be dismissed for lack of jurisdiction over the subject matter.").

Weyerhaeuser asserts purely economic injuries from the critical habitat designation. Specifically, Weyerhaeuser complains of exposure to "increased regulatory burdens, risk of lawsuits, and loss of property value" and cites to FWS's conclusion that "the economic impact to Unit 1 landowners could be as high as $33.9 million." Docket No. 67-1 (Weyerhaeuser Opening Brief at 6). None of these are environmental injuries that fall within NEPA's zone of interests. Because Weyerhaeuser's economic injuries are not recognized by NEPA, Weyerhaeuser lacks prudential standing to bring its NEPA claim, which must therefore be dismissed.

## V.     Weyerhaeuser Fails To Establish Article III Standing

At the summary judgment stage, a plaintiff must use affidavits or other evidence to set forth "specific facts" proving each of the three elements of standing, including "injury in fact." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Here, Weyerhaeuser attempts to rest on "mere allegations" of injury without offering any proof of standing. *Id*. at 561; *Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 496-497 (5th Cir. 2007) ("Standing to sue must be proven, not merely asserted . . . ."). For that reason alone, the Court should find that Weyerhaeuser has failed to meet its burden of establishing standing and grant Intervenor-Defendants' cross-motion for summary judgment.

Even if such assertions could be proven, they do not establish an "injury in fact" that is "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. at 560. Weyerhaeuser asserts that the designation is "likely" to expose it to increased regulatory burdens and that FWS has found that the economic impact "could be" as high as $33.9 million dollars. Docket No. 67-1 (Weyerhaeuser Opening Brief) at 6.[7] While the economic

---

[7] Contrary to Weyerhaeuser's misstatement of the law, Section 7 consultation is triggered only for <u>federal</u> actions that affect listed species or critical habitat. 16 U.S.C. § 1536(a)(2). Private actions that do not require federal approval or funding, such as timber harvest on private land, lack a federal nexus and therefore would not result in "increased regulatory burden."

impact "could be" that high, the record also shows that any future development on Unit 1 could avoid jurisdictional wetlands and thereby completely avoid the need for any federal approvals, and so have <u>no</u> incremental economic impact. AR 6625 (Economic Analysis). Moreover, under a lease that runs through June 30, 2043, Unit 1 is being used for private timber operations that have no federal nexus and do not trigger Section 7 consultation. AR 1825 (Weyerhaeuser's comments on proposed rule); AR 6661 (Economic Analysis).

In short, Weyerhaeuser's injury depends on a number of uncertain events: (1) that Unit 1 would switch from private timber production to development; (2) that any such development would occur on areas with jurisdictional wetlands requiring a federal permit; and (3) that FWS would recommend restrictions on development to protect the habitat. Under these circumstances, Weyerhaeuser has only established the "uncertain potentiality" of injury, which is "too conjectural and hypothetical to provide Article III standing." *Prestage Farms, Inc. v. Bd. of Supervisors*, 205 F.3d 265, 268 (5th Cir. 2000) ("Federal courts consistently deny standing when claimed anticipated injury has not been shown to be more than uncertain potentiality.").

## CONCLUSION

For all the reasons explained above, Intervenor-Defendants respectfully request that the Court grant their Cross-Motion for Summary Judgment and deny Plaintiff Weyerhaeuser's Summary Judgment Motion.


Dated: March 10, 2014

/s/ Collette L. Adkins Giese
_____

Collette L. Adkins Giese (Admitted *Pro Hac Vice*)
(MN Bar No. 035059x)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 339
Circle Pines, MN 55014-0339
Telephone: 651-955-3821
Email: cadkinsgiese@biologicaldiversity.org

24

John Buse (Admitted *Pro Hac Vice*)
(CA Bar No. 163156)
CENTER FOR BIOLOGICAL DIVERSITY
351 California Street, Suite 600
San Francisco, CA 94104
Telephone: 323-533-4416
Email: jbuse@biologicaldiversity.org

Elizabeth Livingston de Calderón
(LA Bar. No. 31443)
TULANE ENVIRONMENTAL LAW CLINIC
6329 Freret Street
New Orleans, LA 70118
Telephone: 504-862-8819
Email: ecaldero@tulane.edu

*Attorneys for Intervenor-Defendants Center for Biological Diversity and Gulf Restoration Network*

## CERTIFICATE OF SERVICE

I hereby certify that today I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such upon all attorneys of record.


Dated: March 10, 2014

/s/ Collette L. Adkins Giese
_____

Collette L. Adkins Giese