# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MARKLE INTERESTS, LLC, | ) | |
| | ) | Civil Action Case No. 2:13-cv-00234 |
| Plaintiff, | ) | (Consolidated with 2:13-cv-00362 |
| v. | ) | and 2:13-cv-00413) |
| | ) | |
| UNITED STATES FISH | ) | Judge:  Martin L. C. Feldman |
| AND WILDLIFE SERVICE, *et al.*, | ) | Magistrate Judge:  Sally Shushan |
| | ) | |
| Defendants. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CENTER FOR BIOLOGICAL DIVERSITY; | ) | |
| GULF RESTORATION NETWORK, | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

## PLAINTIFF MARKLE'S OPPOSITION AND REPLY

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

SUMMARY OF THE ARGUMENT ......................................................................... 1

ARGUMENT ............................................................................................................. 4

   1.  Markle Has Article III Standing ................................................................... 4

   2.  Markle Has NEPA Prudential Standing........................................................ 5

   3.  It Is an Abuse of Discretion To Designate Areas
      as Critical Habitat That Provide No Benefit to the Species ......................... 6

   4.  Unit 1 Does Not Contain the PCE's Necessary for Critical Habitat............ 6

   5.  If the Secretary Does Not Know What "Essential"
      Means She Cannot Determine "Essential" Habitat..................................... 8

   6.  The Secretary's Failure to Determine a
      Habitat Threshold Is Fatal to the Final Designation ................................... 9

   7.  The Baseline Approach to the Economic Analysis
      Typically Understates the Impacts of the Critical Habitat Designation ..... 10

   8.  The Failure of the Secretary To Exclude Unit 1
      from Critical Habitat Was an Abuse of Discretion ..................................... 11

   9.  NEPA Applies To This Case Because the Management
      of Unit 1 Calls for a Physical Change to the Environment......................... 14

  10.  Federal Regulation of Unit 1 Exceeds the Commerce Power .................... 15

CONCLUSION......................................................................................................... 18

DECLARATION OF SERVICE ............................................................................. 19

# TABLE OF AUTHORITIES

**Page**

## Cases

*American Petroleum Inst. v. Johnson*,
541 F. Supp. 2d 165 (D.D.C. 2008) ................................................................. 1, 4

*Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife,*
*Bureau of Land Mgmt.*, 273 F.3d 1229 (9th Cir. 2001) ........................................ 2, 9

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................. 9, 12

*Elison v. Connor*, 153 F.3d 247 (5th Cir. 1998) ................................................... 12-13

*Fisher v. Salazar*, 656 F. Supp. 2d 1357 (N.D. Fla. 2009) ..................................... 7-8

*GDF Realty Investments, Ltd. v. Norton*, 326 F.3d 622 (5th Cir. 2003) ................. 15-16

*Gonzales v. Raich*, 545 U.S. 1 (2005) .............................................................. 4, 16-17

*Heckler v. Chaney*, 470 U.S. 821(1985) ............................................................. 13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555(1992) ............................................ 4

*Monsanto Co. v. Geertson Seed Farms*,
130 S. Ct. 2743 (2010) ............................................................................... 1, 5

*National Federation of Independent Business (NFIB) v.*
*Sebelius*, 132 S. Ct. 2566 (2012) ............................................................... 3, 15, 17

*New Mexico Cattle Growers Association v. U.S. Fish &*
*Wildlife Service,* 248 F.3d 1277 (l0th Cir. 2001) .......................................... 2, 10

*Suntex Dairy v. Block*, 666 F.2d 158 (5th Cir. 1982) ............................................ 11

