UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

MARKLE INTERESTS, LLC                        CIVIL ACTION

v.                                           NO. 13-234
                                             c/w 13-362 and
                                                13-413
                                      (Pertains to all cases)

UNITED STATES                                SECTION "F"
FISH AND WILDLIFE SERVICE, ET AL.


ORDER AND REASONS

These consolidated proceedings ask whether a federal government agency's inclusion of a privately-owned tree farm in its final designation of critical habitat for the dusky gopher frog, pursuant to the Endangered Species Act, was arbitrary or capricious.  Before the Court are  11 motions, including nine cross-motions for summary judgment:

> (1) Weyerhaeuser Company's motion for summary judgment, (2) the federal defendants' cross-motion, and (3) the intervenor defendants' cross-motion; (4) Markle Interests LLC's motion for summary judgment, (5) the federal defendants' cross-motion, and (6) the intervenor defendants' cross-motion; (7) the Poitevent Landowners' motion for summary judgment; (8) the federal defendants' cross-motion, and (9) the intervenor defendants' cross-motion.

Additionally before the Court are two motions to strike extra-record evidence submitted by Poitevent Landowners, one filed by federal defendants and one by intervenor defendants.  For the reasons the follow, the federal and intervenor defendants' motions to strike extra-record evidence are GRANTED; the plaintiffs'

1

motions for summary judgment are GRANTED in part (insofar as they have standing) and DENIED in part; and, finally, the defendants' motions are DENIED in part (insofar as defendants challenge plaintiffs' standing) and GRANTED in part.

## Background

Plaintiffs in these consolidated cases -- landowners and a lessee of a tree farm in Louisiana -- challenge the United States Fish and Wildlife Service's (FWS) final rule designating 1,544 acres of a privately-owned timber farm in St. Tammany Parish as critical habitat that is essential for the conservation of the dusky gopher frog, an endangered species.

Only about 100 adult dusky gopher frogs remain in the wild. The frog, listed as endangered in 2001, is now located only in Mississippi; it does not presently occupy the plaintiffs' tree farm and was last sighted there in the 1960s. Nevertheless, FWS included certain acreage of the plaintiffs' tree farm in its rule designating critical habitat for the frog, finding this land essential to conserving the dusky gopher frog. A determination plaintiffs insist is arbitrary. To better understand the factual and procedural background of this challenge to federal agency action, it is helpful first to consider the context of the administrative framework germane to the present controversy.

*The Endangered Species Act*

Due to the alarming trend toward species extinction "as a consequence of economic growth and development untempered by adequate concern and conservation," Congress enacted the Endangered Species Act, 16 U.S.C. § 1531, et. seq., (ESA) to conserve endangered and threatened species and the ecosystems on which they depend. 16 U.S.C. § 1531(a), (b). By defining "conservation" as "the use of all methods and procedures which are necessary to bring any endangered or threatened species to the point at which the measures provided [by the ESA] are no longer necessary," (16 U.S.C. § 1532(3)), the Act illuminates that its objective is not only "to enable listed species ... to survive, but [also] to recover from their endangered or threatened status." <u>Sierra Club v. FWS</u>, 245 F.3d 434, 438 (5th Cir. 2001); <u>Tenn. Valley Authority v. Hill</u>, 437 U.S. 153, 184 (1978)("The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost.").

The U.S. Secretary of the Department of Interior is charged with administering the Act; the Secretary delegates authority to the U.S. Fish and Wildlife Service.[1] To achieve the Act's survival and recovery objectives, FWS is obligated to utilize enumerated

---

[1]Technically, administration responsibilities are divided between the Department of Interior and the Department of Commerce. 16 U.S.C. § 1533(a)(2). The Secretaries of these agencies then delegated their authority to the FWS or National Marine Fisheries Service.

criteria to promulgate regulations that list species that are "threatened" or "endangered". 16 U.S.C. § 1533 (stating, in mandatory terms, the requirement to determine threatened or endangered species status: "The Secretary *shall* determine...."). A species is listed as "endangered" if it is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). Listing triggers statutory protections for the species. See, e.g., 16 U.S.C. §, 1538(a) (setting forth prohibited acts, such as "taking" (§ 1532(19)) listed animals).

Listing also triggers FWS's statutory duty to designate critical habitat; such designation being another tool in FWS's arsenal to accomplish the Act's species survival and recovery objectives. See 16 U.S.C. § 1533(a)(3)(A)("The Secretary, by regulation promulgated in accordance with subsection (b) of this section and to the maximum extent prudent and determinable ... (i) shall concurrently with making a [listing] determination ... designate any habitat of such species...."). Like its listing duty, FWS's habitat designation duty is mandatory;[2] the designation

---

[2]Sierra Club v. FWS, 245 F.3d 434, 438 (5th Cir. 2001)("Once a species has been listed as endangered or threatened, the ESA states that the Secretary 'shall' designate a critical habitat 'to the maximum extent prudent or determinable.' The ESA leaves to the Secretary the task of defining 'prudent' and 'determinable.'").

It is incumbent on the Secretary -- "to the maximum extent prudent and determinable" -- to designate critical habitat concurrently with listing a species as endangered, 16 U.S.C. § 1533(a)(3)(A)(i), but the Secretary's failure to make a concurrent designation, for whatever reason, does not preclude later designation. See 16 U.S.C. § 1532(a)(3)(B)("Critical habitat may

must be based on "the best scientific data available ... after taking into consideration the economic impact, the impact on national security, and any other relevant impact." 16 U.S.C. § 1533(b)(2). After weighing the impacts of designation, FWS may, however, exclude an area from critical habitat unless it "determines ... that the failure to designate such area as critical habitat will result in the extinction of the species concerned." Id.

Notably, in defining "critical habitat" for an endangered species, the ESA differentiates between habitat that is "occupied" and habitat that is "unoccupied" at the time of listing:

(5)(A) The term "critical habitat" for a threatened or endangered species means-

(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

---

be established for those species now listed as threatened or endangered species for which no critical habitat has heretofore been established...."); see also 16 U.S.C. § 1533(b)(6)(C)(ii)(if "critical habitat of [listed] species is not ... determinable [at the time of listing], the Secretary ... may extend the one-year period specified in paragraph (A) by not more than one additional year...."") and 50 C.F.R. § 424.17(b)(2).

16 U.S.C. § 1532(5)(A).   Thus, in so differentiating, by its express terms, the Act contemplates the designation of both "occupied" and "unoccupied" critical habitat.   FWS may designate as critical *occupied* habitat that contains certain physical or biological features called "primary constituent elements", or "PCEs".[3]   50 C.F.R. § 424.12(b).   FWS may designate as critical *unoccupied* habitat so long as it determines it is "essential for the conservation of the species" and "only when a designation limited to its present range would be inadequate to ensure the conservation of the species."   50 C.F.R. § 424.12(e).

Once designated, critical habitat is protected from harm if and when the ESA's federal agency consultation mechanism is triggered:   federal agencies must consult with FWS on any actions "authorized, funded, or carried out by" the agency to ensure that their actions do "not result in the destruction or adverse modification of habitat...."   16 U.S.C. § 1536(a)(2).[4]   If FWS or

_____

[3]PCEs are those "physical and biological features that, when laid out in the appropriate quantity and spatial arrangement to provide for a species' life-history processes, are essential to the conservation of the species."   77 Fed. Reg. 35118, 35131 (2012).