## Statutes

16 U.S.C. § 1532(3) ............................................................................................ 10

16 U.S.C. § 1533(b)(2) ....................................................................................... 12

**Page**

### Regulations

40 C.F.R. § 1502.2(g) ................................................................................. 3, 5, 14

50 C.F.R. § 424.12 ............................................................................................. 6

50 C.F.R. § 424.12(b) ........................................................................................ 7

### Miscellaneous

77 Fed. Reg. 35123 (2012) ....................................................................... 2, 7, 9

77 Fed. Reg. 35129-32 ................................................................................ 3, 5, 14

77 Fed. Reg. 35132 ............................................................................................ 7

77 Fed. Reg. 35135 ......................................................................................... 6-7

77 Fed. Reg. 35141 ............................................................................................ 4

78 Fed. Reg. 53058 (Aug. 28, 2013) ............................................................... 10

**PLAINTIFF MARKLE'S OPPOSITION AND REPLY**

**SUMMARY OF THE ARGUMENT**

To our knowledge, no landowner has ever been denied standing while challenging the designation of his property as critical habitat. As a regulated party, Markle's Article III standing is self-evident. *See American Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 176 (D.D.C. 2008) ("Standing is usually self-evident when the plaintiff is a regulated party."). Markle's standing under the National Environmental Policy Act (NEPA) is also self-evident. The U.S. Supreme Court has held that a NEPA plaintiff, like Markle, does not lose standing because he seeks to avoid economic harms, so long as the plaintiff identifies actual environmental harms, as Markle has here. *See Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2756 (2010) (Finding that economic harms do not strip plaintiff of prudential standing.).

It is a clear abuse of discretion for the Secretary of Interior to designate an area as critical habitat that provides no benefit to the species. To benefit the species, the area must be both accessible and suitable as habitat. But Unit 1 is not. If the Secretary had the power to regulate any land or water in the faint hope that it might become not only suitable, but essential, habitat at an indefinite time in the future, the Secretary could literally regulate any area of the country as critical habitat. Such an arrogation of power is contrary to congressional intent and established constitutional limitations and should not be allowed.

The final rule states, and the Service concedes, that the gopher frog requires three Primary Constituent Elements (PCEs)—ephemeral wetlands (PCE 1); upland forested areas (PCE 2); and, upland connectivity areas (PCE 3). However, contrary to logic and the agency's own findings, the Secretary designated Unit 1 as critical habitat despite the absence of these essential characteristics. It is all but certain that Unit 1 will likely never contain these essential

1

characteristics.  The designation of Unit 1 as critical habitat is, therefore, the very definition of arbitrary rulemaking.

It is axiomatic that to determine those areas *essential* to the conservation of the species (*i.e.*, critical habitat), the Secretary must know what *essential* means, at least for this species. But the term was never defined, either generally or for the gopher frog in this case.  Therefore, the Secretary applied an arbitrary standard that "more is better", which the Ninth Circuit has held is contrary to the intent of Congress.  *See Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1244 (9th Cir. 2001) (recognizing congressional limits on the regulation of land as critical habitat).

Similarly, the Service concluded Unit 1 was essential to the conservation of the gopher frog because of its importance to the *recovery* of the species.  *See* 77 Fed. Reg. 35123 (2012). But the Service never established a recovery threshold that would allow the Secretary to determine how much area is required as critical habitat.  And, just like the lack of any articulable standard for the term "essential," so the lack of any identifiable threshold for critical habitat necessarily leads to an arbitrary more-is-better approach to critical habitat designation.

For years, the Service agreed with the Tenth Circuit that a "baseline" or "incremental" approach to the economic analysis of critical habitat tended to understate the actual costs to landowners of critical habitat designations and concluded it would employ a cumulative or "co-extensive" approach in future cases.  *See New Mexico Cattle Growers Association v. U.S. Fish & Wildlife Service,* 248 F.3d 1277 (l0th Cir. 2001).  However, the Service abruptly changed course and has now institutionalized the "baseline" approach which only takes into account the incremental impacts of the critical habitat designation itself.  In most cases, this approach makes the economic analysis meaningless and should be rejected here.

In this case, the Service concluded that the incremental impacts alone of designating Unit 1 as critical habitat could cost the landowners, including Markle, as much as $33.9 million. In contrast, any benefit to the gopher frog is purely speculative. Therefore, after the Secretary balanced the *benefits* of including Unit 1 as critical habitat against the *costs* of including Unit 1 as critical habitat (*i.e.*, zero v. $33.9M), it was arbitrary for the Secretary to include Unit 1 in the designation.

NEPA requires environmental review of federal actions that significantly affect the environment. *See* 40 C.F.R. § 1502.2(g). It is uncontested that the final rule calls for special management of Unit 1, including improving the ponds and uplands, controlled burns, and transplanting of frogs. *See* 77 Fed. Reg. 35129-32. This is not benign. In addition to the disruption of introducing a new species into the local ecosystem, controlled burns can have significant adverse effects on the physical environment, including air pollution, water pollution, loss of forest resources, and loss of habitat for other species. Therefore, the Secretary had a duty to undertake a NEPA analysis of the critical habitat designation.