[4]Destruction or modification of critical habitat is defined, by regulation, as "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species."   50 C.F.R. § 402.02. However, the U.S. Court of Appeal for the Fifth Circuit struck down, as facially invalid, this regulatory definition of the destruction/adverse modification standard.   Sierra Club, 245 F.3d at 442-43 (observing that the ESA distinguishes between "conservation" and "survival" and "[r]equiring consultation only where an action affects the value of critical habitat to both the recovery *and* survival of a

the consulting federal agency determines that a contemplated action "may affect ... critical habitat", the agency and FWS must engage in "formal" consultation. 50 C.F.R. § 402.14(a). If FWS finds that a contemplated agency action, such as the issuance of a permit, is likely to adversely modify critical habitat, FWS must suggest reasonable and prudent alternatives that the consulting agency could take to avoid adverse modification. 50 C.F.R. § 402.14(h)(3). "Reasonable and prudent alternatives" must be "economically and technologically feasible." 50 C.F.R. § 402.02. Thus, if a private party's action has no federal nexus (if it is not authorized, funded, or carried out by a federal agency), no affirmative obligations are triggered by the critical habitat designation. In other words, absent a federal nexus, FWS cannot compel a private landowner to make changes to restore his designated property into optimal habitat.

### The Dusky Gopher Frog

The dusky gopher frog (*Rana Sevosa*) is a darkly-colored, moderately-sized frog with warts covering its back and dusky spots on its belly. It is a terrestrial amphibian endemic to the longleaf pine ecosystem. The frogs "spend most of their lives underground[5] in forested habitat consisting of fire-maintained,

---

species imposes a higher threshold than the statutory language permits.")(emphasis in original).

[5]"Underground retreats include gopher tortoise burrows, small mammal burrows, stump holes, and root mounds of fallen trees." 77

open-canopied, pine woodlands historically dominated by longleaf pine." 77 Fed. Reg. at 35129 - 35131. They travel to small, isolated ephemeral ponds[6] to breed, then return to their subterranean forested environment, followed by their offspring that survive to metamorphose into frogs. Amphibians like the dusky gopher frog need to maintain moist skin for respiration and osmoregulation. To this end, the areas connecting their wetland and terrestrial habitats must be protected to provide cover and moisture during migration.[7]

The risk for its extinction is high. Only about 100 adult dusky gopher frogs are left in the wild. They are located in three sites in Harrison and Jackson Counties in southern Mississippi; only one of these sites regularly shows reproduction. The frog is primarily threatened by habitat loss and disease. Due to its small numbers, it is also highly susceptible to genetic isolation, inbreeding, and random demographic or human related events.

---

Fed. Reg. at 35130.

[6]Ephemeral ponds are isolated wetlands that dry periodically and flood seasonally; because they are short-lived, predatory fish are lacking.

[7]"Optimal habitat is created when management includes frequent fires, which support a diverse ground cover of herbaceous plants, both in the uplands and in the breeding ponds." Id. at 35129. Frequent fires are also critical to maintaining the prey base for the carnivorous juvenile and adult dusky gopher frogs. Id. at 35130.

8

*Listing and Proposed Critical Habitat Designation*

In December 2001, in response to litigation commenced by the Center for Biological Diversity, FWS listed the dusky gopher frog[8] as an endangered species. FWS determined that the frog was endangered due to its low population size combined with ongoing threats such as habitat destruction, degradation resulting from urbanization, and associated vulnerability to environmental stressors such as drought. No critical habitat was designated at that time. Nearly six years later, litigation again prompted FWS to action: in resolving, through settlement, the litigation to compel designation, in 2011 FWS published a proposed rule to designate critical habitat; the proposed rule included unoccupied and occupied areas in Mississippi only.[9]

An independent peer review of the proposed rule followed. Every peer reviewer[10] concluded that the amount of habitat already proposed, which included occupied and unoccupied areas in

---

[8]At that time, and until 2012, the dusky gopher frog was known as the Mississippi gopher frog.

[9]FWS determined that the frog's optimal habitat includes three primary constituent elements (PCEs): (1) small, isolated, ephemeral ponds for breeding; (2) upland pine forested habitat that has an open canopy; and (3) upland connectivity habitat. FWS determined that this habitat contains the "physical and biological features necessary to accommodate breeding, growth, and other normal behaviors of the [frog] and to promote genetic flow within the species."

[10]These six individuals had scientific expertise and were familiar with the species and the geographical region, as well as conservation biology principles.

9

Mississippi, was insufficient for conservation of the species. Several peer reviewers suggested that FWS consider other locations within the frog's historical range. One peer reviewer in particular suggested the area of dispute here, identified as Unit 1 by the final rule: although the dusky gopher frog does not presently occupy this land and had not been seen on the land since the 1960s, Unit 1 contained at least two historical breeding sites for the frog. Based on the comments, FWS re-analyzed the "current and historic data for the species, including data from Alabama and Louisiana." FWS identified additional critical habitat in Mississippi and Louisiana,[11] and included those areas within the revised proposed rule published for comment on September 27, 2011.

Before finalizing the rule, FWS considered the potential economic impacts of the designation. The final economic analysis (EA) quantified impacts that may occur in the 20 years following designation, analyzing such economic impacts of designating Unit 1 based on the following three hypothetical scenarios: (1) development occurring in Unit 1 would avoid impacts to jurisdictional wetlands and, thus, would not trigger ESA Section 7 consultation requirements; (2) development occurring in Unit 1 would require a permit from the Army Corps of Engineers due to potential impacts to jurisdictional wetlands, which would trigger ESA Section 7 consultation between the Corps and FWS, and FWS would

---

[11]FWS was not able to identify critical habitat in Alabama.

work with landowners to keep 40% of the unit for development and 60% managed for the frog's conservation ("present value incremental impacts of critical habitat designation due to the lost option for developing 60 percent of Unit 1 lands are $20.4 million"); and (3) development occurring would require a federal permit, triggering ESA Section 7 consultation, and FWS determines that no development can occur in the unit ("present value impacts of the lost option for development in 100 percent of the unit are $33.9 million").[12] Because the EA "did not identify any disproportionate costs that are likely to result from the designation[,] the Secretary [did] not exercis[e] his discretion to exclude any areas from this designation of critical habitat for the dusky gopher frog based on economic impacts."

*The 6/12/12 Final Rule Designating Critical Habitat*

On June 12, 2012 FWS issued its final rule designating critical habitat for the dusky gopher frog. 77 Fed. Reg. 25118 (June 12, 2012). The habitat designation covers 6,477 acres in two states, Mississippi and Louisiana, including approximately 1,544 acres of forested land in St. Tammany Parish, Louisiana, known as Critical Habitat Unit 1. FWS determined that the ephemeral wetlands in Unit 1 contain all of the physical or biological features that make up PCE 1. Unit 1 was included in the designation

---

[12]In preparing the final version of the EA, FWS considered Unit 1's landowners' comments, as well as the landowners' submissions regarding the value of Unit 1 land.

notwithstanding the fact that the dusky gopher frog has not occupied the lands for decades.

*Procedural History of Consolidated Litigation*

The plaintiffs in these consolidated proceedings own all of the forested property identified in the Rule as Unit 1.  P&F Lumber Company (2000), L.L.C., St. Tammany Land Co., L.L.C., and PF Monroe Properties, L.L.C. (the Poitevent Landowners), as well as Markle Interests, L.L.C. own undivided interests in 95% of the 1,544 acres of land comprising Unit 1; and the remaining 5% (approximately 152 acres) of the land in Unit 1 is owned by Weyerhaeuser Company, which also holds a timber lease on the balance of the 1,544 acres comprising Unit 1; that lease is up in 2043.

Seeking to invalidate the Rule insofar as it designates Unit 1 as critical habitat for the dusky gopher frog, Markle Interests filed suit and, shortly thereafter, Poitevent Landowners and later Weyerhaeueser Company followed suit.[13]  Each of the plaintiffs allege that the Rule designating Unit 1 exceeds constitutional authority under the Commerce Clause, U.S. Const. art. 1 § 8, cl. 3, and that it violates the Endangered Species Act, 16 U.S.C. § 1531, et seq.,[14] the Administrative Procedure Act, 5 U.S.C. § 551, et seq., and the National Environmental Policy Act, 42 U.S.C. § 4321,

---

[13]In May 2013 the Court granted motions to consolidated these three lawsuits.