Under recent Supreme Court precedent, a Commerce Clause enactment, like the Endangered Species Act, must regulate some sort of economic "activity." It cannot regulate nonactivity. *See National Federation of Independent Business (NFIB) v. Sebelius*, 132 S. Ct. 2566, 2586 (2012) (Commerce Clause regulation must "*regulate* Commerce."). But, like the Affordable Care Act's "individual mandate" invalidated by the Supreme Court under the Commerce Clause in *NFIB*, the designation of Unit 1 as critical habitat does not involve the regulation of any "activity" whatsoever. It is, therefore, invalid as a regulation of "activities" that individually, or as a class, substantially affect interstate commerce. And, also like the "individual mandate," because the designation of Unit 1 does not involve the regulation of any

"activity," it cannot be saved as part of a larger economic scheme under *Gonzales v. Raich*, 545 U.S. 1 (2005).  Moreover, the Supreme Court has never authorized a limitless federal power to regulate, as the Secretary wields in this case.

For these reasons, Unit 1 should be excluded from the designation of critical habitat for the dusky gopher frog.

## ARGUMENT

**1.      Markle Has Article III Standing**

The Service's assertion that Markle lacks Article III standing, because Markle has suffered no injury, is without merit.  The U.S. Supreme Court has held that when the plaintiff is directly regulated "there is ordinarily little question that the action . . . has caused him injury." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992).  "Similarly, the D.C. Circuit has suggested that standing is usually self-evident when the plaintiff is a regulated party or an organization representing regulated parties." *Am. Petroleum Inst.*, 541 F. Supp. 2d at 176.  As a landowner of Unit 1, Markle is "a regulated party" under the final rule.  Markle's standing is therefore self-evident.  Moreover, the Service failed to cite a single case where a landowner was denied standing in a suit challenging the designation of his property as critical habitat.

Instead, the Service maintains that Markle must still show it will suffer immediate harm. But this too is self-evident.  The designation of Unit 1 as critical habitat imposes an immediate regulatory burden on Markle.  To avoid liability, Markle must refrain from adversely affecting Unit I without federal approval.  Additionally, the Service itself concluded that "due to the importance of the unit" to the species the Service may preclude any development of the site at a cost to the landowners of up to $33.9 million.  77 Fed. Reg. 35141.  The obvious purpose of the critical habitat designation is to protect the habitat.  Actual, imminent harm to Markle and the other landowners is, therefore, neither speculative nor unlikely.  Even if less than predicted, the

*potential* loss of millions of dollars in revenue causes an *immediate* reduction in the value of the property.  "In addition to a drastic reduction in value, the designation also limits the usability and salability of the property to the detriment of Markle Interests, LLC."  Declaration of Robin M. Rockwell at 3.

**2.      Markle Has NEPA Prudential Standing**

The Service and Intervenors' argument that Markle lacks NEPA standing, because it has economic interests in this case, is contrary to controlling Supreme Court authority.  The Supreme Court has held that the "zone of interests" test for prudential standing is met under NEPA where the alleged injury has an environmental as well as an economic component.  *See Monsanto Co.*, 130 S. Ct. at 2756 ("The mere fact that respondents also seek to avoid certain economic harms … does not strip them of prudential standing.").  As noted in Markle's Memorandum, at 7-8, the critical habitat designation calls for special management of Unit 1 that requires a potentially significant physical change to the environment, including pond maintenance, regular controlled burns, upland management and transplanting of frogs.  *See* 77 Fed. Reg. 35129-32.  It is irrelevant that Markle did not present these impacts in the form of an affidavit as they appear in the rule itself.  *Id.*  It is equally irrelevant that the landowners have vowed never to manage Unit 1 as frog habitat because NEPA applies to the project that is proposed.  *See* 40 C.F.R. § 1502.2(g) ("Environmental impact statements shall serve as the means of assessing the environmental impact of *proposed* agency actions.") (emphasis added).  As proposed, the critical habitat designation calls for a significant physical change to the environment that requires NEPA review.  Therefore, Markle has standing to bring a NEPA challenge.