[14]Plaintiffs invoke the ESA's citizen suit provision, 16 U.S.C. § 1540(g).

12

et seq.; they seek identical declaratory and injunctive relief. Named as defendants are the U.S. Fish & Wildlife Service; Daniel M. Ashe, in his official capacity as Director of U.S. Fish & Wildlife Service; the U.S. Department of the Interior; and Sally Jewell, in her official capacity as Secretary of the Department of the Interior.  On June 25, 2013 the Center for Biological Diversity and Gulf Restoration Network were granted leave to intervene, as of right, as defendants. On August 19, 2013 the federal defendants lodged the certified administrative record with the Court.[15] Federal and intervenor defendants now request that the Court strike certain extra-record evidence submitted by the Poitevent Landowners.  And plaintiffs, federal defendants, and intervenor defendants now seek summary judgment.

I. Standards of Review

A. Summary Judgment

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  A genuine issue

---

[15]This Court imposed an October 2013 deadline for supplementing, or challenging, the administrative record; no party requested to supplement the record.

of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed.R.Civ.P. 56(c)(2). Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

14

B. Administrative Procedure Act

Where plaintiffs challenge the Secretary's administration of the ESA -- in particular, a final rule designating critical habitat -- the Administrative Procedure Act is the appropriate vehicle for judicial review. See Bennett v. Spear, 520 U.S. 154, 174-75 (1997).

The APA entitles any "person adversely affected or aggrieved by agency action" to judicial review of "agency action made reviewable by statute and final agency action for which there is no other adequate remedy[.]" 5 U.S.C. § 702 (right of review); 5 U.S.C. § 704 (actions reviewable). A reviewing court must "set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law [or] contrary to constitutional right, power, privilege, or immunity[.]" 5 U.S.C. § 706(2). This standard is "highly deferential" and the agency's decision is afforded a strong presumption of validity. Hayward v. U.S. Dep't of Labor, 536 F.3d 376, 379 (5th Cir. 2008); Miss. River Basin Alliance v. Westphal, 230 F.3d 170, 175 (5th Cir. 2000)(Courts must be particularly deferential to agency determinations made within the scope of the agency's expertise). The reviewing court must decide whether the agency acted within the scope of its authority, "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415-16

(1971)("inquiry into the facts is to be searching and careful, [but] the ultimate standard of review is a narrow one"), *overruled on other grounds by* Califano v. Sanders, 430 U.S. 99 (1977)). The Court may not "reweigh the evidence or substitute its judgment for that of the administrative fact finder." Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

## II.   Scope of the Record

With the exception of the Poitevent Landowners, all parties agree that, in assessing the lawfulness of FWS's designation Rule, this Court is confined to reviewing only the administrative record assembled by FWS. Indeed, "[r]eview of agency action under § 706(2)'s 'arbitrary or capricious' standard is limited to the record before the agency at the time of its decision." See Luminant Generation Co., LLC v. EPA, 675 F.3d 917, 925 (5th Cir. 2012). Notwithstanding this core administrative law principle, the Poitevent Landowners insist that the Court may consider certain extra-record materials. The Court disagrees; because the Poitevent Landowners have failed to demonstrate unusual circumstances justifying a departure from the record, the Court finds that granting the federal and intervenor defendants' motions to strike

extra-record evidence is warranted for the following reasons.

In reviewing agency action, the APA instructs a reviewing court to "review the whole record or those parts of it cited by a party[.]" 5 U.S.C. § 706. "[T]he general presumption [is] that review [of agency action] is limited to the record compiled by the agency." Medina County Environmental Action Ass'n v. Surface Transp. Bd., 602 F.3d 687, 706 (5th Cir. 2010); Goonsuwan v. Ashcroft, 252 F.3d 383, 391 n.15 (5th Cir. 2001)(citing Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985))("It is a bedrock principle of judicial review that a court reviewing an agency decision should not go outside of the administrative record."). Mindful that the Court's task in reviewing agency action is not one of fact-finding but, rather, to determine whether or not the administrative record supports agency action, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973). That is an immensely cramped standard of review for courts.

In support of their motion for summary judgment the Poitevent Landowners submit the following extra-record evidence: (1) Declaration of Edward B. Poitevent signed on December 9, 2013; (2) Wall Street Journal newspaper article dated March 11, 2013, entitled "Fishing for Wildlife Lawsuits"; (3) Washington Times newspaper article dated February 8, 2013, entitled "Vitter:

17

Endangered Species Act's hidden costs"; (4) Poitevent's 60-day notice of intent to sue letter dated October 19, 2012.[16]   The federal and intervenor defendants move to strike these materials, pursuant to Rule 12(f) of the Federal Rules of Civil Procedure; they invoke the administrative record review principle that limits the scope of judicial review of agency action to the record compiled by the agency.

The Court is unpersuaded to depart from the strict record review presumption.   First, the Poitevent Landowners had ample opportunity to request permission to supplement the administrative record; the deadline to do so expired October 7, 2013.   They simply did not do so.[17]   Second, the Poitevent Landowners fall short of demonstrating "unusual circumstances justifying a departure" from the rule that judicial review is limited to the administrative record.   See Medina County, 602 F.3d at 706.   The Fifth Circuit instructs that supplementing the administrative record may be

---

[16]The Poitevent Landowners advance a litany of arguments urging the Court to consider the proffered evidence: (1) judicial review under the ESA's citizen suit provision and under the Commerce Clause is not limited to the administrative record; (2) Rule 56 permits submission of such evidence; (3) the contested evidence is in fact part of the administrative record or otherwise the Court may take judicial notice of such evidence; (4) exceptions to APA record review principles apply to warrant the Court's review of this extra-record evidence; or (5) the FWS' trespass on their lands require judicial review of the proffered evidence.

[17]In fact, the Poitevent Landowners have never requested permission to submit the materials they submit with their summary judgment papers; they simply respond to the defendants' motions to strike.

permitted when:

> (1) the agency deliberately or negligently excluded documents that may have been adverse to its decision, ...
> (2) the district court needed to supplement the record with "background information" in order to determine whether the agency considered all of the relevant factors, or
> (3) the agency failed to explain administrative action so as to frustrate judicial review.

Id. None of these factors are implicated here. Accordingly, the Court must confine the scope of its review to the administrative record compiled by the agency and lodged with the Court. The federal and intervenor defendants' motions to strike the extra-record, post-decisional materials are granted.[18]

### III. Standing

The Court turns to consider the threshold issue of standing. To resolve this issue, the Court must be satisfied that the plaintiffs have standing to challenge the Rule designating their land as critical habitat. The Court finds that they do.

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" Clapper v. Amnesty Int'l USA, --- U.S. ---, 133 S.Ct. 1138, 1146 (2013). "One element of the case-or-controversy requirement" commands that a litigant must have standing to invoke the power of a federal court. See id. (citation omitted); see also National Federation of the

---

[18]The administrative record review principle is not applicable to the standing assessment; the Court will consider Mr. Poitevent's Declaration for the purposes of assessing the Poitevent Landowners' standing.

Blind of Texas, Inc. v. Abbott, 647 F.3d 202, 208 (5th Cir. 2011).
The plaintiffs bear the burden of establishing standing under
Article III. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342
(2006); Miss. State Democratic Party v. Barbour, 529 F.3d 538, 545
(5th Cir. 2008).

The doctrine of standing requires that the Court satisfy
itself that "the plaintiff has 'alleged such a personal stake in
the outcome of the controversy' as to warrant his invocation of
federal-court jurisdiction." See Summers v. Earth Island Institute,
555 U.S. 488, 493 (2009); see also Doe v. Beaumont Independent
School Dist., 240 F.3d 462, 466 (5th Cir. 2001)(citing Warth v.
Seldin, 422 U.S. 490, 498 (1975)). "Standing to sue must be proven,
not merely asserted, in order to provide a concrete case or
controversy and to confine the courts' rulings within our proper
judicial sphere." Doe v. Tangipahoa Parish School Bd., 494 F.3d
494, 499 (5th Cir. 2007).