**3.      It Is an Abuse of Discretion To Designate Areas as
         Critical Habitat That Provide No Benefit to the Species**

At some point, the Service understood that the Secretary did not have unfettered discretion to designate critical habitat. The Service's own regulations state that an area should not be designated if "[s]uch designation of critical habitat would not be beneficial to the species." 50 C.F.R. § 424.12. To do so is futile, wasteful, and absurd. It is axiomatic that to benefit the species the area must be both accessible and suitable as habitat. Unit 1 is neither. The gopher frog does not inhabit the area (and hasn't for almost 50 years) nor does it occupy any adjacent area. It therefore has no natural access to Unit 1. The frog cannot be transplanted to Unit 1 because the landowners will not allow it and (the Service admits) they cannot be compelled to do so. Thus, Unit 1 is inaccessible to the species. Moreover, at least the upland portions of the site cannot support the frog without restoration which the landowners will not allow and which (the Service admits) cannot be compelled. *See* 77 Fed. Reg. 35135 ("Although the uplands associated with the ponds do not currently contain the essential physical or biological features of critical habitat, we believe them to be restorable with reasonable effort."). Because Unit 1 is both inaccessible and unsuitable as habitat, it does not provide a benefit to the species. Designating Unit 1 as critical habitat is, therefore, an abuse of discretion.

**4.      Unit 1 Does Not Contain the PCE's Necessary for Critical Habitat**

The Service's claim that Unit 1 need not contain the very features the Service found essential to the conservation of the species, is nonsensical. The status of an area as unoccupied does not change the physical or biological requirements of the species:

> Dusky gopher frogs *require* small, isolated, ephemeral, acidic, depressional standing bodies of freshwater for breeding [PCE 1]; upland pine forested habitat that has  an open canopy maintained by fire  (preferably) for nonbreeding habitat

[PCE 2]; and upland connectivity habitat areas that allow for movement between nonbreeding and breeding sites [PCE 3].

77 Fed. Reg. 35132 (emphasis added).

Although the Service admits, as it must, that Unit 1 contains at most only PCE 1 (ephemeral wetland habitat), *id.* at 35123, the Service doggedly asserts Unit 1 is somehow suitable as a stand alone gopher habitat today.  *See* Defendant's cross-motion at 14.  But the Service can point to no such finding in the rule itself.  In fact, the rule contradicts this assertion:

> Unit 1 consists of five ponds (ephemeral wetland habitat) and their associated uplands. If dusky gopher frogs are translocated to the site, the five ponds are in close enough proximity to each other that adult frogs could move between them and create a metapopulation, which increases the chances of the long-term survival of the population. *Although the uplands associated with the ponds do not currently contain the essential physical or biological features of critical habitat, we believe them to be restorable with reasonable effort.*

77 Fed. Reg. 35135 (emphasis added).

It is the combination of the ponds (PCE 1) with the upland areas (PCEs 2 and 3) that is essential to the conservation of the gopher frog.  Unless the upland areas are restored, Unit 1 does not, and cannot, provide any sort of stand alone habitat for the gopher frog.  Crucially, the agency's own regulations direct the Secretary to rely on the presence of the PCEs to designate unoccupied areas as critical habitat.  *See* 50 C.F.R. § 424.12(b) ("When considering the designation of critical habitat, *the Secretary shall focus* on the principle biological or physical constituent elements within the defined area that are essential to the conservation of the species.") (emphasis added).

Therefore, the Service's argument that Unit 1 may be designated as critical habitat in the absence of any or all of the PCEs is without merit.  Of course, in a different case, it may make sense to designate such areas as critical habitat.  *Fisher v. Salazar*, 656 F. Supp. 2d 1357 (N.D. Fla. 2009), presents such a case.  In *Fisher*, the plaintiffs challenged the designation of

unoccupied areas on private land as critical habitat for the Perdido Key beach mouse.  Among the five units designated as critical habitat, Units 1, 3, and 5 were occupied and contained the requisite PCEs.  However, Units 2 and 4 were not occupied and contained no PCEs.  Although the court found Units 2 and 4 were essential to the conservation of the beach mouse, even in the absence of any PCEs, those units were quite different from Unit 1 in this case.  Contrary to Unit 1 here, Units 2 and 4 in *Fisher* provided immediate benefit to the species "because they connect adjacent habitat units and because they provide habitat needed for storm refuge, expansion, natural movements, and re-colonization."  *Id.* at 1367.  While unoccupied transition corridors may be deemed essential to a species, without the PCEs[1], the same cannot be said for an area like Unit 1 that must stand alone as critical habitat for a protected species.  The designation of Unit 1 is, therefore, arbitrary, an abuse of discretion and not in accordance with the law.