The plaintiffs must demonstrate the "irreducible
constitutional minimum of standing", which is informed by three
elements: (1) that they personally suffered some actual or
threatened "injury in fact" (2) that is "fairly traceable" to the
challenged action of the defendants; (3) that likely "would be
redressed" by a favorable decision in Court. See Lujan v.

Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).[19]  The federal and intervenor defendants challenge the plaintiffs' standing to contest the Secretary's designation of their land as critical habitat; in particular, the defendants contend that the plaintiffs have failed to establish an actual or imminent injury.[20]  The Court disagrees.

"'Injury in fact [includes] economic injury, [as well as] injuries to aesthetics and well-being.'" See Sabine River Auth. v. U.S. Dept. of Interior, 951 F.2d 669, 674 (5th Cir. 1992) (quoting Save Our Wetlands, Inc. V. Sands, 711 F.2d 634, 640 (5th Cir. 1983)). Notably, when the plaintiff is an object of the government action at issue, "there is ordinarily little question that the action" has caused him injury.  Lujan, 504 U.S. at 561-62.  In fact, when the plaintiff challenging agency action is a regulated party or an organization representing regulated parties, courts have found that the standing inquiry is "self-evident."  See South Coast Air Quality Management Dist. v. EPA, 472 F.3d 882, 895-96 (D.C.Cir. 2006)(an association of oil refineries had standing to

---

[19] The actual injury requirement ensures that issues will be resolved "not in the rarified atmosphere of a debating society, but in a concrete factual context."  Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472 (1982).

[20]The defendants do not challenge whether the injury is fairly traceable to their critical habitat designation; nor do they challenge whether the injury is likely to be redressed by a favorable ruling.

challenge an EPA regulation establishing air pollution standards because it was "inconceivable" that the regulation "would fail to affect ... even a single" member of the association); see also Am. Petroleum Institute v. Johnson, 541 F. Supp. 2d 165, 176 (D.D.C. 2008) ("Regulatory influences on a firm's business decisions may confer standing when, as here, they give rise to cognizable economic injuries or even a 'sufficient likelihood' of such injuries.") (citing Clinton v. City of New York, 524 U.S. 417, 432–33 (1998) and Sabre, Inc. v. Dept. of Transp., 429 F.3d 1113, 1119 (D.C.Cir. 2005)(firm established standing to challenge regulation where it was "reasonably certain that [the firm's] business decisions [would] be affected" by the regulation)). This is so because regulated parties are generally able to demonstrate that they suffer some economic harm or other coercive effect by virtue of direct regulation of their activities or property.

These actual injuries are present here. When the Rule became final, the plaintiffs (each of whom are identically factually situated as Unit 1 landowners) became regulated parties who are subject to regulatory burdens flowing from federal substantive law, the ESA. The plaintiffs' sworn declarations are sufficient to establish constitutional standing.[21]   Now that their land is an

---

[21]At summary judgment, the plaintiff cannot rely on simply "mere allegations," but must "'set forth' by affidavit or other evidence 'specific facts.'" Lujan, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)).

object of agency action, plaintiffs submit that they are economically harmed in that the value of their land has decreased as a result of the agency designation; their business decisions relative to their land are negatively impacted.[22]  Plaintiffs have a personal stake in this controversy and have identified a concrete injury that is actual, not hypothetical.  As a consequence of the Rule's designation of Unit 1 as critical habitat, the plaintiffs' pursuit of any development potential for the land clearly has been impacted by the agency action.  Defendants' attack on standing grounds seems utterly frivolous.  The defendants downplay these economic harms and regulatory burdens as speculative,[23] but the

---

[22]Weyerhaeuser submits that the land it leases and owns has been devalued; the "critical habitat designation ... has immediately devalued the land within Unit 1 for commercial purposes by bringing increased ... regulatory scrutiny under the Endangered Species Act, thereby making it more difficult to sell, exchange, or develop such lands."  Markle and the Poitevent Landowners likewise attribute to the Rule "negative economic impact[s]" and "a drastic reduction in value [of the land]"; they submit that the designation "limits the usability and saleability of the property" to their detriment.

[23]Defendants regard Weyerhaeuser's long-term timber lease as precluding this Court from finding a concrete injury, arguing that the land is essentially "locked up" for many years.  But Weyerhaeuser's submission undermines the defendants' position.  Putting aside that Weyerhaeuser in fact owns part of the land in addition to leasing the remainder, "Weyerhaeuser ... periodically evaluate[s] its land portfolio to identify properties that have greater value if placed in non-timber uses[; it] routinely leases or sub-leases its forest lands for oil, gas and wind energy development[; and it] frequently renegotiate[s] long-term timber leases as conditions change."  Moreover, defendants' charge of speculative injury is further undermined by the administrative record and the Rule itself, which acknowledges that, due to the presence of wetlands on Unit 1 (indeed, the reason underlying its

Court finds that the plaintiffs have demonstrated actual, concrete injuries. <u>See</u> <u>The Cape Hatteras Access Preservation Alliance v.</u> <u>U.S. Dep't of Interior</u>, 344 F. Supp. 2d 108, 117-18 (D.D.C. 2004)(business association that owned land within critical habitat designated for watering piping plover had standing to challenge designation due to its economic and recreational harms).

IV.   Constitutional Challenge

The plaintiffs contend that federal regulation of Unit 1 under the ESA constitutes an unconstitutional exercise of congressional authority under the Commerce Clause. The defendants counter that the ESA is consistently upheld as a constitutional exercise of the Commerce Clause power and that each application of the ESA is not itself subject to the same tests for determining whether the underlying statute is a constitutional exercise of the Commerce Clause. The Court agrees; the plaintiffs' constitutional claim is foreclosed by binding precedent.[24]

---

designation), development of this land is likely to trigger the consultation process.

[24]On a separate constitutional note, the plaintiffs do not allege in their complaint that the Rule constitutes an unconstitutional taking under the Fifth Amendment. But the Poitevent Landowners argue in their papers that the critical habitat designation is an unlawful "extortionate demand" that constitutes "grand theft real estate." Assuming this is an attempt to assert a Fifth Amendment takings claim, the defendants point out that a takings claim must be brought in the Court of Federal Claims. To be sure, this Court would lack jurisdiction over any properly asserted takings claim under the circumstances. <u>See</u> <u>Chichakli v. Szubin</u>, 546 F.3d 315, 317 (5th Cir. 2008)(vacating district court's judgment as it related to takings claim and

Article I, § 8 of the Constitution delegates to Congress the power "[t]o make all laws which shall be necessary and proper for carrying into execution" its authority to "regulate commerce... among the several states." Supreme Court cases have identified three general categories of regulation in which Congress is authorized to engage under its commerce power: (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce and persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce. See Gonzales v. Raich, 545 U.S. 1, 16-17 (2005) (summarizing the evolution of the commerce clause power). The ESA, whose provisions and applications fall under the category of activities that substantially affect interstate commerce, has consistently been upheld as a constitutional exercise of congressional authority under the Commerce Clause. Six Circuits, including the Fifth Circuit, have rejected post-Lopez Commerce Clause challenges to applications of the ESA. See San Luis & Delta-Mendota Water Auth. V. Salazar, 638 F.3d 1163 (9th Cir. 2011); Alabama-Tombigbee Rivers Coal. V. Kempthorne, 477 F.3d 1250 (11th Cir. 2007); Wyoming v. U.S. Dep't of Interior, 442 F.3d 1262 (10th Cir. 2006); GDF Realty Investments, Ltd. V. Norton, 326 F.3d 622 (5th Cir. 2003); Rancho Viejo, LLC v. Norton, 323 F.3d 1062 (D.C. Cir. 2003); Gibbs v.

observing that "Tucker Act grants Court of Federal Claims exclusive jurisdiction over takings claims against the United States that seek monetary damages in excess of $10,000").