**5.      If the Secretary Does Not Know What "Essential"
        Means She Cannot Determine "Essential" Habitat**

Although the ESA requires the Secretary to designate as critical habitat only those areas "essential" to the conservation of the species, the Service claims it need not define the term "essential," either generally or for the gopher frog in this case, so long as it explains the factors the Secretary considered in designating critical habitat.  *See* Defendants' cross-motion at 9.  But if the Secretary has no express standard against which to measure, or even select, the factors she considers, the Secretary will have unfettered authority to designate any unoccupied areas as critical habitat.  This, the Act does not allow:

> [T]he ESA provides for the designation of critical habitat outside the geographic area currently occupied by the species when "such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii).  Absent this procedure, however, there is no evidence that Congress intended to allow the Fish and

---

[1] The better approach would be to define such transition corridors as PCEs.

Wildlife Service to regulate any parcel of land that is merely capable of supporting a protected species.

*Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1244.  Of course, without a definition of "essential," the Secretary cannot perform "this procedure" of designating areas that are "essential" for the conservation of the species and is left to simply "regulate any parcel of land that is merely capable of supporting a protected species."  Or, as in this case, even those areas incapable of supporting a protected species.  But there is no evidence that Congress intended such a broad exercise of federal power.  To the contrary, Congress sought to avoid speculation of any kind in the administration of the Act.

> The obvious purpose of the requirement that each agency "use the best scientific and commercial data available" is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise.  While this no doubt serves to advance the ESA's overall goal of species preservation, we think it readily apparent that another objective (if not indeed the primary one) is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives

*Bennett v. Spear*, 520 U.S. 154, 176-77 (1997).  The designation of Unit 1 as critical habitat is based on speculation and surmise and is, therefore, invalid.

**6.    The Secretary's Failure To Determine a
        Habitat Threshold Is Fatal to the Final Designation**

The Service can point to no language in the ESA that precludes it from determining a minimum habitat size for the gopher frog.  Obviously, making such a determination is not the same as developing a recovery plan.  But more importantly, the Service designated Unit 1 because of its recovery potential:  "Due to the importance of ephemeral ponds to the *recovery* of the dusky gopher frog . . . , the Service determined that the area of Unit 1 is essential for the conservation of the dusky gopher frog."  77 Fed. Reg. 35123 (emphasis added).

The Service cannot now claim that recovery is irrelevant to the critical habitat designation and that recovery goals come into play only when the agency develops a recovery

9

plan.  To conclude that Unit 1 is "important" to the recovery of the gopher frog, the Service must undertake some sort of recovery analysis.  Such an analysis must address the threshold question of how much habitat is required for species conservation (*i.e.*, for recovery).  The ESA defines the term "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary."  16 U.S.C. § 1532(3).  By definition, and logic, if the Service cannot determine a viable habitat threshold (*i.e.*, the point at which the protective measures of the ESA are no longer necessary), it simply cannot determine critical habitat.  And this the Service did not do.

7.    **The Baseline Approach to the Economic Analysis
       Typically Understates the Impacts of the Critical Habitat Designation**

The Service and Intervenors claim the decision in *New Mexico Cattle Growers Association v. U.S. Fish & Wildlife Service*, 248 F.3d 1277, is outdated because the "adverse modification rule" is no longer valid.  But that is irrelevant.  Although the Tenth Circuit concluded that the Service relied on the "baseline approach" because of the rule, it was the use of the "baseline approach" to which the court objected.  The court invalidated the "baseline approach" because it assumes impacts above the baseline, attributable solely to the critical habitat designation, are generally insignificant.  This approach, the court held, makes the economic analysis "virtually meaningless."  *Id.* at 1285.  And that has not changed.  In fact, the Service has now codified the approach the Tenth Circuit expressly rejected in *New Mexico Cattle Growers Association*, leading to the same meaningless analysis.  *See* 78 Fed. Reg. 53058 (Aug. 28, 2013).

Markle urges this Court to adopt the co-extensive approach of the Tenth Circuit because it takes into account the cumulative economic impacts of ESA regulation.  Even if the

incremental effect of the critical habitat designation is small, the overall economic impact of species conservation can be overwhelming.  As a matter of public information and equity, the extent of these combined impacts should be known and considered.  The fact that the Economic Analysis in this case shows significant incremental impacts, above the baseline, because Unit 1 is unoccupied and there are no co-extensive listing impacts, does not change the fact that the Service applied an erroneous methodology that should be overturned.