25

Babbitt, 214 F.3d 483 (4th Cir. 2000). Plaintiffs mistakenly rely on an earlier Supreme Court decision.

Invoking United States v. Lopez, 514 U.S. 549, 558-59 (1995), the plaintiffs argue that, because the ESA is an exercise of Congress's commerce power, actions under the ESA are "therefore limited to the regulation of channels of interstate commerce, things in interstate commerce, or economic activities that substantially affect interstate commerce." Put plainly, they insist that there is no frog on their Louisiana land and the Rule exceeds the commerce power. The Court is tempted to agree, but for the state of the law. By focusing on their individual circumstance, plaintiffs misapprehend Lopez, which dealt with a challenge to an underlying statute, not a challenge to an individual application of a valid statutory scheme. Rejecting a similar argument, the Supreme Court reiterated in Gonzales that "[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class.'" 545 U.S. at 23 (quoting Perez v. United States, 402 U.S. 146, 154 (1971)) (citations and internal quotation marks omitted). As odd as the Court views the agency action, this Court is also without power. Congress would have to act.

The Fifth Circuit has observed that the ESA is a constitutionally valid statutory scheme, whose "'essential purpose,'" according to Congress, "is 'to protect the ecosystems

26

upon which we and other species depend.'" GDF, 326 F.3d at 640 (citation omitted). Courts including the Fifth Circuit endorse the proposition that, in the aggregate, the extinction of a species and the resulting decline in biodiversity will have a predictable and significant effect on interstate commerce. See, e.g., National Ass'n of Home Builders v. Babbit, 130 F.3d 1041, 1053-54 (D.C. Cir. 1997). Thus, "when 'a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence.'" Gonzales, 545 U.S. at 17 (quoting Lopez, 514 U.S. at 558). Aggregating the regulation of activities that adversely modify the frog's critical habitat with the regulation of activities that affect other listed species' habitat, the designation of critical habitat by the Secretary is a constitutionally valid application of a constitutionally valid Commerce Clause regulatory scheme. See GDF, 326 F.3d at 640-41.

## V. Merits of the Rule

The defendants urge the Court to sustain the Rule. The plaintiffs contend that the Secretary's designation of Unit 1 as critical habitat for the dusky gopher frog was arbitrary and in violation of the ESA and the National Environmental Policy Act; they urge the Court to set aside the Rule. They advance a litany of arguments challenging the merits of the Rule insofar as it designates Unit 1 as critical habitat for the dusky gopher frog:

Unit 1 does not meet the statutory definition of "critical habitat"; FWS unreasonably determined that Unit 1 is "essential" for conservation of the frog; FWS arbitrarily failed to identify a recovery plan for the species; FWS failed to consider all economic impacts, and the method used in analyzing economic impacts was flawed; and FWS acted unreasonably (and violated NEPA) in failing to prepare an environmental impact statement. In addition to these challenges, the Poitevent plaintiffs advance additional grounds for condemning the Rule: the dusky gopher frog is not on the endangered species list and FWS's unlawful trespass on its lands to view the ponds invalidates the Rule.

The Court first addresses those arguments concerning whether the designation of Unit 1 satisfies the ESA's requirements, then moves on to consider whether the FWS properly considered the economic impacts of the designation; and, finally, considers whether FWS acted unreasonably in failing to prepare an environmental impact statement.

The Court has little doubt that what the government has done is remarkably intrusive and has all the hallmarks of governmental insensitivity to private property. The troubling question is whether the law authorizes such action and whether the government has acted within the law. Reluctantly, the Court answers yes to both questions.

28

*A.*

The Court first considers whether FWS's designation of Unit 1 satisfies the ESA's substantive requirements. The federal defendants submit that FWS considered the best available science, including the input of six experts, and the importance of ephemeral ponds to the recovery of the frog, and thus reasonably determined that Unit 1 is essential for the conservation for the species.

1.  Did FWS reasonably determine that Unit 1 is "essential for the conservation of" the dusky gopher frog?

The ESA expressly provides that unoccupied areas may be designated as "critical habitat" if FWS determines that those areas are "essential to the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). Congress did not define "essential" but, rather, delegated to the Secretary the authority to make that determination. Plaintiffs take issue with FWS's failure to define "essential", but they do not dispute that FWS explained its considerations for assessing what areas are essential. The Court finds that FWS's determination seems reasonable and, therefore, entitled to <u>Chevron</u> deference. <u>See</u> <u>Chevron, U.S.A., Inc. v. NRDC</u>, 467 U.S. 837, 843 n. 9 (1984)("[T]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."). The Court turns to consider the process that preceded FWS's finding that Unit 1 is essential.

FWS determined that Unit 1 is essential for the conservation

of the dusky gopher frog. It came to this conclusion after its initial June 2010 proposed rule was criticized by all of the peer reviewers as being inadequate to ensure conservation of the frog. Given the alleged high risk of extinction due to localized threats, like droughts, disease, and pollution, FWS agreed that the proposed habitat was inadequate and began considering sites throughout the frog's historical range. FWS considered this specific criteria:

> (1) The historical distribution of the species; (2) presence of open-canopied, isolated wetlands; (3) presence of open-canopied, upland pine forest in sufficient quantity around each wetland location to allow for sufficient survival and recruitment to maintain a breeding population over the long term; (4) open-canopied, forested connectivity habitat between wetland and upland breeding sites; and (5) multiple isolated wetlands in upland habitat that would allow for the development of metapopulations.

Using scientific information on sites throughout the frog's range, FWS could not identify any locations outside Mississippi that contained all of these elements or even all three PCEs. Determining that it is easier to restore terrestrial habitat than it is to restore or create breeding ponds, FWS focused on identifying more ponds in potential sites throughout the species' range. FWS determined that the recovery of the frog "will not be possible without the establishment of additional breeding populations of the species. Isolated, ephemeral ponds that can be used as the focal point for establishing these populations are rare, and this is a limiting factor in" the frog's recovery. 77 Fed. Reg. at 35124.

After a peer reviewer suggested Unit 1 as a potential site, that peer reviewer and a FWS biologist "assessed the habitat quality of ephemeral wetlands in [Unit 1] and found that a series of five ponds contained the habitat requirements for PCE 1."  77 Fed. Reg. at 35123; AR2320.  The five ponds' close proximity to each other meant that a metapopulation structure existed, which increases long-term survival and recovery of the frog; FWS determined that these ponds in Unit 1 "provide breeding habitat that in its totality is not known to be present elsewhere within the historic range."  77 Fed. Reg. at 35124.  Based on this scientific information, FWS determined that Unit 1 is essential for the conservation of the frog

> because it provides: (1) Breeding habitat for the [frog] in a landscape where the rarity of that habitat is a primary threat to the species; (2) a framework of breeding ponds that supports metapopulation structure important to the long-term survival of the [frog]; and (3) geographic distance from extant [frog] populations, which likely provides protection from environmental stochasticity.

Id.

Notably, the plaintiffs do not meaningfully dispute the scientific and factual bases of FWS's "essential" determination. Instead, the plaintiffs insist that Unit 1 can not be "essential" for the conservation of the frog because the frog does not even live there.  Indeed it hasn't been sighted there since the 1960s. But the plaintiffs ignore the clear mandate of the ESA, which tasks FWS with designating unoccupied areas as critical habitat. 16

31

U.S.C. § 1532(5)(A)(ii). FWS's finding that the unique ponds located on Unit 1 are essential for the frog's recovery is supported by the ESA and by the record; it therefore must be upheld in law as a permissible interpretation of the ESA, a statutory scheme focused not only on conservation but also on *recovery* of an endangered species.

2.   Must unoccupied areas contain PCEs to be designated critical habitat?

Plaintiffs similarly argue that FWS acted unreasonably in designating Unit 1 as critical habitat because Unit 1 does not contain all of the PCEs[25] as required by the ESA. Their position is, again, contrary to the ESA; plaintiffs equate what Congress plainly differentiates: the ESA defines two distinct types of critical habitat, occupied and unoccupied; only occupied habitat must contain all of the relevant PCEs.   <u>See</u> 16 U.S.C. § 1532(5)(A).[26]   Wise or unwise, that is for Congress to decide.