**8.      The Failure of the Secretary To Exclude Unit 1
         from Critical Habitat Was an Abuse of Discretion**

The Service and Intervenors assert that the inclusion of Unit 1 as critical habitat is unreviewable under the APA, because that decision is "committed to agency discretion by law." That is incorrect.  The Fifth Circuit has held that

> the "committed to agency discretion" exception, 5 U.S.C. s 701(a), of the APA is "very narrow". Citizens to Preserve Overton Park, supra, 401 U.S. at 410, 91 S.Ct. at 820 (1971). Access to judicial review should be restricted "(o)nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent" to do so. Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); Citizens to Preserve Overton Park, supra, 401 U.S. at 410, 91 S.Ct. at 820.

*Suntex Dairy v. Block*, 666 F.2d 158, 163 (5th Cir. 1982).

But there is no "clear and convincing evidence" of a legislative intent to foreclose judicial review of overly broad critical habitat designations under the ESA.  There is no express language to that effect.  And, neither the purpose nor the structure of the Act precludes judicial review of areas erroneously designated as critical habitat.   To the contrary, Section 4 of the ESA is designed to protect landowners from unnecessary regulation by requiring the Secretary to weigh the economic and other impacts on landowners against the environmental benefit of including any particular area as critical habitat:

> The Secretary shall designate critical habitat . . . on the basis of the best scientific data available and after taking into consideration the economic impact, and any

other relevant impact, of specifying any particular area as critical habitat.   The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat  . . . .

16 U.S.C. 1533(b)(2)

As previously noted, the Supreme Court has found:

> The obvious purpose of the requirement that each agency "use the best scientific and commercial data available" is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise.  While this no doubt serves to advance the ESA's overall goal of species preservation, we think it readily apparent that another objective (if not indeed the primary one) is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives

*Bennett*, 520 U.S. at 176-77 (1997).

In other words, a primary purpose of Section 4's "best scientific data" standard is to avoid needless economic dislocation occasioned by arbitrary and capricious designations of critical habitat.  It would be strange therefore, if a landowner could not challenge the designation of his property as critical habitat on arbitrary and capricious grounds.

Nevertheless, the Service and Intervenors argue the decision to include Unit 1 as critical habitat is unreviewable because this Court has "no meaningful standard against which to judge the agency's exercise of discretion."  But nothing could be further from the truth.

In *Ellison v. Connor*, 153 F.3d 247 (5th Cir. 1998), the Fifth Circuit set forth the characteristics of a statute or regulation that does provide law to be applied.   These characteristics include: (1) whether the provision requires the decision maker to "develop any factual record to support the decision;" (2) whether the decision maker must consider specific factors in making the decision; (3) whether the decision maker must satisfy a particular evidentiary standard; (4) whether the agency must follow certain procedures in making the decision; and, interestingly, (5) whether the decision involves weighing alternative uses of

property.  *Id.* at 253.  In this case, the designation of Unit 1 as critical habitat has all of these characteristics.

First, the Secretary is required to identify on the record particular areas, including Unit 1, that may be essential to the conservation of the species and which may be considered as critical habitat, as well as complete an Economic Analysis of the designation.  Second, the Secretary must consider specific factors in designating critical habitat; namely, the economic and other impacts of including Unit 1 and the ecological benefits to the gopher frog.  Third, the Secretary must rely on the "best available scientific data" as the evidentiary standard for her decision.  Fourth, the Secretary must follow certain procedures such as taking into account the economic or other impacts of including any specific area before designating critical habitat.  And fifth, the designation necessarily involves weighing alternative uses of property.

This Court is, therefore, competent to determine if the Secretary's balancing determination is rational based on the record and the agency's reasoning.  If this Court determines that the balancing determination is irrational, then the decision to include Unit 1 is an abuse of discretion cognizable under the APA.  *See Heckler v. Chaney*, 470 U.S. 821, 834-35(1985) (If Congress "has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under § 701(a)(2), and courts may require that the agency follow that law.").

In this case, the balancing determination is not rational.  No rational decision maker would conclude that the benefits of including a parcel of land as critical habitat, that is inaccessible and unsuitable as habitat, somehow outweighs the potentially overwhelming cost to the landowners of $33.9 million.  If Unit 1 actually provided some benefit to the gopher frog, this

would be a closer case.  But it does not.  The inclusion of Unit 1 in the critical habitat designation was, by any measure, irrational and, therefore, an abuse of discretion.