---

[25]PCEs are those "physical and biological features that, when laid out in the appropriate quantity and spatial arrangement to provide for a species' life-history processes, are essential to the conservation of the species."   77 Fed. Reg. at 35131.

[26](5)(A) The term "critical habitat" for a threatened or endangered species means—
    (i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
    (ii) specific areas outside the geographical area occupied by the species at the time it is listed in

Unit 1 is unoccupied.  Unlike occupied habitat, on which FWS must find all of the physical or biological features called PCEs (50 C.F.R. § 424.12(b)),[27] Congress does not define unoccupied habitat by reference to PCEs; rather, FWS is tasked with designating as critical *unoccupied* habitat so long as it determines it is "essential for the conservation of the species" and "only when a designation limited to its present range would be inadequate to ensure the conservation of the species." 50 C.F.R. § 424.12(e). As previously explained, FWS determined that the recovery of the frog "will not be possible without the establishment of additional breeding populations of the species" and it found that the ponds in Unit 1 "provide breeding habitat that in its totality is not known to be present elsewhere within the historic range."[28]   The plaintiffs have not demonstrated that FWS's findings are

─────────────────

accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species. 16 U.S.C. § 1532(5)(A).

[27]The cases invoked by plaintiffs in support of their argument are distinguishable in that they relate to designations of occupied habitat.

[28]Federal defendants explain "[i]f the biggest threat to a critically endangered species is the destruction of habitat, as is the case with the frog, it does not make sense to hamstring FWS' efforts to conserve the species by limiting the designation of habitat to only those areas that contain optimal conditions for the species. If such habitat was readily available, the frog would not be reduced to 100 individuals."  Again, if this administrative structure is to be changed, it is for Congress to do so.

implausible.

   3.   Did FWS act unreasonably in failing to identify the point
        at which ESA protections will no longer be required for
        the dusky gopher frog?

Before determining what is "essential" to the conservation of the dusky gopher frog, the plaintiffs contend that FWS first must identify the point at which the protections of the ESA will no longer be required.  The defendants respond that the plaintiffs improperly seek to import the recovery planning criteria into the critical habitat designation process.  The Court agrees.

The plaintiffs' argument runs counter to the plain language and structure of the ESA, which provides that the requirement for designating critical habitat (16 U.S.C. § 1533(a)(3)) is separate from the requirement for preparing a recovery plan (16 U.S.C. § 1533(f)).  The ESA recognizes that FWS must designate critical habitat, habitat that is "essential for the conservation of the species", even if it does not know precisely how or when recovery of a viable population will be achieved.  See Home Builders Ass'n of Northern California v. U.S. Fish and Wildlife Service, 616 F.3d 983, 989 (9th Cir. 2010)(rejecting argument that FWS must first identify the point at which the endangered species is considered conserved before it designates critical habitat "because it lacks legal support and is undermined by the ESA's text."); Arizona Cattle Growers' Ass'n v. Kempthorne, 534 F. Supp. 2d 1013, 1025 (D. Ariz. 2008)("While tempting in its logical simplicity...the

34

language of the ESA requires a point of conservation to be determined in the recovery plan, not at the time of critical habitat designation."), aff'd, Arizona Cattle Growers' Ass'n v. Salazar, 606 F.3d 1160 (2010), cert. denied, 131 S. Ct. 1371 (2011). Moreover, in directing FWS to assess what would be "essential for the conservation" of a species, it did not explicitly require that FWS identify specific recovery criteria at that time. Notably, Congress imposed specific deadlines for the designation of critical habitat, but included no such deadlines for the preparation of a recovery plan. FWS's failure (as yet) to identify how or when a viable population of dusky gopher frogs will be achieved, as indifferent and overreaching by the government as it appears, does not serve to invalidate its finding that Unit 1 was part of the minimum required habitat for the frog's conservation.[29]

---

[29]Plaintiffs advance additional arguments that are clearly rebutted by defendants and, most critically, by the ESA's mandate. For example, plaintiffs contend that, to uphold the Rule as valid, it can only apply to the general geographic area in which the frog was found at the time the listing decision for it was made in 2001. This is the same sort of argument already considered and foreclosed by the ESA's clear text. Plaintiffs seek to conflate listing duties with critical habitat designation duties and, again, ignore the plain statutory distinction between occupied and unoccupied habitat. The plaintiffs also argue that the designation is arbitrary because the agency should have exercised its discretion to exclude Unit 1. But this failure to exclude argument -- to the extent it is reviewable (see The Cape Hatteras Access Preservation Alliance v. U.S. Dep't of Interior, 731 F. Supp. 2d 15, 29 (D.D.C. 2010)(Service's decision not to exclude areas from critical habitat designation is not reviewable pursuant to the ESA)) seems better directed to plaintiffs' challenge to FWS's consideration of the

4.   Did FWS designate critical habitat for a species that is not listed as endangered?

The Poitevent Landowners argue that the "Mississippi" gopher frog, not the dusky gopher frog, is the frog on the endangered species list.   For this reason, they insist that the Rule is

_____

economic impacts of designation.
    Finally, to the extent the plaintiffs suggest that the Rule is overbroad, they fail to support their argument.   The defendants submit that all of Unit 1 meets statutory and regulatory criteria for critical habitat; they base their decision on survey methodologies, historical data, and the need for corridors between breeding sites to maintain connectivity and gene flow. To put a finer point on it, the methodology used for delineating the critical habitat unit boundaries starts by using "digital aerial photography using ArcMap 9.3.1 to map...[t]hose locations of breeding sites outside the geographic area occupied by the species at the time it was listed...that were determined to be essential for the conservation of the species...."  77 Fed. Reg. 35134.  FWS looked to breeding sites deemed essential for conservation, the ephemeral ponds.  From these points, FWS created a buffer by using "a radius of 621 m (2,037 ft)."  Id.  FWS "chose the value of 621 m...by using the median farthest distance movement (571 m (1,873 ft)) from data collected during multiple studies of the gopher frog...and adding 50 m (164 ft) to this distance to minimize the edge effects of the surrounding land use...."  Id.  FWS then "used aerial imagery and ArcMap to connect critical habitat areas within 1,000 m (3,281 ft) of each other to create routes for gene flow between breeding sites and metapopulation structure."  Id.  With respect to Unit 1, FWS explained that "the last observation of a dusky gopher frog in Louisiana was in 1965 in one of the ponds within [Unit 1]," and that at least two of the ponds in this immediate area were former breeding sites, and that the five ponds close to each other could create a metapopulation.  Id. at 35123-25.  It was from these ephemeral ponds that FWS applied its methodology (621 m buffer and routes for gene flow) to create Unit 1's boundaries that resulted in the designation of 1,544 acres in Unit 1.  Scientific findings that are not credibly called into question by plaintiffs' hopeful argument.  See Medina County Environmental Action Ass'n v. Surface Transp. Bd., 602 F.3d 687, 699 (5th Cir. 2010("Where an agency's particular technical expertise is involved, we are at our most deferential in reviewing the agency's findings.").  The Court defers, as it must under the law, to FWS's methodology for delineating Unit 1's boundaries.

invalid.  The defendants counter that plaintiffs willfully ignore FWS's taxonomic explanation in the Rule; its mere change of the common and scientific name of the frog does not alter the fact that the listed entity remains the same.  A review of the listing leading up to the designation supports FWS's position.