9.    **NEPA Applies To This Case Because the Management of Unit 1 Calls for a Significant Physical Change to the Environment**

The Service appears to concede that NEPA review would be appropriate in a critical habitat case if the designation resulted in physical changes to the environment.  *See* Defendant's cross-motion at 24-25.  This is such a case.  The critical habitat designation for the dusky gopher frog literally calls for a physical change to the environment through management of the habitat by improving the ponds and uplands, controlled burns, and transplanting of frogs.  *See* 77 Fed. Reg. 35129-32.  Among other things, frequent fires are necessary to maintain the open canopy and ground cover vegetation of the gopher frog's aquatic and terrestrial habitat.  *Id.*  In addition to these changes, and the introduction of a new species into the local environment, controlled burns can have significant adverse effects on the physical environment, including air pollution, water pollution, loss of forest resources, and loss of habitat for other species.  The Service does not dispute these facts.  Whether the landowners are willing to undertake these changes is irrelevant.  As noted above, under NEPA, the cognizant impacts are those that would flow from the project as it is proposed.  *See* 40 C.F.R. § 1502.2(g) ("Environmental impact statements shall serve as the means of assessing the environmental impact of *proposed* agency actions.") (emphasis added).  And as proposed, the above-mentioned changes to the environment would flow.

As to the functional equivalent argument, the designation of critical habitat would not qualify.  Unlike an environmental impact statement under NEPA, the critical habitat rule does not consider alternatives, cumulative impacts, mitigation, etc.  The critical habitat rule falls far short of the informational purpose behind NEPA.

10.     **Federal Regulation of Unit 1 Exceeds the Commerce Power**

Both the Service and Intervenors fail to address Markle's actual constitutional claim or to even mention the controlling authority cited by Markle.  They appear therefore to have conceded the claim.  Markle's claim is simple; the designation of Unit 1, an unoccupied area of private property, as critical habitat, is not the regulation of commercial activity, or any activity at all. Therefore, the designation of Unit 1 as critical habitat is not an act within the commerce power and is invalid.

The unambiguous authority for this proposition, which the opposition ignores, but which is controlling here, is the Supreme Court's recent landmark decision in *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566.  In *NFIB*, the Supreme Court invalidated the "individual mandate" of the Affordable Care Act, under the Commerce Clause, because instead of regulating existing commercial activity, the mandate regulated people into the commercial insurance market.   In accordance with long-standing precedent, the Supreme Court held Commerce Clause regulation must "*regulate* Commerce."   *NFIB* at 2586.   "The power to *regulate* commerce presupposes the existence of commercial activity to be regulated."  *Id*.

The Fifth Circuit came to this conclusion even before *NFIB* was decided.  In *GDF Realty Investments, Ltd. v. Norton*, 326 F.3d 622, 629 (5th Cir. 2003), the Service had listed six subterranean "cave species" in Texas as endangered.  When the landowner sought an Incidental Take Permit to build a shopping center near the species habitat, the Service denied the permit. The landowner then challenged the regulation of the "cave species" for exceeding the commerce power.  In upholding the regulation of species "takes" against this challenge, the court stated:  "It bears reminding that at issue is the power to regulate interstate *commerce*."  *Id.* at 629.

Like the "individual mandate" in *NFIB*, the designation of Unit 1 as critical habitat does not involve the regulation of existing commercial activity, or any activity at all.  Neither the

15

Service nor the Intervenors address this fact.  They fail to identify any specific activity subject to federal regulation at all.  Nor can they.

There is no existing activity underway on Unit 1 and no future activity on Unit 1 could affect the gopher frog because the area is unoccupied and will likely remain so.  Moreover, under *GDF Realty,* it would be improper to look beyond the activity the ESA purports to regulate to future development of Unit 1:

> [T]he district court in this case looked primarily beyond the regulated conduct—Cave Species takes—in order to assess effect on interstate commerce. It looked to plaintiffs' planned commercial development of the property where the takes would occur. True, the *effect* of regulation of ESA takes may be to prohibit such development in some circumstances. But, Congress, through [the] ESA, is not directly regulating commercial development.
>
> To accept the district court's analysis would allow application of otherwise unconstitutional statutes to commercial actors, but not to non-commercial actors. There would be no limit to Congress' authority to regulate intrastate activities, so long as those subjected to the regulation were entities which had an otherwise substantial connection to interstate commerce.
>
> Along this line, looking primarily beyond the regulated activity in such a manner would "effectually obliterate" the limiting purpose of the Commerce Clause. *Jones & Laughlin Steel Corp.,* 301 U.S. at 37, 57 S. Ct. 615.

*GDF Realty*, 326 F.3d at 634-635.