Recall that in 2001 FWS listed a distinct population segment of the gopher frog subspecies and provided a scientific definition of the listed frog.  During that listing process, FWS explained that the population segment was so distinct that some biologists believed it should be recognized as its own species, rather than just a distinct population segment.  Because there was still some dispute, FWS concluded that "[t]he scientific name, *Rana capito sevosa*, will be used to represent this distribution of frogs [but] if the name *Rana sevosa* is ultimately accepted by the herpetological scientific community, we will revise our List...to reflect this change in nomenclature (scientific name)."  66 Fed. Reg. 62993.  Indeed, the scientific community recently did conclude that the species it listed as a distinct population segment of the Mississippi gopher frog in 2001 "is different from other gopher frogs and warrants acceptance as its own species...and the scientific name for the species was changed to *Rana sevosa*."  77 Fed. Reg. 35118.  FWS also changed the common name of this distinct population segment of the gopher frog from Mississippi gopher frog to Dusky gopher frog.

Contrary to the plaintiffs' argument, FWS did not simply arbitrarily "change its mind" about the name of the frog; rather, it adapted changes accepted in the scientific community. Plaintiffs elevate form over substance; they fail to persuade that the listed entity, this distinct population of gopher frogs, has changed, or that FWS's taxonomic finding is unsupported.[30] And, the Court finds that FWS, acting in its expertise, considered the best scientific evidence in effecting a change in the taxonomic and common name of the frog.[31]

5.  Does FWS's alleged "trespass" on Unit 1 invalidate the Rule?

The Poitevent Landowners charge that FWS and a scientist trespassed on its lands in March 2011; they took photos and, as a result of the ponds discovered there, included Unit 1 in the Rule. Although the Poitevent Landowners concede that Wyerhaeuser, a co-owner and lessee, granted permission to the FWS agent and scientist to enter the land, plaintiffs insist that such permission was invalid.  Plaintiffs insist that invalidation of the Rule is the

---

[30]And the record belies the plaintiffs' charge that they were denied the opportunity to publicly comment on the name change.  In fact, the plaintiffs submitted comments on the revised proposed rule, in which FWS asked for comments on the proposed name change. 76 Fed. Reg. 59774, 59775.

[31]Cf. Alabama-Tombigbee Rivers Coalition v. Kempthorne, 477 F.3d 1250, 1260 (11th Cir. 2007)("The Service's finding that the Alabama sturgeon is a separate species is consistent with the [scientists'] position...on the question and is supported by...peer review[,] and by the opinion of the Service's own experts.").

proper way to indemnify them for their trespass damages. Alternatively, the Poitevent Landowners suggest that the Court apply the "civil equivalent" of the fruit-of-the-poisonous-tree doctrine and exclude the evidence as illegally obtained.

This argument was raised for the first time in their reply papers, and the Poitevent plaintiffs fail to plead a trespass claim. They likewise fail to suggest how any such claim would be timely, or why -- (assuming for the sake of argument) their fictitious civil fruit-of-the-poisonous-tree doctrine applies -- FWS's reliance on Weyerhaeuser's good faith consent (again borrowing from exclusionary rule principles in the criminal context) would not validate the "trespass." The Court declines to address the merits of this argument, which is not properly before it, has not been properly or timely raised, and seems an afterthought.

*B.*

The Court now turns to address what, in its view, is the most compelling issue advanced by plaintiffs in challenging the validity of the Rule: FWS's economic analysis and, perhaps most troubling, its conclusion that the economic impacts on Unit 1 are not disproportionate.

Plaintiffs contend that designating Unit 1 as critical habitat is irrational. Unit 1, they submit, provides no benefit to the dusky gopher frog and the designation's estimated potential price

tag for the landowners' damage is somewhere between $20.4 million and $33.9 million. Defendants answer that FWS fulfilled its statutory obligation and applied the proper approach to consider all potential economic impacts to Unit 1. Once again the Court is restrained by a confining standard of review. The Court, therefore, is not persuaded that FWS engaged a flawed economic analysis or otherwise failed to consider all potential economic impacts the designation would have on Unit 1.

The decision to list a species as endangered is made without reference to the economic effects of the listing decision. Not so with critical habitat designations. The ESA directs that the "Secretary shall designate critical habitat ... on the basis of the best scientific data available and after taking into consideration the economic impact ... of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). Informed by these considerations, FWS exercises its wide discretion in determining whether to exclude particular areas. See 16 U.S.C. § 1533(b)(2)(the Service "may exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat"); see also The Cape Hatteras Access Preservation Alliance v. U.S. Dept. of Interior, 731 F. Supp. 2d 15, 29-30 (D.D.C. 2010)(citing Arizona Cattle Growers' Ass'n v. Kempthorne, 534 F. Supp. 2d 1013, 1032 (D.Ariz. 2008)). But the Service is precluded from excluding

40

areas from a designation if it determines that "failure to designate such area as critical habitat will result in extinction of the species." 16 U.S.C. § 1533(b)(2).

The plaintiffs contend that FWS failed to consider all economic impacts of the critical habitat designation. But, in fact, the record establishes that FWS considered several potential economic impacts. The record shows that FWS endeavored to consider any economic impacts that could be attributable to the designation, and that plaintiffs were given (and indeed availed themselves of) the opportunity to participate in the process for evaluating economic impacts. The Court finds that FWS fulfilled its statutory obligation. The outcome seems harsh, but it is not unlawful under the present administrative process and this Court's confined standard of review.

Nevertheless, the plaintiffs object to FWS's methods and findings on the issue of the designations's economic impact. Plaintiffs challenge FWS's utilization of the baseline method for considering potential economic impacts, and argue that, no matter what method is used, FWS arbitrarily concluded that "[o]ur economic analysis did not identify any disproportionate costs that are likely to result from the designation." Although the plaintiffs' dispute as to the appropriate method for considering economic impacts is unfounded, their challenge to FWS's ultimate conclusion invites rigorous scrutiny.

41

As an initial matter, FWS permissibly used the baseline approach in conducting the economic analysis (EA). Under this approach, the impacts of protecting the dusky gopher frog that will occur regardless of the critical habitat designation (i.e., the burdens imposed by simply listing the frog) are treated as part of the regulatory baseline and are not factored into the economic analysis of the effects of the critical habitat designation; the approach calls for a comparison of "the world with the designation ... to the world without it." See The Cape Hatteras Access Preservation Alliance v. U.S. Dept. of Interior, 344 F. Supp. 2d 108, 127 (D.D.C. 2004); see also Cape Hatteras II, 731 F. Supp. 2d 15, 30 (D.D.C. 2010).[32]

Consideration of economic impacts is all that is required. FWS fulfilled this statutory mandate by identifying baseline economic impacts. And the final EA quantified impacts that may occur in the 20 years following designation, analyzing such economic impacts of designating Unit 1 based on the following three hypothetical scenarios: (1) development occurring in Unit 1 would avoid impacts to jurisdictional wetlands and, thus, would not trigger ESA Section 7 consultation requirements; (2) development

---

[32]To the extent the plaintiffs object to the baseline approach and instead advocate for the co-extensive approach to assessing economic impacts, the plaintiffs fail to explain how such an approach changes the economic analysis. The defendants contend, and the Court agrees, that the baseline and co-extensive methods of analyzing potential economic impacts yield the same results.

occurring in Unit 1 would require a permit from the Army Corps of Engineers due to potential impacts to jurisdictional wetlands, which would trigger ESA Section 7 consultation between the Corps and FWS; and FWS would work with landowners to keep 40% of the unit for development and 60% managed for the frog's conservation ("present value incremental impacts of critical habitat designation due to the lost option for developing 60 percent of Unit 1 lands are $20.4 million"); and (3) development occurring would require a federal permit, triggering ESA Section 7 consultation, and FWS determines that no development can occur in the unit ("present value impacts of the lost option for development in 100 percent of the unit are $33.9 million").[33]  Because the EA "did not identify any disproportionate costs that are likely to result from the designation[,] the Secretary [did] not exercis[e] his discretion to exclude any areas from this designation of critical habitat for the dusky gopher frog based on economic impacts."  77 Fed. Reg. 35141.