Instead of identifying a regulated activity, the Service and Intervenors reference generally the designation of critical habitat.  This is not enough, even under *Gonzales v. Raich*, 545 U.S. 1, on which the Service and Intervenors rely.

According to the Service, under *Raich*, the Court need only find that Section's 4 provision requiring designation of critical habitat is essential to the ESA, a comprehensive regulatory scheme that has a substantial relation to interstate commerce.  *See* Service cross-motion at 22-23 (citing Raich for "upholding Congress' authority under the Commerce Clause to regulate noncommercial intrastate activity essential to a comprehensive regulatory scheme").

16

But here, again, the Service ignores the express requirement that the federal government must

regulate an existing "activity."

    *Raich* did not save the "individual mandate" in *NFIB*, even though it was clearly essential

to a comprehensive regulatory scheme for healthcare that has a substantial relation to interstate

commerce.  To the contrary, *Raich* does not authorize the regulation of nonactivity:

> The phrase "active in the market" cannot obscure the fact that most of those
> regulated by the individual mandate are not currently engaged in any commercial
> activity involving health care, and that fact is fatal to the Government's effort to
> "regulate the uninsured as a class."  *Id.,* at 42. Our precedents recognize
> Congress's power to regulate "class [es] of *activities,*" *Gonzales v. Raich,* 545
> U.S. 1, 17, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (emphasis added), not classes of
> *individuals,* apart from any activity in which they are engaged, *see, e.g., Perez,*
> 402 U.S., at 153, 91 S.Ct. 1357 . . . The individual mandate's regulation of the
> uninsured as a class is, in fact, particularly divorced from any link to existing
> commercial activity.

*NFIB*, 132 S. Ct. at 2590, 183 L. Ed. 2d 450 (2012) (Chief Justice Roberts).

    Likewise, in this case, the designation of critical habitat is divorced from any link to

existing commercial activity.  Nor does *Raich* authorize the federal government to regulate some

anticipated future activity:

> The proposition that Congress may dictate the conduct of an individual today
> because of prophesied future activity finds no support in our precedent.  We have
> said that Congress can anticipate the *effects* on commerce of an economic activity.
> See, *e.g., Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed.
> 126 (1938) (regulating the labor practices of utility companies); *Heart of Atlanta
> Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964)
> (prohibiting discrimination by hotel operators); *Katzenbach v. McClung,* 379 U.S.
> 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (prohibiting discrimination by
> restaurant owners). But we have never permitted Congress to anticipate that
> activity itself in order to regulate individuals not currently engaged in commerce.
> Each one of our cases, including those cited by Justice GINSBURG, *post,* at 2619
> —2620, involved preexisting economic activity. See, *e.g., Wickard,* 317 U.S., at
> 127-129, 63 S.Ct. 82 (producing wheat); *Raich, supra,* at 25, 125 S.Ct. 2195
> (growing marijuana).

*NFIB*, 132 S. Ct. at 2590. (Chief Justice Roberts) (Justices Scalia, Kennedy, Thomas, and Alito

are in accord ("*Raich* is no precedent for what Congress has done here.")) *Id.* at  2646.

Unit 1 is unoccupied and no existing activity on Unit 1 can or does affect the gopher frog, or any other protected species.  Accordingly, the regulation of Unit 1 as critical habitat is invalid under the commerce power.

## CONCLUSION

For the foregoing reasons, Unit 1 should be excluded from the critical habitat designation.

DATED:  May 1, 2014.

ANDREW J. HARRISON, JR.
Louisiana Bar No. 20463)
ajh@ajharrisonlawllc.com
MADELINE AHLGREN
(Louisiana Bar No. 31009)
mahlgren@ajharrisonlawllc.com
HARRISON LAW, LLC
One American Plaza, Suite 820
Baton Rouge, Louisiana  70825
Telephone:  (225) 388-0065
Facsimile:  (225) 388-0501

M. REED HOPPER, *Pro Hac Vice* (TA)
mrh@pacificlegal.org
PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

Respectfully submitted,

*/s/  M. Reed Hopper*
M. REED HOPPER

Attorneys for Plaintiff, Markle Interests, LLC

**DECLARATION OF SERVICE**

I hereby certify that on May 1, 2014, I electronically filed the foregoing PLAINTIFF

MARKLE'S OPPOSITION AND REPLY with the Clerk of the Court through the CM/ECF

system which will send a notice of electronic filing to all counsel of record.


*/s/ M. Reed Hopper*
M. REED HOPPER