The plaintiffs do not take issue with these projected costs but, rather, insist that FWS's conclusion -- its decision not to exclude Unit 1 from the designation in light of what the potential economic impacts in the event Section 7 consultation is triggered -- is arbitrary.  This is so, plaintiffs contend, because their land is the only land designated that faces millions of dollars in

---

[33]In preparing the final version of the EA, FWS considered Unit 1's landowners' comments, as well as the landowners' submissions regarding the value of Unit 1 land.

lost development opportunity if the consultation process is triggered.  How can FWS say that the economic impacts are not disproportionate?

FWS defends its determination in the Rule: "considerable uncertainty exists regarding the likelihood of a Federal nexus for development activities [in Unit 1]."  The record confirms that FWS considered potential economic impacts and exercised its discretion, considered potential costs associated with Section 7 consultation, and determined that these economic impacts to Unit 1 were not disproportionate.[34]  All that the ESA requires.  The Court, with its somewhat paralyzing standard of review, defers to the agency's expertise in its methods for cost projections and its refusal to except Unit 1 from the designation.[35]  Only Congress can change the regime of which plaintiffs understandably complain.

*C.*

Finally, the Court considers whether the Secretary acted arbitrarily in failing to prepare an environmental impact

---

[34]The alleged arbitrariness of the "not disproportionate" determination is undermined by the uncertain potential for development.  The ESA only requires that the Service consider all potential costs, which it has done.  Although this "not disproportionate" conclusion is discomforting it, again, is harsh but not invalid as the law exists.

[35]As always, the Court is mindful of its scope of its constrained review.  "If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld."  Luminant Generation Co. LLC v. U.S. E.P.A., 714 F.3d 841, 850 (5th Cir. 2013)(quoting Tex. Oil & Gas Ass'n v. U.S. E.P.A., 161 F.3d 923, 933 (5th Cir. 1998)).

statement.

The plaintiffs submit that the defendants' failure to complete an Environmental Impact Statement concerning the critical habitat designation of Unit 1 violates the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321, et seq., a statute that serves the dual purposes of informing agency decisions as to the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). The defendants counter that, pursuant to long-standing FWS policy, an EIS is simply not required when designating critical habitat.[36]  They are correct.

In passing NEPA, Congress declared that it is the continuing policy of the federal government to "create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and

---

[36]The defendants also argue that the plaintiffs lack prudential standing to bring a NEPA claim because their claims of economic harm fall outside the zone of environmental interests protected by NEPA. Indeed, the Court agrees that prudential standing for NEPA claims is doubtful, given the economic nature of the harm asserted by the plaintiffs and the environmental interests protected by NEPA. See Nevada Land Action Ass'n v. U.S. Forest Serv., 8 F.3d 713, 716 (9th Cir. 1993) ("The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions. Therefore a plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA") (citations omitted). Nevertheless, the Court considers whether an EIS is required.

future generations of Americans." 42 U.S.C. § 4331. Specifically listed as having a "profound influence" on this natural environment that Congress sought to protect are population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances. Id. To accomplish these objectives, NEPA requires that an agency prepare a comprehensive environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). "Notably, the NEPA statutory framework provides no substantive guarantees; it prescribes adherence to a particular process, not the production of a particular result." Spiller v. White, 352 F.3d 235, 238 (5th Cir. 2003)(NEPA "does not prohibit the undertaking of federal projects patently destructive of the environment" but, rather, requires "only that [an agency] make its decision to proceed with the action after taking a 'hard look at environmental consequences.'").

Congress does not expressly mandate preparation of an EIS for critical habitat designations. Nevertheless, through tortured reasoning, the plaintiffs assert that an EIS was required because NEPA demands an EIS for "major Federal actions significantly affecting the quality of the human environment" and the critical habitat designation here involves a change to the physical environment. 42 U.S.C. § 4332(C). Tossing aside the conservation objectives achieved by critical habitat designations, plaintiffs go

on to detail the modifications to Unit 1 that would make it optimal habit for the frog, namely regular burning of the land and planting different trees.  However, the ESA statutory scheme makes clear that FWS has no authority to force private landowners to maintain or improve the habitat existing on their land.[37] 77 Fed. Reg. 35118, 35121, 35128. FWS cannot and will not instruct the plaintiffs to burn their land, thus, the PCEs serve as nothing more than descriptors of ideal habitat.  Plaintiffs invoke Catron County Bd. Of Com'rs, New Mexico v. U.S. Fish and Wildlife Serv., 75 F.3d 1429, 1436-39 (10th Cir. 1996). There, the Tenth Circuit determined that designation of critical habitat would harm the environment by limiting the county's ability to engage in flood control efforts. Id. Unlike the critical habitat designation in that case -- where the environmental impact of the critical habitat designation "will be immediate and disastrous" -- the critical habitat Rule designating Unit 1 does not effect changes to the physical environment.

Moreover, the Ninth Circuit has expressly held that NEPA does not apply to critical habitat designations. Douglas County v. Babbitt, 48 F.3d 1495, 1501-08 (9th Cir. 1995)(considering issue of

---

[37]The only "bite" to the statute is the consultation requirement, which simply requires that, when a private party's action has a federal nexus, the federal agency authorizing such action must first consult with the Secretary. 16 U.S.C. § 1536(a)(2). Activities such as timber management lack a federal nexus and are therefore exempt.

first impression, and determining that NEPA does not apply to the Secretary's decision to designate critical habitat under the ESA). In so holding, the Ninth Circuit articulated three reasons why critical habitat designations are not subject to NEPA: (1) the ESA displaced the procedural requirements of NEPA with respect to critical habitat designation; (2) NEPA does not apply to actions that do not alter the physical environment; and (3) critical habitat designation serves the purposes of NEPA by protecting the environment from harm due to human impacts. Id. Three logical reasons. The Fifth Circuit agrees that NEPA itself provides, in no uncertain terms, that alteration of the physical environment is a prerequisite for NEPA application and the need to prepare an EIS.[38] See Sabine River Authority v. U.S. Dept. of Interior, 951 F.2d 669, 679 (5th Cir. 1992)("[T]he acquisition of the [negative conservation] easement by [FWS] did not effectuate any change to the environment which would otherwise trigger the need to prepare an EIS."); see also City of Dallas v. Hall, 562 F.3d 712, 721-23 (5th Cir. 2009)(setting an acquisition boundary for a wildlife refuge did not alter the physical environment and therefore did not require the preparation of an EIS). For all of these reasons, the

---

[38]The Fifth Circuit has not directly addressed whether NEPA applies to critical habitat designations. Based on competing authority within the Fifth Circuit, one district court has applied the arbitrary and capricious standard to decisions not to prepare EISs. See Center for Biological Diversity v. U.S. Fish and Wildlife Service, 202 F. Supp. 2d 594, 646-48 (W.D.Tex. 2002) (citations omitted).

Court finds that the Secretary was not required to prepare an EIS before designating Unit 1 as critical habitat.[39]

***

Accordingly, IT IS ORDERED: that the defendants' motions to strike extra-record evidence are GRANTED; the defendants' motions for summary judgment are DENIED in part (insofar as they challenge the plaintiffs' standing) and GRANTED in part (insofar as the Rule including Unit 1 in its critical habitat designation is not arbitrary); and the plaintiffs' cross-motions are GRANTED in part (plaintiffs have standing) and DENIED in part (the Rule is sustained).[40]

New Orleans, Louisiana, August 22, 2014

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[39]As defendants acknowledge, there is nothing to preclude preparation of an EIS if or when changes to the physical environment become required, if consultation is triggered.

[40]The Court is compelled to remark on the extraordinary scope of the ESA, the Court's limited scope of review on the matters presented, and the reality that what plaintiffs truly ask of the Court is to embrace or countenance a broad substantive policy: they effectively ask the Court to endorse -- contrary to the express terms and scope of the statute -- a private landowner exemption from unoccupied critical habitat designations.  This, the Third Branch, is the wrong audience for addressing this matter of policy.